**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **STEPHEN MELISE,** | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **C.A. No.: 1:17-cv-00490-MSM-PAS** |
| | : | |
| **COYNE-FAGUE, et al.** | : | |
| **Defendants** | : | |

<u>**PLAINTIFF'S REPLY TO DEFENDANTS' OBJECTION TO PLAINTIFF'S ORAL
MOTION TO COMPEL**</u>

### I.   Introduction

Plaintiff in the above-entitled matter urges this Honorable Court to grant Plaintiff's Oral Motion to Compel pursuant to Fed. R. Civ. P. 37(a)(3).  As grounds therefor and in support thereof, Plaintiff states that the requested documents are not protected by the Rhode Island Confidentiality of Health Care Communications and Information Act ("R.I. Confidentiality Act") or the Health Insurance Portability and Accountability Act ("HIPAA") and are highly relevant to Plaintiff's claims.

As an initial matter, during the Telephonic Conference with this Court on January 29, 2020, Plaintiff pressed his Oral Motion to Compel in regard to Plaintiff's Second Request for Production of Documents, Nos. 6, 7, and 8, which was reflected in this Court's Consent Text Order dated January 30, 2020.  Therefore, Defendants' contention that only Request No. 8 is currently at issue is erroneous and Defendants have thus failed to comply with this Court's Consent Text Order to provide an objection to Plaintiff's oral Motion to Compel in regard to Request Numbers 6 and 7, to be discussed, supra, at the end of Plaintiff's Reply.

## II.    Relevant Facts

Plaintiff filed the instant action against numerous Defendants including the State of Rhode Island, Department of Corrections (the "State" or "RIDOC"), Ashbel T. Wall,[1] individually and in his official capacity as former-Director of RIDOC ("A.T. Wall"), Kerri McCaughey, individually and in her official capacity as Deputy Warden of RIDOC ("McCaughey") (collectively, "State Defendants" or "Defendants"), and Fred Vohr and Jennifer Clarke in their individual and official capacities as medical directors of the RIDOC.  Plaintiff's seeks compensatory and punitive damages, counsel fees and costs for conduct amounting to negligence and in violation of the Eighth and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983, Article 1, § 8 of the Rhode Island Constitution, the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.*, ("ADA"), the Rehabilitation Act 29 U.S.C. § 701, *et seq.*, the Rhode Island Civil Rights Act of 1990 ("RICRA"), R.I. Gen. Laws § 42-112-1, *et seq.*, and the Rhode Island Civil Rights of People With Disabilities Act ("RICRPD"), R.I. Gen. Laws § 42-87-1, *et seq*.

Briefly, Plaintiff alleges that while he was in the care and custody of Defendants, beginning as early as 2013, Plaintiff repeatedly complained to medical staff about, among other issues, back and neck pain that made it difficult for him to climb a latter into top bunks and a history of falling from his bed during sleep that could result in significant injuries.  Complaint ("Compl.") (ECF No. 1) ¶¶12-17.  Because of those conditions, numerous medical staff ordered that Plaintiff be given a bottom bunk, using a "Special Needs/Urgent Orders" form that was used when an inmate needed an accommodation for medical purposes.  *Id.*; *see, e.g.*, Order dated Dec. 13, 2016, attached as Exhibit A to Defendants' Motion (ECF No. 61-2).  Medical orders for

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Patricia Coyne-Fague, in her official capacity as Director of the Rhode Island Department of Corrections, is automatically substituted in place of former-Director Ashbel T. Wall in his official capacity, as Defendant A.T. Wall retired from RIDOC in January 2018.

accommodations were sent to Deputy Warden McCaughey for security concerns-based review and approval and/or modification before correctional staff would implement such orders. Despite numerous requests from medical staff, and an obligation under both RIDOC policy and the ADA to modify any requests that raised security concerns in consultation with medical staff rather than outright deny them, Defendant McCaughey frequently denied orders for Plaintiff to receive a bottom bunk without consulting medical staff prior to or even after the denial.  Compl. ¶¶18-21, 25-29, 35-49, 69-72.  During the time that those orders should have been implemented, Plaintiff suffered three falls from the top bunk, sustaining significant injuries during the second and third falls, including head trauma, injuries to his back, neck, chest, and feet, involving a broken foot/ankle.  Compl. ¶¶22-23, 32-34, 50-54, 63, 64.

Plaintiff alleges that "Defendant McCaugh[e]y routinely denies inmates' medical orders for bottom bunk, even when the order is placed by the Medical Director" and that such conduct was part of a pattern and practice pursuant to "an official policy or custom of the Defendant State that was promulgated, created, acquiesced to, permitted, condoned, encouraged, and/or ratified by the chief policy-making official of the DOC, Defendant Wall."  Compl. ¶¶28, 85.  Plaintiff further alleges that such conduct was in violation of RIDOC policies, federal and state statutes requiring accommodations for disabilities, and deliberate indifference of Plaintiff's medical needs, among other violations.  Compl. ¶¶40, 92-98.

When Defendant McCaughey was asked during her deposition upon what grounds she may deny a reasonable accommodation request for a bottom bunk, she testified that she considers whether the order is for "legitimate reasons," whether there are "climate issues," whether she has sufficient documentation, and whether the inmate is in a therapeutic program. Deposition of Kerri McCaughey ("McCaughey Dep.") 42:2-43:1, relevant portions attached hereto as **Exhibit A**.  She testified that she is always concerned about the number of available

bottom bunks, and so she "granted orders on bottom bunks based on the legitimacy of the request," which she determined based on the medical condition identified in the order. McCaughey Dep. 46:23-47:24. However, Defendant McCaughey has never run out of bottom bunks. McCaughey Dep. 46:8-16. Additionally, Defendant McCaughey testified that, if for whatever reason her facility could not implement a "necessary reasonable accommodation" for an inmate, that inmate could be moved to a different facility. McCaughey Dep. 79:15-24. In regard to Defendant McCaughey's determination of the legitimacy of the medical request, she testified that her ordinary practice would be to review whether "the need is not documented medically. [Medical] cannot provide me more information to make an educated decision based on medical, it's based on self-reporting. … If the request just says bottom bunk, I am going to request more information." McCaughey Dep. 81:4-15. However, that "practice" was routinely violated when Defendant McCaughey denied and/or ignored orders submitted for Plaintiff without consulting medical staff, as alleged above.

On July 29, 2019, Plaintiff served on State Defendants Plaintiff's Second Request for Production of Documents ("Plaintiff's Second RFPD") attached hereto as **Exhibit B**, wherein Plaintiff requested the following three requests relevant to Plaintiff's Oral Motion to Compel:

> 6. The list of the number of individuals with bottom bunk orders from October 5, 2015 to November 11, 2016.
> 7. All documentation demonstrating when an order and/or request for a bottom bunk created a climate issue.
> 8. All approved, denied or altered orders and/or requests for bottom bunk accommodations between October 5, 2015 and November 11, 2016.

Plaintiff did not receive responses to those requests from State Defendants until November 15, 2019, which responses are attached hereto as **Exhibit C**.

III.    **Argument**

    **A.  State Defendants Waived Any and All Objections to Plaintiff's Requests for Production**

Plaintiff's Second RFPD was sent on July 29,2019.  Responses would have been due to Plaintiff by August 28, 2019, in accordance with Fed. R. Civ. P. 34(b)(2).  However, State Defendants failed to respond or to request an extension of time until long after that deadline. Although the undersigned was initially quite lenient, this office requested that State Defendants send responses by October 18, 2019 at the latest.  In fact, it was not until the day that a telephone conference was scheduled to occur with this Court that State Defendants' counsel even indicated that he was in possession of documents and intended to produce them to Plaintiff's counsel.  See Email Correspondence attached hereto as **Exhibit D**.[2]  Ultimately, responses were not received until November 15, 2019.

Therefore, because State Defendants repeatedly failed to respond to Plaintiff's discovery requests in accordance with Fed. R. Civ. P. 34(b)(2), State Defendants have waived any objection to production of the requested documents.  *See Marx v. Kelly, Hart & Hallman, P.C.*, 929 F.2d 8, 12 (1st Cir. 1991) ("Fed.R.Civ.P. 34(b) requires that a party upon whom a request for discovery is served respond within thirty days, either stating its willingness to comply or registering its objections. If the responding party fails to make a timely objection, or fails to state the reason for an objection, he may be held to have waived any or all of his objections.").

    **B.  The Documents Requested by Plaintiff are Discoverable Subject to a Court Order**

        **i.  Rhode Island Confidentiality Act**

State Defendants press an argument that the Rhode Island Confidentiality Act bars them from providing the requested information.  This argument is beyond spurious and ignores

---

[2] Redactions have been used to remove any discussions related to settlement.

binding law on this Court from both the Federal and State courts that counsel for State Defendants was required to disclose.

First, it is blackletter law and a basic tenant of Federal court practice that "[f]ederal common law governs claims of privilege in United States courts where jurisdiction is based on a federal question." *Marcum v. Scioto Cty., Ohio*, No. 1:10-CV-790, 2012 WL 2018523, at *4 (S.D. Ohio June 5, 2012) (citing Fed.R.Evid. 501; *Hancock v. Dodson*, 958 F.2d 1367, 1372–73 (6th Cir. 1992)). "Federal courts are not permitted to apply state privilege law, regardless of the importance of implicated policy concerns; rather, they are obligated to apply federal privilege law." *Id.* Fed.R.Evid. 501 says exactly this, "[t]he common law--as interpreted by United States courts in the light of reason and experience--governs a claim of privilege unless any of the following provides otherwise: the United States Constitution; a federal statute; or rules prescribed by the Supreme Court."

Indeed, the primacy of Federal law over State law on issues of privilege in Federal Court has been well settled since at least 1876 when the U.S. Supreme Court held unambiguously that, in the context of attorney client privilege, that the admissibility of a privilege is not dependent upon the statues of the state in which the Federal Court sits but on Federal law. *See Connecticut Mut. Life Ins. Co. v. Schaefer,* 94 U.S. 457, 458, 24 L. Ed. 251 (1876) ("The laws of the State are only to be regarded as rules of decision in the courts of the United States where the Constitution, treaties, or statutes of the United States have not otherwise provided. When the latter speak, they are controlling; that is to say, on all subjects on which it is competent for them to speak"). As recently as 2016 the U.S. Supreme Court again heartily endorsed this continued validity and vibrance of this position when it denied cert in *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 835 F.3d 1155, 1158 (9th Cir. 2016) *cert. denied Hannstar Display Corp. v. Sony Elecs., Inc.*, 138 S. Ct. 378, 199 L. Ed. 2d 277 (2017) (holding, in a Federal case involving both state and federal

claims and a later dispute of a settlement and the admissibility of an email exchange in a federal court retaining jurisdiction after federal claims had been dismissed, that "the eventual dismal of federal claims does not govern whether the evidence related to federal law.  Because, here, at the time the parties engaged in mediation, their negotiations concerned (and the mediated settlement settled) both federal and state law claims, the federal law of privilege applies.").

Additionally, "[t]he federal courts do not recognize a physician-patient privilege nor 'has Congress codified the concept in a federal statute.'" *Id.* (quoting *G.M.C. v. Director of the Nat'l Institute for Occupational Safety & Health*, 636 F.2d 163, 165 (6th Cir.1980)).  Here, as nearly all of Plaintiff's claims are for federal statutory or constitutional violations, this Court's jurisdiction is plainly based on federal questions.  Thus, any argument that Rhode Island privileges bar Plaintiff from obtaining the requested documents is unfounded.

Second, even if state law privileges could apply, the Rhode Island Confidentiality of Health Care Communications and Information Act ("R.I. Confidentiality Act"), R.I. Gen. Laws § 5-37.3-1 *et seq.*, does not prohibit the disclosure of the documents requested by Plaintiff, particularly in light of the numerous Rhode Island Supreme Court decisions ruling the R.I. Confidentiality Act unconstitutional, including explicitly rejecting on constitutional grounds the exact argument promoted by Defendants in their Memorandum of Law in Opposition to Plaintiff's Oral Motion to Compel ("Defendants' Memo") (ECF No. 61-1).  Although Defendants are correct in that the R.I. Confidentiality Act contains extraordinary language on the requirements for obtaining confidential information, including obtaining consent or at least proof of notice to every patient whose records are being sought, *see* § 5-37.3-4(a)(1), 6(a), 6.1(a), the Rhode Island Supreme Court has made clear that a strict application of those provisions in all civil and criminal judicial proceedings would render the statute unconstitutional.  *See Bartlett v. Danti*, 503 A.2d 515, 518 (R.I. 1986) ("§§ 5-37.3-4 and 6 subject the procurement and use of

health-care information at all stages of litigation to the caprice of the patient.  The trial justice is stripped of all authority to require production of medical information.  … We conclude that § 5-37.3-6 is violative of article 1, section 5[, of the Rhode Island Constitution]. We find that § 5-37.3-6, absent the patient consent mandated by § 5-37.3-4(a), precludes litigants from obtaining and introducing material evidence, thereby preventing litigants from effectively presenting their claims before the trier of fact.").

The R.I. Supreme Court then declared a similar statute unconstitutional that "was enacted a few months subsequent to our decision in *Bartlett* in an obvious attempt to avoid our declaration of unconstitutionality" of §§ 5-37.3-4 and 6.  *State v. Almonte*, 644 A.2d 295, 298 (R.I. 1994).  In 1996, the General Assembly passed a third iteration of the statute, including § 5-37.3-6.1, in an attempt to provide a procedure for the disclosure of confidential healthcare information in judicial proceedings.  *See* P.L.1996, ch. 248, § 3, and P.L.1996, ch. 266, § 3. However, the R.I. Supreme Court has also spoken directly on the current version of the statute and declared it to be unacceptable *if read in precisely the manner that State Defendants are now pressing.*

In *Pastore v. Samson*, 900 A.2d 1067, 1085–86 (R.I. 2006), the Court addressed the exact argument now pressed by State Defendants.  There, plaintiffs filed a medical malpractice suit against individual doctors and the hospital and submitted requests for the production of documents to the hospital, much of which the hospital refused to produce, asserting protection under the peer-review privilege and the R.I. Confidentiality Act.  *Id.* at 1071-72.  On a motion to compel, plaintiffs requested an *in camera* review to determine whether the privileges applied. *Id.* at 1072.  Following the motion judge's review and order that the hospital produce 750 pages of documents subject to redactions of all patient information, such as names and social security numbers, the hospital petitioned the Supreme Court to review the motion judge's order.  *Id.* at

1072-73.  The entirety of the Court's analysis on the privilege created by the R.I. Confidentiality

Act is pertinent to this case.  After explaining the history of the statute, the Court explained as

follows:

> This Court noted that the Confidentiality of Health Care Information Act 'was intended 'to establish safeguards for maintaining the integrity of confidential health-care information that relates to an individual.'' We concluded that § 5–37.3–6.1 struck 'a permissible balance between a party's interest in maintaining the confidentiality of his or her personal health care records and the court's need to access relevant information." Thus, at least with respect to known, personally identifiable health-care records, § 5–37.3–6.1 sets forth a procedure by which the person whose records are sought is provided notice and an opportunity to contest their production or seek to limit their disclosure or use. *That is not the situation with which we currently are faced.*
>
> The plaintiff in this case has not sought health-care records personally identifiable to a particular patient. Rather, plaintiff requested information that was reviewed by the hospital in the course of its credentialing decisions.  Thus, because the individuals whose records defendants assert are privileged have not been identified to plaintiff, compliance with § 5–37.3–6.1 is impossible. *The plaintiff cannot be expected to serve a copy of a subpoena on an unknown putative patient or to obtain his or her acquiescence to access an as-yet-unidentified document.* Moreover, plaintiff is attempting to prove that the hospital negligently credentialed Dr. Samson, a claim that can be proved without the need to identify a particular individual.
>
> In response to the hospital's claim that some documents were protected by the Confidentiality of Health Care Information Act, plaintiff requested and was granted an *in camera* review of the records. The motion justice ordered the disclosure of all documents without identifying any confidential health-care records, although she ordered that some records be redacted.
>
> ***The Confidentiality of Health Care Information Act is not a shield behind which a medical provider may hide to avoid liability for medical negligence or for any other purpose.***  This Court has declared that privileges do not aid the quest for truth, the core function of the adversary process and, therefore, privileges should narrowly be construed.
>
> Accordingly, we are of the opinion that *in camera* review and redaction of personally identifying patient information is an appropriate procedure to decide whether the documents should be produced.  However, the trial justice failed to make a record finding about which documents, if any, met the definition of personally identifiable confidential health-care information as set

forth in § 5–37.3–3(13), and, if so, whether the records could be produced after they were redacted. We remand this case for that determination.

*Id.* at 1085-86 (emphasis added) (internal citations omitted).  Thus, the R.I. Supreme Court's decision in *Pastore* is directly controlling on the discovery dispute at hand.  That decision makes it clear that Plaintiff's request for documents containing healthcare information of third parties is absolutely permissible in civil litigation and well within the authority of the judicial officer to compel.

In pressing this argument in the face of not one but two well litigated and well known lines of binding case law in this jurisdiction that explicitly and directly reject their argument, the Attorney General's Office appears to have neglected its professional responsibilities 1) not to defend a proceeding or assert an issue without a basis in law that is not frivolous, and 2) to disclose to the court legal authority in the controlling jurisdiction that is directly adverse to their position.  *See* RI R S CT ART V RPC Rules 3.1 and 3.3.[3]

Furthermore, in the case such as this, where Plaintiff requested documents of individuals who have not been identified to Plaintiff, compliance with § 5–37.3–6.1 is impossible, impractical, and completely unnecessary.  Specifically, Plaintiff has requested "[a]ll approved, denied or altered orders and/or requests for bottom bunk accommodations between October 5, 2015 and November 11, 2016."  Plaintiff's Second Request for Production of Documents, No. 8.

---

[3] *See* Rule 3.1, Meritorious Claims and Contentions ("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law."); Rule 3.1, Note 2 ("What is required of lawyers, however, is that they inform themselves about the facts of their clients' cases and the applicable law and determine that they can make good faith arguments in support of their clients' positions. … The action is frivolous … if the lawyer is unable either to make a good faith argument on the merits of the action taken or to support the action taken by a good faith argument for an extension, modification or reversal of existing law."); Rule 3.3, Candor Toward the Tribunal ("a) A lawyer shall not knowingly: … (2) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel"); Rule 3.3, Note 4 ("A lawyer is not required to make a disinterested exposition of the law, but must recognize the existence of pertinent legal authorities. Furthermore, as stated in paragraph (a)(2), an advocate has a duty to disclose directly adverse authority in the controlling jurisdiction that has not been disclosed by the opposing party.").

Those orders contain specific and limited personally identifiable information that is currently unknown by Plaintiff.  Because the records requested by Plaintiff are all uniform, there is no need for this Court to conduct an *in camera* review of all of the records.  *See* Plaintiff's special needs order attached as Exhibit A to Defendants' Motion (ECF No. 61-2).  This Court can, based on the information already before it, order Defendants to produce the requested records, identifying the "Personally identifiable confidential healthcare information" that "explicitly or by implication identifies a particular patient," which must be redacted to comply with the R.I. Supreme Court's directive for compliance with § 5–37.3–3(13).  That would include the patient-inmate's name, prison ID number, and date of birth, which, once redacted, would render those documents unprotected by the privilege contained in the R.I. Confidentiality Act.

Additionally, although Plaintiff initially requested these documents in an unredacted form subject to the existing Protective Order (ECF No. 56), as Plaintiff's counsel explained to this Court during the Telephonic Conference on January 29, 2020, Plaintiff is more than satisfied if he receives these documents with redactions to the personally identifiable information.

Therefore, Defendants' argument in regard to the R.I. Confidentiality Act is not only wrong, it is frivolous, and without merit.  For this reason, it would be entirely appropriate for this Court to order Defendants to pay Plaintiff's attorneys fees for the time and effort required to press this Motion to Compel.  Such an order would properly redistribute the cost of such efforts from Plaintiff, an incarcerated individual without substantial means whose rights have already been violated by State Defendants, to State Defendants who decided to press an argument before this Court that is explicitly barred by binding case law that would have been identified through the most basic of legal research.  Such conduct, whether intentional or not, makes this litigation more costly and time consuming and dissuades future plaintiffs and counsel from litigating even meritorious claims.

### ii. HIPAA Does Not Prohibit Disclosure of Plaintiff's Requested Documents

Defendants' argument in regard to federal confidentiality requirements is nearly as frivolous as its previous argument.  First, "HIPAA did not give rise to a physician-patient or medical records privilege.  It did, however, 'create a procedure for obtaining authority to use medical records in litigation."  *United States v. Bek*, 493 F.3d 790, 802 (7th Cir. 2007) (quoting *Northwestern Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 926 (7th Cir. 2004)).  Second, HIPAA *only* applies to and, therefore, protects from disclosure "individually identifiable health information," which is defined as follows:

> The term "individually identifiable health information" means any information, including demographic information collected from an individual, that--
> (A) is created or received by a health care provider, health plan, employer, or health care clearinghouse; and
> (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and--
> (i) identifies the individual; or
> (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C.A. § 1320d.  The Privacy Rule, as the regulations implementing HIPAA are called, expressly exempts from the application of the disclosure requirements any "de-identified" health information.  45 C.F.R. § 164.502 ("The requirements of this subpart do not apply to information that has been de-identified in accordance with the applicable requirements of § 164.514").  However, while Defendants argue that compliance with § 164.514 would be burdensome, Defendants failed to acknowledge applicable exceptions that would allow this Court to do exactly that which Plaintiff is requesting.  This is not the first time this issue has been before federal district courts, and other judges have remarked on other defendants' failure to be forthright:

Rule 26(c)(1) allows the Court to "for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense ... forbidding the [requested] disclosure or discovery[.]" Fed. R. Civ. P. 26(c)(1). [Defendant] makes three arguments in support of its request for a protective order. First, it contends that disclosing patient identities "is prohibited by statutory confidentiality provisions and may subject [Defendant] to liability." …

But, as Plaintiff contends (and [Defendant] ignores), HIPAA allows for the disclosure of protected information in response to a court order. Specifically, 45 C.F.R. § 164.512 states, in part:

> (e) Standard: Disclosures for judicial and administrative proceedings.
> (1) Permitted disclosures. A covered entity may disclose protected health information in the course of any judicial or administrative proceeding:
> (i) In response to an order of a court or administrative tribunal, provided that the covered entity discloses only the protected health information expressly authorized by such order[.]

45 C.F.R. § 164.512(e)(1)(i).

As the movant, [Defendant]'s failure to address this procedural possibility is particularly unhelpful to the Court. *Indeed, the regulation cited by [Defendant] (45 C.F.R. § 164.502(a)) for the proposition that disclosure is strictly prohibited expressly allows for disclosure "[a]s permitted by and in compliance with this section*, § 164.512, § 164.514(e), (f), or (g)[.]" 45 C.F.R. § 164.502. Put simply, [Defendant] should have anticipated that Plaintiff would rely on this mechanism for disclosure, and the failure to address it, in any way, compels the conclusion that [Defendant] has not met its burden to establish that HIPAA's protections amount to good cause for purposes of Rule 26(c).

*Carr v. Lake Cumberland Reg'l Hosp.*, LLC, No. 6:15-CV-138-DLB-HAI, 2017 WL 6211078, at *1–2 (E.D. Ky. May 17, 2017);  *see also Roth v. Sunrise Senior Living Mgmt., Inc.*, No. 2:11-CV-4567, 2012 WL 748401, at *1–2 (E.D. Pa. Mar. 8, 2012) ("Once medical records have been appropriately redacted and de-identified, patient privacy concerns dissipate and HIPAA poses no obstacle to the production of the redacted records.").  Although Plaintiff is more than willing to

accept records that have been de-identified, the Privacy Rule specifically allowed for disclosure of protected health information (that has not been de-identified) pursuant to a protective order. At any point, Defendants could have asked for a more specific protective order than the order already in effect in this case to permit disclosure of protected health information.  Instead, Defendants refused any disclosure of relevant requested records, forcing Plaintiff's counsel to expend unnecessary and time-consuming efforts to obtain records to which Plaintiff is entitled. Unfortunately, the tactics of obstruction, delay, and outright bad-faith in responding to discovery requests from Plaintiff's counsel's law firm evidences a pervasive pattern and practice on the part of the Attorney General's Office, making it exceedingly difficult for Plaintiff's counsel, and presumably other plaintiffs' counsel, to represent clients for violations of their rights perpetrated by State agencies, and particularly the RIDOC.

### iii. Releasing the Requested Documents Would Not Violate Privacy Protections

Because "[f]ederal courts are not permitted to apply state privilege law, regardless of the importance of implicated policy concerns," the argument that State Defendants would be subject to lawsuits from each inmate whose records were disclosed is also unfounded.  *Marcum*, 2012 WL 2018523, at *4.   Additionally, since no personally identifiable information would be disclosed, any claim for violating confidentiality statutes would similarly fail.  *See id.* at *5 ("Defendants' argument that an order compelling the production of the medical records will subject them to tort liability is equally unavailing.").

### C. The Documents Requested by Plaintiff are Relevant, Proportional to Plaintiff's Needs, and Would Not Present an Undue Burden to Defendants.

Plaintiff's request for documents at issue in this motion are significantly relevant to Plaintiff's claims, and numerous courts facing nearly identical requests have granted motions to compel.

As mentioned above, Plaintiff's Complaint includes claims for violation of the Eighth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983. "A prisoner claiming a violation of his Eighth Amendment right to adequate medical care during his incarceration must prove that the defendants' actions amounted to 'deliberate indifference' to the inmate's 'serious medical need.'" *McEvoy v. Hillsborough Cty.*, No. 09-CV-431-SM, 2011 WL 1813014, at *4 (D.N.H. May 5, 2011) (quoting *Braga v. Hodgson*, 605 F.3d 58, 61 (1st Cir. 2010)). Additionally, in order to prove municipal liability, Plaintiff must also prove that "action pursuant to official municipal policy" caused his injury. *Id.* This requires Plaintiff to demonstrate the practices and protocols employed, that they "were pervasive enough to be considered 'custom or policy,'" and "that the municipal defendants were aware of that policy and, by allowing it to continue, were deliberately indifferent to the constitutional rights of the inmates receiving that care." *Id.* at *5 (citing *Connick v. Thompson*, 563 U.S. 51, 60-61 (2011)). "Policymakers' 'continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability.'" *Connick*, 563 U.S. at 62.

Numerous courts have orders production of documents based on similar requests for third-party medical records, particularly in the prison context in § 1983 actions. *See Burris v. Dodds*, No. 2:19-CV-815, 2019 WL 6251340, at *5 (S.D. Ohio Nov. 22, 2019); *Marcum*, 2012 WL 2018523, at *7; *McEvoy*, 2011 WL 1813014 at *10. In *McEvoy*, the administrator of the estate of a man who died in prison following inadequate medical care for heroin detoxification filed suit against the prison and numerous employees. 2011 WL 1813014 at *1. The plaintiff sought records of all other inmates who underwent detoxification at the jail during the year prior to the inmate's death. *Id.* at *2. Pursuant to a motion to compel such records, the court held that the requested records were relevant and the plaintiff had a need for such records to prove that

there were inmates in similar medical situations to the inmate who died, that the incidents gave the municipality notice of the insufficient care, and that the municipality participated in the harmful acts and/or tolerated the custom or policy of providing such care. *Id.* at *5. The court then weighed the need of the plaintiff against the burden on the defendants, finding that the burden was not *undue*. *Id.* at *8. Specifically, in response to defendants' argument that they would have to manually review approximately 5,500 paper medical records, the court found that,

> While 5,500 inmates may have passed through the [prison] during the relevant one-year time frame, it is likely that a large number of those inmates received no medical care at all. Accordingly, the review of a large number of the records, even by hand, would need to be only cursory—inmates who received no medical treatment, for example, would require almost none of defendants' time. Further, records of inmates who received minimal medical care for issues other than those relevant here, and who therefore did not generate a significant medical record, would be quickly identifiable, and would not take an inordinate amount of time to review.
> For these reasons, the court finds that the burden on defendants to produce the redacted records of all inmates who received medical treatment, beyond an intake interview, for drug (and not alcohol) detoxification or withdrawal, and/or dehydration, while significant, is not undue under the circumstances presented by the case.

*Id.* Similarly, in this case, Plaintiff requested "[a]ll approved, denied or altered orders and/or requests for bottom bunk accommodations between October 5, 2015 and November 11, 2016." Plaintiff's Second RFPD, Request Number 8. As Defendants acknowledge, they already have four lists of inmates with approved bottom bunk orders, so it would not be required to review medical records for every inmate to pass through the medium security facility during that time, some of whom may never have received a bottom bunk order. However, Defendants argue that they would have to "manually go through the confidential medical file for each of the one thousand one hundred (1,100) inmates named on the lists, copy each approved accommodation request (which may include multiple requests per file), and manually redact any confidential

health information and identifying information." Defendants' Memo at 11. First, Plaintiff has significant doubts that the lists contain 1,100 distinct inmate names, considering that Plaintiff's name appears on each list. Second, contrary to Defendants' contention, Defendants maintain electronic medical records, including audit trails that could be electronically key word searched to assist in locating medical accommodation orders, significantly reducing the amount of time and effort required by Defendants. Furthermore, each order only contains minimal personally identifiable information that can easily be redacted, including names, inmate ID numbers, and dates of birth. *See* Order (ECF No. 61-2). Finally, the use of an antiquated, poorly maintained, or improperly utilized electronic medical records system cannot be used to benefit Defendants at the expense of Plaintiff's case. *See Briddell v. Saint Gobain Abrasives Inc.*, 233 F.R.D. 57, 61 (D.Mass.2005) ("[I]t is [defendant's] own record keeping policies which have contributed significantly to the burden imposed on it. Courts have been loath to reward (and possibly encourage) poor record keeping by shielding companies with inefficient recording methods from discovery."). Plaintiff's harm, not coincidentally, was caused, at least in part, because of Defendants' inability to effectively track, implement, and enforce special needs accommodation orders.

Thus, while the production and redaction of these records may well be a burden, it is certainly not an *undue* burden, as the court in *McEvoy* found. *See also Burris* 2019 WL 6251340, at *5 (holding that "Plaintiff's request for medical records of other inmates is limited to those who also experienced symptoms of alcohol withdrawal and is further limited to the one-year period preceding Mr. Burris' death" and "the burden is not 'undue' and does not outweigh Plaintiff's demonstrated need for the discovery to prove her municipal liability claim."); *Marcum*, 2012 WL 2018523, at *2-7 (holding production and redaction of all medical records of 187 inmates treated for asthma not an undue burden in light of plaintiff's need to support Eighth

Amendment claim); *Trask v. Olin Corp.*, 298 F.R.D. 244, 267 (W.D. Pa. 2014) (Even where defendant had already spent 260 hours at a cost of $44,000 to review 25 out of 270 of the boxes of relevant documentation, Court found there was no undue burden). Indeed, it would be particularly unjust to allow the State to avoid liability because it keeps records in a way which makes it hard for the State to produce exactly the records plaintiffs need to establish such liability.

### D. Plaintiff's Motion to Compel Responses Intentionally Included Request Numbers 6 and 7 of Plaintiff's Second Request for Production

#### i. Request Number 6

Request Number 6 seeks "the list of the number of individuals with bottom bunk orders from October 5, 2015 to November 11, 2016." State Defendants' Responses to Plaintiff's Second RFPD and Supplemental Responses to Plaintiff's First RFPD included production of four emails, dated March 6, 2015, March 9, 2015, December 17, 2015, and June 21, 2017, that each referenced an attached list of medical bottom bunk assignments, but those lists were not included in Defendants' responses. In Plaintiff's Rule 37 Letter, and in subsequent discussions with State Defendants' counsel, Plaintiff's counsel insisted on receiving the bottom bunk lists attached to four previously identified emails at a minimum, but also pressed for responsive documents including any other lists of individuals with bottom bunk assignments. At the time, Defendants' counsel did not know whether such lists still existed, and Plaintiff's counsel explained, in the event that no other lists exist, we would require a formal response from the RIDOC in the form of an affidavit or possibly responses to additional interrogatory requests, explaining why those lists no longer exist. Therefore, although Plaintiff has received the four verifiable lists, which Defendants attached as Exhibit B to their Memorandum (ECF No. 61-3), Plaintiff has not received a written response as to the existence of other lists.

Plaintiff insists on obtaining a sworn written response from the RIDOC in large part because, on numerous occasions, Defendants have responded to various requests that no responsive documents exist, only to later provide those exact documents, often in incomplete form.  Therefore, it has become necessary for Plaintiff to protect his interests by pressing State Defendants for more formal and verifiable documentation regarding the existence of responsive documents.  For example, in Defendants' First Response to Plaintiff's Second RFPD, Request No. 9, Defendants produced one email.  Plaintiff's Second RFPD Request No. 9 sought "[d]ocumentation from meetings between correctional staff and medical staff wherein medical staff expressed disagreement with the requirement that all inmates with bottom bunk orders be on the first tier."  Plaintiff explained in his Rule 37 letter that Defendants' response to Request No. 9 was "completely inadequate" because the Deputy Warden had testified that there was documentation of "triage" meetings, possibly including minutes, that counsel for Plaintiff has obtained minutes of triage meetings in at least one other lawsuit, and insisted that any such documents, at least some of which it was clear existed, be produced.  In response, Plaintiff was informed by State Defendants' counsel that no documents of triage meetings exist, a claim which was repeated to Plaintiff on January 29, 2020, immediately prior to the Telephonic Conference with this Court.  However, despite that claim, Defendants' obtained and produced 25 pages of Triage Meeting minutes on February 5, 2020, following this Court's order.

Plaintiff's oral motion intentionally included Request No. 6 and Defendants' failure to adequately object to Plaintiff's motion must result in Defendants' waiver of any objection. Therefore, Plaintiff requests this Court to order State Defendants to conduct a proper investigation of its records and provide Plaintiff with either responsive documents or an affidavit explaining such investigation and the reason that those documents no longer exist.

### E.  Request Number 7

Setting aside the fact that State Defendants have waived their objections to Plaintiff's requests, Request Number 7 seeks "All documentation demonstrating when an order and/or request for a bottom bunk created a climate issue." State Defendants submitted the following untimely objection:

> Objection, as release of documents would disclose the identity of third-party inmate(s), not a patty to this case. Further objection, as this request is vague, over broad, unduly burdensome, and not proportional to the needs of this case. Additional objection, as this request seeks information that is not relevant to the allegations and claims in this civil action. Additional objection, as this request seeks the disclosure of documents that may compromise the institutional safety and security of the facility. Additional objection, as this request is not limited in time or scope.

In State Defendants' Memo, Defendants claim that "it remains unclear what documents Plaintiff is referencing.  The request is simply vague and fails to provide any definition for 'climate issue' and additionally is not limited to any particular facility or limited to any particular timeframe." Defendants' Memo at 2 n.3.  First, Plaintiff's requests have all been related to the Medium Security Facility unless Plaintiff specified otherwise, which Defendants could have reasonably assumed.  Second, at no point did State Defendants reach out to Plaintiff to request clarification of any ambiguities in the request.   Third, Defendant McCaughey testified in her deposition that one of the considerations in approving or denying bottom bunk orders is whether the order will present "climate issues."  McCaughey Dep. 42:2-43:1.  Because that term came directly from one of the named Defendants, it is inappropriate and disingenuous for State Defendants to now claim that the term is unclear to them. *See Parente v. Wall*, C.A. No. 16-CV-055 (D.R.I. May 7, 2018) (McConnell, J.) (RIDOC objected that phrase "sick call" was vague as it claimed the phrase was not understood, despite that the phrase was one regularly used by RIDOC's employees and/or agents and referenced by RIDOC's own documentation; after plaintiff moved

to compel, RIDOC no longer pressed its objection based on vagueness, and this Court ordered the documentation be produced); *U.S. ex rel. Englund v. Los Angeles Cty.*, 235 F.R.D. 675, 684 (E.D. Cal. 2006) ("When the purpose and significance of a request are reasonably clear, courts do not permit denials based on an overly-technical reading of the request").   Fourth, records relating to "climate issues" that have occurred at the Medium Security Facility in the past would help Plaintiff understand that alleged security concern and would be relevant to Plaintiff's ADA claims, among others, because Plaintiff must prove that there were no legitimate security related reasons for denying, ignoring, or modifying orders for Plaintiff to receive a bottom bunk.

Therefore, because Defendants waived any objections to Plaintiff's requests and failed to object to Plaintiff's Oral Motion to Compel on this topic, as ordered by this Court, this Court should order Defendants to provide any responsive documents to Request Number 7 of Plaintiff's Second RFPD.

### F.  Other Records Recently Received Were Improperly Redacted

As mentioned above, on February 5, 2020, Plaintiff received documents related to triage meetings that State Defendants had repeatedly declared not to exist.   In those records, State Defendants redacted entire sections that appeared to relate specifically to discussions between medical, correctional, and administrative staff of medical bottom bunk issues faced by particular inmates.   On February 6, 2020, Plaintiff's counsel sent an email to State Defendants' counsel addressing numerous issues with Defendants' responses, including to the redactions of the triage meeting records, stating,

> We strenuously object to each instance where the "Inmates to be discussed" section is redacted in full.   As discussed with Judge McElroy, the only information that should be redacted is personal identifying information, i.e. names and inmate numbers.   The discussion of medical issues should not be redacted, particularly where there are any discussions of legitimate security issues, medical orders and/or bottom bunk issues.   We insist that the redactions in these documents be removed.

In responses, Plaintiff's counsel received a letter from Defendants' counsel stating,

> RIDOC acknowledges that you "strenuously object" to the redactions contained in Response No. 9. The redactions in Response No. 9 contain confidential healthcare information of other third-party inmates not a party to this litigation, which is prohibited from disclosure under Rhode Island law as well as the Health Insurance Portability and Accountability Act (HIPPA), as well as security information that is not relevant to the allegations contained in the Amended Complaint.

See Plaintiff's counsel's email and letter response attached as **Exhibit E**.  Plaintiff is cognizant that the Motion to Compel currently before this Court did not specifically address Plaintiff's Request Number 9, in part because Plaintiff had not yet received the responsive documents from Defendants.  Nonetheless, because the issue is nearly identical to the issues currently before this Court, i.e. whether Defendants are entitled to completely protect from disclosure any and all information related to third-party inmates' health information, Plaintiff requests that this Court consider the broader impact of this Court's decision and issue an order that would encompass Defendants' obligations in responding to all of Plaintiff's discovery requests as they pertain to the healthcare information of third-party inmates.

## IV.    Conclusion

WHEREFORE, Plaintiff respectfully prays that this Court grant his Motion to Compel, including the following relief:

1. Overrule Defendants' objections and/or declare Defendants' objections waived, grant the within Motion in the form and manner requested herein, and order Defendants to provide full responses to the above-referenced requests for production of documents, subject to any redactions that this Court deems appropriate, within twenty-one (21) days;

2. That this Court's Pre-Trial Order be modified to reflect a sixty (60) day extension to the discovery deadline to permit sufficient time for Plaintiff to receive and review the outstanding discovery;

3. That, under the circumstances, Defendants be ordered to pay the counsel fees and costs of bringing this Motion to Compel as a sanction for Defendants' willful and intentional refusal to comply with discovery requests and requiring Plaintiff to respond to numerous frivolous arguments; and,

4. Such other and further relief as this Court deems just and proper.

Plaintiff,
By his attorney,

**Dated: February 14, 2020**                          /s/ **Chloe A. Davis_____**
                                                      **Chloe A. Davis, Esq**. Bar No. 9334
                                                      Sinapi Law Associates, Ltd.
                                                      2374 Post Road, Suite 201
                                                      Warwick, RI 02886
                                                      Phone: (401) 739-9690
                                                      Email cad@sinapilaw.com

<u>**CERTIFICATION**</u>

Jeffrey G. Latham, Esquire            Justin J. Sullivan, Esquire
Christine A. Stowell, Esquire         Lauren E. Hill, Esquire
Tate & Latham                         Department of the Attorney General
40 Westminster Street, Suite 350      150 South Main Street
Providence, RI 02903                  Providence, RI 02903
(401) 421-7400                        401-274-4400
jlatham@tatelawri.com                 jjsullivan@riag.ri.gov
cstowell@tatelawri.com                lhill@riag.gov

I hereby certify that on **February 14, 2020**, a true copy of the within was filed electronically via the Court's CM/ECF System. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and the filing is available for viewing and downloading from the Court's CM/ECF System. Service on the counsel of record listed above has been effectuated by electronic means.

/s/ **Chloe A. Davis_____**