# EXHIBIT H

**In The Matter Of:**

*Melise vs*
*Wall, et al*

*Kerri McCaughey*
*July 12, 2019*



**Page 1**

```
 1            UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF RHODE ISLAND
 2

 3  STEPHEN MELISE,
        Plaintiff,
 4
        vs.                    C.A. NO. 1:17-cv-00490-JJM-PAS
 5
    ASHBEL T. WALL, et al.
 6       Defendants.

 7
            DEPOSITION of KERRI McCAUGHEY,
 8  a Defendant in the above-entitled cause,
    taken on behalf of the Plaintiff, before
 9  Lori Spremulli Confreda, Certified Court
    Reporter, R.P.R., Commissioner, in and
10  for the State of Rhode Island, at
    Sinapi Law Associates, Ltd., 2374 Post
11  Road, Suite 201, Warwick, Rhode Island
    02886, on Friday, July 12th, 2019
12  scheduled at 10:00 A.M.

13

14  PRESENT,

15  FOR THE PLAINTIFF,
        SINAPI LAW ASSOCIATES, Ltd.
16      BY: CHLOE A. DAVIS, ESQ.

17
    FOR THE DEFENDANTS,
18  (RIDOC)
        RHODE ISLAND OFFICE OF THE ATTORNEY GENERAL
19      BY:  JUSTIN J. SULLIVAN,
             SPECIAL ASSISTANT ATTORNEY GENERAL
20      AND: LAUREN HILL,
             SPECIAL ASSISTANT ATTORNEY GENERAL
21           - and -

22
    (FRED VOHR AND JENNIFER CLARKE)
23      TATE & LATHAM
        BY:  CHRISTINE STOWELL, ESQ.
24
    ALSO PRESENT:  ANTHONY SINAPI, PARALEGAL,
25                 SINAPI LAW ASSOCIATES, Ltd.
```

**Page 2**

```
 1              I N D E X

 2  WITNESS                                    PAGE

 3  KERRI McCAUGHEY

 4
    EXAMINATION BY ATTORNEY DAVIS....................05
 5
    EXAMINATION BY ATTORNEY HILL....................171
 6
    EXAMINATION BY ATTORNEY SULLIVAN................175
 7
    EXAMINATION BY ATTORNEY STOWELL.................176
 8

 9
10           ***** SO NOTED *****

11           PAGE 154.....LINE 01

12
```

**Page 3**

```
 1                E X H I B I T S

 2
    PLAINTIFF'S
 3  NO.              DESCRIPTION              PAGE

 4  EXHIBIT 1  (01PG) PHOTOCOPY OF 11/12/2014 9:13 A.M.
                DEPARTMENT OF CORRECTIONS
 5              ADMINISTRATIVE NOTE...........................82

 6  EXHIBIT 2  (01PG) PHOTOCOPY OF 02/09/2013 10:24 A.M.
                DEPARTMENT OF CORRECTIONS
 7              ADMINISTRATIVE NOTE...........................86

 8  EXHIBIT 3  (01PG) PHOTOCOPY OF 06/09/2015 11:17 A.M.
                DEPARTMENT OF CORRECTIONS
 9              ADMINISTRATIVE NOTE...........................88

10  EXHIBIT 4  (01PG) PHOTOCOPY OF 06/09/2015 11:17 A.M.
                DEPARTMENT OF CORRECTIONS
11              ADMINISTRATIVE NOTE W/ADDITIONAL NOTES.......92

12  EXHIBIT 5  (01PG) PHOTOCOPY MEDIUM MORAN SECURITY
                11/12/2015 SPECIAL NEEDS/URGENT ORDERS......102
13
    EXHIBIT 6  (01PG) PHOTOCOPY MEDIUM MORAN SECURITY
14              11/20/2015 SPECIAL NEEDS/URGENT ORDERS......103

15  EXHIBIT 7  (01PG) PHOTOCOPY MEDIUM MORAN SECURITY.
                12/21/2015 SPECIAL NEEDS/URGENT ORDERS......104
16
    EXHIBIT 8  (01PG) PHOTOCOPY OF 12/21/2015 11:50 A.M.
17              DEPARTMENT OF CORRECTIONS
                ADMINISTRATIVE NOTE..........................105
18
    EXHIBIT 9  (01PG) PHOTOCOPY MEDIUM MORAN SECURITY
19              06/21/2016 SPECIAL NEEDS/URGENT ORDERS......107

20  EXHIBIT 10 (01PG) PHOTOCOPY MEDIUM MORAN SECURITY
                06/28/2016 SPECIAL NEEDS/URGENT ORDERS......108
21
    EXHIBIT 11 (01PG) PHOTOCOPY OF 09/08/2016 9:34 A.M.
22              DEPARTMENT OF CORRECTIONS
                ADMINISTRATIVE NOTE..........................109
23
    EXHIBIT 12 (03PP) STATE OF RHODE ISLAND
24              DEPARTMENT OF CORRECTIONS
                INMATE EVENTS LOG
25              FROM 08/01/2013 TO 12/30/2016...............114
```

**Page 4**

```
 1  PLAINTIFF'S
    NO.              DESCRIPTION              PAGE

 2

 3  EXHIBIT 13 (01PG) PHOTOCOPY OF 11/11/2016, 1:19:42 A.M
                RHODE ISLAND DEPARTMENT OF CORRECTIONS
 4              INCIDENT REPORT.............................119

 5  EXHIBIT 14 (03PP) PHOTOCOPY - LOG BOOK
                RHODE ISLAND DEPARTMENT OF CORRECTIONS
 6              ADULT SERVICES,
                FROM 11-3-16 THROUGH 1-28-17................126
 7
    EXHIBIT 15 (02PP) PHOTOCOPY -- LIFESPAN
 8              11/11/2018 02:48
                EMERGENCY DEPARTMENT RECORD.................133
 9
    EXHIBIT 16 (01PG) PHOTOCOPY OF 11/11/2016 1:08 P.M.
10              DEPARTMENT OF CORRECTIONS
                ADMINISTRATIVE NOTE.........................135
11
    EXHIBIT 17 (01PG) PHOTOCOPY OF 12/13/2016 2:27 P.M.
12              DEPARTMENT OF CORRECTIONS
                ADMINISTRATIVE NOTE.........................138
13
    EXHIBIT 18 (01PG) PHOTOCOPY OF 06/07/2017 8:52 A.M.
14              DEPARTMENT OF CORRECTIONS
                ADMINISTRATIVE NOTE.........................139
15
    EXHIBIT 19 (17PP) PHOTOCOPY OF RHODE ISLAND DEPARTMENT
16              OF CORRECTIONS POLICY AND PROCEDURE,
                POLICY NUMBER: 18.22 DOC,
17              EFFECTIVE DATE 08/18/08.....................140

18  EXHIBIT 20 (16PP) PHOTOCOPY OF RIDOC DEFENDANTS'
19              ANSWERS TO PLAINTIFF'S INTERROGATORIES......157
```

Melise vs
Wall, et al

Kerri McCaughey
July 12, 2019

Page 5

1    (DEPOSITION COMMENCED AT 10:00 A.M.)
2    KERRI McCAUGHEY
3    Being duly sworn, deposes and testifies
4 as follows:
5    THE REPORTER: State your full name and
6 spell your last name for the record, please.
7    THE WITNESS: Kerri McCaughey,
8 K-E-R-R-I, M-c-C-A-U-G-H-E-Y.
9    THE REPORTER: I ask that counsel and
10 others present state their name and affiliation.
11    MS. DAVIS: Chloe Davis, on behalf of the
12 plaintiff, Stephen Melise.
13    MR. SINAPI: Anthony Sinapi, paralegal,
14 on behalf of the plaintiff.
15    MR. SULLIVAN: My name is Justin
16 Sullivan, on behalf of the state defendants.
17    MS. HILL: Lauren Hill, on behalf of the
18 state defendants.
19    MS. STOWELL: Christine Stowell with Tate
20 & Latham, on behalf of defendants, Drs. Vhor and
21 Clarke.
22    EXAMINATION BY ATTORNEY DAVIS
23 Q.   So, I assume you know why you are here?
24 A.   Yes.
25 Q.   To be deposed in the lawsuit filed by Stephen Melise

Page 6

1 against Ashbel T. Wall and the DOC, and others,
2 including yourself, as a named defendant in Case
3 Citation 1:17-cv-490.
4    I know that you have recently been
5 deposed in other cases, so I am going to try to
6 abbreviate some of the background questions and all of
7 that, so we are not here forever.
8    First, I'll lay down some of the ground
9 rules, which I sure you understand and remember, but
10 we'll go through them quickly.
11    There is a court reporter here who is
12 taking down every word that we say, and so it is
13 important that all answers are verbal, and none of the
14 answers are using hand gestures, or anything like that,
15 and I'll ask questions, and you will answer them, and
16 I'll make every effort to wait until you finish
17 answering my questions before I start asking the next
18 one, and so I ask that you also wait for me to finish
19 my questions before you start answering.
20    If you do not understand a question,
21 please let me know, don't guess, or you know, anything
22 like that just, just say I don't understand, can you
23 please rephrase. If you don't tell me that you do not
24 understand the question, I'll assume that you
25 understand, and that your answer is complete and

Page 7

1 accurate.
2    If there any questions that you want to
3 go back to, if you feel that an answer was not
4 complete, or may have been inaccurate in any way, we
5 can absolutely go back to earlier questions, just let
6 me know.
7    Throughout the deposition, I am sure that
8 your attorney will be giving objections, I just want to
9 remind you to answer the questions, even if there is an
10 objection, that is, unless your attorney advises you
11 not to answer a particular question.
12    Let me start by asking, is there any
13 reason that you cannot give your best testimony today?
14 A.   No.
15 Q.   Are you currently under the influence of any
16 medications or any substances that may affect your
17 ability to testify today?
18 A.   No.
19 Q.   And finally, if at any time during the deposition you
20 feel you need a break, to use the rest room, or
21 anything else, please, let me know, and we can take a
22 break at any time. Just make sure that you finish
23 answering whatever question has been posed before we
24 take a break, so that the record is clean. All right.
25 Did you do anything to prepare for this deposition?

Page 8

1 A.   Just spoke with my attorney.
2 Q.   Did you review any documents?
3 A.   Just my interrogatories.
4 Q.   And did you help prepare those interrogatories?
5 A.   Yes.
6 Q.   Originally?
7 A.   Yes.
8 Q.   There were no other documents; you didn't review the
9 complaint, or anything like that?
10 A.   No.
11 Q.   Did you meet with anybody, other than your attorney to
12 prepare, for this deposition?
13 A.   No.
14 Q.   That was easy. Have you discussed the facts of this
15 case with anybody at any time, besides your attorney?
16 A.   No.
17 Q.   And does that include even when you first received the
18 complaint? When you were served with the complaint
19 because you're a named defendant, did you at any point
20 discuss the fact that you were served, or the facts of
21 the case with anybody at any time?
22 A.   Just our legal.
23 Q.   What is your address?
24 A.   18227 Patriot Way, West Greenwich, Rhode Island
25 02817.

Page 9

1  Q.   What is your date of birth?
2  A.   9/1/1959.
3  Q.   And your education, starting with college?
4  A.   I have an Associate's degree, a Bachelor's Degree
5   in Social Work, and a Master's degree in Criminal
6   Justice.
7  Q.   Where was your Associate's degree obtained?
8  A.   Community College of Rhode Island.
9  Q.   What year was that?
10  A.   I graduated in 1979.
11  Q.   And you said you had a Bachelor's Degree?
12  A.   Yes.
13  Q.   Where was that obtained?
14  A.   Bachelor's of Social Work, Rhode Island College.  I
15   graduated in 1981.
16  Q.   And you said you have a Master's degree?
17  A.   Yes.
18  Q.   Where was that obtained?
19  A.   Salve Regina University.
20  Q.   What year?
21  A.   I graduated in -- hold on a second.  1999.
22  Q.   And do you currently work for the Department of
23   Corrections?
24  A.   Yes.
25  Q.   When did you first start working there?

Page 10

1  A.   August 13, 2000.
2  Q.   What was your position when you were first hired?
3  A.   Adult counselor.
4  Q.   How long did you have that position?
5  A.   Ten years.
6  Q.   And what were your duties as an adult counselor?
7  A.   To provide counseling services to the adult male
8   inmate population.
9  Q.   What facility?
10  A.   John J. Moran Medium Security, men's.
11  Q.   Was that all of the inmates, or was it a subsection of
12   the inmates?
13  A.   I had a caseload of inmates.
14  Q.   How many were in your caseload?
15  A.   Approximately 145.
16  Q.   How many adult counselors were there?
17  A.   Initially, six.
18  Q.   And so you said you were an adult counselor for ten
19   years; what was your position after that?
20  A.   I was promoted to the counseling services
21   coordinator.
22  Q.   And what were your duties in that position?
23  A.   Just to supervise the counseling department for the
24   Department of Corrections.
25  Q.   Did that include supervising the adult counselors?

Page 11

1  A.   Yes.
2  Q.   And what sort of counseling were they providing, and
3   did you supervise; as in, what aspect of the inmates'
4   lives were you dealing with in that position?
5  A.   As the supervisor?
6  Q.   Yes.
7  A.   I was overseeing the adult counselors and their
8   caseloads.
9  Q.   Was that dealing with, like, the social aspect of
10   inmates' lives, or was it educational, what sort of
11   aspect of the inmates' lives in the prison was that
12   dealing with?
13  A.   Inmate life in general, anything that affected
14   their day-to-day.
15  Q.   Anything, okay.  And how long did you hold that
16   position?
17  A.   Three years.
18  Q.   What was your next position?
19  A.   Acting deputy warden.
20  Q.   What year was that, do you remember?
21  A.   2013.
22  Q.   What were your responsibilities as acting deputy
23   warden?
24  A.   I was the program deputy warden at John J. Moran
25   Medium Security, I oversaw the program aspect of the

Page 12

1   administration.
2  Q.   Can you explain a little more about what that means?
3  A.   The program deputy is responsible for the programs
4   that are implemented within the facility.
5  Q.   Such as?
6  A.   Parenting, sex offender treatment, drug treatment.
7  Q.   Did it involve in any way dealing with medical
8   treatment, or anything like that?
9  A.   Just special needs requests.
10  Q.   Those were the only aspects of medical treatment that
11   you ever dealt with programmatic (sic) deputy warden?
12  A.   Correct.
13  Q.   How long were you acting deputy warden, acting
14   programmatic deputy warden?
15  A.   I remained the acting program deputy until April of
16   2016 when I was hired permanently as a program deputy.
17  Q.   I am sorry.  Can you say that one more time.  You were
18   the acting program deputy warden from 2013 to
19   April 2016?
20  A.   Correct.
21  Q.   And then you were full-time programmatic deputy warden?
22  A.   I was hired permanently.
23  Q.   Did your job duties remain the same when you became a
24   permanent programmatic deputy warden?
25  A.   Yes.

Melise vs
Wall, et al

Kerri McCaughey
July 12, 2019

Page 13

1 Q. How long did you have that position?

2 A. Until approximately two years ago, I was made the

3 operational deputy in the same facility.

4 Q. How did your job duties change with that position?

5 A. I oversaw the institution operations' side of

6 medium security.

7 Q. And is that your current position?

8 A. Yes.

9 Q. So that would be somewhere in 2017?

10 A. Approximately.

11 Q. So you held the position of acting programmatic deputy

12 warden for approximately three years, and you were only

13 hired full time in that position for a year before you

14 were promoted -- or I am sorry, your job duty changed

15 to institution operations; is that correct?

16 A. Yes.

17 Q. What other responsibilities did you have as

18 programmatic deputy warden?

19 A. Visitation, mostly the programs of inmate life on

20 an administration level.

21 Q. Are you aware that as programmatic deputy warden, you

22 were the facility ADA coordinator?

23 A. Yes.

24 Q. Was that position only with programmatic deputy warden;

25 as in, are you no longer the facility ADA coordinator?

Page 14

1 A. Yes, correct.

2 Q. Who is the current programmatic deputy warden?

3 A. Kathy Lyons.

4 Q. Who was your supervisor while you were programmatic

5 deputy?

6 A. Warden Sergio Desousa Rosa.

7 Q. Who is your current supervisor?

8 A. Warden Ruis Diniz.

9 Q. When you became the acting programmatic deputy warden,

10 did you receive any training in regard to your position

11 as facility ADA coordinator?

12 A. No.

13 Q. Did anyone ever discuss with you or explain the

14 obligations of being the facility ADA coordinator to

15 you?

16 A. No.

17 Q. What do you understand to be your responsibilities when

18 you were facilities ADA coordinator?

19 A. To ensure that individuals with disabilities are

20 afforded the same opportunities as anyone else within

21 reasoning.

22 Q. How did you learn what your responsibilities were if

23 you obtained no training and no one spoke to you about

24 it?

25 A. When we are hired, we are told about ADA, as far as

Page 15

1 my coordinator role, I just followed the rule of a

2 program deputy when it came to special needs requests.

3 Q. When did those rules come from?

4 A. In policies.

5 Q. Do you know how many policies there were in regard to

6 the ADA?

7 A. No.

8 Q. At any point, were you responsible for reviewing

9 policies?

10 A. Not as a program deputy warden.

11 Q. When did you at some point become responsible for

12 reviewing the policies?

13 A. When I became an operational deputy, I reviewed all

14 of the policies that related to institution and

15 operations. When I was program deputy, I reviewed

16 policies -- or I became familiar with policies that

17 were under my responsibility as a program administrator

18 deputy.

19 Q. Which policies would that have included?

20 A. All departmental policies that fall under the

21 program deputy's purview.

22 Q. So do you know approximately how many that was?

23 A. I don't.

24 Q. When you were a programmatic deputy warden in regard to

25 the policies that you were responsible for, for being

Page 16

1 aware of, such as the ADA policies, was it your

2 responsibility to review and implement those, or did

3 you just need to be familiar with them?

4 A. I needed to be familiar with them.

5 Q. So you did not have any responsibility for ensuring

6 that those policies were carried out?

7 A. Could you rephrase that?

8 Q. While you were the programmatic deputy warden, you were

9 the ADA coordinator for the facility, and as I

10 understand it, you just testified that you were

11 responsible for being familiar with the policies

12 relevant to that; did that also include being

13 responsible for implementing those policies?

14 A. I was responsible for signing special needs

15 requests.

16 Q. Anything else?

17 A. No.

18 Q. That was the only thing you were responsible for?

19 A. Medically, yes.

20 Q. Okay. Do you know if all of the inmates are provided

21 with copies of the policies?

22 A. Some policies, not all.

23 Q. Do you know which ones -- I understand that there is a

24 lot of them, but can you give me sort of an explanation

25 of which types of policies might be provided to the

Melise vs
Wall, et al

Kerri McCaughey
July 12, 2019

Page 17

1  inmates?
2  A.  Policies that are available to the inmates are in
3   the law library.  I cannot answer of the top of my head
4   which ones are in the law bribery and which ones or
5   not.
6  Q.  Do you have access to all of the policies?
7  A.  Yes.
8  Q.  Did you as programmatic deputy warden?
9  A.  Yes.
10 Q.  Even policies that didn't apply to your job, you had
11  access to all of them?
12 A.  I had access, yes.
13 Q.  Are those policies provided to the correctional staff?
14 A.  Yes.
15 Q.  All of them?
16 A.  I don't know.
17 Q.  Do you have any idea how many policies concern medical
18  treatment and/or special needs accommodations?
19 A.  No.
20 Q.  I believe you have already testified to this, but you
21  did review the ADA policies while you were programmatic
22  deputy warden?
23 A.  Yes.
24 Q.  Did you review them as soon as you became the
25  programmatic deputy warden?

Page 18

1  A.  I don't remember.
2  Q.  I believe you also testified that when you are hired,
3   people are told about the ADA; can you explain what
4   that means?
5  A.  It is something that is covered at new employee
6   orientation.
7  Q.  Do you remember what was covered?
8  A.  No.
9  Q.  What was discussed?
10 A.  No.
11 Q.  Were you first informed about the ADA when you were
12  hired in 2000?
13 A.  At new employee orientation.
14 Q.  At any time point, did you receive follow-up training
15  on that?
16 A.  No.
17 Q.  So, you have never received any training on any changes
18  that might have happened to the ADA since you were
19  first hired in 2000?
20 A.  No.
21 Q.  Who is responsible for establishing the protocols and
22  procedures for dealing with special needs orders?
23 A.  Medical staff.
24 Q.  Medical staff are responsible for establishing the
25  procedures?

Page 19

1  A.  Medical staff are responsible for generating a
2   special needs requests.
3  Q.  Who was responsible, for instance, for writing the
4   policies on compliance with the ADA and special needs
5   accommodations?
6  A.  I don't know.
7  Q.  I believe you testified a few minutes ago to the fact
8   that when you became the operations deputy warden, you
9   were responsible for reviewing policies, is that
10  correct?
11 A.  Any administrator is responsible for reviewing
12  policies as they are updated.
13 Q.  Who is responsible for updating them?
14 A.  The policy and planning unit.
15 Q.  Is that a completely separate unit from the operations
16  or medical staff?
17 A.  Yes.
18 Q.  Is that a unit that covers all of the facilities, or is
19  there a particular unit within the medium security
20  facility?
21 A.  The policy unit covers the entire department.
22 Q.  At any point while you were the programmatic deputy
23  warden, or the operations deputy warden, did anyone
24  from the policies unit -- I am sorry.  What did you
25  call it.

Page 20

1  A.  It's the policy and planning unit.
2  Q.  Did they contact you to discuss the policy on special
3   needs accommodations?
4  A.  No.
5  Q.  While you have been the operations deputy warden, did
6   you review the ADA policy?
7  A.  As the operations deputy warden?
8  Q.  Yes.
9  A.  No.
10 Q.  So, at no point have you reviewed and/or been involved
11  in reviewing the ADA policy for purposes of determining
12  if it needs to change?
13 A.  No.
14 Q.  Would that be encompassed in your current job?
15 A.  I don't understand your question.
16 Q.  Would it be your responsibility as operations deputy
17  warden to review the ADA policy to determine if it
18  might need to be evaluated or changed in any way?
19 A.  No.
20 Q.  When you review policies, what are you reviewing them
21  for?
22 A.  Familiarization.
23 Q.  So you have absolutely no role in determining if the
24  policies make sense or if the policies should be
25  changed in any way or should be updated?

Page 21

1  A. No.
2  Q. Do you believe that the current procedures for handling
3    special needs orders are adequate?
4  A. From my perspective?
5  Q. Yes.
6  A. No.
7  Q. In what way are they not adequate?
8  A. By not providing enough information.
9  Q. In what regard?
10 A. With the request itself.
11 Q. As in the request that is provided to the programmatic
12   deputy warden does not include enough information?
13 A. Sometimes.
14 Q. Any other way that you believe that it is inadequate,
15   the policy?
16 A. I can't answer that.
17 Q. Well, you said that you do not think that the
18   procedures are adequate; was there any other way, other
19   than the fact that there was not sufficient
20   information?
21 A. No.
22 Q. How about the procedures for implementing orders, do
23   you believe that those are adequate?
24 A. That's medical.
25 Q. How so?

Page 22

1  A. The implementation of special needs is the
2    responsibility of medical.
3  Q. All right. We can circle back to this in just a
4    second. I am going to get to a couple of other issues.
5    How do inmates request medical treatment?
6  A. They put in a request slip to medical.
7  Q. How do they obtain that request slip?
8  A. They are all over the facility.
9  Q. Who do they give the slip to?
10 A. They drop them in a mailbox.
11 Q. And what happens after it is dropped in the mailbox?
12 A. The mail officer delivers the mail into the
13   facility where it is designated to go, and medical
14   makes appointments from there.
15 Q. So an inmate will fill out a slip, and it will be
16   delivered to the medical department or staff, and the
17   medical staff will contact the inmate?
18 A. You would have to ask them how they do that.
19 Q. Are correction staff in any way involved in that
20   process?
21 A. Just the delivery of the mail, it is a mail
22   officer.
23 Q. How is it that medical staff would contact the inmate
24   to make an appointment?
25 A. They would generate a list of individuals they want

Page 23

1  to see on a certain day, and the front desk officer in
2  the dispensary would call those offenders down.
3  Q. So there are correctional staff involved in the
4    process, because they would receive the list of inmates
5    that medical would want to see, and they would contact
6    those inmates?
7  A. They would call the housing units.
8  Q. Then what, who are they contacting in the housing unit?
9  A. The correctional officer that works in the main
10   control center.
11 Q. And then at some point somebody would contact the
12   inmate?
13 A. Yes.
14 Q. Is there a way for inmates to contact medical directly?
15 A. They can go to sick call.
16 Q. What happens if they go to a sick call; can they see
17   somebody immediately, or do they have to put a slip in
18   there, or is there another process?
19 A. That's up to medical.
20 Q. Are security staff allowed to overrule medical staff
21   orders?
22 A. No.
23 Q. It is my understanding that there are three shifts of
24   correctional staff, specifically, in medium security, I
25   think, and so, can you explain what hours each shift

Page 24

1  is?
2  A. 7 A.M. to 3:00 P.M.; 3:00 P.M. to 11:00 P.M., and
3    11:00 P.M. to 7 A.M.
4  Q. And are there medical staff available in medium
5    security on each of those shifts?
6  A. No.
7  Q. Can you explain when they are available?
8  A. 7 to 3, 7 A.M. to 3:00 P.M. and 3:00 P.M. to 11
9    P.M.
10 Q. What happen in the 11 to 7 shift?
11 A. There is on-call medical staff.
12 Q. The on-call medical staff, does that mean that the
13   medical staff are at home and can be called, or does
14   that mean they are available in another facility?
15 A. They are available in another facility.
16 Q. What facility are medical staff available in during
17   third shift?
18 A. The intake center.
19 Q. That's the only one?
20 A. Yes.
21 Q. So what happens if there is an incident, a medical
22   incident, on third shift in medium security?
23 A. It depends on what the incident is.
24 Q. Well, can you explain what possible instances there
25   might be?

Melise vs
Wall, et al

Kerri McCaughey
July 12, 2019

Page 25

1 A.  If an offender has a medical emergency, he would
2 flash a light in his cell to get the attention of the
3 officer.  The officer would determine if that inmate
4 needs to be seen right away, and he would contact our
5 commander, and our shift commander would reach out to
6 the on-call medical staff at the intake center.
7 Q.  And you said that would be if there is a medical
8 emergency; are there other types of instances that
9 occur that might require medical attention?
10 A.  I don't understand the question.
11 Q.  What would you qualify as a medical emergency?
12 A.  If someone is having, if someone is in distress or
13 what appears to be a heart attack.
14 Q.  Would that include a fight where somebody might have
15 gotten injured?
16 A.  It could.
17 Q.  Would it include, for instance, someone falling out of
18 bed and being injured?
19 A.  It could.
20 Q.  So you might classify that as a medical emergency, or
21 you might not?
22 A.  I would leave that to medical.
23 Q.  In any potential incident that occurs during third
24 shift, at some point, the shift commander could be
25 called, and medical would determine how to approach it?

Page 26

1 A.  Yes.
2 Q.  So you said earlier that, when I asked what happened
3 when there is a medical incident, you said it depends;
4 what does it depend on; as in, what does the procedure
5 depend on?  Are there different procedures?
6 A.  It would depend on the nature of the inmates -- it
7 would depend on the nature of the incident.
8 Q.  How so?
9 A.  If an inmate flashes a light because he is in
10 distress, the correctional officer is going to contact
11 the shift commander, and when the shift commander
12 responds, he will determine whether or not medical
13 needs to come and evaluate this person, and medical
14 will determine where that will happen.
15 Q.  So it is the shift commander's decision to call medical
16 and ask them to report to medium?
17 A.  They will present the situation, and medical will
18 decide whether they report to medium, or the offender
19 is brought to intake, or it can wait until the morning.
20 Q.  Okay.  What is a code white?
21 A.  That's a medical emergency.
22 Q.  And is that the process that you've just described to
23 me, that would be calling the shift commander, or is
24 there some other procedure?
25 A.  Again, it depends on the incident itself.

Page 27

1 Q.  So when would a code white be called, or what happens
2 in a code white, specifically?
3 A.  The officer will come over the radio, and call a
4 code white, and medical staff will respond -- unless it
5 is 11 to 7.
6 Q.  So a code white might be called at any time during the
7 day?
8 A.  Yes.
9 Q.  Are code whites called on third shift?
10 A.  I don't know.
11 Q.  Is the code white -- or how is the code white
12 announced?
13 A.  Over the radio, or a call to shift commander if
14 it's 11 to 7.
15 Q.  So it is not, like, a loudspeaker announcement?
16 A.  Yes.
17 Q.  It is?
18 A.  Yes.
19 Q.  So anybody in the facility could hear it, it is not
20 just like as if you are holding a radio you could hear
21 it; is that correct?
22 A.  That's correct.
23 Q.  Is that announced in the medium facility only, or is it
24 announced in other facilities?
25 A.  I can only attest to medium security.

Page 28

1 Q.  Fair enough.  And so what is supposed to happen when a
2 code white is called?
3 A.  A shift commander responds, and medical staff if on
4 duty respond.
5 Q.  Otherwise, the shift commander would call intake to
6 talk to medical?
7 A.  Correct.
8 Q.  What happens during a code white, or following a code
9 white in regard to video footage?
10 A.  Video footage is 24/7.  If we need to secure video
11 footage, we would secure video footage.
12 Q.  Does that automatically occur when an code white or an
13 incident occurs; as in, is video footage stored or kept
14 in response from an incident if a code white is called?
15 A.  If it is requested.
16 Q.  Who would request it?
17 A.  The shift commander.
18 Q.  Is the shift commander the only person that can request
19 that video footage be stored?
20 A.  No.
21 Q.  Who else can request it?
22 A.  Administrators.
23 Q.  Why might video footage be requested to be stored?
24 A.  Depending on the incident.
25 Q.  Do you know how often it might be stored for medical

Page 29

1  instances?
2  A.  I don't.
3  Q.  Have you ever requested footage to be stored?
4  A.  Not that I can recall.  On code white, not that I
5  can recall.
6  Q.  What about for other incidents?
7  A.  I have requested video storage be stored.
8  Q.  What types of incidents have you requested video
9  footage for?
10  A.  Assaults, fights.
11  Q.  But never for a medical issue?
12  A.  Not that I can recall.
13  Q.  Is there a particular protocol for requesting footage
14  be stored, or does it completely depend on whoever is
15  the shift commander is and whatever administrator might
16  ask for it; as in, is there any policy on requesting
17  video footage?
18  A.  Not that I can recall.
19  Q.  So, there is no formal protocol for choosing to store
20  footage, it just depends on whoever decides to store
21  it, requests for it to be stored?
22  A.  I don't know.
23  Q.  What are correctional staff permitted to do when there
24  is an incident during third shift; as in, are they
25  permitted to provide any sort of treatment or response

Page 30

1  of any kind to an inmate that might be injured?
2  A.  It depends on the incident.
3  Q.  Can you explain what circumstances or what provision of
4  treatment correctional staff might be permitted to
5  provide?
6  A.  CPR.
7  Q.  Anything else?
8  A.  It would be lifesaving intervention.
9  Q.  Would they be permitted to provide a wheelchair for
10  someone that would be injured?
11  A.  Medical would bring that with them.
12  Q.  Do correctional staff have access to wheelchairs?
13  A.  Yes.
14  Q.  Would they be able to provide a wheelchair if they
15  thought it was necessary?
16  A.  Yes.
17  Q.  Would they be permitted to do that?
18  A.  Yes.
19  Q.  Would they be permitted to provide over-the-counter
20  medications, such as ibuprofen?
21  A.  No.
22  Q.  No over-the-counter medication whatsoever?
23  A.  No.
24  Q.  What about providing ice, could they do that for an
25  inmate that might be injured?

Page 31

1  A.  They do not have accessibility to ice.
2  Q.  Are correctional staff permitted to call ambulances?
3  A.  The shift command would call for an ambulance.
4  Q.  Would that be the same for a decision to send an inmate
5  to the hospital?
6  A.  Medical staff and the shift commander.  Medical
7  staff would determine whether someone goes to the
8  hospital.
9  Q.  Are shift commanders or other correctional officers
10  able to overrule a medical staff decision to send
11  somebody to the hospital?
12  A.  No.
13  Q.  What if a medical staff decided that someone didn't
14  need to go to the hospital, but a correctional staff
15  said they should, can they overrule that decision?
16  A.  I don't know.
17  Q.  Have you ever seen a correctional staff decide to send
18  somebody to the hospital when medical staff said not
19  to?
20  A.  Not that I can recall, no.
21  Q.  How long would it ordinarily take for medical staff to
22  respond to a code white or an incident on third shift
23  in medium?
24  A.  I don't know.
25  Q.  Have you ever been at medium during third shift?

Page 32

1  A.  Not when a code white was called.
2  Q.  So you have no idea how long it might take for medical
3  to respond to the medium security?
4  A.  Correct.
5  Q.  Do you know how long it might take during the day?  Are
6  there any times when medical staff would report to
7  medium during first or second shift?
8  A.  Medical staff is on duty during first and second
9  shifts.
10  Q.  So nobody from intake would ever need to go to medium
11  during the day; is that correct?
12  A.  I don't know.
13  Q.  Do you know if there are different types of orders that
14  medical staff can issue, or how many different types of
15  orders they can issue?
16  A.  I don't know how many.
17  Q.  One of those is a special needs orders; is that
18  correct?
19  A.  A special needs request.
20  Q.  A special needs request.  So, how do inmates request
21  reasonable accommodations, or special needs?
22  A.  Through medical.
23  Q.  Are there any other ways for them to make requests for
24  reasonable accommodations?
25  A.  Not that I am aware of.

Melise vs
Wall, et al

Kerri McCaughey
July 12, 2019

---

Page 33

1 Q. Do you know how inmates are informed about their
2 ability to request special needs accommodations?
3 A. I don't understand your question.
4 Q. How would an inmate know whether or how he could
5 request an accommodation?
6 A. He would ask through medical.
7 Q. So when inmates arrive at medium, is there any sort of
8 handbook or explanation of how things work that's given
9 to them when they get there?
10 A. Yes.
11 Q. And would that handbook include an explanation of how
12 they might request reasonable accommodations?
13 A. No.
14 Q. Why not?
15 A. It is a general overview of what is available in
16 the facility. If it is medical, they are going to go
17 to medical for requests.
18 Q. So the handbook would just say, if you have any medical
19 issues, go to medical?
20 A. Yes.
21 Q. That's all it would say?
22 A. Yes.
23 Q. So their only avenue for figuring out how they might
24 obtain reasonable accommodations would be to go to
25 medical, and ask medical for a reasonable

---

Page 34

1 accommodations; is that correct?
2 A. As I recall.
3 Q. So what happens when an inmate requests a reasonable
4 accommodation?
5 A. That would be on medical.
6 Q. But, presumably, they would go to medical, they would
7 request some sort of reasonable medical accommodation,
8 and medical would submit a request?
9 A. Medical would review their record and generate a
10 special needs request.
11 Q. And then what would happen with that request?
12 A. It would come out to myself, or the program deputy.
13 Q. And how does it get from medical to you when you were
14 the programmatic deputy warden?
15 A. Medical staff would leave those requests in my
16 mailbox.
17 Q. So the medical staff that filled out the request would
18 presumably print it out, and they would walk it over to
19 your mailbox?
20 A. Yes.
21 Q. Do you know if it would be the person who filled it
22 out, or just anybody who was asked to carry it over to
23 your mailbox?
24 A. It could be anyone.
25 Q. Are there any correctional staff involved between the

---

Page 35

1 medical staff filling out the request and putting it in
2 your mailbox; is there any correctional staff involved
3 at any point during that?
4 A. Not that I am aware of.
5 Q. So once it gets to your mailbox, what do you do?
6 A. I review the request.
7 Q. What do you review it for?
8 A. I review it to determine whether or not it may or
9 may not be warranted, depending on what the request is.
10 Q. What, in your determination, would warrant a special
11 needs request; are you reviewing it for medical
12 reasons? For security reasons?
13 A. I am reviewing for safety and security reasons.
14 Q. Is that the only thing that you review it for?
15 A. No.
16 Q. What else do you review it for?
17 A. Operationally, is it sound, is it safe, is it a
18 safe practice, does it present a hazard for staff and
19 inmates.
20 Q. Anything else?
21 A. Legitimacy.
22 Q. What does that mean?
23 A. If the request is legitimate.
24 Q. Can you explain what you mean by legitimate?
25 A. If the special need is an actual legitimate request

---

Page 36

1 that has been -- that there is an issue that has been
2 documented.
3 Q. Documented in what way?
4 A. In some cases, the diagnosis.
5 Q. So are you referring to documented in medical records?
6 A. Yes.
7 Q. Do you have access to medical records?
8 A. No.
9 Q. Then how would you be able to determine if it was,
10 quote/unquote, "legitimate"?
11 A. I would request more information.
12 Q. Why would you be concerned about whether or not it was
13 documented?
14 A. Because special needs sometimes come to us that
15 have no legitimacy.
16 Q. Can you give an example?
17 A. Instances that are self-reported.
18 Q. Wouldn't all instances be self-reported by an inmate if
19 he is requesting a special needs accommodation?
20 A. No.
21 Q. What do you mean by self-reported?
22 A. They present to medical that they have a
23 self-reported injury, a self-reported condition that's
24 not documented.
25 Q. Are you suggesting that the medical staff have not

---

Page 37

1  verified the complaint?
2  A.  I am not suggesting that.
3  Q.  How would you know whether or not something was
4  documented or self-reported?
5  A.  I would ask for more information from medical
6  staff.
7  Q.  And in what way is that concern related to security
8  operational or hazard concerns?
9  A.  I am not sure what you are asking me.
10  Q.  Would the legitimacy of the request affect whether the
11  request presented operational concerns?
12  A.  In some cases.
13  Q.  How so?
14  A.  It may interfere with the orderly running of the
15  facility itself.  It may present a safety or security
16  issue of the normal day-to-day operations.
17  Q.  How so?
18  A.  It depends on what the incident is.
19  Q.  Can you give some examples of what reasonable
20  accommodations might be requested?
21  A.  Canes, wheelchair accessibility, hand braces, knee
22  braces.
23  Q.  Anything else?
24  A.  Bottom bunks.
25  Q.  So I suppose I could imagine why a cane might present

Page 38

1  some security concerns.  Can you explain how some of
2  the other accommodations might present security
3  concerns; such as if someone had a knee brace?
4  A.  Some medical supplies have and can be used as
5  weapons or to store weapons.
6  Q.  What about a bottom bunk assignment, how could those
7  present security concerns?
8  A.  Well, enemy issues, gang issues, housing assignment
9  by reclassification.
10  Q.  What do you mean housing assignment by
11  reclassification?
12  A.  Well, to determine where somebody is going to live
13  within the facility, there are a lot of considerations
14  that come into play before they're assigned their
15  housing unit.
16  Q.  Would that be right when they got to the facility?
17  A.  That would be the first time.
18  Q.  Are they reconsidered at any point?
19  A.  It depends.
20  Q.  Would classification be reconsidered if, for instance,
21  a reasonable accommodation was needed that could be not
22  provided in a particular facility?
23  A.  An offender cannot be reclassified to a higher
24  security based upon medical needs.
25  Q.  But could an inmate be reclassified to a lower security

Page 39

1  facility?
2  A.  Not for medical reasons.
3  Q.  So they could never be reassigned for medical purposes?
4  A.  I am not going to say never.  I am saying I have
5  never seen it happen.
6  Q.  What other reasons might an inmate be reclassified
7  after he was originally classified when he showed up?
8  A.  By law.
9  Q.  All right.  When you review special needs orders or
10  requests, what are the options for you to handle it?
11  What are the procedures?  You know, would you deny it,
12  approve it, ask for more information; are those the
13  three options for you to handle it?
14  A.  Those are the three options, yes.
15  Q.  Are there any other options?
16  A.  In some cases, if it requires a device of some
17  kind, I would ask to see it.
18  Q.  Ask to see the device?
19  A.  Yes.
20  Q.  Is that so that you could figure out if it might
21  present security concerns?
22  A.  Correct.
23  Q.  So when you decide that you need more information, what
24  do you do?
25  A.  I write that right on the special needs request,

Page 40

1  that I am requiring more information to make a
2  decision.
3  Q.  Then what happens?
4  A.  It goes back to medical.
5  Q.  How does it get back it medical?
6  A.  I put it in their mailbox.
7  Q.  Is there just one medical mailbox, or is it for
8  different --
9  A.  In our administration, there is a medical mailbox
10  that they check every day.
11  Q.  So somebody from medical would come check their
12  mailbox, take it back to medical, and they would decide
13  how to distribute; as in, distribute whatever mail they
14  receive; correct?
15  A.  Yes.
16  Q.  Presumably?
17  A.  Yes.
18  Q.  So once you put it in the mailbox you have no more, no
19  further interaction or contact with that order until
20  you might see it again; is that correct?
21  A.  Correct.
22  Q.  So once it goes back to medical, and you tell them you
23  need more information, do you ever follow up on the
24  orders that you have asked for more information on?
25  A.  When they send them back to me.

Melise vs
Wall, et al

Kerri McCaughey
July 12, 2019

Page 41

1 Q.   So you will ask for more information, put it in the
2   mailbox, and just wait to see if medical responds?
3 A.   I wait for it to come back, yes.
4 Q.   So have you ever thought about an order that you asked
5   for more information on and decided to go ask what was
6   happening with it?
7 A.   No.
8 Q.   What is the procedure when you deny a medical order --
9   or I am sorry, a special needs accommodation request?
10 A.   I write denied on it, and I date it, and I sign it.
11 Q.   And then you put it in the box, presumably?
12 A.   Yes.
13 Q.   Do you know where the denied order goes after that?
14 A.   Back to medical.
15 Q.   Do you provide a copy to anybody else?
16 A.   No.
17 Q.   Do you document the orders that you receive, or the
18   requests that you receive; as in, do you keep a list of
19   the requests that you receive, or do you write down the
20   ones that you receive and whether you approve or deny
21   them, anything like that?
22 A.   No.
23 Q.   You keep no independent documentation of those orders
24   when you receive them or after you have reviewed them;
25   correct?

Page 42

1 A.   Correct.
2 Q.   What are the grounds that you have for denying a
3   reasonable accommodation request?
4 A.   It depends on what it is.
5 Q.   What would be some grounds for denying a request for a
6   bottom bunk?
7 A.   Again, bottom bunks, we only have so many.  So, my
8   role would be to make sure that those that have bunks
9   have them for legitimate reasons that cannot be
10   accommodated in any other way.
11 Q.   Are there any other reasons why you might deny a
12   reasonable request?
13 A.   Any reasonable request?
14 Q.   Yes.  What are the reasons why you would deny a
15   reasonable accommodation request other than --
16      MS. DAVIS: Let me rephrase.
17 Q.   You just said that you would, you might deny a bottom
18   bunk if you determine that it was not legitimate; are
19   there other reasons why you might deny a bottom bunk
20   request?
21 A.   Not enough information, no documentation to jusfify
22   the request.
23 Q.   Are there any security reasons why you might deny it?
24 A.   Well, in general, climate issues.  I don't have a
25   large, huge number of bottom bunks.  So, again, I am

Page 43

1   making sure that those that have them are legitimate.
2 Q.   Who is responsible for assigning bunks?
3 A.   Housing lieutenant.
4 Q.   So is there more than one person in the medium security
5   facility responsible for that?
6 A.   There are more than one housing lieutenant, yes.
7 Q.   How many housing lieutenants are there in medium?
8 A.   Four.
9 Q.   Are they responsible for a particular mod, or just do
10   they work sort of together; how does that work?
11 A.   They are responsible for a particular area in the
12   facility.
13 Q.   Do you know how they make decisions for assigning
14   bunks?
15 A.   Any number of reasons.
16 Q.   How many beds are in medium security?
17 A.   Well, I am not going to give you an exact number,
18   but I can tell you there are six housing units with 906
19   bunks on the housing unit, each side has a left and a
20   right.  So there's 12 housing areas with 96 bunks on
21   each side.
22 Q.   So there are 12 housing areas each with 96 beds, and
23   that's the total for medium security, or did you say
24   housing units on each side?
25 A.   Each side.

Page 44

1 Q.   So there are 24 housing areas in medium security?
2 A.   There are 12.  There are six housing units, each
3   housing unit has a left and a right side, each side has
4   96.
5 Q.   Okay.  So, total, there is 12 housing areas, and each
6   one has 96 beds?
7 A.   96 beds, yes.
8 Q.   Can I assume that half of those beds are bottom bunks
9   and half of them are top bunks?
10 A.   Yes.
11 Q.   So are not any single bed bunks, I don't know if that
12   even makes sense?  Do you understand what I am asking?
13 A.   I do.  We do not have single cells, but we do have
14   in a very small instance individuals who live in a cell
15   without a roommate.
16 Q.   But each one of those cells has two bunks?
17 A.   Correct.
18 Q.   Do you know how many inmates are currently in medium
19   security?
20 A.   As of yesterday, it was 982, I believe.
21 Q.   Do you know approximately how many inmates there were
22   in 2015 and 2016?
23 A.   I do not.
24 Q.   Is medium security at capacity?
25 A.   Not currently.

Melise vs
Wall, et al

Kerri McCaughey
July 12, 2019

Page 45

1 Q. Has it been at capacity at any point in the last five
2 years?
3 A. Not full capacity, but close.
4 Q. Do you know how many reasonable accommodation requests
5 you get in a day when you were the programmatic deputy
6 warden?
7 A. Several.
8 Q. Is that five? Is that ten?
9 A. It depends on the day. I never don't get one.
10 Q. So anywhere between one and, what, ten, fifteen?
11 A. I would be guessing if I gave you a number.
12 Q. But several each day?
13 A. Yes.
14 Q. And would you review those, and respond to them the
15 same day that you received them?
16 A. I can't say I would respond the same day, but
17 within reason.
18 Q. How long would it ordinarily take to respond to a
19 reasonable accommodation request?
20 A. I would tend to respond within 48 hours.
21 Q. And can you give me an approximation of how many you
22 would approve each day?
23 A. I can't.
24 Q. Do you know how many reasonable accommodations for
25 bottom bunks were in effect each day?

Page 46

1 A. I don't have that number.
2 Q. But earlier you testified that there are only so many
3 bottom bunks, and you are concerned about providing
4 them. So does that mean that there are enough orders
5 for people to have bottom bunks to reach the total
6 number of bottom bunks available; does that make sense?
7     MS. DAVIS: Let me rephrase.
8 Q. Were there so many bottom bunk orders that you might
9 run out of the bottom bunks?
10 A. That's always a consideration.
11 Q. Are you aware that it had happened at any point?
12 A. No.
13 Q. So at no point while you were the programmatic deputy
14 warden did you actually discover that you had run out
15 of bottom bunks to provide to inmates?
16 A. I never officially ran out of bottom bunks, no.
17 Q. What made you be concerned that you were going to run
18 out of bottom bunks?
19 A. Availability.
20 Q. Was there some point at which you were informed that
21 you might run out of bottom bunks?
22 A. Yes.
23 Q. So, you understand that at some point there was a
24 concern that medium security was not going to have
25 enough bottom bunks available?

Page 47

1 A. That's always a concern.
2 Q. Have you ever denied a bottom bunk because you had run
3 out of available bottom bunks?
4 A. No.
5 Q. But you were concerned that you might, and therefore,
6 you did not grant all orders for bottom bunks; is that
7 what you are saying?
8 A. I granted orders on bottom bunks based on the
9 legitimacy of the request.
10 Q. How frequently would you return a request for a bottom
11 bunk to medical requesting more information?
12 A. I don't know.
13 Q. Can you give an approximation, like 50 percent of the
14 requests, or 75 percent, 25 percent, anything?
15 A. I can't.
16 Q. Were there requests that you approved right away,
17 without asking for further information?
18 A. Yes.
19 Q. Why?
20 A. Because the order was legitimate. They sent me the
21 information I received.
22 Q. What information that you received would indicate to
23 you that it was legitimate?
24 A. The medical condition.
25 Q. The medical condition?

Page 48

1 A. Yes.
2 Q. So you would look at the condition that was asserted by
3 the medical staff, and decide if you thought it was
4 legitimate, or not?
5 A. Yes.
6 Q. What types of medical conditions did you believe to be
7 legitimate?
8 A. People who have seizure disorders, diabetes, people
9 who are missing limbs.
10 Q. Anything else?
11 A. Elderly.
12 Q. Did you receive bottom bunk requests for conditions
13 that were not permanent?
14 A. Yes.
15 Q. Would you grant those requests, if you believed that
16 they were legitimate?
17     MS. DAVIS: I am sorry. Let me rephrase.
18 Q. What types of impermanent conditions would you grant
19 bottom bunks for, if you can recall?
20 A. Impermanent conditions?
21 Q. Yes. Conditions that were for a short period of time.
22 A. Someone who had a surgery.
23 Q. Anything else?
24 A. Anything that was temporary, gestational. If it
25 was a surgery or someone had a broken limb, yes, we

Page 49

1   would -- I would approve a bottom bunk for the duration
2   of the healing process.
3 Q.   All right.
4       MS. Davis:  Can we take a break?
5       (BRIEF RECESS TAKEN)
6 Q.   Have you ever received a personal needs accommodation
7   request from anyone, other than medical?
8 A.   I don't believe so.
9 Q.   Never received one from an inmate directly?
10 A.   Inmates do write to me about special needs
11   requests.
12 Q.   How do they write to you about special needs request?
13 A.   On a request slip.
14 Q.   On a request slip?
15 A.   On the request slips that are available to the
16   inmate population throughout the facility.  It's how
17   they correspond with us, one of the ways.
18 Q.   So inmates are allowed to submit requests for
19   information to you directly?
20 A.   They follow a chain of command, but ultimately,
21   yes.
22 Q.   What is the chain of command?
23 A.   Their block officer first.
24 Q.   And what is the next step?
25 A.   The housing lieutenant where they are at.

Page 50

1 Q.   And then?
2 A.   The shift commander.
3 Q.   And then?
4 A.   Then me.
5 Q.   And then you?
6 A.   Well, the administration.
7 Q.   When they send slips, are they sending information
8   regarding a previously sent request, or are they
9   submitting new requests?
10 A.   Both.
11 Q.   So you do receive requests from inmates directly?
12 A.   Yes.
13 Q.   What types of requests do inmates requesting, what
14   types of accommodations are inmates requesting?
15 A.   Inmates request all kinds of things, it is not just
16   accommodations.
17 Q.   But do you receive accommodation requests from inmates
18   directly?
19 A.   I don't recall if I have, but if I do, I send it to
20   medical.
21 Q.   So if you received a request for a reasonable
22   accommodation from an inmates directly, you would not
23   review it or consider it, you would immediately send it
24   to medical; is that correct?
25 A.   Yes.

Page 51

1 Q.   Why would you send it to medical, without reviewing it?
2 A.   It has not been approved.
3 Q.   So you will only consider an accommodation request if
4   it has been approved by medical?
5 A.   If it has been generated by medical.
6 Q.   Have you ever received any accommodation requests
7   electronically?
8 A.   Not that I can recall.
9 Q.   Would you be capable of receiving requests
10   electronically?
11 A.   In an e-mail from a provider.
12 Q.   So medical staff could send you an E-mail directly?
13 A.   Yes.
14 Q.   Do you receive E-mails from medical staff directly?
15 A.   I have.
16 Q.   What do they usually concern?
17 A.   Meeting times, my request to be at a particular
18   meeting.
19 Q.   But it is not, it would not be about an inmate's
20   treatment or an inmate's accommodation?
21 A.   It could be.
22 Q.   It could be.  Do you recall every receiving such an
23   E-mail?
24 A.   I don't.
25 Q.   Would it be easier for you to receive accommodation

Page 52

1   requests electronically?
2 A.   I don't understand what you are asking me, easier
3   how?
4 Q.   Well, would there be any benefits to receiving requests
5   electronically that you could think of?
6 A.   Not that I can think of.
7 Q.   Would there be any benefit to having an electronic
8   paper trail in regard to accommodation requests?
9 A.   Medical has an electronic paper trail.
10 Q.   Is there any electronic paper trail, though, for you
11   receiving accommodation requests?
12 A.   I am not sure what you are asking.
13 Q.   So if medical puts an order or a request, accommodation
14   request into the inmate's electronic medical records,
15   then they print it out; correct?
16 A.   I don't know what they do with it, if they print it
17   out.
18 Q.   In order to give it to you, they would have to print it
19   out; correct?
20 A.   No.  They give it to me on a special needs request.
21   It is a separate form.
22 Q.   So, they would enter, or they would put a note, if you
23   will, into the medical records indicating that they
24   want or need a special needs accommodation, and then
25   they would fill out a separate form in order to submit

Melise vs
Wall, et al

Kerri McCaughey
July 12, 2019

Page 53

1  it to you; is that what you are saying?
2  A.  I just get a special request needs form.
3  Q.  As far as you understand, they would fill out a
4  separate request form, and then that's what you'd see?
5  A.  Correct.
6  Q.  But the only way to get that form to you is in paper;
7  correct?
8  A.  That's the way they get it to me, yes.
9  Q.  So, because they get it to you in paper, there is no
10  electronic record of you receiving those requests;
11  correct?
12  A.  When it goes back to medical, they do with it what
13  they will.  Scan it back into the EMR, potentially.
14  Q.  So, my question is if for some reason there was a
15  notation in the medical records that a medical provider
16  wanted to get an accommodation for an inmate, and there
17  was no record in the medical file of your handwritten
18  note, is there any electronic record of you seeing it?
19  A.  My signature on the special needs request.
20  Q.  So, if there is not such a thing, if there isn't a
21  record with your signature on it, but there is a
22  notation in the medical records that they wanted a
23  request, there is it no way to know if you ever saw
24  that document?
25  A.  Correct.

Page 54

1  Q.  Have you ever recommended to anyone that the special
2  needs forms should be different; as in that medical
3  providers should include more information?
4  A.  I have requested more information on a special
5  needs request.
6  Q.  But have you ever requested a change in the protocol,
7  in the practice, as in a change to the policy?
8  A.  Not that I call.
9  Q.  So you have never told anybody that you find the
10  process inadequate; is that correct?
11  A.  No.  I have never told anybody in medical that I
12  found it inadequate, no.
13  Q.  What about anyone in administration?
14  A.  Not that I can recall.
15  Q.  Do you think that there should be an electronic record
16  as to whether you have seen the accommodation request?
17  A.  I don't have an opinion on that.
18  Q.  So you don't think that would improve the system in any
19  way to have more accountability, if you will, of
20  ensuring that you actually see requests that are
21  submitted to you?
22  A.  I don't have a comment on that.
23  Q.  Would you prefer that the special needs accommodation
24  requests be submitted to you electronically?
25  A.  I prefer to get them as I got them.

Page 55

1  Q.  So you like getting them in paper?
2  A.  Yes.
3  Q.  Why is that?  What is it about paper that you like
4  better than electronic?
5  A.  I can put my signature on it.
6  Q.  Fair enough.  Can we go back a little bit to the
7  accommodation request for bottom bunks.  I think we did
8  not finish going through what all of the possible
9  security concerns would be.  Can you run through that
10  one more time, what all of the concerns might be that
11  you would be reviewing a bottom bunk request for?
12  A.  I would be reviewing a housing assignment
13  initially.
14  Q.  What do you mean?
15  A.  Bottom bunks in medium security, there are 96
16  cells, as I testified to, but those bottom bunks on the
17  top tiers of those cells are not available for medical
18  bottom bunk, so that's one consideration.
19  Q.  Why not?
20  A.  It has not been approved by medical to have anyone
21  who has an assigned medical bottom to be housed on a
22  top tier.
23  Q.  Why would it matter to medical why there is somebody
24  with a bottom bunk that was housed on the top tier?
25  A.  Because there is a staircase that goes up to a

Page 56

1  tier.  If medical is coming in from outside, it is a
2  lot more difficult to support someone if they need to
3  get them down from there.
4      So we are not allowed to put anyone on a bottom
5  bunk on a top tier that has a medical bottom bunk
6  order, so that eliminates the number that I have.
7  Q.  How long has that been the policy?
8  A.  As long as I have been there.
9  Q.  Are you not permitted in any circumstance to put
10  somebody with a medical bottom bunk order on a top
11  tier?
12  A.  To the best of my recollection, yes.
13  Q.  That's never happened?
14  A.  I don't know that it has never happened.  I can't
15  recall that it has ever happened.
16  Q.  So would a request for a bottom bunk be denied on that
17  ground?
18  A.  I am sorry, on what ground?
19  Q.  On the ground that you run out of bottom bunks on the
20  first tier, and therefore, you do not have any bottom
21  bunks available; is that correct?
22  A.  I have never not had bottom bunks available, but I
23  have a limited ability of bottom bunk based on several
24  factors.  One of them is that I can't put medical
25  bottom bunks on a top tier.

Melise vs
Wall, et al

Kerri McCaughey
July 12, 2019

Page 57

1 Q. Are there medical concerns related that might
2 necessitate a bottom bunk that would not affect whether
3 or not somebody could go upstairs?
4 A. I am not sure what you are asking me.
5 Q. So I can understand why, if somebody was medically
6 ordered a bottom bunk because of a broken leg, why that
7 might prevent them from being able to go upstairs to a
8 second tier, but are there other reasons why somebody
9 would be given a bottom bunk that would not affect
10 whether or not they could walk upstairs?
11 A. If there is a bottom bunk ordered medically, they
12 cannot go upstairs.
13 Q. The inmate, or the medical staff?
14 A. The inmate cannot be housed on the top tier if he
15 has an approved bottom bunk order.
16 Q. But I am asking, would there be reasons why it would
17 not matter whether they were on a top tier or a bottom
18 tier?
19 A. Not medically.
20 Q. So, you're saying that regardless of the basis for the
21 bottom bunk order, they are never permitted to be
22 housed on the second tier?
23 A. Correct.
24 Q. And has that ever been the reason why you denied a
25 bottom bunk order?

Page 58

1 A. No.
2 Q. If you had a bottom bunk on a second tier available,
3 would you grant a bottom bunk order, or are you saying
4 that it would not be able to be implemented?
5 A. I would not put an inmate that's got a medical
6 bottom bunk order on the second tier. I would put
7 general population inmates on the second tier.
8 Q. But who makes that decision of where to put them?
9 A. The housing lieutenants.
10 Q. So it is possible that you would have granted an order
11 for a bottom bunk, and so they have an approved order
12 for a bottom bunk, but then they do not receive that
13 bottom bunk because there are not enough bottom bunks
14 available on the first tier?
15 A. Yes. They would wait for an available bottom bunk,
16 especially if it is a medical bottom bunk for a person
17 who is in one of the therapeutic communities in the
18 building.
19 Q. What do you mean by any of the therapeutic communities?
20 A. I have two housing areas where both sides are a
21 therapeutic community; one of them is the sex offender
22 treatment program, and the other is a drug treatment
23 program. So, if an inmate had a medical bottom bunk,
24 but was enrolling in the sex offender treatment
25 program, I would have to wait until a medical bottom

Page 59

1 bunk was available in that therapeutic community in
2 order to move that person.
3 Q. So there is no circumstance where somebody who has an
4 approved bottom bunk order would be able to change
5 housing units in order to receive that bottom bunk?
6 A. If someone has a medical bottom bunk order, I am
7 going -- they will be assigned to a housing unit that
8 can accommodate that bottom bunk, if, in fact, it is
9 available.
10 Q. So I am sorry. I don't think I understand what you
11 were saying about sex offender and the drug treatment
12 programs. How does those factor in?
13 A. That eliminates, they are therapeutic communities,
14 so people who have a specific crime live in those
15 communities, because that's where their programs are.
16 So, anyone who is a sex offender in medium security
17 and is involved in the sex offender treatment program
18 is living in F Mod, which is a 96-bed unit.
19 So, some of those offenders in that program have
20 medical bottom bunk orders, and it eliminates the
21 number of housing units I can put the general
22 population inmates in that have medical bottom bunk
23 order.
24 Q. Within F Mod, how many first tier cells are there?
25 A. On each side?

Page 60

1 Q. Yes.
2 A. There's 48.
3 Q. There are two sides to the F Mod?
4 A. There are two sides to all housing units, yes.
5 Q. So, someone who was a sex offender and received a
6 bottom bunk order would only be allowed to be able to
7 be assigned to a bunk in F Mod?
8 A. Correct.
9 Q. And, therefore, if they have had a bottom bunk order,
10 they would only be able to be assigned bottom bunk
11 within the first tier of F Mod; is that what you're
12 saying?
13 A. Yes.
14 Q. There is no circumstance where a sex offender would be
15 assigned to a different mod?
16 A. In some cases, the sex offender treatment program
17 may do individual treatments with someone on another
18 mod until they are able to be housed in F Mod that's on
19 the program.
20 Q. So, are there inmates that are in those programs that
21 are not housed in those specific mods at any point?
22 A. Yes.
23 Q. Can you explain when and why?
24 A. If someone has a medical bottom bunk order, but it
25 is assigned to the sex offender treatment program, I

Allied Court Reporters, Inc. (401)946-5500
115 Phenix Avenue, Cranston, RI 02920  www.alliedcourtreporters.com

Page 61

1  can't move them to the mod that the therapeutic
2  community exists in if there is not a bottom bunk for
3  them, they are all taken.
4  Q.  So what would, essentially, win out, would the bottom
5  bunk order be more important than the sex offender
6  treatment program, or vice versa?
7  A.  If there is an approved medical bottom bunk order,
8  that would take priority, yes.
9  Q.  So they would be able to be assigned to a different mod
10  if they had an approved bottom bunk?
11  A.  Until a bed is available.
12  Q.  Until a bed is available in the sex offender mod?
13  A.  Um-umm.
14       (REPORTER ASKS FOR CLARIFICATION)
15  A.  Yes.
16  Q.  While they are housed in a different mod, would they
17  not be able, or would that kick them out of the program
18  for some reason; would they not be able to participate
19  in the program?
20  A.  No.
21  Q.  They would still have access to all of the aspects of
22  that treatment program that they ordinarily would if
23  they were housed in that mod; right?
24  A.  To my knowledge, the sex offender treatment program
25  clinician reach out to those individuals, and work out

Page 62

1  their treatments separately that would be for them.
2  Q.  All right.  So I think we were running through what all
3  of the possible security concerns are for a bottom bunk
4  order.  So we have gone through whether or not the
5  order was legitimate and whether or not there were
6  gang-related issues, and now we have talked about
7  whether or not they were assigned to a particular
8  treatment program, are there any other security-based
9  concerns for a request for a bottom bunk?
10  A.  Considerations, other considerations would come
11  into play when someone is being requested for a bottom
12  bunk, job assignments.
13  Q.  How so, why would that be a concern when you were
14  reviewing a bottom bunk request?
15  A.  Depending on what the request is for, one of my
16  concerns would be could they hold a job, or would they
17  be restricted from specific jobs because of their
18  medical conditions.  Would they be restricted from any
19  type of physical activity, like weightlifting, because
20  of the nature of their bottom bunk order, and I request
21  medical to provide that for me so I can ensure their
22  safety within the facility.
23  Q.  The inmates' safety?
24  A.  Correct.
25  Q.  What would the concern be about holding a job have to

Page 63

1  do with security concerns?
2  A.  It is safety and security in combination.  If
3  someone has a bottom bunk order because they have a
4  spinal injury that prevents them from climbing the
5  ladder to the top bunk, I would be reluctant to offer
6  them a job assigned in the yard shovelling snow and
7  mowing grass.  It is something that might affect his
8  medical condition, so I would take those into
9  consideration.
10  Q.  How would that affect your review of granting an order
11  for a bottom bunk?
12  A.  Like I said, I take all kind of things into
13  consideration.  It is not just approving the bottom
14  bunk.  It is what other restrictions go along with it.
15  Q.  What else might you consider in conducting that
16  evaluation?
17  A.  Specific jobs within the facility, the specific
18  ability or inability to work out, to play organized
19  sports.
20  Q.  What else?
21  A.  And/or what types of jobs can they have, could this
22  person have, given their medical condition.
23  Q.  What else might you consider, anything else?
24  A.  Again, it is the safe and orderly running of the
25  facility, availability, gang issues, enemy issues,

Page 64

1  jobs, programmatic concerns, programmatic needs.
2  Q.  Any other specific security related concerns; as in,
3  are there any specific aspects to granting a bottom
4  bunk that might present a safety issue?
5  A.  Climate issue.
6  Q.  What do you mean by that?
7  A.  Well, as I stated, the legitimacy of the medical
8  bottom bunk request is really important to ensure that
9  it is legitimate.  If there is an offender who has a
10  legitimate need for a bottom bunk, and there is another
11  offender who is in one that does have a legitimate
12  need, that could cause a climate issue.
13  Q.  I don't understand what do you mean by a climate issue?
14  A.  Within the inmate population itself.
15  Q.  Meaning, hostilities between inmates?
16  A.  Correct.
17  Q.  Can you explain to me what medical conditions you would
18  consider legitimate for granting a bottom bunk?
19  A.  Which ones I would consider legitimate?  Seizure
20  disorders, diabetes, missing limbs.
21  Q.  What else?
22  A.  Inability to climb a ladder for whatever reason.
23  Q.  Such as?
24  A.  The need for hand braces, neck brace, knee brace.
25  For whatever their condition is, that condition would

Page 65

1  be presented to me.
2  Q.  Would that include like nerve issues in the neck, or
3  anything like that?
4  A.  Not necessarily.
5  Q.  So what else do you consider legitimate?
6  A.  Like I said, anything that prevents a person's
7  ability to climb a ladder.
8  Q.  What else; anything else?
9  A.  The two biggest ones I deal with are seizure
10  disorders and people that suffer or have diabetes.
11  Q.  Are there any legitimate, what you consider legitimate,
12  concerns that would allow you to grant the bottom bunk
13  that would not affect their ability to climb stairs, as
14  in, if somebody could not climb a ladder, might they
15  still be able to climb stairs?
16  A.  I don't know.  I can't answer whether someone could
17  climb a ladder or climb stairs.
18  Q.  But you can make that determination when you are
19  determining an order as legitimate?
20  A.  The stairs would not be an issue if the order is
21  going to be legitimate because they won't go on a top
22  tier.
23  Q.  I am asking if it would be possible to put somebody in
24  a top tier that has a bottom bunk order because their
25  condition might not have any effect on their ability to

Page 66

1  climb stairs?
2  A.  If they have a medical bottom bunk order, they are
3  not going to go on the top tier.
4  Q.  I understand that is the policy, but would it be
5  possible to change the policy?
6  A.  I am not at liberty to determine whether a policy
7  gets changed.
8  Q.  Would it be possible to put somebody in the second
9  tier, even if it is against the policy?
10  A.  I have no recollection of that.  I can't answer
11  that.  I have never put anybody on a top tier bottom
12  bunk that has a medical bottom bunk order.
13  Q.  Have you ever had inmates that had a bottom bunk order
14  that were not given a bottom bunk for any reason?
15  A.  That had a legitimate one?
16  Q.  That had an approved order for a bottom bunk, were they
17  ever not given a bottom bunk?
18  A.  I don't recall.
19  Q.  All right.  Are there any other examples of legitimate
20  reasons why you might not grant -- why you might grant
21  a bottom bunk, any other reasons that you consider
22  legitimate, besides seizure disorders, diabetes, broken
23  limbs, and the inability to climb a ladder, anything
24  else that you can think of?
25  A.  Not off the top of my head.

Page 67

1  Q.  I think you testified earlier to the fact that you
2  would grant a bottom bunk order for something like a
3  surgery or a broken limb for the duration of the
4  healing process; is that correct?
5  A.  Yes.
6  Q.  Whose determination would decide the duration of the
7  healing process?
8  A.  Medical.
9  Q.  So, you would not have any input on how long it might
10  take for an inmate to heal from such an injury or
11  surgery?
12  A.  Medical would make that determination.
13  Q.  So if medical sent you a request for a bottom bunk
14  accommodation, and it had a particular duration, would
15  you change that duration for any reason?
16  A.  If medical said someone needed a medical bottom
17  bunk for three months, then I would typically write on
18  that slip review in three months.
19  Q.  So you would not unilaterally change the date on that
20  order?
21  A.  Not without reaching out to medical, no.
22  Q.  Have you ever changed a date unilaterally on a
23  reasonable accommodation request?
24  A.  I have asked for earlier reviews.
25  Q.  So you have never written on an order a change in date?

Page 68

1  A.  I don't recall.
2  Q.  How would the review occur, if you requested a review?
3  A.  Medical would regenerate a special needs request to
4  me.
5  Q.  So, essentially, it submits a new request?
6  A.  Yes.
7  Q.  So the review process is entirely up to whether or not
8  medical decides to send you a request?
9  A.  Medical sends me a request, say, because it is
10  surgery, they are going to make a suggestion to me for
11  likely how long that should be for.  I will typically
12  write to review in that amount of time, whatever it may
13  be.
14  Q.  Would that mean that if medical did not submit a new
15  request, the order would expire?
16  A.  Yes.
17  Q.  How are orders, once they are approved, how are they
18  implemented?
19  A.  When I approve a special needs request, I send it
20  back to medical.  Medical does what they do with the
21  form for their record purposes, and the original with
22  my red ink signature goes to the offender.
23  Q.  How does it get to the offender?
24  A.  Medical gives it to them.
25  Q.  So you send the only copy of the signed approved order

Melise vs
Wall, et al

Kerri McCaughey
July 12, 2019

Page 69

1   to medical, and medical is responsible for distributing
2   it?
3   A.   Yes.
4   Q.   Who does medical distribute it to, just the inmate?
5   A.   The individual himself, correct.
6   Q.   Medical does not at any point send it to the
7   correctional staff?
8   A.   No.
9   Q.   How does the order get implemented by an assignment of
10  the bunk?
11  A.   When the order is given to the offender, the
12  offender presents that order to the housing lieutenant
13  in his area.
14  Q.   The only way for the order to be implemented is if the
15  approved order is given to the inmate, and the inmate
16  has to personally give it to the housing lieutenant; is
17  that correct?
18  A.   Yes.  The inmate is responsible for keeping that
19  medical order either on his person or when he is in
20  housing unit on the door of his cell in a clear packet.
21  Q.   So if the inmate were to not receive an approved order,
22  it would not get implemented; is that correct?
23  A.   If the inmate did not receive it?
24  Q.   Yes.
25  A.   It won't get implemented until the inmate receives

Page 70

1   the copy in red by me.
2   Q.   Are you aware of any time when an inmate has not
3   received an order that you have approved?
4   A.   Not that I can recall.
5   Q.   Have you ever followed up on an order that you approved
6   to make sure that an inmate received it?
7   A.   Not that I can recall.
8   Q.   So you assume that everybody is following the correct
9   process; is that correct?
10  A.   I am not making assumptions.  I don't recall.
11  Q.   Do you believe that it would be your responsibility to
12  ensure that an order that you approved is implemented?
13  A.   My responsibility is to approve or deny that order.
14  Once it goes back to medical, it is implemented through
15  the medical process.
16  Q.   But medical can't tell a correctional staff what to do;
17  is that correct?
18  A.   They work together.  They don't tell them what to
19  do, no.
20  Q.   Is there any single person within that process who
21  might be responsible for ensuring the complete
22  implementation of the process?
23  A.   The medical staff.
24  Q.   Even though it is the correctional staff's job to
25  assign bunks, you are saying that medical would be

Page 71

1   responsible for ensuring that that happens?
2   A.   Medical can reach out to the housing lieutenant and
3   say this person has been given a medical bottom bunk
4   order, and the lieutenant will now need to accommodate
5   that order to the best of his or her ability.
6   Q.   Do the housing lieutenants ever consult with you about
7   bunk assignments?
8   A.   Yes.
9   Q.   What do they consult with you about in regard to bunk
10  assignments?
11  A.   Just mostly just to review.  We have certain
12  inmates that can't live with other inmates.
13       They may come to me and ask if they can put them in
14  another block until a better, a more available, or a
15  better bunk is available.  It's for any number of
16  reasons, but it is, ultimately, their responsibility.
17  It is in their post orders to assign bunks.
18  Q.   When did you first become aware of this lawsuit?
19  A.   I don't remember.
20  Q.   Were you at some point served with the complaint of the
21  lawsuit?
22  A.   Yes.
23  Q.   Did you read the complaint at that time?
24  A.   I did.
25  Q.   When you received the complaint, did you do anything

Page 72

1   after reading it?
2   A.   Contacted our legal department.
3   Q.   Did you conduct any sort of investigation after
4   receiving or becoming aware of the lawsuit?
5   A.   No.
6   Q.   Are you aware of the allegations that are being made in
7   the complaint?
8   A.   Yes.
9   Q.   What do you understand to be the allegations?
10  A.   That I denied a bottom bunk for Stephen Melise.
11  Q.   And do you understand why that might have been
12  problematic or illegal?
13       MR. SULLIVAN: Objection.
14  Q.   Do you know why the fact that you denied the bottom
15  bunk would be a problem?
16  A.   I am not sure what you are asking.
17  Q.   Do you understand that there was an injury caused by
18  the fact that you denied a bottom bunk?
19  A.   I can acknowledge there was an injury caused, but
20  as to the nature of how, I cannot.
21  Q.   What do you understand to be the nature of the
22  allegation in regard to the Department of Corrections
23  as a whole, if you do?
24  A.   I don't.
25  Q.   Were you ever questioned by anybody in regard to what

Page 73

1  happened to the plaintiff in this case?
2  A.  No.
3  Q.  Did you complete a report regarding what happened to
4    the plaintiff?
5  A.  No.
6  Q.  Are you aware that the plaintiff was injured when he
7    rolled off the top bunk while sleeping on November 30,
8    2015?
9  A.  I am aware that he was injured, yes.
10 Q.  Are you aware that he was injured when he rolled off
11   the top bunk while sleeping on June 21, 2016?
12 A.  I don't recall.
13 Q.  Are you aware that the plaintiff was injured when he
14   rolled off the top bunk while sleeping on
15   November 11th, 2016?
16 A.  I don't recall.
17 Q.  Were you aware that he, the plaintiff, was injured on
18   three separate occasions?
19 A.  I don't recall.
20 Q.  Did you ever at any point hold a triage meeting in
21   regard to Stephen Melise?
22 A.  I held triage meetings.  I don't recall whether he
23   came up.
24 Q.  Did you ever consult with any medical staff in regard
25   to special needs orders specific to Stephen Melise?

Page 74

1  A.  If I did, it would be to request more information.
2  Q.  Which would have been by writing a note on the request;
3    is that correct?
4  A.  Yes.
5  Q.  So, do you ever recall discussing matters related to
6    Stephen Melise one-on-one with any medical staff?
7  A.  I don't recall.
8  Q.  Do you ever recall consulting with Dr. Jennifer Clarke
9    in regard to his special needs orders?
10 A.  I don't recall if I have discussed Stephen Melise
11   with Dr. Clarke, no.
12 Q.  Have you ever discussed personal needs accommodation
13   requests, in general, with Dr. Jennifer Clarke?
14 A.  Yes.
15 Q.  What is the nature of your discussions?
16 A.  Mainly just what types of orders medical staff
17   gives to us for approval, the number of them they give
18   to us for approval.
19 Q.  What aspect of the numbers is of a concern?
20 A.  Sometimes orders that come through to us that don't
21   have a lot of legitimacy to them, and I work with Dr.
22   Clarke as the medical director.
23 Q.  Have you talked to any medical staff, other than Dr.
24   Jennifer Clarke, in regard to legitimacy of special
25   needs orders?

Page 75

1  A.  I don't recall.
2  Q.  Do you recall ever speaking with Dr. Salas about
3    medical orders?
4  A.  Dr. Salas would come to the triage meeting, and
5    correspondences that I would have with him would
6    typically be through the triage meeting.
7  Q.  Has Dr. Salas ever indicated to you that he felt that
8    there were orders not being approved that should have
9    been?
10 A.  I don't recall.
11 Q.  Has any medical staff ever made any comment to you in
12   regard to orders not being approved?
13 A.  I don't recall.
14 Q.  So you do not recall anybody ever complaining to you
15   about orders not being approved?
16 A.  Orders that are approved are approved when I have
17   enough information to make an educated decision, that
18   would be the correspondence I would have.  I request
19   more information.
20 Q.  Nobody has ever made any sort of general comments,
21   saying we have made a lot of orders, and they get
22   denied?
23 A.  Not that I recall, no.
24 Q.  Do you know the plaintiff in this case personally, Mr.
25   Stephen Melise?

Page 76

1  A.  I know of him.
2  Q.  You have never spoken to him directly?
3  A.  I am sure I have at some point.
4  Q.  But you do not remember?
5  A.  I don't remember having a conversation with him,
6    no.
7  Q.  All right.  So now we get to the fun part.  If you were
8    to have more orders of bottom bunks than you had
9    available of bottom bunks, what would you do about
10   that, if anything?
11 A.  If I had orders and I don't have bottom bunks?
12 Q.  Yes.
13 A.  That has not come to me yet.
14 Q.  You have never had more bottom bunk orders than
15   available bottom bunks; is that what you are testifying
16   to?
17 A.  We haven't gotten to an actual, completely out of
18   bottom bunk issue yet.
19 Q.  Does that mean it's specific to, like, first tier
20   bottom bunks, have you ever run out of first tier
21   bottom bunks for inmates that have approved medical
22   orders?
23 A.  I don't know.
24 Q.  If you did, would you be able to move inmates between
25   facilities?

Page 77

1 A. Not based on medical. If we cannot accommodate
2 somebody, we have to do our absolute best to
3 accommodate them within our facility.
4 Q. Would that include putting them on a bottom bunk on a
5 second tier?
6 A. No.
7 Q. Why not?
8 A. If they have an approved medical bottom bunk, I am
9 not going to put them on a second tier.
10 Q. Even if you run out of bottom bunks in the first tier?
11 A. Correct.
12 Q. So you would assign somebody with an approved medical
13 bottom bunk order to a top bunk because they can't be
14 on the second tier; is that what you are saying?
15 A. I have not -- if I have approved a medical bottom
16 bunk, to the best of my knowledge, we have found a
17 medical bottom bunk in the facility.
18 I have not completely exhausted all bottom tiered
19 medical bottom bunks as of yet.
20 Q. If you did, would you put them on a top bunk, or would
21 you put them on a bottom bunk in a second tier?
22 A. I would work with medical.
23 Q. What does that mean?
24 A. I would go through Dr. Clarke, and see if there was
25 anyone that is on a bottom bunk medically that may be

Page 78

1 able to come off, an order has been expired, it's no
2 longer necessary, but medical would make that
3 determination.
4 Q. Was there any other reason why you might, or is it
5 possible to move inmates to other facilities for
6 medical reasons?
7 A. Is it possible to move them for medical reasons?
8 Q. Yes.
9 A. Yes. It is possible.
10 Q. Would you, is it possible, or can they be moved to a
11 different facility for reasonable accommodation
12 purposes?
13 A. They are moved to the intake service center for
14 treatment purposes, that's medical.
15 Q. For how long?
16 A. Depending on what their issue is.
17 Q. Would it be just for the duration of the medical issue,
18 or could it be on a more permanent basis?
19 A. That's up to medical.
20 Q. It's up to medical whether or not somebody goes to a
21 different facility?
22 A. It is up to medical to determine if they need to go
23 to a facility that has an actual hospital in it, for
24 treatment. They are not going to the intake service
25 center to be housed there because they have a medical

Page 79

1 bottom bunk.
2 Q. And that would include for any necessary reasonable
3 accommodation, is that what you are saying? Medical
4 would decide if somebody could be moved to a different
5 facility or should be moved to a different facility if
6 they have the necessary reasonable accommodation that
7 could not be accommodated in, for instance, medium
8 security?
9 MR. SULLIVAN: Objection to form.
10 MS. DAVIS: You can stoll go ahead and
11 answer.
12 MR. SULLIVAN: You can answer.
13 A. Oh, I am not sure exactly what you are asking me.
14 I am sorry.
15 Q. If an inmate had an approved necessary reasonable
16 accommodation that could not be accommodated in medium,
17 could they be moved to a different facility?
18 A. What medical accommodation are you referring to?
19 Q. Any type of reasonable accommodation.
20 A. That would be up to medical.
21 Q. So it would also be up to medical whether an inmate
22 with a necessary reasonable accommodation that could
23 not be accommodated in medium needed to be moved?
24 A. Yes. That would go to medical.
25 Q. And medical decides where to send them?

Page 80

1 A. Medical would decide if it was a legitimate request
2 to send them. It is based on medical, it is going to
3 come from medical.
4 Q. Whose decision is it ultimately to move inmates between
5 facilities?
6 A. That depends.
7 Q. What does it depend on?
8 A. It depends on what the incident is. It depends on
9 what the medical issue is. It depends on what the lack
10 of reasonable accommodation exists or does not exist.
11 All cases are going to be very individual.
12 Q. But you are saying that the correctional staff could be
13 involved in the decision to move an inmate for
14 reasonable accommodation purposes?
15 A. The administration would be involved in a decision,
16 the warden.
17 Q. Have you ever denied an order for a bottom bunk for
18 inmates, other than the plaintiff in this case?
19 A. I don't recall.
20 Q. You do not recall ever denying an order for a bottom
21 bunk?
22 A. Yes. I am sure I have. I just don't recall anyone
23 in particular.
24 Q. Do you know how many approximately?
25 A. I don't.

Page 81

1 Q. What do you consider to be illegitimate medical
2 conditions to be granted a bottom bunk?
3 A. Illegitimate medical conditions?
4 Q. You testified that you review whether or not bottom,
5 whether reasonable accommodation are requested for
6 legitimate reasons; what do consider to be illegitimate
7 reasons?
8 A. It would be a request for a bottom bunk where the
9 need is not documented medically. They cannot provide
10 me more information to make an educated decision based
11 on medical, it's based on self-reporting.
12 Q. Can you determine just from looking at the request that
13 is sent to you whether or not an order is illegitimate?
14 A. If the request says just bottom bunk, I am going to
15 request more information.
16 Q. Would you ever deny one without requesting more
17 information?
18 A. I would request more information before I denied
19 it.
20 Q. When you request more information, how do you receive
21 more information? Is it on the order itself? Is it
22 over the phone? Is it an E-mail?
23 A. It is typically on the form itself, either written
24 on the form itself, or in some cases, a sticky note.
25 Q. Did you ever receive more information, other than

Page 82

1 having it written on the form?
2 A. Not that I can recall.
3 Q. So, you have never had a medical provider call you, and
4 say, hey, here is why I think this person needs a
5 reasonable accommodation?
6 A. I may have, but I don't remember.
7     MS. DAVIS: Anybody want to take a break
8 before we get to documents?
9     MR. SULLIVAN: Yes.
10     MS. STOWELL: Yes.
11     MS. DAVIS: Let's take a break.
12     (BRIEF RECESS TAKEN)
13     MS. DAVIS: So, well have this marked as
14 Exhibit 1.
15     EXHIBIT 1, PLAINTIFF'S, MARKED FOR I.D.
16 Q. Can you identify that document?
17 A. Yes.
18 Q. What is it?
19 A. It is the special needs request.
20 Q. For?
21 A. Stephen Melise.
22 Q. What is the request for?
23 A. Bottom bunk.
24     MR. SULLIVAN: I think you are missing a
25 copy.

Page 83

1     (OFF THE RECORD)
2 Q. When is this order dated?
3 A. 11/12.
4 Q. And what are the handwritten notifications on the
5 document?
6 A. Mine are need more information, and then approved.
7 Q. When did you receive this document?
8 A. On or around 11/12.
9 Q. What are the other notations on the document?
10 A. There is a document on the bottom of the page.
11 Q. Can you read it?
12 A. "Severe pain, osteoarthritis neck on x-ray."
13 Q. By looking at this document, can you explain why you
14 asked for more info.?
15 A. Because initially it just said bottom bunk, neck
16 pain.
17 Q. Why would that require more info.?
18 A. Because neck pain is not enough information for me
19 to go on.
20 Q. Would you say that that is an illegitimate reason in
21 your determination?
22 A. That's a request for needing more information.
23 Q. And what was the basis for you saying that you received
24 it on or around November 12th?
25 A. That's when the order is.

Page 84

1 Q. So, you assumed that the order was provided to you on
2 the day it was completed?
3 A. That would be an assumption, yes.
4 Q. The notation at the bottom for severe pain
5 osteoarthritis, neck on x-ray, did that provide to you
6 sufficient information to approve the document, or the
7 order?
8 A. Well, it told me that he had osteoarthritis in his
9 neck.
10 Q. Was that sufficient for you to make the decision to
11 approve it?
12 A. I opposed a proved it.
13 Q. So, are you saying that that information in your mind
14 was enough of a legitimate reason to grant a bottom
15 bunk?
16 A. Yes.
17 Q. Had you ever granted a request for a bottom bunk that
18 was only given the reason of neck pain?
19 A. I don't recall.
20 Q. Can you explain why you approved this order?
21 A. It was a request for a bottom bunk. I asked for
22 more information. More information was given to me,
23 and I approved it.
24 Q. Was there any security based concern about this order?
25 A. Not that I can recall.

Page 85

1  Q.  So on the face, this order would not, or this request
2  for a bottom bunk would not present to you any security
3  concerns; is that what you are saying?
4  A.  Correct.  If I am giving more information that I
5  can make a decision based on, then I would approve it.
6  Q.  So with this notation at the bottom, it did not present
7  any sort of security concerns?
8  A.  I just needed more information.
9  Q.  Did it present a security concern before the notation
10  on the bottom was written?
11  A.  I just needed more information.
12  Q.  So prior to receiving more information, was there a
13  security concern related to this request?
14  A.  There was a lack of information concern.
15  Q.  Why was that relevant to security?
16  A.  Because I needed more information to be able to
17  approve a bottom bunk.
18  Q.  Why do you think it took from November 12th to
19  November 19th to approve this order?
20  A.  When I got it, I put the need for more information,
21  and I sent it back to medical.  By the time they sent
22  it back to me and I signed it, it was 11/19/14.
23  Q.  Do you have any recollection of how long it took you to
24  review it and request more information?
25  A.  No.

Page 86

1  Q.  When was this order set to expire?
2  A.  2/12/15.
3  Q.  So if you approved this on November 19, 2014, and it
4  was set to expire on February 12, 2015, does that mean
5  that Mr. Melise would have been placed in a bottom bunk
6  between those dates?
7  A.  According to this, yes.
8  Q.  Do you have any reason to believe, or any reason to
9  think that it would not have been implemented?
10  A.  Not that I can recall.
11  Q.  Is there any legitimate basis for not implementing this
12  once it is approved?
13  A.  Not that I can recall.
14  Q.  Okay.
15      MS. DAVIS: Exhibit 2.
16      EXHIBIT 2, PLAINTIFF'S, MARKED FOR I.D.
17  Q.  What is this document?
18  A.  This is an administrative note.
19      MR. SULLIVAN: Just for the record, she
20  is referring to Exhibit 2.
21  Q.  Yes.  I am sorry.  Exhibit 2, can you identify this
22  document?
23  A.  Yes.
24  Q.  When was this document dated?
25  A.  2/9/2015.

Page 87

1  Q.  Do understand why this document was submitted to you?
2  A.  They were requesting a bottom bunk.
3  Q.  Would it have been normal for them to submit this order
4  to you prior to the expiration of the prior order?
5  A.  In some cases.
6  Q.  So would it have concerned you why they submitted this
7  to you on the date that they did?
8  A.  No.
9  Q.  Why did you decide that you needed more information?
10  A.  I don't recall.  It says just bottom bunk, neck
11  pain.
12  Q.  Does the fact that you had originally approved an order
13  for the same reason affect your review of this order?
14  A.  No.
15  Q.  Would you have remembered that you had initially
16  approved an order for the same person for the same
17  thing?
18  A.  No.
19  Q.  By looking at it, can you tell what happened with this
20  document?
21  A.  I needed more information, and whoever wrote that
22  note to me wanted me to schedule a time.
23  Q.  Do you know if this order was ever approved?
24  A.  I don't.
25  Q.  Is it fair to say that it was not approved if there is

Page 88

1  no indication that it was approved?
2  A.  I don't know if it was approved.
3  Q.  If it was not specifically approved by you, is it fair
4  to say that it was never implemented?
5  A.  If it was not specifically approved by me, it does
6  not mean in my absence it could not have gone to
7  another administrator.
8  Q.  What other administrator has the authority to review
9  these orders?
10  A.  My coworker deputy or the warden himself.
11  Q.  So in your absence, they could go to a different
12  administrator for approval?
13  A.  Yes.
14  Q.  Does that happen regularly?
15  A.  It happens when one or the other of us is not
16  available, or is out on vacation.  We do not want the
17  orders to just sit.
18      MS. DAVIS: Exhibit 3, please.
19      EXHIBIT 3, PLAINTIFF'S, MARKED FOR I.D.
20  Q.  Do you recognize this document?
21  A.  Administrative note.
22  Q.  When was it dated?
23  A.  6/9/2015.
24  Q.  Was this a request for a reasonable accommodation?
25  A.  Bottom bunk.

Melise vs
Wall, et al

Kerri McCaughey
July 12, 2019

Page 89

1 Q. And what are the notations on this document?
2 A. More information, and then denied by me.
3 Q. What was the date it was denied?
4 A. 6/19.
5 Q. 2015; is that correct?
6 A. I am sorry, 2015. Yes.
7 Q. What are the other handwritten notes on it; can you
8 please read them?
9 A. "Osteoarthritis neck."
10 Q. Does that say severe pain, maybe?
11 A. Maybe.
12 Q. And the date right above the osteoarthritis neck is
13 6/12/2015?
14 A. I am sorry.
15 Q. The date just above osteoarthritis?
16 A. Oh, "6/12."
17 Q. So is it reasonable to infer from this that this
18 document was submitted to you on 6/9/2015. At some
19 date on 6/9/2015, you requested more information, and
20 on 6/12, it was sent back to you, and then it was
21 denied on 6/19; does that appear to be what happened
22 with this document?
23 A. Yes.
24 Q. Can you explain why you denied the document, or why you
25 denied the request?

Page 90

1 A. I don't know at the time. I don't know.
2 Q. Can you, by looking at it, can you explain what you
3 might have thought after looking at this document?
4 A. Although he appears he has osteoarthritis in his
5 neck, it does not mean he can't climb a ladder.
6 Q. Would that be the only reason why he would request a
7 bottom bunk, or that the medical provider would request
8 a bottom bunk for him?
9 A. That's the only reason they gave.
10 Q. I mean, the fact that he could not climb a ladder, is
11 that the only reason why the medical provider might
12 request a bottom bunk?
13 A. I don't know.
14 Q. So you are not sure what the medical basis would be for
15 them to request that he was on the bottom bunk; is that
16 correct?
17 A. Based on the information they gave me, no.
18 Q. Now, is this notation in response to your request for
19 more information the same as the previous order -- or,
20 I am sorry, the same as the response on Exhibit 1?
21 A. Yes.
22 Q. But you approved it on Exhibit 1, and you denied it on
23 Exhibit 3; can you explain why that might be?
24 A. Very possibly we were adding -- we were adding
25 ladders to the blocks at the time. It was right around

Page 91

1 that time.
2 Q. I am sorry. Can you explain what that means?
3 A. He has the capability of climbing to the top tier,
4 based on this information. I don't see any reason why
5 he would not be able to. I am not sure why I would
6 have approved it once and denied it a second time, if
7 he could climb a ladder, I would deny it.
8 Q. Does it matter for security purposes why the medical
9 staff submitted an order for a special needs
10 accommodation?
11 A. Yes, based on availability of bottom bunks.
12 Q. When you are looking at this order, would you look at
13 how many bottom bunks were available at that time?
14 A. No.
15 Q. You would just assume that there is a limitation on
16 bottom bunks, and deny this order based on that
17 assumption; is that what you are saying?
18 A. I have a lieutenant that keeps a list of all of the
19 bottom bunks in the building.
20 Q. Would you review that list?
21 A. We usually review that list at our triage meetings,
22 yes.
23 Q. So, at any given time, did you have an understanding of
24 how many bottom bunks might be available for people who
25 needed a reasonable accommodation?

Page 92

1 A. I don't recall.
2 Q. So, when you are reviewing this document, you are
3 thinking that there might be a limitation on bottom
4 bunks, and therefore, you would deny this order; is
5 that what you are saying?
6 A. No. I am thinking I don't -- when I signed this
7 particular order, I didn't feel like I had enough
8 information to give him a bottom bunk.
9 Q. Even though it was identical to a previous order that
10 you did approve?
11 A. Correct.
12     EXHIBIT 4, PLAINTIFF'S, MARKED FOR I.D.
13 Q. Can you explain how this document is different from the
14 previous exhibit, this being Exhibit 4, you may want to
15 look at Exhibit 3 again, if you want?
16 A. How is this different?
17 Q. Yes.
18 A. The notations at the bottom.
19 Q. It is otherwise dated the same, in that it is on order
20 from 6/9/2015, it has your same notations, indicating
21 that you denied it on 6/19/2015, and there are
22 additional notations; is that correct?
23 A. Yes.
24 Q. Can you explain what the additional notations indicate?
25 A. The patient states he should not be on the top bunk

Melise vs
Wall, et al

Kerri McCaughey
July 12, 2019

Page 93

1  because of severe neck pain that radiates into his left
2  arm.  He says that climbing down and up makes pain
3  worse, and he is advised to follow up with security.
4  Signed by nurse practitioner neck Marianne Warren.
5  Q.  What is the next notation?
6  A.  Per Dr. Melnick on August 21, 2013, and Ken Davis,
7  OT, this patient has cervical neuropathy, and should be
8  placed on bottom bunk referred to security, Marianne
9  Warren.
10  Q.  Can you tell from these notations what happened with
11  this order, or why it was submitted to you again on
12  October 28, 2015?
13  A.  I am sorry?
14  Q.  Do you understand what these notations are for?  Or why
15  are these notations on this document, and what happened
16  with this document after these notations were added;
17  can you tell?
18  A.  I can tell that Marianne Warren responded to my
19  request for more information.  I can tell that on
20  10/28/2015, her notation indicates self-reported
21  information from the inmate on whether or not he can
22  climb up and down the ladder.
23  Q.  How would that information have been significant to
24  you?
25  A.  Because he could be on the top bunk.

Page 94

1  Q.  You would have interpreted that as saying that he did
2  not need a bottom bunk; is that what you are saying?
3  A.  I am saying in this top notation, it's
4  self-reported, that he has issues climbing up to a top
5  bunk.
6  Q.  So, after reading that top notation, you would have
7  decided that it was not a legitimate reason for a
8  bottom bunk; is that what you are saying?
9  A.  What I am saying is if he could climb up a ladder,
10  I don't believe he had a legitimate request for a
11  bottom bunk.
12  Q.  Even if it was causing him pain?
13  A.  Self-reported.
14  Q.  So you don't believe him; is that what you are saying?
15  A.  I am saying it is self-reported.  I want more
16  documentation to tell me he actually could not climb.
17  The notation from Dr. Melnick gives a medical
18  condition.  It still does not tell me that he cannot
19  climb a ladder.
20  Q.  Why would whether or not he could climb a ladder affect
21  whether or not you would grant this order?
22  A.  Because he could sleep on a top bunk.
23  Q.  So you would not approve this order that was submitted
24  by a medical professional and as a request to you to
25  grant this inmate a bottom bunk because you did not

Page 95

1  think that it meant that he could not climb a ladder --
2  I am sorry.  There were a lot of nots in there.
3  MS. DAVIS: Let me rephrase.
4  Q.  When you read this, this bottom -- I am sorry, this
5  first, top notation, that did not indicate to you that
6  he needed a bottom bunk?
7  A.  It didn't indicate that he could climb a ladder,
8  yes.
9  Q.  And this, the second one when it was submitted to you
10  from a medical professional, did you think that he
11  needed a bottom bunk?
12  A.  All right.  This order is signed by me on 6/19, and
13  these notations are in October.
14  Q.  Yes.
15  A.  I don't have another signature after these.
16  Q.  Right.  But you just a minute ago testified that after
17  reading this, this would not indicate to you that he
18  needed a bottom bunk?
19  A.  The top piece.
20  Q.  And what did you, or would you think after reading the
21  bottom piece?
22  A.  If I had a medical doctor tell me that he needed a
23  bottom bunk, then I would order that bottom bunk.
24  Q.  Okay.  Any indication on this that you did approve the
25  order?

Page 96

1  A.  On this?
2  Q.  Yes?
3  A.  No.
4  Q.  Is there any indication on this document that you saw
5  these additional notations?
6  A.  No.
7  Q.  Do you know how this document would have gotten into
8  the medical record?
9  A.  I don't.
10  Q.  Is there any way that you know of that we could
11  determine that you saw this?
12  A.  No.
13  Q.  Is that because there is no electronic record of when
14  documents are submitted to you and when you review
15  them?
16  A.  This is how I get them.  What medical does with
17  them when I give them back is what they do with them.
18  Q.  But there is no notation from you after 6/19/2015; is
19  that correct?
20  A.  That's correct.
21  Q.  So there is no indication on this document that you
22  ever saw these 10/28 notations; is that correct?
23  A.  Yes.
24  Q.  So, is that because there is no other electronic record
25  indicating whether or not you saw an order like this?

Melise vs
Wall, et al

Kerri McCaughey
July 12, 2019

Page 97

1 A. I don't know if that's why.
2 Q. Would we be able to determine if you had seen this
3  document if these documents were submitted to you
4  electronically?
5 A. They are not.
6 Q. Would it be more likely that we would be able to
7  determine if you had seen if there was an electronic
8  record of them being submitted to you?
9 A. I can't answer that because they are not.
10 Q. I am asking if it was a better procedure if they were
11  received by you electronically because it would allow
12  us to determine if you ever saw this document?
13    MR. SULLIVAN: Objection. You can
14  answer.
15 A. But I would still not be able to sign it.
16 Q. Well, for instance, if this was sent to your E-mail,
17  would we be able to determine if it was an E-mail that
18  you ever opened?
19 A. Yes.
20 Q. So there might be an electronic record demonstrating
21  that you saw the document?
22 A. There might.
23 Q. Without having your handwritten note on this, is there
24  any way that we can determine whether or not you ever
25  saw this document?

Page 98

1 A. Not to my knowledge.
2 Q. When this first notation was put in, I know we do not
3  have a record of your response to it, but when you just
4  read it, you indicated that you would not have approved
5  it; is that correct?
6 A. Not based on the top notation.
7 Q. Does it matter that a medical professional decided to
8  send this request to you?
9 A. Does it matter how?
10 Q. In your review.
11 A. It only comes to me from medical professionals.
12 Q. But you understand that a medical professional received
13  this information from an inmate and decided to send it
14  to you; is that correct?
15 A. Yes.
16 Q. And so would that presumably mean that the medical
17  staff decided that it was important enough to send it
18  to you to be approved?
19 A. Yes.
20 Q. And in deciding, after reading that, that it is not
21  necessary to approve, are you overriding a decision by
22  a medical professional?
23 A. No.
24 Q. Why not?
25 A. Because it is self-reported.

Page 99

1 Q. How does that affect security concerns that you are
2  reviewing this for?
3 A. Because inmates self-report things all of the time.
4  I want more information medically that backs up their
5  claims, so I can make an educated decision based on
6  medical need, that this order should be approved.
7 Q. Do you think that the medical staff are not making that
8  determination?
9 A. The medical staff are receiving the information
10  from the offender directly, self-reported, not
11  documented.
12 Q. But do you think that the medical staff are making a
13  decision based on information that they are receiving
14  from an inmate that is sufficient to send you a
15  request?
16    MR. SULLIVAN: Objection. You can
17  answer.
18 A. They're making a request to me based on the
19  information that the inmate gave them.
20 Q. How do you know that information is not documented?
21 A. They would provide me documentation -- they would
22  provide me information that he has a legitimate issue.
23 Q. In the previous notation, she indicated that he has
24  osteoarthritis in his neck; is that not a sufficient
25  documentation of a medical condition?

Page 100

1 A. Yes.
2 Q. It is, that is sufficient?
3 A. If he has that, yes.
4 Q. Well, that's on the same document; is it not?
5 A. Yes.
6 Q. So you have already been told that he has a medical
7  condition that has been documented, which is
8  osteoarthritis in the neck; is that correct?
9 A. Yes.
10 Q. And, yet, you are saying that this notation from the
11  nurse practitioner was still not sufficient to approve
12  a bottom bunk; is that what you are saying?
13 A. Because her notation is referring to his inability
14  to climb a ladder, self-reported.
15 Q. I am just trying to figure out how the fact that he has
16  a documented condition, the nurse has indicated it to
17  you, and that he is saying that he has pain and trouble
18  because of that documented condition, he has pain in
19  climbing up and down a ladder, and a nurse has decided
20  that that is sufficient, a sufficient reason to send
21  the request to you, why, based on your security
22  concerns, why that is not sufficient to grant a bottom
23  bunk?
24 A. Because it does not indicate medically that he
25  cannot climb a ladder. In addition, he has

Page 101

1 consistently held a job as a block porter since he has
2 been there.
3 Q. What does that have to do with it?
4 A. He is a janitor.
5 Q. What does the fact that he is a janitor have to do with
6 his ability to climb a ladder?
7 A. His ability to perform the duties of a porter -- in
8 this case, it is a called a porter. So he does not
9 have a medical condition that prevents him from doing a
10 physical job.
11 Q. What does his job as a porter have to do with him
12 having to climb a ladder?
13 A. Because he climbs stairs in the mod to perform his
14 job duties.
15 Q. How is climbing stairs and climbing a ladder relevant
16 to each other, or in any way the same thing?
17 A. He can climb.
18 Q. He can climb with his legs?
19 A. Yes. He climbs up and down the stairs.
20 Q. Using his legs?
21 A. Yes.
22 Q. What do you need to use in order to climb a ladder?
23 A. Your legs and your arms.
24 Q. So do you need to use your arms in order to climb
25 stairs?

Page 102

1 A. If you are carrying janitorial supplies, yes.
2 Q. And, so, are you saying that it does not matter if a
3 medical professional has ordered that this inmate be
4 given a bottom bunk, all that matters is if you decide
5 that the basis for the order is legitimate; is that
6 what you are testifying to?
7 A. No. In this particular case, I didn't see this.
8 Q. But you just testified that you would not have granted
9 the order based on that information?
10 A. Based on the top notation.
11 Q. Even though you had previously approved orders for this
12 inmate based on osteoarthritis in the neck, you would
13 not have granted this order; is that what you are
14 saying?
15 A. Based on this, the top notation, no.
16 Q. And it does not matter to you that a medical
17 professional has made the determination that the inmate
18 should be given a bottom bunk; is that what you are
19 saying?
20 A. I am not saying it does not matter to me. I am
21 saying I would request more information that is
22 documented in this case that he cannot climb a ladder,
23 but again, I didn't see this.
24     MS. DAVIS: Exhibit 5, please.
25     EXHIBIT 5, PLAINTIFF'S, MARKED FOR I.D.

Page 103

1 Q. Can you identify this document?
2 A. It's a special needs request form.
3 Q. By looking at this, what is the date of the document?
4 A. 11/12/2015.
5 Q. What is the request for?
6 A. Bottom bunk, neck pain.
7 Q. And by looking at this document, can you tell what
8 happened with it?
9 A. The special needs appeared to have been generated,
10 and that's where it stopped.
11 Q. So there is no evidence that this was ever submitted to
12 you or that you ever saw it or reviewed it or approved
13 or denied it; is that correct?
14 A. Correct.
15 Q. Because there is no electronic record of these being
16 submitted to you, there is no -- we have no ability to
17 determine if you ever saw this; is that correct?
18 A. That's correct.
19 Q. Is there a reason why a medical professional might have
20 entered it into the medical record and not giving it to
21 you?
22 A. I don't know.
23     MS. DAVIS: Exhibit 6, please.
24     EXHIBIT 6, PLAINTIFF'S, MARKED FOR I.D.
25 Q. Exhibit Number 6, can you identify this document?

Page 104

1 A. Yes.
2 Q. What is it?
3 A. It is a personal needs request form.
4 Q. When is the date?
5 A. 11/20/2015.
6 Q. And as with the previous exhibit, is there any
7 indication that this was ever submitted to you or that
8 you ever saw this?
9 A. No.
10 Q. When is this requested order set to expire?
11 A. 12/12/16.
12     MS. DAVIS: Exhibit 7, please.
13     EXHIBIT 7, PLAINTIFF'S, MARKED FOR I.D.
14 Q. Exhibit 7, can you identify this document?
15 A. Yes. It is a special needs request form.
16 Q. When is it dated?
17 A. 12/21/2015.
18 Q. Is there any indication on it that you ever saw it, or
19 it was ever submitted to you?
20 A. No.
21 Q. We can assume that it was never implemented because
22 there is no indication that you ever saw it or approved
23 it or denied it; is that fair?
24 A. I never saw it.
25     MS. DAVIS: Exhibit 8, please.

Page 105

1    EXHIBIT 8, PLAINTIFF'S, MARKED FOR I.D.
2  Q.  This exhibit may actually change your answer on the
3  last one because the date is the same, 12/21/2015; is
4  that correct?
5  A.  12/21/2015.
6  Q.  And that's the same date as the previous exhibit,
7  Exhibit 7?
8  A.  Yes.
9  Q.  Is there an indication on this document that you saw
10  it?
11  A.  Yes.
12  Q.  And what does the notation indicate to you?
13  A.  Bottom bunk, neck pain.
14  Q.  And what is the notation from you?
15  A.  Denied.
16  Q.  On what date?
17  A.  12/29/15.
18  Q.  And can you explain why this was denied?
19  A.  It had been denied previously.
20  Q.  Is there a reason why you did not request more
21  information?
22  A.  I don't recall.
23  Q.  Can you think of a reason why you might not have
24  requested more information on this request?
25    MR. SULLIVAN: Objection.  You can

Page 106

1  answer.
2  A.  I don't recall.
3  Q.  Previously in your deposition, do you recall testifying
4  that you always request more information when you feel
5  like more information is needed?
6  A.  Yes.
7  Q.  And, so, based on looking at this document, does it
8  look like you denied it without requesting more
9  information?
10  A.  Yes.
11  Q.  And there is no other documentation or indication on
12  this document that would give us an explanation of why
13  it was denied without a request for further
14  information; is that correct?
15  A.  That's correct.
16  Q.  If this order had been approved, when would it have
17  expired?  When does it state it would have expired?
18  A.  12/12/2016.
19  Q.  Is there any reason why it would not have expired on
20  that date if it had been approved that you could think
21  of?
22  A.  That's over a year, it is over a year.
23  Q.  What is the significance of that?
24  A.  Normally, any -- normally, I would not approve a
25  request that goes longer than a year without a review.

Page 107

1  I typically would pick earlier review dates.  This
2  would have gone over a year, almost two years.
3  Q.  If you had picked an earlier review date, how would you
4  have indicated that on the document?
5  A.  I would have wrote earlier review, and I would have
6  put the date.
7  Q.  And the effect of putting that on it would have meant
8  it expired on the date that you set; is that correct?
9  A.  Yes.
10    MS. DAVIS: Exhibit 9, please.
11    EXHIBIT 9, PLAINTIFF'S, MARKED FOR I.D.
12  Q.  Can you identify this document?
13  A.  It's a special needs request.
14  Q.  When is it dated?
15  A.  6/21/2016.
16  Q.  By looking at this document, can you determine if you
17  ever saw it or reviewed it or approved or denied it?
18  A.  No.
19  Q.  Have you ever seen a request for special needs that
20  indicated multiple reasons?
21  A.  In the former medical records system, yes.  In the
22  current one, no.
23  Q.  How come?
24  A.  EMR, the electronic medical records were updated
25  from one system to another, and the old system just

Page 108

1  gave us a list of anything that has ever been requested
2  with a start date and expiration date.  The new system
3  does not.
4  Q.  When did the new system go into effect?
5  A.  I don't recall.
6  Q.  Was it after 6/21/2016?
7  A.  I don't recall.
8  Q.  Can I ask you to look very quickly back at Exhibit 7?
9  A.  Yes.
10  Q.  I'm sorry, Exhibit 8?
11    (WITNESS COMPLIES)
12  Q.  Do you know if you ever consulted with any medical
13  professionals in regard to this order?
14  A.  I don't recall.
15    MS. DAVIS: Exhibit 10, please.
16    EXHIBIT 10, PLAINTIFF'S, MARKED FOR I.D.
17  Q.  Can you identify this document?
18  A.  Yes.  It is a special needs form.
19  Q.  And when is it dated?
20  A.  6/28/2016.
21  Q.  And what is the request for?
22  A.  There are three separate requests.
23  Q.  Can you explain what each request is for?
24  A.  The top is bottom bunk, neck pain.  Start date
25  11/12/14, stop date 12/12/16.  Bottom bunk -- second

Melise vs
Wall, et al

Kerri McCaughey
July 12, 2019

Page 109

1  entry, bottom bunk, falls, 6/21/16, expiring 6/21/2017,
2  and the third entry, bottom bunk, falls, question mark,
3  apnea, 6/28/2016 through 9/28/2016.
4  Q.  Is there any indication based on looking at this that
5  you saw this document on or after 6/28/2016, and by
6  after, I mean, recently after, or around the time of
7  6/28/2015?
8  A.  No.
9       MS. DAVIS: Exhibit 11, please.
10      EXHIBIT 11, PLAINTIFF'S, MARKED FOR I.D.
11  Q.  Can you identify this document?
12  A.  I can.
13  Q.  What did?
14  A.  An administrative note.
15  Q.  Is it a request for special accommodations?
16  A.  Yes.
17  Q.  When is it dated?
18  A.  9/8/2016.
19  Q.  And does it contain the same three requests from the
20  previous exhibit that you read?
21  A.  Yes.
22  Q.  And what does it indicate to you on it, in the
23  handwritten notation, what does those indicate?
24  A.  Approved, 9/21/16.
25  Q.  And the bottom notation?

Page 110

1  A.  What bottom notation?  That's a signature from the
2  nurse practitioner?
3  Q.  When is it dated?
4  A.  9/19/2016.
5  Q.  Or potentially 9/14?
6  A.  In my opinion, it could be either one.
7  Q.  It is a little ambiguous whether it was submitted to
8  you on 9/14/16 or 9/19/2016, but at some point between
9  then and 9/21/2016, you saw it; is that correct?
10  A.  Yes.
11  Q.  Do you see the other handwritten notation, the circle?
12  A.  Yes.
13  Q.  The circle, bottom bunk, can you explain to me what
14  that indicates?
15  A.  That's -- I circled that, saying that was the order
16  I was approving.
17  Q.  What is the significance of circling that order?
18  A.  As I mentioned before, some of these orders come
19  through with multiple requests on them.  This is the
20  most recent because it is the last one entered, so
21  that's why I would circle it.
22  Q.  Is there reason based on looking at this why you
23  approved this request?
24  A.  I approved it based on the information that was
25  there, falls and apnea.

Page 111

1  Q.  And reading falls and apnea was a legitimate enough
2  reason to you that you did not feel the need to request
3  more information; is that a fair reading of this?
4  A.  Yes.
5  Q.  The fact that you circled that third notation, does
6  that mean that it was set to expire on September 28,
7  2016?
8  A.  Yes.
9  Q.  So it would not have been implemented past that date;
10  is that correct?
11  A.  I can only assume it would not have been
12  implemented past that date.  It was generated on
13  9/8/2016, and it was set to expire on 9/28/2016 based
14  on this documentation.
15  Q.  Is there a reason why you would have only approved the
16  third order?
17  A.  Like I said, they come to me.  I usually will
18  approve the last one, because sometimes I have them
19  listed from years before.
20  Q.  So you would not even consider looking or granting a
21  previous order that was not the most recent order?
22  A.  I am saying I circled the bottom one, and that's
23  the one I approved.
24  Q.  So you approved this order, and it would only last for
25  one week; is that fair to say?

Page 112

1  A.  Yes.
2  Q.  Would it have been possible for you to approve one of
3  the other orders and allow the order to last longer?
4  A.  I signed this one based on circling the bottom one.
5  Q.  But could you have circled one of the others?
6  A.  Yes.  I could have.
7  Q.  And if you had circled one of the others, would that
8  have meant it would have expired later?
9  A.  Yes.
10  Q.  So, can we assume that you knowingly chose the last
11  one, knowing that it was set to expire in one week?
12  A.  I chose the last one because it was the last one in
13  line.
14  Q.  And, to your knowledge, on this date, did Mr. Melise
15  still have his job as a porter?
16  A.  I don't recall.  He has been a porter since he has
17  been there, as far as I can recall.
18  Q.  So do you know if that was a factor that you considered
19  when you reviewed this request?
20  A.  I don't know.
21  Q.  But you did approve it?
22  A.  Yes.
23  Q.  So, if he did have that job at that time, that did not
24  prevent you from approving it; is that fair to say?
25  A.  That's fair to say.

Page 113

1 Q. Is there a reason that you can think of that this order
2 did not get to you until at the earliest 9/14, but
3 maybe 9/19?
4 A. I don't know.
5 Q. Is it unusual for you to see orders that are dated two
6 weeks prior to you seeing them?
7 A. In this case, yes.
8 Q. It is unusual?
9 A. Oh, is it unusual?
10 Q. Yes.
11 A. I don't know.
12 Q. Would you, do you recall if you noted the fact that the
13 start date for this order was 6/28/2016?
14 A. I don't remember.
15 Q. Would you have found that unusual if you had noticed
16 it?
17 A. No.
18 Q. Why not?
19 A. Because sometimes medical just generates these at
20 random.
21 Q. So the fact that this order was originally put in the
22 system on 6/28/2016 but was printed or generated on
23 9/08/2015 would not appear unusual to you?
24 A. No.
25 Q. I am sorry, but can you go back, and look at Exhibit 1

Page 114

1 one more time?
2    (WITNESS COMPLIES)
3 Q. I know you said that you approved the third one on
4 Exhibit 1, and I think you said you would be capable of
5 approving one of the other orders, are you permitted to
6 determine which medical reason an order is granted or
7 approved?
8 A. I don't understand what you are asking me.
9 Q. Based on the policy or based on the, you know,
10 obligations of being the ADA coordinator, the facility
11 ADA coordinator, were you permitted to choose which
12 medical reason you were granting an order for?
13 A. I am the signoff person for the warden, so I get
14 these slips, and it is delegated to me to sign off.
15 Q. Well, the policy specifically identifies you as the
16 facility ADA coordinator; is that correct?
17 A. Correct, because I am the signoff for the warden,
18 correct.
19 Q. So they go to you, and does the policy allow you to
20 choose which medical reason you are granting an order
21 for?
22 A. I don't know.
23    MS. DAVIS: Exhibit 12, please.
24    EXHIBIT 12, PLAINTIFF'S, MARKED FOR I.D.
25 Q. Can you identify this document?

Page 115

1 A. It is an inmate event screen printout.
2 Q. And what type of events does it list?
3 A. It lists transfers, like when an inmate went to
4 court, where they are living, the dates and times.
5 Q. So, if you could, could you refer back to Exhibit 1,
6 this order was approved on what date?
7 A. 11/19/14.
8 Q. And it was set to expire on February 12, 2015; is that
9 correct?
10 A. Yes.
11 Q. Can you tell me, based on this document, if the inmate
12 was assigned to a bottom bunk between those dates?
13 A. He was on a bottom bunk on 11/11 -- wait a minute.
14 Q. Let me try to make this a little bit easier. On 11/19,
15 was he assigned to a top or bottom bunk?
16 A. He was assigned to a bottom bunk on 11/3, or he was
17 living in a bottom bunk on 11/3.
18 Q. What is the next entry, where he was transferred on the
19 next line?
20 A. On 12/9/2014, he is transferred from C mod, right
21 one bottom, to B mod left 19 top.
22 Q. Was this inmate at any point a participant in the sex
23 offender treatment program?
24 A. He was interviewed by the clinician for the sex
25 offender treatment program, and it was determined that

Page 116

1 he needed to be in it.
2 Q. So he was?
3 A. It was determined that he needed to be in there; he
4 refused.
5 Q. So he was not assigned to the F block during this time?
6 A. No.
7 Q. Because he was not a participant in that?
8 A. He refused, yes.
9 Q. So he was, based on looking at this, he was assigned to
10 a bottom bunk for the period 11/19/2014 to 2/12/2015;
11 is that correct?
12 A. What were the dates you gave me?
13 Q. The date that this order was in effect, 11/19/2014 to
14 2/12/2015, besides the random transfer on 12/09, he
15 was, otherwise, assigned to a bottom bunk; is that
16 correct.
17 A. 12/9/2014 he was on a top bunk in B left, and then
18 he was moved to C right into a bottom bunk, bottom.
19 Q. When is the next time he was assigned to a top bunk?
20 A. 9/20/2015.
21 Q. What bunk was he assigned to on November 30, 2015?
22 A. B left, 1 top.
23 Q. So he was assigned to a top bunk on that date?
24 A. He was assigned to that on 10/18/2015.
25 Q. Right. So on the date of November 30th, he was in a

Page 117

1 top bunk, is that correct, from reading this?
2 A.  Yes.
3 Q.  So, on that date, when he reported to a nurse that he
4 fell out of the top bunk and injured himself, is that
5 because he was, in fact, assigned to a top bunk?  Is
6 that correct?
7 A.  Yes.
8 Q.  When is the next time that he was assigned to a bottom
9 bunk following that?
10 A.  8/12/2016 -- no, 7/7/2016.
11 Q.  So, it is fair to say that on June 21, 2016, when he
12 reported to medical professionals that he fell out of
13 his bed from the top bunk and was injured, that he was,
14 in fact, assigned to a top bunk on June 21, 2016?
15 A.  Can you ask that question again?
16 Q.  On June 21, 2016, was he assigned to a top bunk?
17 A.  Yes.
18 Q.  So, this document corroborates this statement to
19 medical that he fell off the top bunk because he was,
20 in fact, assigned to a top bunk on that date?
21     MR. SULLIVAN: Objection.
22 A.  It corroborates that he was on a top bunk.
23 Q.  When is the next time that he was moved to a bottom
24 bunk?
25 A.  After which date?

Page 118

1 Q.  After June 21, 2016.
2 A.  July 7, 2016.
3 Q.  And how long did he have a bottom bunk?
4 A.  Until 8/12/2016.
5 Q.  Was he moved to a top bunk on that date?
6 A.  Yes.
7 Q.  And was he assigned to a top bunk until November 11,
8 2016?
9 A.  Yes.
10 Q.  So can you, please, refer to back to Exhibit 11?
11     (WITNESS COMPLIES)
12 Q.  And this is an order that you approved?
13 A.  Yes.
14 Q.  What was the date that you approved this order?
15 A.  9/21/2016.
16 Q.  So, based on Exhibit 12, was he given a bottom bunk
17 after you approved an order for giving him a bottom
18 bunk on 9/21/2016?
19 A.  No.
20 Q.  Do you know why he was not given a bottom bunk after he
21 was approved for receiving a bottom bunk accommodation?
22 A.  I don't.
23 Q.  Is there any reason you can think of why he was not
24 given a bottom bunk?
25     MR. SULLIVAN: Objection.

Page 119

1 A.  That's something I would have to ask the housing
2 lieutenant.
3 Q.  But based on your prior testimony when you approved
4 this, you would have sent it back to medical?
5 A.  Yes.
6 Q.  And assumed that it would have gotten implemented
7 through the process; is that correct?
8 A.  Yes.
9 Q.  So you would not at any point talk to correctional
10 staff to ensure that this was implemented; is that
11 correct?
12 A.  That's correct.
13 Q.  And it appears that it was not implemented; is that
14 correct?
15 A.  Correct.
16     MS. DAVIS: Exhibit 13, please.
17     EXHIBIT 13, PLAINTIFF'S, MARKED FOR I.D.
18 Q.  Can you identify this document?
19 A.  It is an incident report.
20 Q.  When is it dated?
21 A.  11/11/2016.
22 Q.  And can you tell me what the incident report is
23 describing?
24 A.  Inmate fell out of top bunk while sleeping.  Inmate
25 complained of an injured ankle.  Nurse responded, and

Page 120

1 inmate was sent to Rhode Island Hospital ER via DOC van
2 for x-rays.
3 Q.  Did you receive this incident report?
4 A.  It would have come to all of us as administrators.
5 Q.  The following day primarily, or when would it have come
6 to you?
7 A.  It would have come to me probably the following
8 day.
9 Q.  Would it have come to you with any other documents?
10 A.  No, not that I can recall.
11 Q.  It would not be part of a packet of documents that you
12 would receive?
13 A.  Based on this incident?
14 Q.  Yes.
15 A.  I would get an incident report sent to me through
16 by the lieutenant, and in this case, it was generated
17 to the warden -- I am sorry, to the deputy that I am
18 now.
19 Q.  It was generated to the operational deputy warden?
20 A.  Correct.
21 Q.  At the time?
22 A.  Yes.
23 Q.  Would you have taken any action, or did you take any
24 action after receiving this incident report?
25 A.  Not that I can recall.

Page 121

1 Q. Who was the shift commander on November 11, 2016?
2 A. Lieutenant Flynn.
3 Q. Can you tell me what is indicated at the bottom of this
4   document, just the last notation on this document,
5   starting with shift commander's comments; what does
6   that say?
7 A. It's Stephen Melise's ID, and his name, security
8   and his area and bunk assignment.
9 Q. If Patrick Flynn was the shift commander on this date,
10   why are there additional shift commander comments on
11   the incident report?
12 A. I don't understand what you are asking me. He
13   would have written this.
14 Q. So this is a normal incident report?
15 A. That's a normal incident report.
16 Q. Wherein at the bottom it contains shift commander's
17   comments, even though the document is filled out by the
18   shift commander?
19 A. It is basically giving you the demographics of the
20   inmate himself and where he was living at the time.
21 Q. So this notation would not have been added by somebody
22   else; it would have been added by the person who filled
23   out the form?
24 A. On that particular shift, there is only one shift
25   commander, yes.

Page 122

1 Q. And does the information in this incident report appear
2   accurate as to what you would expect would be in an
3   incident report?
4 A. It gives me a description of what happened.
5 Q. And would you, or is there a reason why these boxes are
6   not checked off, and some of these fields appear not to
7   be filled in?
8 A. That would be a request for Lieutenant Flynn.
9 Q. Is that normal, that they would all be filled out?
10 A. It depends on the incident.
11 Q. Based on this incident, was outside medical attention
12   necessary?
13 A. Yes.
14 Q. So that check box should have been filled out; is that
15   correct?
16 A. It could have been checked off, yes. He wrote it
17   in his incident report.
18 Q. Who reviews incident reports once they are filled out;
19   does anybody? Are they submitted to a superior?
20 A. They are submitted to the administration, the
21   warden, the warden and the deputies, and deputy of
22   operations, in particular.
23 Q. Would anybody review this to determine if it was, if
24   there was sufficient information or not? Would anybody
25   look at this and decide that it was insufficient and

Page 123

1   ask for some information?
2 A. In some cases.
3 Q. Who would be that that would make that decision?
4 A. Given the particular document, it would have been
5   Deputy Diniz.
6 Q. If it also came to you, would you, might you have
7   requested additional information after reading this
8   incident report, even though it was not addressed to
9   you, could you have asked for more information?
10 A. I could have.
11 Q. Does that happen often, that you would see an incident
12   report and decide that you needed more information?
13 A. On certain incidents, yes.
14 Q. Do you recall reviewing this incident report?
15 A. I don't.
16 Q. Is the information in this incident report correct, as
17   far as you can tell?
18     MR. SULLIVAN: Objection.
19 A. I don't understand what you mean by correct.
20 Q. Does it look inaccurate for any reason? Would you
21   assume the information in this document is correct?
22 A. Yes.
23 Q. Do you know if a code white was called in relation to
24   this incident?
25 A. I don't.

Page 124

1 Q. Is there any way to determine if a code white was
2   called in regard to this incident?
3 A. Not based on this report.
4 Q. But based on other documents? Are there other
5   documents that might indicate that a code white was
6   called?
7 A. It would be logged in the shift's commanders daily
8   blotter. It would be logged in the block itself, in
9   the housing unit itself, in the log book.
10 Q. The log book specific to the mod?
11 A. Yes.
12 Q. Would it be recorded anywhere else?
13 A. It would also then be recorded in the daily
14   packets.
15 Q. What are the daily packets?
16 A. It is a daily packet of events that occurred during
17   the 24-hour shift.
18 Q. Who receives the daily packets?
19 A. The operations deputy.
20 Q. So you would not have received the daily packet
21   following this incident; is that correct?
22 A. Correct.
23 Q. Deputy Warden Diniz would?
24 A. Yes.
25 Q. And in that packet, it would contain information as to

Page 125

1  whether or not a code white was called?
2  A.   Yes.
3  Q.   Would it also indicate who was on staff that night?
4  A.   Yes, the roll calls.
5  Q.   Would it indicate who responded to the code white, if
6  one was called?
7  A.   The shift commander.
8  Q.   Any other staff, would any other staff report?
9  A.   The only other staff in the area would be the
10  officer in the main control center in the mod.
11  Q.   Would there only be one other correctional staff on
12  that night?
13  A.   In that block, yes.
14  Q.   In that block.  Do you know if there was any video
15  footage of the plaintiff's incident on November 11,
16  2016?
17  A.   There would not be footage of anything that
18  happened inside of a cell room.
19  Q.   Would there be footage from outside of the cell?
20  A.   Yes.
21  Q.   Do you know if that footage was retained, or?
22  A.   I don't.
23  Q.   Would there have been video footage of the plaintiff
24  being transported to the van that took him to Rhode
25  Island Hospital?

Page 126

1  A.   Yes.
2  Q.   Do you know if any of that footage was retained?
3  A.   I do not.
4  Q.   Would there have been footage of when he returned from
5  Rhode Island Hospital?
6  A.   Yes.
7  Q.   Do you know if any of that footage was retained?
8  A.   I do not.
9       EXHIBIT 14, PLAINTIFF'S, MARKED FOR I.D.
10  Q.   Is this the log book specific to B mod that just
11  referred to as?
12  A.   Yes.
13  Q.   Can you read to me everything that is written on this
14  document?
15  A.   I'll do my best.
16  Q.   Thank you.  That's what I am asking?
17  A.   "12:41, B right, 9, top, apparently fell off his
18  bunk.  Lieutenant Flynn notified, nurse called."  Then
19  there is a signature in the log book by Lieutenant
20  Flynn.
21  Q.   Are you referring to the initials?
22  A.   This right here (indicating).
23  Q.   So the next line down, there is a scribble that is a
24  signature?
25  A.   Lieutenant Flynn's.

Page 127

1  Q.   And the next line?
2  A.   1:17 A.M., nurse arrived; 12:22, nurse -- I don't
3  know what that name is.
4  Q.   Is it possible that nurse leaves?
5  A.   That's a guess.  I am not sure, to be honest with
6  you.
7  Q.   What does it say next?
8  A.   Inmate still in day room with four utility
9  officers.  I am sorry -- 1:30 -- I am having -- I can't
10  make out what that says.
11  Q.   Me neither.
12  A.   And 1:58 nurse, I don't know what that next word
13  is, inmate Melise, B, right, 9 top -- I don't know what
14  the last word is.
15  Q.   Is there anyone that might be able to decipher this?
16  Do you know who wrote it?
17  A.   The officer who wrote it.
18  Q.   Do you know who wrote it?
19  A.   I don't.
20  Q.   At the very top, it says 11-7 shift, 11/16 Friday; do
21  you see what it says after Friday?
22  A.   I am not sure where you are.
23      MR. SULLIVAN: Second page.
24  A.   CO -- it looks like Corvese.  That's a guess.
25  Q.   Do you know if such a person exists, if there is an

Page 128

1  Officer Corvese?
2  A.   I don't.
3  Q.   But, presumably, that officer whose name is on the top
4  might be able to decipher this document?
5  A.   If it is his handwriting.
6  Q.   Can you look at the next page, and can you read who
7  that officer is at the top?
8  A.   Yes, "CO J. Machado."
9  Q.   What does it say there in the middle of the page?
10  A.   "9-20, Inmate Melise to A left, 6 bottom, from B
11  right, 9 top, reason broke foot last night from fall."
12  Q.   Do you know whose signature that is at the bottom
13  underneath that?
14  A.   It is a lieutenant.
15  Q.   Somebody?
16  A.   (Witness nods)
17  Q.   Are there documents that would help us decipher who
18  might have signed that; as in, are there other
19  documents that would indicate who was on staff that
20  day?
21  A.   It would be the roll calls.
22  Q.   Can you quickly refer back to Exhibit 13?
23      (WITNESS COMPLIES)
24  Q.   And compare that to the second page of Exhibit 14, at
25  the top, see where it says date and time of incident,

Melise vs
Wall, et al

Kerri McCaughey
July 12, 2019

Page 129

1    11/11/2016, 1:19:42 A.M.; is that what that says on top
2   of the incident report?
3   A.  Yes.
4   Q.  And can you tell me what the time of the incident is
5   reported in the log book?
6   A.  It does not have the time next to Lieutenant
7   Flynn's -- in front of the notation that Lieutenant
8   Flynn was notified and the nurse was called.
9   Q.  But the line right above that, does it say 12:41 A.M.?
10  A.  Yes.
11  Q.  Apparently fell off his bunk?
12  A.  Yes.
13  Q.  So does that appear to indicate that the time of the
14  incident was 12:41 A.M.?
15  A.  It could be that's when the inmate told him that he
16  fell off the bunk.  I am not sure what you are asking
17  me.  That's what it says 12:41.
18  Q.  So, it is fair to assume that the plaintiff fell out of
19  his bed somewhere close to 12:41 A.M.?
20  A.  According to this notation, yes.
21  Q.  And is that different from what is listed in the
22  incident report?
23  A.  Yes.  This is the time that Lieutenant Flynn
24  generated the report.
25  Q.  Does it not indicate at the top that that's the date

Page 130

1   and time of the incident?
2   A.  Yes.
3   Q.  So it appears that the date and time listed in the
4   incident report for the incident is about 40 minutes of
5   from the time indicated in the log book; is that
6   accurate?
7   A.  That's what it appears, yes.
8   Q.  Do you know why there would have been a significant
9   discrepancy?
10  A.  I don't.
11  Q.  Do you know where Lieutenant Flynn would have gotten
12  the information about the date and time of the
13  incident?
14  A.  I don't.
15  Q.  It appears that did he did not refer to the log book in
16  order to determine the date and time of the incident;
17  is that fair to say?
18  A.  I am not going to answer for Lieutenant Flynn.
19  Q.  But it is not the same as what is in the log book?
20  A.  Correct.
21  Q.  It is normal for the date and time in an incident
22  report to be so different than what is indicated in the
23  log books?
24  A.  Not in my experience.
25  Q.  Based on the log book, it appears that the inmate fell

Page 131

1   out of his bed at approximately 12:45 A.M., and a nurse
2   arrived at approximately 1:12; is that accurate?
3   A.  Yes.
4   Q.  So, it took approximately 31 minutes for a nurse to
5   arrive; is that accurate?
6   A.  Yes.
7   Q.  Do you think that that's normal?
8   A.  It depends on what else was going on at the intake
9   center with the nurse.
10  Q.  Is there any way to determine what was going on at the
11  intake with the nurse?
12  A.  That would be in a log book at the intake center.
13  Q.  Can you explain to me what the day room is?
14  A.  The day room is, it is just a day room.  When
15  inmates come out of their cells, they are in their day
16  room, a recreation room in the middle of the mod.
17  There are tables, showers, phones.
18  Q.  Is it immediately outside of the cell, or are there
19  hallways between cells, and then they open up into the
20  day room -- I am just trying to get an idea of how it
21  is laid out?
22  A.  No.  It is immediately outside of the cell doors.
23  Q.  So would the cells be lined up around the day room?
24  A.  Yes.
25  Q.  And they would all open up into the day room?

Page 132

1   A.  Yes.
2   Q.  So this indicates that the inmate was sitting in the
3   day room from at least 1:12 to -- I am not sure, to
4   possibly 1:58; does that make sense?
5   A.  I can't make out what that notation is at 1:58.
6   Q.  On the incident report where does it indicate that the
7   incident location was?
8   A.  B mod, right, day room.
9   Q.  Does that make any sense to you?
10  A.  He would have came out -- once he acknowledged that
11  he had fallen, he would come out into the day room.
12  That's where he would wait for medical.
13  Q.  But the incident, as it was reported, would have
14  occurred in his cell next to his bunk?
15  A.  And it says that in the report, yes.
16  Q.  So why would the incident location then be listed as
17  the day room?
18      MR. SULLIVAN: Objection.
19  A.  That's a question for Lieutenant Flynn.
20  Q.  If it took between 12:41 and 1:58 for the plaintiff to
21  be removed from the B mod, does that appear to you to
22  be a reasonable amount of time to receive treatment for
23  his injuries?
24      MR. SULLIVAN: Objection.
25      MS. STOWELL: Objection.

Page 133

1  MS. DAVIS: You can still answer.
2 A.  That depends on -- I have no control.  I can't
3  answer that, that's for the nursing staff.
4 Q.  Do you have any knowledge about why it took an
5  hour-and-a-half for the plaintiff to leave the B mod?
6 A.  No.
7  MS. DAVIS: Exhibit 15, please.
8  EXHIBIT 15, PLAINTIFF'S, MARKED FOR I.D.
9 Q.  Can you tell me what this document is?
10 A.  It is a document generated by Lifespan.
11 Q.  Does this appear to be the Rhode Island Hospital
12  records of when Mr. Melise's reported after his injury
13  on 11/11/2016?
14 A.  That's what it appears to be, yes.
15 Q.  Do you see where it says the arrival date and time?
16 A.  Yes.
17 Q.  What time does it say?
18 A.  11/11/2016, 2:48.
19 Q.  Presumably that's A.M.; correct?
20 A.  Presumably.
21 Q.  Does it appear that it took over two hours for Mr.
22  Melise to be taken to a hospital after his injuries, is
23  that safe to assume from this document?
24  MR. SULLIVAN: Objection.
25 A.  From what I see here, yes.  He arrived at 2:48 at

Page 134

1  the top.
2 Q.  And the log book indicates that he fell around 12:41?
3 A.  Yes.
4 Q.  So it took over two hours for him to get to a hospital
5  after his injury; correct?
6 A.  Yes.
7 Q.  Based on this document?
8 A.  Yes.
9 Q.  Between 12:41 and 2:48, do you know if Mr. Melise
10  received any sort of medical treatment?
11 A.  I don't.
12 Q.  Is there any indication in the log book of receiving
13  any sort of treatment?
14 A.  I don't believe so, no.
15 Q.  So, during that time, he had a broken leg, and he was
16  not given ice or any other medical treatment, is this
17  safe to assume?
18 A.  He didn't have a broken leg.
19 Q.  I am sorry?
20 A.  He had a broken ankle.
21 Q.  I am sorry.  A broken ankle -- a broken fibula, I
22  believe.  But there is no indication in the log book
23  saying that he received any sort of treatment between
24  12:41 and 2:48?
25 A.  Right.  That treatment would have been provided by

Page 135

1  medical staff.
2  MS. DAVIS: Exhibit 16, please.
3  EXHIBIT 16, PLAINTIFF'S, MARKED FOR I.D.
4 Q.  Please look at this document?
5 A.  Yes.
6 Q.  What is it?
7 A.  An administrative note.
8 Q.  What date was it on?
9 A.  11/11/16.
10 Q.  And what was it for?
11 A.  It was for a bottom bunk, fall from sleep problems,
12  bottom tier, crutches for broken ankle.
13 Q.  Did you approve it?
14 A.  Yes.
15 Q.  On what date?
16 A.  11/17/16.
17 Q.  Do you know why it took a week to approve this?
18 A.  I don't.
19 Q.  Is there any indication of when you first saw it?
20 A.  On or around 11/17/16.
21 Q.  Do you know that for sure, or is that an assumption
22  based on when you signed it?
23 A.  Based on when I signed it.
24 Q.  So you cannot tell from this document when it was sent
25  to you, we just know it was sometime between 11/11 and

Page 136

1  11/17?
2 A.  Yes.
3 Q.  What are the other notations on this document?
4 A.  When broken ankle is healed, bottom bunk expires as
5  well.
6 Q.  Why did you write that note?
7 A.  I can't recall at the time.
8 Q.  What is the other notation on this document, the other
9  handwritten notation?
10 A.  3/10/17.
11 Q.  What does that indicate?
12 A.  Well, the stop date is crossed out, so I am
13  assuming that's the new stop date, or a date that it is
14  going to be reviewed.
15 Q.  So this indicates that you changed the expiration date
16  on the order to 3/10/2017; is that correct?
17 A.  Yes.  I changed time of review.
18 Q.  Well, you changed the expiration date because it would
19  expire on that date; is that correct?
20 A.  I changed it, based on when the broken ankle is
21  healed, the bottom bunk expires.
22 Q.  But in making that notation, you changed the expiration
23  date of the order; is that correct?
24 A.  Yes.
25 Q.  And is there any reason why you would have only granted

Page 137

1  this for the broken ankle?
2  A.  I don't recall.
3  Q.  The fact that it is listed as one of the reasons as
4  falls from sleep problem, what would that have
5  indicated to you?
6  A.  The way it appears to me is that I wanted both of
7  these issues reviewed on the same date.
8  Q.  Why?
9  A.  I don't know.
10 Q.  Is it safe to say at this point you had -- or previous
11 to this point, you had been given notification that
12 this inmate had sleep problems and did fall out of his
13 bed because of sleep problems; is that fair?
14      MR. SULLIVAN: Objection.
15 A.  No.
16 Q.  Can you look at Exhibit 11, please.  What was the
17 reason for granting this order?
18 A.  Falls.
19 Q.  And?
20 A.  There is a question mark of sleep apnea.
21 Q.  Is it fair to say that as of, at least as of 9/08/2016,
22 you were on notice that this inmate had experienced
23 falls and had some sleep issues; is that fair to say?
24 A.  It is fair to say that it was reported that the
25 inmate falls, and that there is question of sleep apnea

Page 138

1  on here.
2      MS. DAVIS: Exhibit 17, please.
3      EXHIBIT 17, PLAINTIFF'S, MARKED FOR I.D.
4  Q.  Can you identify this document?
5  A.  It is an administrative note.
6  Q.  A request for reasonable accommodations; is that
7  correct?
8  A.  Yes, special needs.
9  Q.  When did dated?
10 A.  12/13/2016.
11 Q.  And did you approve it?
12 A.  I approved the CPAP machine.
13 Q.  When was it set to expire?
14 A.  6/13/2017.
15 Q.  Do you know why the CPAP was circled?
16 A.  I circled it.
17 Q.  Do you know why?
18 A.  Because that's the order I was approving.
19 Q.  Do you know why that was the order you were approving;
20 do you know why that was the order you were approving,
21 among the three orders?
22 A.  I was approving a CPAP machine for sleep apnea.
23 Q.  Okay.  So was not an order for a bottom bunk, it was an
24 order just for the CPAP machine; that's what you were
25 approving?

Page 139

1  A.  Yes.
2  Q.  I understand.  As you had discussed, the reason there
3  were multiple orders listed on this order is just
4  because that's the way the system functioned?
5  A.  That's how it is generated.
6      MS. DAVIS: Exhibit 18, please.
7      EXHIBIT 18, PLAINTIFF'S, MARKED FOR I.D.
8  Q.  Can you identify this document?
9  A.  It is an administrative note dated 6/7/2017.
10 Q.  Is that a request for a reasonable accommodation for a
11 bottom bunk?
12 A.  Yes.
13 Q.  Who approved this?
14 A.  Deputy Diniz.
15 Q.  Why did it go to Deputy Diniz instead of you?
16 A.  I was likely out.
17 Q.  So, at that point, you had been -- I am not sure, but
18 you had referred to being promoted, had you changed
19 jobs to being the operational deputy warden?
20 A.  The dates?  I may not have moved yet.  I just may
21 not have been here.  As I mentioned earlier, as my peer
22 deputy, we would pick up the slack when the other one
23 was not around, so this was signed by the then
24 operations deputy.
25 Q.  Does it indicate any sort of request for additional

Page 140

1  information, or does it appear that it was approved
2  automatically?
3  A.  He circled bottom bunk, and he approved it.
4      MS. DAVIS: I promise, we are very close
5  to being done.  Do you all want to take a quick break?
6      (OFF-THE-RECORD DISCUSSION)
7      MS. DAVIS: Exhibit 19, please.
8      EXHIBIT 19, PLAINTIFF'S, MARKED FOR I.D.
9  Q.  What is this document?
10 A.  It is a policy on inmates and visitors and special
11 needs.
12 Q.  Do you recall reviewing this policy?
13 A.  I don't recall reviewing this policy.  I have at
14 one point reviewed all policies pertaining to my job.
15 Q.  But do you recall that at some point you did have to
16 review this policy specifically?
17 A.  Yes.
18 Q.  Can you look at Section II A., and read that for me,
19 please -- it is right there (indicating) at the bottom?
20 A.  "The RIDOC ensures that existing programs are
21 readily accessible to and usable by inmates with
22 special needs unless such accommodation would
23 materially impair the safe and efficient operations of
24 the program, present a safety hazard to the staff or
25 the individual inmate, threaten the security of the

Page 141

1    correctional institution/facility, or would otherwise
2    cause extreme hardship in the operation of the
3    institution/facility."
4    Q.   Can you please look at Section III D.2 -- I am sorry.
5    Can you look at Section III C2?  Just to confirm what
6    it says, that "The deputy warden in each facility is
7    designated as the facility ADA coordinator" -- as we
8    discussed, is that correct?  It is Page 3.
9    A.   Yes.  Oh, yes.  Did you want me to read that?
10   Q.   No.  I just wanted you to take a look at it to confirm
11   that this policy is what designates the deputy warden
12   as the facility ADA coordinator; is that correct?
13   A.   That's correct.
14   Q.   Can you look at D2b., which is on Page 4.
15        (WITNESS COMPLIES)
16   Q.   Can you read that first sentence in b.?
17   A.   In b.?
18   Q.   Yes.
19   A.   "The use of classification unit procedures to
20   explore options, such as transfer to a more suitable
21   facility or a unit within the institution, which may be
22   better equipped to deal with the needs of a particular
23   disability.  The associate director of classification
24   shall be responsible for ensuring that classification
25   staff are familiar with this policy and the concern

Page 142

1    presented by inmates with special needs."
2    Q.   Does this appear to allow inmates to be transferred to
3    other facilities that may be better equipped to deal
4    with the needs of an inmate, particularly, in regard to
5    special needs accommodation?
6    A.   That would be the intake center.
7    Q.   So this would allow the transfer of an inmate for
8    special need accommodation purposes?
9    A.   Yes.  For treatment at the intake center, which is
10   a hospital.
11   Q.   Look at Section III E, which is the next page, Page 5,
12   Section E 1.; what does this indicate are the avenues
13   for an inmate to request a reasonable accommodation?
14   A.   a.  "By request to or from medical staff for a
15   medically prescribed accommodation."
16   Q.   Or, what does b. say?
17   A.   b.  "Or by the inmate's completion of a request for
18   reasonable accommodation of special need(s) form."
19   Q.   So does that indicate to you that an inmate could make
20   a request directly to you on a particular form?
21   A.   They can, but they have to follow the chain of
22   command first.
23   Q.   Right, but that form would then go to you directly; is
24   that correct?
25   A.   Yes.

Page 143

1    Q.   And this does not indicate that it needs to be reviewed
2    by a medical staff first; is that correct?
3    A.   It does.
4    Q.   How so?
5    A.   Well, the actual -- the medical -- an inmate cannot
6    tell me that he has medical needs that require a
7    special accommodation.  I need that documented from
8    medical, so I am going to give that to medical.
9    Q.   Is that what this policy says?
10   A.   The inmate can request it.  It does not mean I am
11   not going to go to medical to get approval.
12   Q.   Can you look at Number E 2.?
13   A.   Same page?
14   Q.   Yes.  Can you read that?
15   A.   "If a medical staff member determines that a
16   medically prescribed accommodation is warranted, s/he
17   shall convey the medical order to the facility ADA
18   coordinator via the communication of inmate's special
19   needs form order, and shall enter a physician's order
20   in the inmate's medical record."
21   Q.   Can you read the next paragraph?
22   A.   "Under no circumstances shall correctional staff
23   substitute their judgment for that of medical staff
24   where a medical accommodation has been prescribed:
25        "Medically prescribed accommodations may be

Page 144

1    reviewed only to address institutional safety and
2    security concerns.  Should a medically prescribed
3    accommodation require a modification under these
4    circumstances, the facility ADA coordinator shall
5    notify medical staff of the safety and security
6    concerns so that medical staff can appropriately modify
7    the prescribed accommodation, if possible, or alternate
8    housing can be arranged."
9    Q.   So, does this section that you have just read indicate
10   to you that you are permitted to make decisions based
11   on anything, other than security concerns?
12   A.   Or to require a modification.
13   Q.   What does it say must happen if you are to require a
14   modification?
15   A.   I refer back to medical.
16   Q.   I believe that it says, "You shall notify medical staff
17   of the safety and security concerns so that medical
18   staff can appropriately modify the prescribed
19   accommodation."  At any point between 2014 and 2016,
20   when you were reviewing the medical orders for the
21   reasonable accommodation requests that we've just went
22   over, did you ever notify medical staff of your safety
23   and security concerns?
24   A.   I don't recall.
25   Q.   There is no indication on the request forms that we

Page 145

1 reviewed that you did; is that correct?
2 A. Yes.
3 Q. At no point is there any documentation that you ever
4 informed medical staff of your safety and security
5 concerns; is that correct?
6 A. To the best of my knowledge, that's correct.
7 Q. Can you go to Page 7?
8   (WITNESS COMPLIES)
9 Q. F 1. At the bottom; can you read that?
10 A. "Upon approval of a reasonable accommodation,
11 regardless of how the request was initiated, the
12 facility ADA coordinator will prepare and send a
13 reasonable accommodation/special needs memorandum to
14 the concerned inmate and distribute copies as indicated
15 on the form and to whomever else the facility ADA
16 coordinator deems necessary in order to properly
17 implement the accommodation.
18   "Additionally upon receipt of the memorandum of the
19 department, the ADA coordinator shall enter a brief,
20 but informative description of the accomodation(s) to
21 the inmate medical record in a form of a memo."
22 Q. Does this section conflict with any of your earlier
23 testimony regarding how special needs orders are
24 implemented?
25 A. No. I don't believe so.

Page 146

1 Q. Have you ever between 2014 and 2016 prepared and sent a
2 memorandum to the concerned inmate regarding the
3 approval of his accommodation?
4 A. No. I have sent it back to medical, and they send
5 my approval or denial to the inmate directly.
6 Q. So did you comply with the requirements of this section
7 of the policy?
8 A. I have not generated a memo to an inmate regarding
9 their special needs, no.
10 Q. Therefore, you have not complied with the specific
11 requirement of this section of the policy to prepare
12 such a memo and send it to the concerned inmate; is
13 that correct?
14   MR. SULLIVAN: Objection.
15 A. I have sent, I have ensured the information through
16 medical has gotten to the offender based on the special
17 needs request. I have not generated it through a memo.
18 I generate it through the special needs request so
19 medical can put it back into their EMR, and the red
20 copy signed by me goes to the inmate.
21 Q. Can you read F, Number 2?
22 A. Same page?
23 Q. Yes.
24 A. "When a request for reasonable accommodation is
25 modified or denied, the facility ADA provides the

Page 147

1 inmate with written notification to include reason(s)
2 for modification or denial.
3   "Copies are also forwarded to medical records and
4 records and identification for inclusion in the
5 affected inmate's file."
6 Q. Did you at any point between 2014 and 2016 provide the
7 plaintiff with written notification in the form of a
8 letter or memo, including reasons for the modification
9 or denial?
10 A. On the special needs request form.
11 Q. In what way?
12 A. By signing the special needs request form, that
13 documentation is provided to the inmates, the original.
14 Q. Did any of those orders that we've reviewed previously
15 include the reason for the modification or denial?
16 A. No.
17 Q. Then let me ask you again, at any point during 2014 and
18 2016, did you ever send to the plaintiff in this case a
19 written notification of the reasons for your
20 modification or denial of one of those accommodation
21 orders?
22 A. No. I sent it back to medical.
23 Q. In your estimation, did you comply with the
24 requirements of this policy, specifically, Section F2?
25 A. I got the information back to the offender through

Page 148

1 medical.
2 Q. But it did not include reasons for the modification or
3 the denial?
4 A. Correct.
5 Q. In that way, you did not fully comply with this section
6 of the policy; is that correct?
7 A. Correct.
8 Q. Why didn't you ever provide reasons for your
9 modification or denial for reasonable accommodation
10 requests?
11   MR. SULLIVAN: Objection. You can
12 answer, if you know.
13 A. Why did I not?
14 Q. Yes.
15 A. Because I responded to them through the special
16 needs request, that gave them the answer on their
17 request. They have it.
18 Q. Who is they, the medical staff, or the inmates?
19 A. The inmates received the red signed copy from me so
20 that they can have it on their person anywhere they are
21 in the facility.
22   So if any correctional staff questions whether they
23 have a special need for any reason, they are able to
24 produce that. That's why I do it that way.
25 Q. But, specifically, in regard to the denial, why did you

Page 149

1  not provide the inmate with reasons for denying the
2  orders?
3  A. I don't know.
4  Q. Would it have been helpful for the inmate to understand
5  why the reasonable accommodation requests were being
6  denied?
7     MR. SULLIVAN: Objection.
8  A. He received -- he made a request, and his request
9  was denied. He got that information back from me in a
10  denial. That's as far as I have taken it.
11  Q. Do you know, or do you understand why this policy might
12  require you to provide reasons for modifying or denying
13  reasonable accommodation requests?
14  A. Information that I would give back to inmates, I
15  would give them exactly what they needed to know for
16  safety and security reasons.
17  Q. Did you give them the required information that this
18  policy requires?
19  A. I gave him either the approval or denial with the
20  notation of the medical request.
21  Q. But you did not give him reasons for the denial?
22  A. No.
23  Q. Do you understand why this policy might have required
24  you to provide reasons for denial to the plaintiff?
25     MR. SULLIVAN: Objection.

Page 150

1  A. Yes.
2  Q. Why?
3  A. Do I understand why?
4  Q. Why do you think it would have required you to provide
5  reasons for denying the request?
6  A. So he would have closure.
7  Q. Do you think it might have given him the ability to
8  talk to medical staff about what he could have done
9  differently to obtain the necessary bottom bunk order?
10  A. I don't know that he didn't.
11  Q. Well, we know from the inmate event history that he was
12  assigned to a top bunk from at least October 5, 2015
13  until June 7, 2016, and then again from August 12, 2016
14  through November 11, 2016; is that correct?
15  A. Yes.
16  Q. So, during that time, he did not have a bottom bunk
17  that several medical providers believed that he should
18  have; is that correct?
19  A. He did not have a bottom bunk. Yes.
20  Q. And at no point during that time did you explain to the
21  plaintiff why his orders were being denied; is that
22  correct?
23  A. That's correct.
24  Q. Do you think it would have helped him to understand why
25  those orders were denied?

Page 151

1     MR. SULLIVAN: Objection.
2  A. I don't know.
3  Q. If you had provided written explanations, would you be
4  better able to explain today why you denied many of
5  special needs order that we went over?
6  A. I am sorry. I don't understand what you are asking
7  me.
8  Q. For many of the exhibits that we went over, many of the
9  special needs accommodation requests, I asked you why
10  you denied certain orders, or why you approved certain
11  orders, and on multiple occasions, you said I don't
12  know; is that correct?
13  A. Yes.
14  Q. Do you think if you had provided a written explanation
15  to the plaintiff, you would be better able today to
16  explain why you denied several of those requests?
17  A. No.
18  Q. Why not?
19  A. I have explained to you why I denied them when you
20  asked me.
21  Q. Did you not just agree that there were some orders that
22  you said you did not know why you denied them?
23  A. Yes.
24  Q. So if you had written down an explanation at that time,
25  would we be able to understand why you denied them

Page 152

1  today?
2  A. Yes.
3  Q. Can you, please, look at section III H, which is on
4  Page 9?
5     (WITNESS COMPLIES)
6  Q. Can you read that?
7  A. Section H.
8  Q. Yes?
9  A. "Facility-specific procedures: The warden or
10  designee of each facility shall be responsible for
11  implementing and implementing facility-specific
12  procedures pursuant to this policy.
13     "Such procedures shall include at a minimum:
14     "1. a description as to how special needs
15  accommodations are communicated to affected staff on
16  the various shifts who may have responsibility for
17  implementation of said accommodations; and
18     "2. a designation of the locations where inmates
19  may obtain a request for reasonable accommodations of
20  special need(s) form." A request, where an inmate can
21  obtain the request for reasonable accommodations."
22  Q. And as we have discussed, you were the designee for
23  this facility; is that correct?
24  A. Yes.
25  Q. And did you at any point prepare, develop or implement

Page 153

1   facility-specific procedures pursuant to this policy?
2   A.   Yes.  When I would have -- I had personal needs
3   request that were going to be approved, I worked with
4   medical staff to generate a form that allowed us --
5   security staff and medical staff -- to determine what
6   an offender could or could not do based on their
7   medical needs, including jobs, including programs,
8   including gym activities, organized sports.
9       Those were generated to all of the areas of the
10  facilities that would be affected by that.  For
11  example, the gym, the housing units, the industries
12  lieutenant who assigns job, the housing lieutenants who
13  assign jobs.
14  Q.   Are you saying that there's a document that explains
15  all of that?
16  A.   Yes.
17  Q.   What is that document?
18  A.   It's a special needs accommodation form.  I created
19  it with medical staff.
20  Q.   But is that different from the form that the medical
21  staff were filling out to send to you?
22  A.   It is in addition to.
23      MS. DAVIS:  Okay.  I would like to get a
24  copy of that form?
25      MR. SULLIVAN:  Sure.

Page 154

1       (SO NOTED)
2   Q.   Were there any other written procedures specific to
3   implementing this policy, other than what you have just
4   described?
5   A.   Well, in addition to what I have just described --
6   if I could revisit the question about me not writing a
7   memo to an inmate on why there was an a denial or an
8   approval.  They sign those forms.
9       So, if a special needs request was implemented, and
10  there was going to be accommodations that we would need
11  to implement, that offender is going to sign that form
12  that indicates what restrictions they have to keep them
13  safe, whether it is not lifting weights or not having a
14  specific job, they sign that off.
15      So, they are very well aware that the medical
16  condition that they have, we are going to protect them
17  from not harming themselves further.
18      So, when the medical staff gives me that form, and
19  it is signed, they are going to attach that -- they are
20  going to attach that to it.
21  Q.   Are you aware if the inmate in this case has ever been
22  provided with one of those?
23  A.   I don't know.
24  Q.   Are there any specific written procedures on
25  implementing the processes described in this policy; as

Page 155

1   in, how the medical staff submits the form to you, how
2   you submit it back, are there any written procedures
3   specifically on that aspect?
4   A.   I don't know.
5   Q.   Did you at any point train affected staff on how to
6   implement this policy?
7   A.   Did I specifically train?
8   Q.   Yes.
9   A.   No.
10  Q.   And I believe that you previously testified that at no
11  point did you take any steps to ensure that orders that
12  you had approved had been implemented; is that correct?
13  A.   Yes.
14  Q.   Does this policy indicate that that would have been
15  your responsibility?
16  A.   To ensure that?
17  Q.   That all aspects of this policy were implemented; as
18  in, if an accommodation request was approved, that it
19  would then be implemented fully?
20  A.   I give the special needs back to medical, and the
21  copy goes to inmate, and the housing assignment goes to
22  security.
23  Q.   Does this policy indicate that it is your
24  responsibility for ensuring that every aspect of this
25  policy is implemented?

Page 156

1   A.   Yes.
2   Q.   So, ultimately, it would have been your responsibility
3   to ensure that the orders you approved were fully
4   implemented; is that accurate?
5   A.   It is my responsibility that I make sure that I
6   generate the information to the parties that need it.
7   Q.   That would include having correctional staff implement
8   approved orders; is that correct?
9   A.   Yes.
10  Q.   Based on all of these sections that we have reviewed in
11  this policy, have you properly exercised your
12  responsibility to ensure that the medium security
13  facility fully complied with this policy?
14      MR. SULLIVAN:  Objection.  You can
15  answer.
16  A.   Can you ask one more time, please?
17  Q.   Based on each of the sections that we have just
18  discussed, have you properly exercised your
19  responsibility to ensure that this policy is followed
20  by the medium security facility?
21  A.   I implemented it, yes, to the best of my ability.
22  Q.   Do you believe you fully complied with every aspect of
23  this policy?
24  A.   Yes.
25  Q.   Did you at any point send a written explanation to the

Page 157

1 inmate for why you denied a reasonable accommodation
2 request?
3 A. I sent him the denial.
4 Q. You did not at any point provide a written explanation
5 for those denials?
6 A. No.
7 Q. So do you believe that you fully complied with this
8 policy?
9 A. By not explaining to him why I denied him, in that
10 particular instance, yes.
11 Q. Yes, you do think you fully complied? I am sorry. Do
12 you believe that you complied with every aspect of this
13 policy?
14 A. Not that particular aspect. However, he did have
15 his denial, and he also had his -- he would have a
16 signoff sheet for restrictions.
17 Q. If the accommodation had been approved?
18 A. Yes, and so on those instances, that it was, he
19 would, one of those sheets should have been attached.
20 I just can't tell you right here if it actually was.
21 MS. DAVIS: Exhibit 20.
22 EXHIBIT 20, PLAINTIFF'S, MARKED FOR I.D.
23 Q. Can you quickly look on Page 2? At the second page,
24 the second paragraph, your name, and it says that you
25 assisted in the preparation of these responses,

Page 158

1 including responses to Interrogatories 1 through 7, and
2 9 through 22; is that correct?
3 A. Yes.
4 Q. Can you look at Response Number 4?
5 (WITNESS COMPLIES)
6 Q. Can you look at Response Number 8 -- I am sorry?
7 (WITNESS COMPLIES)
8 Q. Number 8 is one of the two that you did not respond to,
9 do you know why Kim Kane responded to this question,
10 and not you?
11 MR. SULLIVAN: Objection.
12 A. I don't.
13 Q. This is a request in regard to the procedures and
14 practices for the DOC medical staff to submit special
15 needs, urgent orders, medical orders, reasonable
16 accommodation requests; is that correct?
17 A. Are you reading the interrogatories?
18 Q. I am just reading if that is what this interrogatory is
19 about. This is about special needs and urgent orders;
20 is that correct?
21 A. From the medical staff's perspective, yes.
22 Q. Based on the policy that you have just read, were you
23 responsible to ensure that the implementation of that
24 policy be followed by all staff?
25 A. Not medical staff.

Page 159

1 Q. Why not medical staff?
2 A. That would be where Kim Kane would come in.
3 Q. If you were responsible for implementing that policy,
4 why would you not be responsible for ensuring that
5 medical staff complied with that policy?
6 A. That would be something that would be followed up
7 by medical. So, medical would ensure that their staff
8 are following that policy.
9 Q. But would you communicate with medical staff to ensure
10 that they're following that policy?
11 A. With Kim Kane.
12 Q. So you would talk to Kim Kane about ensuring that
13 medical staff are following the policy; is that
14 correct?
15 A. Yes. If it was today, it would be Kim Kane, but it
16 was not Kim Kane back then.
17 Q. Who was it back then?
18 A. Gordon Bouchard.
19 Q. That is the person that you would communicate in regard
20 to implementing the ADA policy?
21 A. He is the one that I would go to to ensure that
22 medical staff are submitting them the way they are
23 supposed to be.
24 Q. Did us discuss with Mr. Bouchard your concerns about
25 the special needs requests?

Page 160

1 A. No, not that I can recall.
2 Q. Why not?
3 A. I don't recall.
4 Q. Can you look at Interrogatory Number 9, your response
5 to this interrogatory was assisted in preparation by
6 you; is that correct?
7 A. I am sorry?
8 Q. You assisted in preparing the response to this
9 interrogatory response?
10 A. Yes.
11 Q. And in this explanation, or let's discuss Interrogatory
12 Number 9, it requests that you describe in detail the
13 procedures and practices to be followed by correctional
14 staff in regard to the intake and medium security
15 facilities, including the deputy warden, in evaluating
16 and approving, modifying, or denying special
17 needs/urger orders, is that correct? This
18 interrogatory is asking about procedures in regard to
19 special needs accommodation; is that correct?
20 A. Yes.
21 Q. And in this, you responded -- I am looking at the third
22 paragraph in the response, the second sentence starts
23 with, "Orders for medically prescribed special
24 accommodations are reviewed by the deputy warden of the
25 facility to address institutional safety and security

Melise vs
Wall, et al

Kerri McCaughey
July 12, 2019

Page 161

1   concerns"?
2   A.   Yes.
3   Q.   Is that correct?
4   A.   Yes.
5   Q.   Then it says, "After reviewing the order, the deputy
6    warden may either request more information, recommend a
7    modification, grant the request, or deny the request.
8    Orders are denied if they would materially impair the
9    safe and efficient operation of the program, present a
10   safety hazard to staff or the individual inmate,
11   threaten the security of the correctional
12   institution/facility, or otherwise cause extreme
13   hardship in the operation of the institution/facility";
14   is that correct?
15   A.   Yes.
16   Q.   And that comports with the ADA policy that we have just
17   reviewed; is that correct?
18   A.   Yes.
19   Q.   Is there anything in this explanation that gives you
20   the authority to review medical providers' requests
21   based on the legitimacy of the request?
22   A.   If I am looking for documentation, yes.  If I am
23   looking for real documentation, that this actually
24   exists, yes, that the medical condition actually
25   exists.

Page 162

1   Q.   Which specific reason listed in this answer allows you
2    to do that?
3   A.   Addressing institutional and safety concerns.
4   Q.   Specifically, it says that it would threaten the
5    security of the correctional institution/facility or
6    otherwise cause extreme hardship in the operations; is
7    that correct?
8   A.   I am looking at the paragraph above.
9   Q.   Orders are denied if they would materially impair the
10   safe and efficient operation; is that what you are
11   looking at?
12   A.   I am looking at that, and I am also looking at
13   orders for medically prescribed special accommodations
14   are reviewed by the deputy warden of the facility to
15   address institutional safety and security concerns.
16   Q.   Right, but it then gives explicit reasons why you are
17   permitted to deny an order; is that correct?
18   A.   It gives me the opportunity to request more
19   information.
20   Q.   Well, I do not believe that the policy actually does
21   that.  It says, Orders are denied if they would impair
22   the safe -- if they would materially impair the safe
23   and efficient operation of the program; is that
24   correct?
25   A.   That's one reason, yes.

Page 163

1   Q.   And would a request for a bottom bunk, in regard to the
2    plaintiff in this case, would that have ever materially
3    impaired the safe and efficient operation of the
4    program?
5   A.   Well, the bottom bunk order is not a program, but
6    it could have presented a safety hazard to staff and/or
7    other individual inmates.
8   Q.   Granting a bottom bunk would have presented a safety
9    hazard; is that what you are saying?
10   A.   I am saying that bottom bunk orders are -- I have
11   limited bottom bunk orders, so I am going to ensure
12   that people who actually have them have documented
13   medical documentation that indicates it is required.
14   Q.   How would granting a request for a bottom bunk present
15   a safety hazard to staff or the individual inmate?
16   A.   By creating a climate issue.
17   Q.   Would it have created a climate issue to grant it
18   specifically for the plaintiff in this case?
19   A.   It could have.
20   Q.   Did it?
21   A.   No.
22   Q.   At any point, have you seen the granting of a bottom
23   bunk create a hazard to staff or inmates?
24   A.   Yes.
25   Q.   In what way?

Page 164

1   A.   By granting bottom bunks to individuals who don't
2    necessarily need them, and preventing someone who
3    clearly does need one from potentially not getting one.
4   Q.   Has that actually happened?  Have you granted orders
5    that prevented other inmates from receiving orders for
6    a bottom bunk?
7   A.   What I have had is an inmate who was on a bottom
8    bunk who did not have a bottom bunk order being moved
9    to a top bunk so another offender could come into that
10   same cell and have the bottom bunk.  Sometimes that's
11   caused a climate issue between the two of them, if the
12   person on the bottom bunk order does not appear to be
13   legitimate.
14   Q.   Was that a concern for the plaintiff in this case?
15   A.   Was what a concern?
16   Q.   The creation of a safety hazard to the inmate.
17   A.   It was one of the things that I looked at, yes.
18   Q.   Are you aware that it ever did create a safety hazard
19   in regard to the plaintiff in this case?
20   A.   No.
21   Q.   Would granting the bottom bunk for the plaintiff in
22   this case have, otherwise, caused an extreme hardship
23   in the operation of the institution/facility?
24   A.   I don't know.
25   Q.   Do you have any reason to believe that it would have

Melise vs
Wall, et al

Kerri McCaughey
July 12, 2019

Page 165

1 created an extreme hardship of the operation of the
2 institution/facility?
3 A. I don't know.
4 Q. You do not know? Does that mean that you have no
5 information to believe that it would have created an
6 extreme hardship?
7 A. I have no information to believe that this
8 particular case would have created an extreme hardship
9 as one of the areas that I looked at.
10 Q. Can you look at response to Number 11, please.
11 (WITNESS COMPLIES)
12 Q. Does this provide a response to the request for a
13 description in detail of the circumstances under which
14 a deputy warden may deny or modify special needs
15 accommodation requests?
16 A. I am sorry. Can you ask that again?
17 Q. Does this interrogatory request a response, describing
18 in detail the circumstances under with a deputy warden
19 may deny or modify a special needs request; is that
20 what this interrogatory is requesting?
21 A. Yes.
22 Q. And can you, please, read the last paragraph on that
23 page, and you can read it to yourself?
24 (WITNESS COMPLIES)
25 Q. Does the answer provided in this interrogatory, Number

Page 166

1 11, conflict with any of your prior testimony?
2 A. I don't believe so, no.
3 Q. Does it say that a deputy warden may not change,
4 substitute, or modify an order from a medical provider?
5 A. Yes.
6 Q. Were there exhibits that we reviewed earlier where you
7 did, in fact, change or modify orders unilaterally?
8 A. I changed a review date.
9 Q. Which is the expiration date; is that correct?
10 A. It is a review date.
11 Q. But it determines the expiration of the order; is that
12 correct?
13 A. Yes.
14 Q. So you, unilaterally, on multiple occasions changed the
15 expiration date from what the medical provider had
16 designated; is that correct?
17 A. No. I believe I changed it on one form.
18 Q. Would you like to look at them to verify?
19 A. Are you referring to this as one of them?
20 Q. Does it change the expiration date?
21 A. No. I just circled the bottom one. Is that the
22 one you are referring to?
23 Q. It is also be regarded as a modification, but I believe
24 there are at least two orders where you changed the
25 expiration date.

Page 167

1 A. I find one (indicating).
2 MR. SULLIVAN: I believe she is referring
3 to Exhibit 11, I think.
4 THE WITNESS: That's what I said.
5 A. Is that what you are referring to, the one where I
6 just circled the bottom bunk one?
7 Q. Yes. I think Number 11 and Number 16?
8 A. Yes. Where I changed it to March.
9 Q. So on those two occasions, you did unilaterally modify
10 the expiration date of those orders; is that correct?
11 A. No. I circled the bottom bunk order, which was the
12 last order entered. That's the last order entered, so
13 I just circled it, because it was the last order
14 entered, and the other one, I changed the review date.
15 Q. In effect, you had chosen the expiration date for the
16 one that you circled; is that correct?
17 A. I chose a review date.
18 Q. And that date is the date that the order will expire;
19 correct?
20 A. Yes. Well, we would review, and it may have gotten
21 extended, but that was the date we were going to review
22 it.
23 Q. But without a review, it would not continue; correct?
24 A. Correct. Medical would give me a new form.
25 Q. When Dr. Vohr was the medical director at medium

Page 168

1 security, was he aware that you denied an accommodation
2 request based upon whether or not you deemed them
3 legitimate?
4 MS. STOWELL: Objection.
5 A. I don't know.
6 Q. Did you ever discuss it with him?
7 MS. STOWELL: Objection.
8 A. I don't recall.
9 Q. Is Dr. Clarke currently aware that you denied
10 accommodation requests based on whether or not you
11 deemed them legitimate?
12 MS. STOWELL: Objection.
13 MR. SULLIVAN: Objection.
14 A. I don't know.
15 Q. Have you ever discussed your review of accommodation
16 requests with Dr. Clarke?
17 A. I don't recall.
18 Q. Was Director Wall ever aware that you denied
19 accommodation requests based on whether or not you
20 deemed them legitimate?
21 MR. SULLIVAN: Objection.
22 A. I don't know.
23 Q. Did you ever discuss it with him?
24 A. I don't recall.
25 Q. And who is the current director of the DOC?

Melise vs
Wall, et al

Kerri McCaughey
July 12, 2019

Page 169

1  A.  Trish Coyne-Fague.
2     MS. STOWELL: I do believe it is
3  Patricia, actually.
4  A.  Yes, it is.
5     MS. DAVIS: Thank you.
6  Q.  Is she currently aware that you deny accommodation
7  requests based on whether or not you deem them
8  legitimate?
9  A.  I don't do them anymore.
10 Q.  You're right.  That was my fault.  When was the last
11 time that you reviewed accommodation requests?
12 A.  Approximately 18 months ago.
13 Q.  And was the warden of medium security facility aware
14 that you were denying accommodation requests, based
15 upon whether or not you deemed them legitimate?
16 A.  I am not sure.
17 Q.  Did you ever discuss your review of the accommodation
18 requests with the warden?
19 A.  Yes.
20 Q.  So, do you recall ever telling the warden that you felt
21 that you did not have enough information in the
22 requests that were given to you from medical?
23 A.  On some occasions, I did.
24 Q.  Did you tell him that you found the lack of information
25 to be difficult in your determination of whether or not

Page 170

1  the request was legitimate?
2  A.  I am sorry?  Can you ask that again.
3  Q.  I believe that you earlier testified that you did not
4  like that you did not receive enough information
5  because you could not determine whether or not the
6  request was legitimate; is that correct?
7  A.  Yes.
8  Q.  Did you ever complain to the warden, that the lack of
9  information in the request meant that you could not
10 determine whether the requests were legitimate?
11 A.  I didn't complain to the warden, but it is
12 something that would have been documented in triage
13 meetings of mine that he would review.
14 Q.  So, he very well might have been aware of the fact that
15 you were reviewing these based on whether or not you
16 deemed them legitimate?
17 A.  Some of them, yes.
18 Q.  Who was warden of the medium facility -- medium
19 security facility when you were the programmatic
20 deputy?
21 A.  Sergio DeSousa Rosa.
22 Q.  Was that the whole time that you were in that position?
23 A.  Yes.
24    MS. DAVIS: I have no further questions.
25    MS. STOWELL: I have a few.

Page 171

1     EXAMINATION BY ATTORNEY HILL
2  Q.  Earlier in the deposition you gave a list of the
3  reasons that you might approve an accommodation
4  request; is that correct?
5  A.  Yes.
6  Q.  Do you review all of those requests individually?
7  A.  Yes.
8  Q.  Do you decide whether to grant or reject an
9  accommodation request based solely on those categories
10 of injuries that you named earlier?
11 A.  No.
12 Q.  So you might decide to approve or reject --
13    MS. STOWELL: Strike that.
14 Q.  You might have approved a request for accommodation
15 based on a reason that was not one of the ones that you
16 named earlier?
17 A.  Yes.
18 Q.  So that was not an inclusive list of medical conditions
19 that you would grant an accommodation for?
20 A.  Correct.
21 Q.  You testified earlier that you would grant bottom bunk
22 requests for inmates who are diabetic?
23 A.  Yes.
24 Q.  And why would that be granted?
25 A.  That's a request that came through medical, that

Page 172

1  people who have a diagnosis of diabetes be not only
2  house in bottom bunks, but obviously, on bottom tiers.
3  Q.  Do you know if medical staff verifies an inmate has a
4  medical condition before sending in an accommodation
5  request to you?
6  A.  Do I know if they verify?
7  Q.  Right.
8  A.  They don't always verify.
9  Q.  Let me back up.  Have you been in a meeting with
10 medical staff and an inmate where they requested
11 accommodations at any point?
12 A.  Yes.
13 Q.  And in that meeting, did medical staff verify that an
14 inmate had a medical condition requiring an
15 accommodation?
16 A.  No.
17 Q.  Are you in all meetings between medical staff and an
18 inmates when they request accommodations?
19 A.  No.
20 Q.  So you are not aware if medical staff always verifies
21 that an inmate has a medical condition before they send
22 an accommodation request to you?
23 A.  Correct.
24 Q.  So, medical staff may have sent every request for
25 accommodations from an inmate to you?

Melise vs
Wall, et al

Kerri McCaughey
July 12, 2019

Page 173

1 A. Yes.
2 Q. Is there any way in the documentation sent to you for
3   you to know if medical staff has verified that an
4   inmate has a medical condition before they request
5   accommodations from you?
6 A. No.
7 Q. When you say that you reviewed these requests for
8   legitimacy, what criteria were you using to determine
9   whether or not a request was legitimate?
10 A. When a special needs request comes to me, I want
11   verification that there is a documented medical need.
12   So, legitimacy, the offender population asks for
13   requests all of the time for all different things,
14   wedges, eggcrate mattresses, and what I am looking to
15   do is to determine whether or not that request is
16   valid, if it is a valid request, if the information
17   that the inmate is presenting, especially if it is
18   self-reported, can be validated.
19 Q. So when you say validated, you are asking if there is
20   appropriate medical -- sorry.
21   MS. STOWELL: Strike that.
22 Q. So, you're looking to see if there has been a medical
23   diagnosis or documentation of a condition that an
24   inmate would need an accommodation for?
25 A. To support that request, yes.

Page 174

1 Q. The documents that are sent to you from medical staff,
2   those are requests for accommodations?
3 A. Yes.
4 Q. They are not orders for accommodations?
5 A. Correct.
6 Q. What about a bunk order, would that be the kind of
7   accommodation that would typically warrant a transfer
8   of an inmate to another facility?
9 A. A bottom bunk order?
10 Q. Yes.
11 A. No.
12 Q. What type of an accommodation would generally warrant a
13   transfer to another facility?
14 A. A medical condition that requires more than we can
15   provide at medium security, so then they would go to
16   the intake hospital.
17 Q. Would that be a condition like a cancer treatment?
18 A. Yes.
19 Q. Now, you testified earlier that you have not been in a
20   situation where you have run out of bottom bunks;
21   correct?
22 A. Correct.
23 Q. Would running out of bottom bunks to assign be an
24   extreme hardship to the facility?
25 A. Yes.

Page 175

1 Q. In what way would that be an extreme hardship?
2 A. Because if we have legitimate medical bottom bunk
3   orders that we can't fulfill, it is at that point that
4   we would be in violation of law with the ADA.
5 Q. And just to clarify, when you say legitimate, you mean
6   that to be medically documented?
7 A. Yes.
8   MS. STOWELL: Anything from you, Justin?
9   MR. SULLIVAN: Just one.
10   EXAMINATION BY ATTORNEY SULLIVAN
11 Q. If you could take a look at Exhibit 19, on the top, in
12   the box, do you see where it says inmate/public access?
13 A. Yes.
14 Q. Do you see there are check boxes next to it?
15 A. Yes.
16 Q. Which one of those check boxes is checked?
17 A. Yes.
18 Q. The one that says yes?
19 A. Yes.
20 Q. Would that indicate that inmates in all facilities have
21   access to this particular policy?
22 A. Yes.
23 Q. Including the plaintiff, Stephen Melise?
24 A. Yes.
25 Q. So if I draw your attention to Page 5, Section E, where

Page 176

1   it says, The inmate's request for reasonable
2   accommodation may be initiated in one of two ways, is
3   it fair to say that the plaintiff would have access to
4   this policy, and in that policy, he would have
5   knowledge that he could submit a reasonable
6   accommodation request?
7 A. Yes.
8 Q. To your knowledge, do you recall ever having received
9   an accommodation request directly from the plaintiff?
10 A. No. I don't recall.
11   MR. SULLIVAN: Nothing further.
12   MS. STOWELL: I have one question.
13   FURTHER EXAMINATION BY ATTORNEY STOWELL
14 Q. Very quickly, just for the record, we are talking about
15   tiers and floors and mods. Would you able to give a
16   very basic description of the layout of medium security
17   for those of us that have never been there?
18 A. The housing unit, or the security itself?
19 Q. The housing unit, tiers, mods.
20 A. Okay. I am a visual person, so I can appreciate
21   that. So when you walk into a housing unit, there is a
22   solid, locked door. The door is popped open by the
23   main control center. You walk in. There is a main
24   control center in front of you. There is a
25   correctional officer in that main control center.

Page 177

1    There are two sliders, doors that slide and lock on
2  each side of that control center, left and right.  When
3  those sliders are open, you enter the housing unit.
4    The housing unit has a set of stairs that goes up
5  to a top tier.  It has phones on the walls.  It has a
6  bank of showers, and then it has 48 cells that go
7  around the day room and 48 cells that go around the
8  top.
9  Q.  Okay.
10 A.  The day rooms have metal picnic tables in the
11  center of them where they can play games, listen to MVP
12  players, tablets, what have you.
13 Q.  Then each mod would be what you would call unit B mod,
14  A mod?
15 A.  A through F.
16 Q.  And they each have a left and a right?
17 A.  Correct.
18 Q.  And each of those have two floors with the day room in
19  the middle?
20 A.  Correct.
21    MS. STOWELL: That's my only question.
22  Thank you.  No further questions.
23    THE REPORTER: For the record, does
24  counsel want a transcript of the proceedings?
25    MS. DAVIS: Original, or actually

Page 178

1  whatever our standard order is.
2    MR. SULLIVAN: Regular copy and
3  electronic with exhibits.
4    MS. STOWELL: Standard order, electronic
5  full, and mini with exhibits.
6    (DEPOSITION CONCLUDED AT 3:15 P.M.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 179

1                C E R T I F I C A T E
2
3  I, Lori Spremulli Confreda, Certified Court Reporter, in
   and for the State of Rhode Island, duly commissioned and
   qualified to administer oaths, do hereby certify that the
4  foregoing deposition of Kerri McCaughey, a Defendant in the
   above-entitled cause, was taken before me on behalf of the
5  Plaintiff, at Sinapi Law Associates, Ltd., 2374 Post Road,
   Suite 201, Warwick, Rhode Island 02886, on Friday, July
6  12th, 2019, at 10:00 A.M.  That previous to examination of
   said witness, who was of lawful age, she was first sworn by
7  me and duly cautioned and sworn to testify to the truth,
   the whole truth and nothing but the truth, and that she
8  thereupon testified as in the foregoing manner as set out
   in the aforesaid transcript.
9
   I further certify that the foregoing deposition was taken
10 down by me in machine shorthand and was later transcribed
   by computer and that the foregoing deposition is a true and
11 accurate record of the testimony of said witness.
12 Pursuant to Rule 28 of the Federal Rules of Civil
   Procedure, original transcripts shall not be filed in
13 court; therefore, the original is delivered and retained by
   Plaintiff's attorney, Chloe A. Davis.
14
   Reading and signing of the deposition was not requested by
15 the Witness and Counsel.
16 IN WITNESS WHEREOF, I have hereunto set my hand this 25th
17 day of July, 2019.
18
19
20
21
22    _____
      LORI SPREMULLI CONFREDA,
23      CERTIFIED COURT REPORTER, R.P.R.
24 IN RE:  MELISE VS. WALL, ET AL.
   C.A. NO. 1:17-cv-00490-JJM-PAS,
25        UNITED STATES DISTRICT COURT,
          FOR THE DISTRICT OF RHODE ISLAND

# A

**abbreviate (1)**
6:6
**ability (13)**
7:17;33:2;56:23;
63:18;65:7,13,25;71:5;
101:6,7;103:16;150:7;
156:21
**able (28)**
30:14;31:10;36:9;
57:7;58:4;59:4;60:6,
10,18;61:9,17,18;
65:15;76:24;78:1;
85:16;91:5;97:2,6,15,
17;127:15;128:4;
148:23;151:4,15,25;
176:15
**above (4)**
89:12,15;129:9;
162:8
**absence (2)**
88:6,11
**absolute (1)**
77:2
**absolutely (2)**
7:5;20:23
**access (9)**
17:6,11,12;30:12;
36:7;61:21;175:12,21;
176:3
**accessibility (2)**
31:1;37:21
**accessible (1)**
140:21
**accommodate (4)**
59:8;71:4;77:1,3
**accommodated (4)**
42:10;79:7,16,23
**accommodation (94)**
33:5;34:4,7;36:19;
38:21;41:9;42:3,15;
45:4,19;49:6;50:17,22;
51:3,6,20,25;52:8,11,
13,24;53:16;54:16,23;
55:7;67:14,23;74:12;
78:11;79:3,6,16,18,19,
22;80:10,14;81:5;82:5;
88:24;91:10,25;
118:21;139:10;140:22;
142:5,8,13,15,18;
143:7,16,24;144:3,7,
19,21;145:10,17;146:3,
24;147:20;148:9;
149:5,13;151:9;
153:18;155:18;157:1,
17;158:16;160:19;
165:15;168:1,10,15,19;
169:6,11,14,17;171:3,
9,14,19;172:4,15,22;
173:24;174:7,12;
176:2,6,9

**accommodation/special (1)**
145:13
**accommodations (30)**
17:18;19:5;20:3;
32:21,24;33:2,12,24;
34:1;37:20;38:2;45:24;
50:14,16;109:15;
138:6;143:25;152:15,
17,19,21;154:10;
160:24;162:13;172:11,
18,25;173:5;174:2,4
**accomodations (1)**
145:20
**According (2)**
86:7;129:20
**accountability (1)**
54:19
**accurate (6)**
7:1;122:2;130:6;
131:2,5;156:4
**acknowledge (1)**
72:19
**acknowledged (1)**
132:10
**Acting (8)**
11:19,22;12:13,13,
15,18;13:11;14:9
**action (2)**
120:23,24
**activities (1)**
153:8
**activity (1)**
62:19
**actual (4)**
35:25;76:17;78:23;
143:5
**actually (12)**
46:14;54:20;94:16;
105:2;157:20;161:23,
24;162:20;163:12;
164:4;169:3;177:25
**ADA (31)**
13:22,25;14:11,14,
18,25;15:6;16:1,9;
17:21;18:3,11,18;19:4;
20:6,11,17;114:10,11,
16;141:7,12;143:17;
144:4;145:12,15,19;
146:25;159:20;161:16;
175:4
**added (3)**
93:16;121:21,22
**adding (2)**
90:24,24
**addition (3)**
100:25;153:22;154:5
**additional (6)**
92:22,24;96:5;
121:10;123:7;139:25
**Additionally (1)**
145:18
**address (4)**
8:23;144:1;160:25;

162:15
**addressed (1)**
123:8
**Addressing (1)**
162:3
**adequate (4)**
21:3,7,18,23
**administration (7)**
12:1;13:20;40:9;
50:6;54:13;80:15;
122:20
**administrative (6)**
86:18;88:21;109:14;
135:7;138:5;139:9
**administrator (6)**
15:17;19:11;29:15;
88:7,8,12
**Administrators (2)**
28:22;120:4
**Adult (7)**
10:3,6,7,16,18,25;
11:7
**advised (1)**
93:3
**advises (1)**
7:10
**affect (10)**
7:16;37:10;57:2,9;
63:7,10;65:13;87:13;
94:20;99:1
**affected (5)**
11:13;147:5;152:15;
153:10;155:5
**affiliation (1)**
5:10
**afforded (1)**
14:20
**Again (13)**
26:25;40:20;42:7,25;
63:24;92:15;93:11;
102:23;117:15;147:17;
150:13;165:16;170:2
**against (2)**
6:1;66:9
**ago (4)**
13:2;19:7;95:16;
169:12
**agree (1)**
151:21
**ahead (1)**
79:10
**allegation (1)**
72:22
**allegations (2)**
72:6,9
**allow (6)**
65:12;97:11;112:3;
114:19;142:2,7
**allowed (5)**
23:20;49:18;56:4;
60:6;153:4
**allows (1)**
162:1

**almost (1)**
107:2
**along (1)**
63:14
**alternate (1)**
144:7
**Although (1)**
90:4
**always (5)**
46:10;47:1;106:4;
172:8,20
**ambiguous (1)**
110:7
**ambulance (1)**
31:3
**ambulances (1)**
31:2
**among (1)**
138:21
**amount (2)**
68:12;132:22
**and/or (4)**
17:18;20:10;63:21;
163:6
**ankle (7)**
119:25;134:20,21;
135:12;136:4,20;137:1
**announced (3)**
27:12,23,24
**announcement (1)**
27:15
**Anthony (1)**
5:13
**anymore (1)**
169:9
**apnea (6)**
109:3;110:25;111:1;
137:20,25;138:22
**apparently (2)**
126:17;129:11
**appear (11)**
89:21;113:23;122:1,
6;129:13;132:21;
133:11,21;140:1;
142:2;164:12
**appeared (1)**
103:9
**appears (9)**
25:13;90:4;119:13;
130:3,7,15,25;133:14;
137:6
**apply (1)**
17:10
**appointment (1)**
22:24
**appointments (1)**
22:14
**appreciate (1)**
176:20
**approach (1)**
25:25
**appropriate (1)**
173:20

**appropriately (2)**
144:6,18
**approval (9)**
74:17,18;88:12;
143:11;145:10;146:3,
5;149:19;154:8
**approve (25)**
39:12;41:20;45:22;
49:1;68:19;70:13;84:6,
11;85:5,17,19;92:10;
94:23;95:24;98:21;
100:11;106:24;111:18;
112:2,21;135:13,17;
138:11;171:3,12
**approved (77)**
47:16;51:2,4;55:20;
57:15;58:11;59:4;61:7,
10;66:16;68:17,25;
69:15,21;70:3,5,12;
75:8,12,15,16,16;
76:21;77:8,12,15;
79:15;83:6;84:20,23;
86:3,12;87:12,16,23,
25;88:1,2,3,5;90:22;
91:6;98:4,18;99:6;
102:11;103:12;104:22;
106:16,20;107:17;
109:24;110:23,24;
111:15,23,24;114:3,7;
115:6;118:12,14,17,21;
119:3;138:12;139:13;
140:1,3;151:10;153:3;
155:12,18;156:3,8;
157:17;171:14
**approving (10)**
63:13;110:16;
112:24;114:5;138:18,
19,20,22,25;160:16
**Approximately (11)**
10:15;13:2,10,12;
15:22;44:21;80:24;
131:1,2,4;169:12
**approximation (2)**
45:21;47:13
**April (2)**
12:15,19
**area (4)**
43:11;69:13;121:8;
125:9
**areas (7)**
43:20,22;44:1,5;
58:20;153:9;165:9
**arm (1)**
93:2
**arms (2)**
101:23,24
**around (10)**
83:8,24;90:25;109:6;
131:23;134:2;135:20;
139:23;177:7,7
**arranged (1)**
144:8
**arrival (1)**

Case 1:17-cv-00490-MSM-PAS   Document 109-8   Filed 09/26/22   Page 49 of 65 PageID #:
1484

Melise vs
Wall, et al

Kerri McCaughey
July 12, 2019

133:15
**arrive (2)**
33:7;131:5
**arrived (3)**
127:2;131:2;133:25
**Ashbel (1)**
6:1
**aspect (10)**
11:3,9,11,25;74:19;
155:3,24;156:22;
157:12,14
**aspects (4)**
12:10;61:21;64:3;
155:17
**Assaults (1)**
29:10
**asserted (1)**
48:2
**assign (5)**
70:25;71:17;77:12;
153:13;174:23
**assigned (27)**
38:14;55:21;59:7;
60:7,10,15,25;61:9;
62:7;63:6;115:12,15,
16;116:5,9,15,19,21,
23,24;117:5,8,14,16,
20;118:7;150:12
**assigning (2)**
43:2,13
**assignment (7)**
38:6,8,10;55:12;
69:9;121:8;155:21
**assignments (3)**
62:12;71:7,10
**assigns (1)**
153:12
**assisted (3)**
157:25;160:5,8
**associate (1)**
141:23
**Associate's (2)**
9:4,7
**assume (12)**
5:23;6:24;44:8;70:8;
91:15;104:21;111:11;
112:10;123:21;129:18;
133:23;134:17
**assumed (2)**
84:1;119:6
**assuming (1)**
136:13
**assumption (3)**
84:3;91:17;135:21
**assumptions (1)**
70:10
**attach (2)**
154:19,20
**attached (1)**
157:19
**attack (1)**
25:13
**attention (4)**

25:2,9;122:11;
175:25
**attest (1)**
27:25
**ATTORNEY (9)**
5:22;7:8,10;8:11,
15;171:1;175:10;
176:13
**August (3)**
10:1;93:6;150:13
**authority (2)**
88:8;161:20
**automatically (2)**
28:12;140:2
**Availability (3)**
46:19;63:25;91:11
**available (28)**
17:2;24:4,7,14,15,
16;33:15;46:6,25;47:3;
49:15;55:17;56:21,22;
58:2,14,15;59:1,9;
61:11,12;71:14,15;
76:9,15;88:16;91:13,
24
**avenue (1)**
33:23
**avenues (1)**
142:12
**aware (24)**
13:21;16:1;32:25;
35:4;46:11;70:2;71:18;
72:4,6;73:6,9,10,13,17;
154:15,21;164:18;
168:1,9,18;169:6,13;
170:14;172:20
**away (2)**
25:4;47:16

**B**

**Bachelor's (3)**
9:4,11,14
**back (37)**
7:3,5;22:3;40:4,5,12,
22,25;41:3,14;53:12,
13;55:6;68:20;70:14;
85:21,22;89:20;96:17;
108:8;113:25;115:5;
118:10;119:4;128:22;
144:15;146:4,19;
147:22,25;149:9,14;
155:2,20;159:16,17;
172:9
**background (1)**
6:6
**backs (1)**
99:4
**bank (1)**
177:6
**based (58)**
38:24;47:8;56:23;
77:1;80:2;81:10,11;
84:24;85:5;90:17;91:4,

11,16;98:6;99:5,13,18;
100:21;102:9,10,12,15;
106:7;109:4;110:22,
24;111:13;112:4;
114:9,9;115:11;116:9;
118:16;119:3;120:13;
122:11;124:3,4;
130:25;134:7;135:22,
23;136:20;144:10;
146:16;153:6;156:10,
17;158:22;161:21;
168:2,10,19;169:7,14;
170:15;171:9,15
**basic (1)**
176:16
**basically (1)**
121:19
**basis (6)**
57:20;78:18;83:23;
86:11;90:14;102:5
**became (6)**
12:23;14:9;15:13,16;
17:24;19:8
**become (2)**
15:11;71:18
**becoming (1)**
72:4
**bed (8)**
25:18;44:11;61:11,
12;117:13;129:19;
131:1;137:13
**beds (5)**
43:16,22;44:6,7,8
**behalf (5)**
5:11,14,16,17,20
**benefit (1)**
52:7
**benefits (1)**
52:4
**besides (3)**
8:15;66:22;116:14
**best (8)**
7:13;56:12;71:5;
77:2,16;126:15;145:6;
156:21
**better (8)**
55:4;71:14,15;97:10;
141:22;142:3;151:4,15
**biggest (1)**
65:9
**birth (1)**
9:1
**bit (2)**
55:6;115:14
**block (7)**
49:23;71:14;101:1;
116:5;124:8;125:13,14
**blocks (1)**
90:25
**blotter (1)**
124:8
**book (13)**
124:9,10;126:10,19;

129:5;130:5,15,19,25;
131:12;134:2,12,22
**books (1)**
130:23
**Both (3)**
50:10;58:20;137:6
**Bottom (242)**
37:24;38:6;42:6,7,
17,19,25;44:8;45:25;
46:3,5,6,8,9,15,16,18,
21,25;47:2,3,6,8,10;
48:12,19;49:1;55:7,11,
15,16,18,21,24;56:4,5,
10,16,19,20,22,23,25;
57:2,6,9,11,15,17,21,
25;58:2,3,6,11,12,13,
13,15,16,23,25;59:4,5,
6,8,20,22;60:6,9,10,24;
61:2,4,7,10;62:3,9,11,
14,20;63:3,11,13;64:3,
8,10,18;65:12,24;66:2,
11,12,13,14,16,17,21;
67:2,13,16;71:3;72:10,
14,18;76:8,9,11,14,15,
18,20,21;77:4,8,10,13,
15,17,18,19,21,25;
79:1;80:17,20;81:2,4,8,
14;82:23;83:10,15;
84:4,14,17,21;85:2,6,
10,17;86:5;87:2,10;
88:25;90:7,8,12,15;
91:11,13,16,19,24;
92:3,8,18;93:8;94:2,8,
11,25;95:4,6,11,18,21,
23,23;100:12,22;102:4,
18;103:6;105:13;
108:24,25;109:1,2,25;
110:1,13;111:22;
112:4;115:12,13,15,16,
17,21;116:10,15,18,18;
117:8,23;118:3,16,17,
20,21,24;121:3,16;
128:10,12;135:11,12;
136:4,21;138:23;
139:11;140:3,19;
145:9;150:9,16,19;
163:1,5,8,10,11,14,22;
164:1,6,7,8,10,12,21;
166:21;167:6,11;
171:21;172:2,2;174:9,
20,23;175:2
**Bouchard (2)**
159:18,24
**box (3)**
41:11;122:14;175:12
**boxes (3)**
122:5;175:14,16
**brace (3)**
38:3;64:24,24
**braces (3)**
37:21,22;64:24
**break (7)**
7:20,22,24;49:4;

129:5;130:5,15,19,25;
131:12;134:2,12,22
**books (1)**
82:7,11;140:5
**bribery (1)**
17:4
**BRIEF (3)**
49:5;82:12;145:19
**bring (1)**
30:11
**broke (1)**
128:11
**broken (13)**
48:25;57:6;66:22;
67:3;134:15,18,20,21,
21;135:12;136:4,20;
137:1
**brought (1)**
26:19
**building (2)**
58:18;91:19
**bunk (211)**
38:6;42:6,18,19;
46:8;47:2,11;48:12;
49:1;55:11,18,24;56:5,
5,10,16,23;57:2,6,9,11,
15,21,25;58:2,3,6,11,
12,13,15,16,23;59:1,4,
5,6,8,20,22;60:6,7,9,10,
24;61:2,5,7,10;62:3,9,
12,14,20;63:3,5,11,14;
64:4,8,10,18;65:12,24;
66:2,12,12,13,14,16,17,
21;67:2,13,17;69:10;
71:3,7,9,15;72:10,15,
18;73:7,11,14;76:14,
18;77:4,8,13,13,16,17,
20,21,25;79:1;80:17,
21;81:2,8,14;82:23;
83:15;84:15,17,21;
85:2,17;86:5;87:2,10;
88:25;90:7,8,12,15;
92:8,25;93:8,25;94:2,5,
8,11,22,25;95:6,11,18,
23,23;100:12,23;102:4,
18;103:6;105:13;
108:24,25;109:1,2;
110:13;115:12,13,15,
16,17;116:10,15,17,18,
19,21,23;117:1,4,5,9,
13,14,16,19,20,22,24;
118:3,5;132:14;135:11;136:4,
21;138:23;139:11;
140:3;150:9,12,16,19;
163:1,5,8,10,11,14,23;
164:6,8,8,9,10,12,21;
167:6,11;171:21;
174:6,9;175:2
**bunks (54)**
37:24;42:7,8,25;
43:2,14,19,20;44:8,9,
11,16;45:25;46:3,5,6,9,
15,16,18,21,25;47:3,3,6,

8;48:19;55:7,15,16;
56:19,21,22,25;58:13;
70:25;71:17;76:8,9,11,
15,20,21;77:10,19;
91:11,13,16,19,24;
92:4;164:1;172:2;
174:20,23

**C**

**C2 (1)**
141:5
**call (14)**
19:25;23:2,7,15,16;
26:15;27:3,13;28:5;
31:2,3;54:8;82:3;
177:13
**called (16)**
24:13;25:25;27:1,6,
9;28:2,14;32:1;101:8;
123:23;124:2,6;125:1,
6;126:18;129:8
**calling (1)**
26:23
**calls (2)**
125:4;128:21
**came (5)**
15:2;73:23;123:6;
132:10;171:25
**can (173)**
6:22;7:5,21;12:2,17;
16:24;18:3;22:3;23:15,
16,25;24:7,13,24;
26:19;27:25;28:18,21;
29:4,5,12,18;30:3;
31:15,20;32:14,15;
35:24;36:16;37:19;
38:1,4;43:18;44:8;
45:21;47:13;48:19;
49:4;51:8;52:6;54:14;
55:5,6,9;57:5;59:8,21;
60:23;62:21;63:21;
64:17;65:18;66:24;
70:4;71:2,13;72:19;
78:10;79:10,12;81:12;
82:2,16;83:11,13;
84:20,25;85:5;86:10,
13,21;87:19;89:7,24;
90:2,2,23;91:2;92:13,
24;93:10,17,18,19,21;
97:13,24;99:5,16;
101:17,18;103:1,7,25;
104:14,21;105:18,23,
25;107:12,16;108:8,17,
23;109:11,12;110:13;
111:11;112:10,17;
113:1,25;114:25;
115:11;117:15;118:10,
23;119:18,22;120:10,
25;121:3;123:17;
126:13;128:6,6,22;
129:4;131:13;133:1,9;
137:16;138:4;139:8;

140:18;141:4,5,14,16;
142:21;143:10,12,14,
21;144:6,8,18;145:7,9;
146:19,21;148:11,20;
152:3,6,20;156:14,16;
157:23;158:4,6;160:1,
4;165:10,16,22,23;
170:2;173:18;174:14;
176:20;177:11
**cancer (1)**
174:17
**cane (1)**
37:25
**Canes (1)**
37:21
**capability (1)**
91:3
**capable (2)**
51:9;114:4
**capacity (3)**
44:24;45:1,3
**carried (1)**
16:6
**carry (1)**
34:22
**carrying (1)**
102:1
**Case (19)**
6:2;8:15,21;73:1;
75:24;80:18;101:8;
102:7,22;113:7;
120:16;147:18;154:21;
163:2,18;164:14,19,22;
165:8
**caseload (2)**
10:13,14
**caseloads (1)**
11:8
**cases (9)**
6:5;36:4;37:12;
39:16;60:16;80:11;
81:24;87:5;123:2
**categories (1)**
171:9
**cause (4)**
64:12;141:2;161:12;
162:6
**caused (4)**
72:17,19;164:11,22
**causing (1)**
94:12
**cell (9)**
25:2;44:14;69:20;
125:18,19;131:18,22;
132:14;164:10
**cells (10)**
44:13,16;55:16,17;
59:24;131:15,19,23;
177:6,7
**center (15)**
23:10;24:18;25:6;
78:13,25;125:10;
131:9,12;142:6,9;

176:23,24,25;177:2,11
**certain (5)**
23:1;71:11;123:13;
151:10,10
**cervical (1)**
93:7
**chain (3)**
49:20,22;142:21
**change (13)**
13:4;20:12;54:6,7;
59:4;66:5;67:15,19,25;
105:2;166:3,7,20
**changed (17)**
13:14;20:18,25;66:7;
67:22;136:15,17,18,20,
22;139:18;166:8,14,17,
24;167:8,14
**changes (1)**
18:17
**check (5)**
40:10,11;122:14;
175:14,16
**checked (2)**
122:6,16;175:16
**Chloe (1)**
5:11
**choose (2)**
114:11,20
**choosing (1)**
29:19
**chose (3)**
112:10,12;167:17
**chosen (1)**
167:15
**Christine (1)**
5:19
**circle (4)**
22:3;110:11,13,21
**circled (13)**
110:15;111:5,22;
112:5,7;138:15,16;
140:3;166:21;167:6,
11,13,16
**circling (2)**
110:17;112:4
**circumstance (3)**
56:9;59:3;60:14
**circumstances (5)**
30:3;143:22;144:4;
165:13,18
**Citation (1)**
6:3
**claims (1)**
99:5
**CLARIFICATION (1)**
61:14
**clarify (1)**
175:5
**Clarke (9)**
5:21;74:8,11,13,22,
24;77:24;168:9,16
**classification (4)**
38:20;141:19,23,24

**classified (1)**
39:7
**classify (1)**
25:20
**clean (1)**
7:24
**clear (1)**
69:20
**clearly (1)**
164:3
**climate (7)**
42:24;64:5,12,13;
163:16,17;164:11
**climb (7)**
64:22;65:7,13,14,15,
17,17;66:1,23;90:5,10;
91:7;93:22;94:9,16,19,
20;95:1,7;100:14,25;
101:6,12,17,18,22,24;
102:22
**climbing (7)**
63:4;91:3;93:2;94:4;
100:19;101:15,15
**climbs (2)**
101:13,19
**clinician (2)**
61:25;115:24
**close (3)**
45:3;129:19;140:4
**closure (1)**
150:6
**CO (2)**
127:24;128:8
**code (21)**
26:20;27:1,2,4,6,9,
11,11;28:2,8,8,12,14;
29:4;31:22;32:1;
123:23;124:1,5;125:1,
5
**college (3)**
9:3,8,14
**combination (1)**
63:2
**coming (1)**
56:1
**command (4)**
31:3;49:20,22;
142:22
**commander (20)**
25:5,5,24;26:11,11,
23;27:13;28:3,5,17,18;
29:15;31:6;50:2;121:1,
9,10,18,25;125:7
**commanders (2)**
31:9;124:7
**commander's (3)**
26:15;121:5,16
**COMMENCED (1)**
5:1
**comment (2)**
54:22;75:11
**comments (2)**
75:20;121:5,10,17

**communicate (2)**
159:9,19
**communicated (1)**
152:15
**communication (1)**
143:18
**communities (4)**
58:17,19;59:13,15
**Community (4)**
9:8;58:21;59:1;61:2
**compare (1)**
128:24
**complain (2)**
170:8,11
**complained (1)**
119:25
**complaining (1)**
75:14
**complaint (8)**
8:9,18,18;37:1;
71:20,23,25;72:7
**complete (4)**
6:25;7:4;70:21;73:3
**completed (1)**
84:2
**completely (4)**
19:15;29:14;76:17;
77:18
**completion (1)**
142:17
**compliance (1)**
19:4
**complied (7)**
146:10;156:13,22;
157:7,11,12;159:5
**COMPLIES (11)**
108:11;114:2;
118:11;128:23;141:15;
145:8;152:5;158:5,7;
165:11,24
**comply (3)**
146:6;147:23;148:5
**comports (1)**
161:16
**concern (15)**
17:17;37:7;46:24;
47:1;51:16;62:13,25;
74:19;84:24;85:9,13,
14;141:25;164:14,15
**concerned (8)**
36:12;46:3,17;47:5;
87:6;145:14;146:2,12
**concerns (30)**
37:8,11;38:1,3,7;
39:21;55:9,10;57:1;
62:3,9,16;63:1;64:1,2;
65:12;83:3,7;99:1;
100:22;144:2,6,11,17,
23;145:5;159:24;
161:1;162:3,15
**CONCLUDED (1)**
178:6
**condition (24)**

36:23;47:24,25;48:2;
63:8,22;64:25,25;
65:25;94:18;99:25;
100:7,16,18;101:9;
154:16;161:24;172:4,
14,21;173:4,23;174:14,
17
**conditions (10)**
48:6,12,18,20,21;
62:18;64:17;81:2,3;
171:18
**conduct (1)**
72:3
**conducting (1)**
63:15
**confirm (2)**
141:5,10
**conflict (2)**
145:22;166:1
**consider (12)**
50:23;51:3;63:15,23;
64:18,19;65:5,11;
66:21;81:1,6;111:20
**consideration (4)**
46:10;55:18;63:9,13
**considerations (3)**
38:13;62:10,10
**considered (1)**
112:18
**consistently (1)**
101:1
**consult (3)**
71:6,9;73:24
**consulted (1)**
108:12
**consulting (1)**
74:8
**contact (9)**
20:2;22:17,23;23:5,
11,14;25:4;26:10;
40:19
**Contacted (1)**
72:2
**contacting (1)**
23:8
**contain (2)**
109:19;124:25
**contains (1)**
121:16
**continue (1)**
167:23
**control (7)**
23:10;125:10;133:2;
176:23,24,25;177:2
**conversation (1)**
76:5
**convey (1)**
143:17
**coordinator (18)**
10:21;13:22,25;
14:11,14,18;15:1;16:9;
114:10,11,16;141:7,12;
143:18;144:4;145:12,

16,19
**copies (3)**
16:21;145:14;147:3
**copy (9)**
41:15;68:25;70:1;
82:25;146:20;148:19;
153:24;155:21;178:2
**correction (1)**
22:19
**correctional (28)**
17:13;23:3,9,24;
26:10;29:23;30:4,12;
31:2,9,14,17;34:25;
35:2;69:7;70:16,24;
80:12;119:9;125:11;
141:1;143:22;148:22;
156:7;160:13;161:11;
162:5;176:25
**Corrections (3)**
9:23;10:24;72:22
**correspond (1)**
49:17
**correspondence (1)**
75:18
**correspondences (1)**
75:5
**corroborates (2)**
117:18,22
**Corvese (2)**
127:24;128:1
**counsel (2)**
5:9;177:24
**counseling (4)**
10:7,20,23;11:2
**counselor (3)**
10:3,6,18
**counselors (3)**
10:16,25;11:7
**couple (1)**
22:4
**court (2)**
6:11;115:4
**covered (2)**
18:5,7
**covers (2)**
19:18,21
**coworker (1)**
88:10
**Coyne-Fague (1)**
169:1
**CPAP (1)**
138:12,15,22,24
**CPR (1)**
30:6
**create (2)**
163:23;164:18
**created (5)**
153:18;163:17;
165:1,5,8
**creating (1)**
163:16
**creation (1)**
164:16

**crime (1)**
59:14
**Criminal (1)**
9:5
**criteria (1)**
173:8
**crossed (1)**
136:12
**crutches (1)**
135:12
**current (7)**
13:7;14:2,7;20:14;
21:2;107:22;168:25
**currently (6)**
7:15;9:22;44:18,25;
168:9;169:6

# D

**D2 (1)**
141:4
**D2b (1)**
141:14
**daily (6)**
124:7,13,15,16,18,20
**date (67)**
9:1;41:10;67:19,22,
25;87:7;89:3,12,15,19;
103:3;104:4;105:3,6,
16;106:20;107:3,6,8;
108:2,2,24,25;111:9,
12;112:14;113:13;
115:6;116:13,23,25;
117:3,20,25;118:5,14;
121:9;128:25;129:25;
130:3,12,16,21;133:15;
135:8,15;136:12,13,13,
15,18,19,23;137:7;
166:8,9,10,15,20,25;
167:10,14,15,17,18,18,
21
**dated (13)**
83:2;86:24;88:22;
92:19;104:16;107:14;
108:19;109:17;110:3;
113:5;119:20;138:9;
139:9
**dates (6)**
86:6;107:1;115:4,12;
116:12;139:20
**Davis (36)**
5:11,11,22;42:16;
46:7;48:17;49:4;79:10;
82:7,11,13;86:15;
88:18;93:6;95:3;
102:24;103:23;104:12,
25;107:10;108:15;
109:9;114:23;119:16;
133:1,7;135:2;138:2;
139:6;140:4,7;153:23;
157:21;169:5;170:24;
177:25
**day (31)**

23:1;27:7;32:5,11;
40:10;45:5,9,12,15,16,
22,25;84:2;120:5,8;
127:8;128:20;131:13,
14,14,15,20,23,25;
132:3,8,11,17;177:7,
10,18
**day-to-day (2)**
11:14;37:16
**deal (3)**
65:9;141:22;142:3
**dealing (5)**
11:4,9,12;12:7;18:22
**dealt (1)**
12:11
**decide (14)**
26:18;31:17;39:23;
40:12;48:3;67:6;79:4;
80:1;87:9;102:4;
122:25;123:12;171:8,
12
**decided (7)**
31:13;41:5;94:7;
98:7,13,17;100:19
**decides (3)**
29:20;68:8;79:25
**deciding (1)**
98:20
**decipher (3)**
127:15;128:4,17
**decision (17)**
26:15;31:4,10,15;
40:2;58:8;75:17;80:4,
13,15;81:10;84:10;
85:5;98:21;99:5,13;
123:3
**decisions (2)**
43:13;144:10
**deem (1)**
169:7
**deemed (5)**
168:2,11,20;169:15;
170:16
**deems (1)**
145:16
**defendant (2)**
6:2;8:19
**defendants (3)**
5:16,18,20
**degree (6)**
9:4,4,5,7,11,16
**delegated (1)**
114:14
**delivered (1)**
22:16
**delivers (1)**
22:12
**delivery (1)**
22:21
**demographics (1)**
121:19
**demonstrating (1)**
97:20

**denial (15)**
146:5;147:2,9,15,20;
148:3,9,25;149:10,19,
21,24;154:7;157:3,15
**denials (1)**
157:5
**denied (46)**
41:10,13;47:2;56:16;
57:24;72:10,14,18;
75:22;80:17;81:18;
89:2,3,21,24,25;90:22;
91:6;92:21;103:13;
104:23;105:15,18,19;
106:8,13;107:17;
146:25;149:6,9;
150:21,25;151:4,10,16,
19,22,25;157:1,9;
161:8;162:9,21;168:1,
9,18
**deny (18)**
39:11;41:8,20;42:11,
14,17,19,23;70:13;
81:16;91:7,16;92:4;
161:7;162:17;165:14,
19;169:6
**denying (6)**
42:2,5;80:20;149:1,
12;150:5;160:16;
169:14
**Department (8)**
9:22;10:23,24;19:21;
22:16;72:2,22;145:19
**departmental (1)**
15:20
**depend (6)**
26:4,5,6,7;29:14;
80:7
**Depending (4)**
28:24;35:9;62:15;
78:16
**depends (16)**
24:23;26:3,25;29:20;
30:2;37:18;38:19;42:4;
45:9;80:6,8,8,9;
122:10;131:8;133:2
**deposed (2)**
5:25;6:5
**deposes (1)**
5:3
**DEPOSITION (8)**
5:1;7:7,19,25;8:12;
106:3;171:2;178:6
**deputies (1)**
122:21
**deputy (63)**
11:19,22,24;12:3,11,
13,14,15,16,18,21,24;
13:3,11,18,21,24;14:2,
5,9;15:2,10,13,15,18,
24;16:8;17:8,22,25;
19:8,22,23;20:5,7,16;
21:12;34:12,14;45:5;
46:13;88:10;120:17,

19;122:21;123:5;
124:19,23;139:14,15,
19,22,24;141:6,11;
160:15,24;161:5;
162:14;165:14,18;
166:3;170:20
**deputy's (1)**
15:21
**describe (1)**
160:12
**described (4)**
26:22;154:4,5,25
**describing (2)**
119:23;165:17
**description (5)**
122:4;145:20;
152:14;165:13;176:16
**designated (3)**
22:13;141:7;166:16
**designates (1)**
141:11
**designation (1)**
152:18
**designee (2)**
152:10,22
**desk (1)**
23:1
**Desousa (2)**
14:6;170:21
**detail (3)**
160:12;165:13,18
**determination (9)**
35:10;65:18;67:6,12;
78:3;83:21;99:8;
102:17;169:25
**determine (31)**
20:17;25:3,25;26:12,
14;31:7;35:8;36:9;
38:12;42:18;66:6;
78:22;81:12;96:11;
97:2,7,12,17,24;
103:17;107:16;114:6;
122:23;124:1;130:16;
131:10;153:5;170:5,
10;173:8,15
**determined (2)**
115:25;116:3
**determines (2)**
143:15;166:11
**determining (3)**
20:11,23;65:19
**develop (1)**
152:25
**developing (1)**
152:11
**device (2)**
39:16,18
**diabetes (5)**
48:8;64:20;65:10;
66:22;172:1
**diabetic (1)**
171:22
**diagnosis (3)**

36:4;172:1;173:23
**different (20)**
26:5;32:13,14;40:8;
54:2;60:15;61:9,16;
78:11,21;79:4,5,17;
88:11;92:13,16;
129:21;130:22;153:20;
173:13
**differently (1)**
150:9
**difficult (2)**
56:2;169:25
**Diniz (5)**
14:8;123:5;124:23;
139:14,15
**directly (14)**
23:14;49:9,19;50:11,
18,22;51:12,14;76:2;
99:10;142:20,23;
146:5;176:9
**director (5)**
74:22;141:23;
167:25;168:18,25
**disabilities (1)**
14:19
**disability (1)**
141:23
**discover (1)**
46:14
**discrepancy (1)**
130:9
**discuss (8)**
8:20;14:13;20:2;
159:24;160:11;168:6,
23;169:17
**discussed (9)**
8:14;18:9;74:10,12;
139:2;141:8;152:22;
156:18;168:15
**discussing (1)**
74:5
**DISCUSSION (1)**
140:6
**discussions (1)**
74:15
**disorders (4)**
48:8;64:20;65:10;
66:22
**dispensary (1)**
23:2
**distress (2)**
25:12;26:10
**distribute (4)**
40:13,13;69:4;
145:14
**distributing (1)**
69:1
**DOC (4)**
6:1;120:1;158:14;
168:25
**doctor (1)**
95:22
**document (70)**

41:17;53:24;82:16;
83:5,7,9,10,13;84:6;
86:17,22,24;87:1,20;
88:20;89:1,18,22,24;
90:3;92:2,13;93:15,16;
96:4,7,21;97:3,12,21,
25;100:4;103:1,3,7,25;
104:14;105:9;106:7,
12;107:4,12,16;
108:17;109:5,11;
114:25;115:11;117:18;
119:18;121:4,4,17;
123:4,21;126:14;
128:4;133:9,10,23;
134:7;135:4,24;136:3,
8;138:4;139:8;140:9;
153:14,17
**documentation (14)**
41:23;42:21;94:16;
99:21,25;106:11;
111:14;145:3;147:13;
161:22,23;163:13;
173:2,23
**documented (18)**
36:2,3,5,13,24;37:4;
81:9;99:11,20;100:7,
16,18;102:22;143:7;
163:12;170:12;173:11;
175:6
**documents (12)**
8:2,8;82:8;96:14;
97:3;120:9,11;124:4,5;
128:17,19;174:1
**done (2)**
140:5;150:8
**door (1)**
69:20;176:22,22
**doors (2)**
131:22;177:1
**down (11)**
6:8,12;23:2;41:19;
56:3;93:2,22;100:19;
101:19;126:23;151:24
**Dr (14)**
74:8,11,13,21,23;
75:2,4,7;77:24;93:6;
94:17;167:25;168:9,16
**draw (1)**
175:25
**drop (1)**
22:10
**dropped (1)**
22:11
**Drs (1)**
5:20
**drug (3)**
12:6;58:22;59:11
**duly (1)**
5:3
**duration (6)**
49:1;67:3,6,14,15;
78:17
**during (18)**

7:19;24:16;25:23;
27:6;28:8;29:24;31:25;
32:5,7,8,11;35:3;
116:5;124:16;134:15;
147:17;150:16,20
**duties (6)**
10:6;22:12:23;13:4;
101:7,14
**duty (3)**
13:14;28:4;32:8

## E

**earlier (17)**
7:5;26:2;46:2;67:1,
24;107:1,3,5;139:21;
145:22;166:6;170:3;
171:2,10,16,21;174:19
**earliest (1)**
113:2
**easier (3)**
51:25;52:2;115:14
**easy (1)**
8:14
**educated (3)**
75:17;81:10;99:5
**education (1)**
9:3
**educational (1)**
11:10
**effect (6)**
45:25;65:25;107:7;
108:4;116:13;167:15
**efficient (5)**
140:23;161:9;
162:10,23;163:3
**effort (1)**
6:16
**eggcrate (1)**
173:14
**either (5)**
69:19;81:23;110:6;
149:19;161:6
**Elderly (1)**
48:11
**electronic (16)**
52:7,9,10,14;53:10,
18;54:15;55:4;96:13,
24;97:7,20;103:15;
107:24;178:3,4
**electronically (7)**
51:7,10;52:1,5;
54:24;97:4,11
**eliminates (3)**
56:6;59:13,20
**else (24)**
7:21;14:20;16:16;
28:21;30:7;35:16,20;
37:23;41:15;48:10,23;
63:15,20,23,23;64:21;
65:5,8,8;66:24;121:22;
124:12;131:8;145:15
**e-mail (6)**

51:11,12,23;81:22;
97:16,17
**E-mails (1)**
51:14
**emergency (5)**
25:1,8,11,20;26:21
**employee (2)**
18:5,13
**EMR (3)**
53:13;107:24;146:19
**encompassed (1)**
20:14
**enemy (2)**
38:8;63:25
**enough (16)**
21:8,12;28:1;42:21;
46:4,25;55:6;58:13;
75:17;83:18;84:14;
92:7;98:17;111:1;
169:21;170:4
**enrolling (1)**
58:24
**ensure (8)**
14:19;62:21;64:8;
70:12;119:10;155:11,
16;156:3,12,19;
158:23;159:7,9,21;
163:11
**ensured (1)**
146:15
**ensures (1)**
140:20
**ensuring (8)**
16:5;54:20;70:21;
71:1;141:24;155:24;
159:4,12
**enter (4)**
52:22;143:19;
145:19;177:3
**entered (5)**
103:20;110:20;
167:12,12,14
**entire (1)**
19:21
**entirely (1)**
68:7
**entry (3)**
109:1,2;115:18
**equipped (2)**
141:22;142:3
**ER (1)**
120:1
**especially (2)**
58:16;173:17
**essentially (2)**
61:4;68:5
**establishing (2)**
18:21,24
**estimation (1)**
147:23
**evaluate (1)**
26:13
**evaluated (1)**

20:18
**evaluating (1)**
160:15
**evaluation (1)**
63:16
**even (13)**
7:9;8:17;17:10;
44:12;66:9;70:24;
77:10;92:9;94:12;
102:11;111:20;121:17;
123:8
**event (2)**
115:1;150:11
**events (2)**
115:2;124:16
**everybody (1)**
70:8
**evidence (1)**
103:11
**exact (1)**
43:17
**exactly (2)**
79:13;149:15
**EXAMINATION (4)**
5:22;171:1;175:10;
176:13
**example (2)**
36:16;153:11
**examples (2)**
37:19;66:19
**exercised (2)**
156:11,18
**exhausted (1)**
77:18
**Exhibit (65)**
82:14,15;86:15,16,
20,21;88:18,19;90:20,
22,23;92:12,14,14,15;
102:24,25;103:23,24,
25;104:6,12,13,14,25;
105:1,2,6,7;107:10,11;
108:8,10,15,16;109:9,
10,20;113:25;114:4,23,
24;115:5;118:10,16;
119:16,17;126:9;
128:22,24;133:7,8;
135:2,3;137:16;138:2,
3;139:6,7;140:7,8;
157:21,22;167:3;
175:11
**exhibits (4)**
151:8;166:6;178:3,5
**exist (1)**
80:10
**existing (1)**
140:20
**exists (5)**
61:2;80:10;127:25;
161:24,25
**expect (1)**
122:2
**experience (1)**
130:24

**experienced (1)**
137:22
**expiration (12)**
87:4;108:2;136:15,
18,22;166:9,11,15,20,
25;167:10,15
**expire (11)**
68:15;86:1,4;104:10;
111:6,13;112:11;
115:8;136:19;138:13;
167:18
**expired (6)**
78:1;106:17,17,19;
107:8;112:8
**expires (2)**
136:4,21
**expiring (1)**
109:1
**explain (26)**
12:2;14:13;18:3;
23:25;24:7,24;30:3;
35:24;38:1;60:23;
64:17;83:13;84:20;
89:24;90:2,23;91:2;
92:13,24;105:18;
108:23;110:13;131:13;
150:20;151:4,16
**explained (1)**
151:19
**explaining (1)**
157:9
**explains (1)**
153:14
**explanation (10)**
16:24;33:8,11;
106:12;151:14,24;
156:25;157:4;160:11;
161:19
**explanations (1)**
151:3
**explicit (1)**
162:16
**explore (1)**
141:20
**extended (1)**
167:21
**extreme (9)**
141:2;161:12;162:6;
164:22;165:1,6,8;
174:24;175:1

**F**

**F2 (1)**
147:24
**face (1)**
85:1
**facilities (10)**
14:18;19:18;27:24;
76:25;78:5;80:5;142:3;
153:10;160:15;175:20
**facility (60)**
10:9;12:4;13:3,22,

25;14:11,14;16:9;
19:20;22:8,13;24:14,
15,16;27:19,23;33:16;
37:15;38:13,16,22;
39:1;43:5,12;49:16;
62:22;63:17,25;77:3,
17;78:11,21,23;79:5,5,
17;114:10,16;141:6,7,
12,21;143:17;144:4;
145:12,15;146:25;
148:21;152:10,23;
156:13,20;160:25;
162:14;169:13;170:18,
19;174:8,13,24
**Facility-specific (3)**
152:9,11;153:1
**fact (20)**
8:20;19:7;21:19;
59:8;67:1;72:14,18;
87:12;90:10;100:15;
101:5;111:5;113:12,
21;117:5,14,20;137:3;
166:7;170:14
**factor (2)**
59:12;112:18
**factors (1)**
56:24
**facts (2)**
8:14,20
**Fair (17)**
28:1;55:6;87:25;
88:3;104:23;111:3,25;
112:24,25;117:11;
129:18;130:17;137:13,
21,23,24;176:3
**fall (4)**
15:20;128:11;
135:11;137:12
**fallen (1)**
132:11
**falling (1)**
25:17
**falls (8)**
109:1,2;110:25;
111:1;137:4,18,23,25
**familiar (5)**
15:16;16:3,4,11;
141:25
**Familiarization (1)**
20:22
**far (5)**
14:25;53:3;112:17;
123:17;149:10
**fault (1)**
169:10
**February (2)**
86:4;115:8
**feel (5)**
7:3,20;92:7;106:4;
111:2
**fell (10)**
117:4,12,19;119:24;
126:17;129:11,16,18;

130:25;134:2
**felt (2)**
75:7;169:20
**few (2)**
19:7;170:25
**fibula (1)**
134:21
**fields (1)**
122:6
**fight (1)**
25:14
**fights (1)**
29:10
**figure (2)**
39:20;100:15
**figuring (1)**
33:23
**file (2)**
53:17;147:5
**filed (1)**
5:25
**fill (3)**
22:15;52:25;53:3
**filled (8)**
34:17,21;121:17,22;
122:7,9,14,18
**filling (2)**
35:1;153:21
**finally (1)**
7:19
**find (2)**
54:9;167:1
**finish (4)**
6:16,18;7:22;55:8
**First (24)**
6:8;8:17;9:25;10:2;
18:11,19;32:7,8;38:17;
49:23;56:20;58:14;
59:24;60:11;71:18;
76:19,20;77:10;95:5;
98:2;135:19;141:16;
142:22;143:2
**five (2)**
45:1,8
**flash (1)**
25:2
**flashes (1)**
26:9
**floors (2)**
176:15;177:18
**Flynn (10)**
121:2,9;122:8;
126:18,20;129:8,23;
130:11,18;132:19
**Flynn's (2)**
126:25;129:7
**follow (4)**
40:23;49:20;93:3;
142:21
**followed (6)**
15:1;70:5;156:19;

158:24;159:6;160:13
**following (9)**
28:8;70:8;117:9;
120:5,7;124:21;159:8,
10,13
**follows (1)**
5:4
**follow-up (1)**
18:14
**foot (1)**
128:11
**footage (20)**
28:9,10,11,13,19,
23;29:3,9,13,17,20;
125:15,17,19,21,23;
126:2,4,7
**forever (1)**
6:7
**form (34)**
52:21,25;53:2,4,6;
68:21;79:9;81:23,24;
82:1;103:2;104:3,15;
108:18;121:23;142:18,
20,23;143:19;145:15,
21;147:7,10,12;
152:20;153:4,18,20,24;
154:11,18;155:1;
166:17;167:24
**formal (1)**
29:19
**former (1)**
107:21
**forms (3)**
54:2;144:25;154:8
**forwarded (1)**
147:3
**found (4)**
54:12;77:16;113:15;
169:24
**Four (2)**
43:8;127:8
**frequently (1)**
47:10
**Friday (2)**
127:20,21
**front (3)**
23:1;129:7;176:24
**fulfill (1)**
175:3
**full (4)**
5:5;13:13;45:3;
178:5
**full-time (1)**
12:21
**fully (7)**
148:5;155:19;156:3,
13,22;157:7,11
**fun (1)**
76:7
**functioned (1)**
139:4
**further (8)**
40:19;47:17;106:13;

154:17;170:24;176:11,
13;177:22

**G**

**games (1)**
177:11
**gang (2)**
38:8;63:25
**gang-related (1)**
62:6
**gave (9)**
45:11;90:9,17;99:19;
108:1;116:12;148:16;
149:19;171:2
**general (7)**
11:13;33:15;42:24;
58:7;59:21;74:13;
75:20
**generally (1)**
174:12
**generate (5)**
22:25;34:9;146:18;
153:4;156:6
**generated (12)**
51:5;103:9;111:12;
113:22;120:16,19;
129:24;133:10;139:5;
146:8,17;153:9
**generates (1)**
113:19
**generating (1)**
19:1
**gestational (1)**
48:24
**gestures (1)**
6:14
**gets (2)**
35:5;66:7
**given (21)**
33:8;57:9;63:22;
66:14,17;69:11,15;
71:3;84:18,22;91:23;
102:4,18;118:16,20,24;
123:4;134:16;137:11;
150:7;169:22
**gives (8)**
68:24;74:17;94:17;
122:4;154:18;161:19;
162:16,18
**giving (5)**
7:8;85:4;103:20;
118:17;121:19
**goes (14)**
31:7;40:4,22;41:13;
53:12;55:25;68:22;
70:14;78:20;106:25;
146:20;155:21,21;
177:4
**Gordon (1)**
159:18
**graduated (3)**
9:10,15,21

**grant (17)**
47:6;48:15,18;58:3;
65:12;66:20,20;67:2;
84:14;94:21,25;
100:22;161:7;163:17;
171:8,19,21
**granted (10)**
47:8;58:10;81:2;
84:17;102:8,13;114:6;
136:25;164:4;171:24
**granting (12)**
63:10;64:3,18;
111:20;114:12,20;
137:17;163:8,14,22;
164:1,21
**grass (1)**
63:7
**Greenwich (1)**
8:24
**ground (4)**
6:8;56:17,18,19
**grounds (2)**
42:2,5
**guess (3)**
6:21;127:5,24
**guessing (1)**
45:11
**gym (2)**
153:8,11

**H**

**half (2)**
44:8,9
**hallways (1)**
131:19
**hand (3)**
6:14;37:21;64:24
**handbook (1)**
33:8,11,18
**handle (2)**
39:10,13
**handling (1)**
21:2
**handwriting (1)**
128:5
**handwritten (7)**
53:17;83:4;89:7;
97:23;109:23;110:11;
136:9
**happen (8)**
24:10;26:14;28:1;
34:11;39:5;88:14;
123:11;144:13
**happened (16)**
18:18;26:2;46:11;
56:13,14,15;73:1,3;
87:19;89:21;93:10,15;
103:8;122:4;125:18;
164:4
**happening (1)**
41:6
**happens (9)**

22:11;23:16;24:21;
27:1;28:8;34:3;40:3;
71:1;88:15
**hardship (9)**
141:2;161:13;162:6;
164:22;165:1,6,8;
174:24;175:1
**harming (1)**
154:17
**hazard (10)**
35:18;37:8;140:24;
161:10;163:6,9,15,23;
164:16,18
**head (2)**
17:3;66:25
**heal (1)**
67:10
**healed (2)**
136:4,21
**healing (3)**
49:2;67:4,7
**hear (2)**
27:19,20
**heart (1)**
25:13
**held (3)**
13:11;73:22;101:1
**help (2)**
8:4;128:17
**helped (1)**
150:24
**helpful (1)**
149:4
**hey (1)**
82:4
**higher (1)**
38:23
**HILL (3)**
5:17,17;171:1
**himself (4)**
69:5;88:10;117:4;
121:20
**hired (8)**
10:2;12:16,22;13:13;
14:25;18:2,12,19
**history (1)**
150:11
**hold (4)**
9:21;11:15;62:16;
73:20
**holding (2)**
27:20;62:25
**home (1)**
24:13
**honest (1)**
127:5
**hospital (14)**
31:5,8,11,14,18;
78:23;120:1;125:25;
126:5;133:11,22;
134:4;142:10;174:16
**hostilities (1)**
64:15

**hour-and-a-half (1)**
133:5
**hours (4)**
23:25;45:20;133:21;
134:4
**house (1)**
172:2
**housed (9)**
55:21,24;57:14,22;
60:18,21;61:16,23;
78:25
**housing (41)**
23:7,8;38:8,10,15;
43:3,6,7,18,19,20,22,
24;44:1,2,3,5;49:25;
55:12;58:9,20;59:5,7,
21;60:4;69:12,16,20;
71:2,6;119:1;124:9;
144:8;153:11,12;
155:21;176:18,19,21;
177:3,4
**huge (1)**
42:25

**I**

**ibuprofen (1)**
30:20
**ice (3)**
30:24;31:1;134:16
**ID (21)**
82:15;86:16;88:19;
92:12;102:25;103:24;
104:13;105:1;107:11;
108:16;109:10;114:24;
119:17;121:7;126:9;
133:8;135:3;138:3;
139:7;140:8;157:22
**idea (3)**
17:17;32:2;131:20
**identical (1)**
92:9
**identification (1)**
147:4
**identifies (1)**
114:15
**identify (12)**
82:16;86:21;103:1,
25;104:14;107:12;
108:17;109:11;114:25;
119:18;138:4;139:8
**II (1)**
140:18
**III (4)**
141:4,5;142:11;
152:3
**illegal (1)**
72:12
**illegitimate (5)**
81:1,3,6,13;83:20
**imagine (1)**
37:25
**immediately (4)**

23:17;50:23;131:18,
22
**impair (5)**
140:23;161:8;162:9,
21,22
**impaired (1)**
163:3
**impermanence (2)**
48:18,20
**implement (6)**
16:2;145:17;152:25;
154:11;155:6;156:7
**implementation (4)**
22:1;70:22;152:17;
158:23
**implemented (25)**
12:4;58:4;68:18;
69:9,14,22,25;70:12,
14;86:9;88:4;104:21;
111:9,12;119:6,10,13;
145:24;154:9;155:12,
17,19,25;156:4,21
**implementing (8)**
16:13;21:22;86:11;
152:11;154:3,25;
159:3,20
**important (4)**
6:13;61:5;64:8;
98:17
**improve (1)**
54:18
**inability (4)**
63:18;64:22;66:23;
100:13
**inaccurate (2)**
7:4;123:20
**inadequate (3)**
21:14;54:10,12
**incident (53)**
24:21,22,23;25:23;
26:3,7,25;28:13,14,24;
29:24;30:2;31:22;
37:18;80:8;119:19,22;
120:3,13,15,24;121:11,
14,15;122:1,3,10,11,
17,18;123:8,11,14,16,
24;124:2,21;125:15;
128:25;129:2,4,14,22;
130:1,4,4,13,16,21;
132:6,7,13,16
**incidents (3)**
29:6,8;123:13
**include (16)**
8:17;10:25;16:12;
21:12;25:14,17;33:11;
54:3;65:2;77:4;79:2;
147:1,15;148:2;
152:13;156:7
**included (1)**
15:19
**including (8)**
6:2;147:8;153:7,7,8;
158:1;160:15;175:23

**inclusion (1)**
147:4
**inclusive (1)**
171:18
**independent (1)**
41:23
**indicate (25)**
47:22;92:24;95:5,7,
17;100:24;105:12;
109:22,23;124:5;
125:3,5;128:19;
129:13,25;132:6;
136:11;139:25;142:12,
19;143:1;144:9;
155:14,23;175:20
**indicated (11)**
75:7;98:4;99:23;
100:16;107:4,20;
121:3;130:5,22;137:5;
145:14
**indicates (7)**
93:20;110:14;132:2;
134:2;136:15;154:12;
163:13
**indicating (6)**
52:23;92:20;96:25;
126:22;140:19;167:1
**indication (14)**
88:1;95:24;96:4,21;
104:7,18,22;105:9;
106:11;109:4;134:12,
22;135:19;144:25
**individual (7)**
60:17;69:5;80:11;
140:25;161:10;163:7,
15
**individually (1)**
171:6
**individuals (5)**
14:19;22:25;44:14;
61:25;164:1
**industries (1)**
153:11
**infer (1)**
89:17
**influence (1)**
7:15
**info (2)**
83:14,17
**information (101)**
21:8,12,20;36:11;
37:5;39:12,23;40:1,23,
24;41:1,5;42:21;47:11,
17,21,22;49:19;50:7;
54:3,4;74:1;75:17,19;
81:10,15,17,18,20,21,
25;83:6,18,22;84:6,13,
22,22;85:4,8,11,12,14,
16,20,24;87:9,21;89:2,
19;90:17,19;91:4;92:8;
93:19,21,23;98:13;
99:4,9,13,19,20,22,23;
102:9,21;105:21,24;

106:4,5,9,14;110:24;
111:3;122:1,24;123:1,
7,9,12,16,21;124:25;
130:12;140:1;146:15;
147:25;149:9,14,17;
156:6;161:6;162:19;
165:5,7;169:21,24;
170:4,9;173:16
**informative (1)**
145:20
**informed (4)**
18:11;33:1;46:20;
145:4
**Initially (4)**
10:17;55:13;83:15;
87:15
**initials (1)**
126:21
**initiated (2)**
145:11;176:2
**injured (13)**
25:15,18;30:1,10,25;
73:6,9,10,13,17;117:4,
13;119:25
**injuries (3)**
132:23;133:22;
171:10
**injury (7)**
36:23;63:4;67:10;
72:17,19;133:12;134:5
**ink (1)**
68:22
**inmate (99)**
10:8;11:13;13:19;
22:15,17,23;23:12;
25:3;26:9;30:1,25;
31:4;33:4;34:3;36:18;
38:25;39:6;49:9,16;
53:16;57:13,14;58:5,
23;64:14;67:10;69:4,
15,15,18,21,23,25;
70:2,6;79:15,21;80:13;
93:21;94:25;98:13;
99:14,19;102:3,12,17;
115:1,3,11,22;119:24,
24;120:1;121:20;
127:8,13;128:10;
129:15;130:25;132:2;
137:12,22,25;140:25;
142:4,7,13,19;143:5,
10;145:14,21;146:2,5,
8,12,20;147:1;149:1,4;
150:11;152:20;154:7,
21;155:21;157:1;
161:10;163:15;164:7,
16;172:3,10,14,21,25;
173:4,17,24;174:8
**inmate/public (1)**
175:12
**inmates (55)**
10:11,12,13;16:20;
17:1,2;22:5;23:4,6,14;
26:6;32:20;33:1,7;

35:19;44:18,21;46:15;
49:10,18;50:11,13,14,
15,17,22;58:7;59:22;
60:20;64:15;66:13;
71:12,12;76:21,24;
78:5;80:4,18;99:3;
131:15;140:10,21;
142:1,2;147:13;
148:18,19;149:14;
152:18;163:7,23;
164:5;171:22;172:18;
175:20
**inmates' (4)**
11:3,10,11;62:23
**inmate's (8)**
51:19,20;52:14;
142:17;143:18,20;
147:5;176:1
**input (1)**
67:9
**inside (1)**
125:18
**instance (7)**
19:3;25:17;38:20;
44:14;79:7;97:16;
157:10
**instances (6)**
24:24;25:8;29:1;
36:17,18;157:18
**instead (1)**
139:15
**institution (4)**
13:5,15;15:14;
141:21
**institution/facility (7)**
141:1,3;161:12,13;
162:5;164:23;165:2
**institutional (4)**
144:1;160:25;162:3,
15
**insufficient (1)**
122:25
**intake (14)**
24:18;25:6;26:19;
28:5;32:10;78:13,24;
131:8,11,12;142:6,9;
160:14;174:16
**interaction (1)**
40:19
**interfere (1)**
37:14
**interpreted (1)**
94:1
**interrogatories (4)**
8:3,4;158:1,17
**interrogatory (9)**
158:18;160:4,5,9,11,
18;165:17,20,25
**intervention (1)**
30:8
**interviewed (1)**
115:24
**into (19)**

22:12;38:14;52:14,
23;53:13;62:11;63:8,
12;93:1;96:7;103:20;
108:4;116:18;131:19,
25;132:11;146:19;
164:9;176:21
**investigation (1)**
72:3
**involve (1)**
12:7
**involved (8)**
20:10;22:19;23:3;
34:25;35:2;59:17;
80:13,15
**Island (7)**
8:24;9:8,14;120:1;
125:25;126:5;133:11
**issue (18)**
29:11;32:14,15;36:1;
37:16;64:4,5,12,13;
65:20;76:18;78:16,17;
80:9;99:22;163:16,17;
164:11
**issues (12)**
22:4;33:19;38:8,8;
42:24;62:6;63:25,25;
65:2;94:4;137:7,23

## J

**janitor (2)**
101:4,5
**janitorial (1)**
102:1
**Jennifer (3)**
74:8,13,24
**job (19)**
12:23;13:4,14;17:10;
20:14;62:12,16,25;
63:6;70:24;101:1,10,
11,14;112:15,23;
140:14;153:12;154:14
**jobs (7)**
62:17;63:17,21;64:1;
139:19;153:7,13
**John (2)**
10:10;11:24
**judgment (1)**
143:23
**July (1)**
118:2
**June (6)**
73:11;117:11,14,16;
118:1;150:13
**Justice (1)**
9:6
**justify (1)**
42:21
**Justin (2)**
5:15;175:8

## K

**Kane (6)**
158:9;159:2,11,12,
15,16
**Kathy (1)**
14:3
**keep (3)**
41:18,23;154:12
**keeping (1)**
69:18
**keeps (1)**
91:18
**Ken (1)**
93:6
**kept (1)**
28:13
**KERRI (2)**
5:2,7
**K-E-R-R-I (1)**
5:8
**kick (1)**
61:17
**Kim (6)**
158:9;159:2,11,12,
15,16
**kind (4)**
30:1;39:17;63:12;
174:6
**kinds (1)**
50:15
**knee (3)**
37:21;38:3;64:24
**knowing (1)**
112:11
**knowingly (1)**
112:10
**knowledge (8)**
61:24;77:16;98:1;
112:14;133:4;145:6;
176:5,8

## L

**lack (4)**
80:9;85:14;169:24;
170:8
**ladder (23)**
63:5;64:22;65:7,14,
17;66:23;90:5,10;91:7;
93:22;94:9,19,20;95:1,
7;100:14,19,25;101:6,
12,15,22;102:22
**ladders (1)**
90:25
**laid (1)**
131:21
**large (1)**
42:25
**last (18)**
5:6;45:1;105:3;
110:20;111:18,24;
112:3,10,12,12;121:4;
127:14;128:11;165:22;
167:12,12,13;169:10

**later (1)**
112:8
**Latham (1)**
5:20
**Lauren (1)**
5:17
**law (4)**
17:3,4;39:8;175:4
**lawsuit (4)**
5:25;71:18,21;72:4
**lay (1)**
6:8
**layout (1)**
176:16
**learn (1)**
14:22
**least (4)**
132:3;137:21;
150:12;166:24
**leave (3)**
25:22;34:15;133:5
**leaves (1)**
127:4
**left (9)**
43:19;44:3;93:1;
115:21;116:17,22;
128:10;177:2,16
**leg (3)**
57:6;134:15,18
**legal (2)**
8:22;72:2
**Legitimacy (10)**
35:21;36:15;37:10;
47:9;64:7;74:21,24;
161:21;173:8,12
**legitimate (48)**
35:23,24,25;36:10;
42:9,18;43:1;47:20,23;
48:4,7,16;62:5;64:9,10,
11,18,19;65:5,11,11,
19,21;66:15,19,22;
80:1;81:6;84:14;86:11;
94:7,10;99:22;102:5;
111:1;164:13;168:3,
11,20;169:8,15;170:1,
6,10,16;173:9;175:2,5
**legs (3)**
101:18,20,23
**letter (1)**
147:8
**level (1)**
13:20
**liberty (1)**
66:6
**library (1)**
17:3
**lieutenant (23)**
43:3,6;49:25;69:12,
16;71:2,4;91:18;119:2;
120:16;121:2;122:8;
126:18,19,25;128:14;
129:6,7,23;130:11,18;
132:19;153:12

**lieutenants (4)**
43:7;58:9;71:6;
153:12
**life (2)**
11:13;13:19
**lifesaving (1)**
30:8
**Lifespan (1)**
133:10
**lifting (1)**
154:13
**light (2)**
25:2;26:9
**likely (1)**
68:11;97:6;139:16
**limb (2)**
48:25;67:3
**limbs (3)**
48:9;64:20;66:23
**limitation (2)**
91:15;92:3
**limited (2)**
56:23;163:11
**line (5)**
112:13;115:19;
126:23;127:1;129:9
**lined (1)**
131:23
**list (10)**
22:25;23:4;41:18;
91:18,20,21;108:1;
115:2;171:2,18
**listed (7)**
111:19;129:21;
130:3;132:16;137:3;
139:3;162:1
**listen (1)**
177:11
**lists (1)**
115:3
**little (4)**
12:2;55:6;110:7;
115:14
**live (4)**
38:12;44:14;59:14;
71:12
**lives (3)**
11:4,10,11
**living (4)**
59:18;115:4,17;
121:20
**location (2)**
132:7,16
**locations (1)**
152:18
**lock (1)**
177:1
**locked (1)**
176:22
**log (14)**
124:9,10;126:10,19;
129:5;130:5,15,19,23,
25;131:12;134:2,12,22

**logged (2)**
124:7,8
**long (15)**
10:4;11:15;12:13;
13:1;31:21;32:2,5;
45:18;56:7,8;67:9;
68:11;78:15;85:23;
118:3
**longer (4)**
13:25;78:2;106:25;
112:3
**look (26)**
48:2;91:12;92:15;
106:8;108:8;113:25;
122:25;123:20;128:6;
135:4;137:16;140:18;
141:4,5,10,14;142:11;
143:12;152:3;157:23;
158:4,6;160:4;165:10;
166:18;175:11
**looked (2)**
164:17;165:9
**looking (23)**
81:12;83:13;87:19;
90:2,3;91:12;103:3,7;
106:7;107:16;109:4;
110:22;111:20;116:9;
160:21;161:22,23;
162:8,11,12,12;173:14,
22
**looks (1)**
127:24
**lot (6)**
16:24;38:13;56:2;
74:21;75:21;95:2
**loudspeaker (1)**
27:15
**lower (1)**
38:25
**Lyons (1)**
14:3

**M**

**Machado (1)**
128:8
**machine (3)**
138:12,22,24
**mail (5)**
22:12,12,21,21;
40:13
**mailbox (13)**
22:10,11;34:16,19,
23;35:2,5;40:6,7,9,12,
18;41:2
**main (5)**
23:9;125:10;176:23,
23,25
**Mainly (1)**
74:16
**makes (2)**
22:14;44:12;58:8;
93:2

**making (6)**
43:1;70:10;99:7,12,
18;156:22
**male (1)**
10:7
**many (24)**
10:14,16;15:5,22;
17:17;32:14,16;42:7;
43:7,16;44:18,21;45:4,
21,24;46:2,8;59:24;
80:24;91:13,24;151:4,
8,8
**March (1)**
167:8
**Marianne (3)**
93:4,8,18
**mark (2)**
109:2;137:20
**marked (21)**
82:13,15;86:16;
88:19;92:12;102:25;
103:24;104:13;105:1;
107:11;108:16;109:10;
114:24;119:17;126:9;
133:8;135:3;138:3;
139:7;140:8;157:22
**Master's (2)**
9:5,16
**materially (5)**
140:23;161:8;162:9,
22;163:2
**matter (8)**
55:23;57:17;91:8;
98:7,9;102:2,16,20
**matters (2)**
74:5;102:4
**mattresses (1)**
173:14
**may (27)**
7:4,16;35:8,9;37:14,
15;60:17;68:12;71:13;
77:25;82:6;92:14;
105:2;139:20,20;
141:21;142:3;143:25;
152:16,19;161:6;
165:14,19;166:3;
167:20;172:24;176:2
**maybe (3)**
89:10,11;113:3
**McCAUGHEY (2)**
5:2,7
**M-c-C-A-U-G-H-E-Y (1)**
5:8
**mean (25)**
24:12,14;35:22,24;
36:21;38:10;46:4;
55:14;58:19;64:6,13;
68:14;76:19;77:23;
86:4;88:6;90:5,10;
98:16;109:6;111:6;
123:19;143:10;165:4;
175:5
**Meaning (1)**

**64:15**
**means (3)**
12:2;18:4;91:2
**meant (4)**
95:1;107:7;112:8;
170:9
**medical (326)**
12:7,10;17:17;18:23,
24;19:1,16;21:24;22:2,
5,6,13,16,17,23;23:5,
14,19,20;24:4,11,12,
13,16,21;25:1,6,7,9,11,
20,22,25;26:3,12,13,
15,17,21;27:4;28:3,6,
25;29:11;30:11;31:6,6,
10,13,18,21;32:2,6,8,
14,22;33:6,16,17,18,
19,25,25;34:5,6,7,8,9,
13,15,17;35:1,11;36:5,
7,22,25;37:5;38:4,24;
39:2,3;40:4,5,7,9,11,
12,22;41:2,8,14;47:11,
24,25;48:3,6;49:7;
50:20,24;51:1,4,5,12,
14;52:9,13,14,23;
53:12,15,15,17,22;
54:2,11;55:17,20,21,
23;56:1,5,10,24;57:1,
13;58:5,16,23,25;59:6,
20,22;60:24;61:7;
62:18,21;63:8,22;64:7,
17;66:2,12;67:8,12,13,
16,16,21;68:3,8,9,14,
20,20,24;69:1,1,4,6,19;
70:14,15,16,23,25;
71:2,3;73:24;74:6,16,
22,23;75:3,11;76:21;
77:1,8,12,15,17,19,22;
78:2,6,7,14,17,19,20,
22,25;79:3,18,20,21,
24,25;80:1,2,3,9;81:1,
3,11;82:3;85:21;90:7,
11,14;91:8;94:17,24;
95:10,22;96:8,16;98:7,
11,12,16,22;99:6,7,9,
12,25;100:6;101:9;
102:3,16;103:19,20;
107:21,24;108:12;
113:19;114:6,12,20;
117:12,19;119:4;
122:11;132:12;134:10,
16;135:1;142:14;
143:2,5,6,8,8,11,15,17,
20,23,24;144:5,6,15,
16,17,20,22;145:4,21;
146:4,16,19;147:3,22;
148:1,18;149:20;
150:8,17;153:4,5,7,19,
20;154:15,18;155:1,
20;158:14,15,21,25;
159:1,5,7,7,9,13,22;
161:20,24;163:13;
166:4,15;167:24,25;

Melise vs
Wall, et al

Kerri McCaughey
July 12, 2019

169:22;171:18,25;
172:3,4,10,13,14,17,20,
21,24;173:3,4,11,20,
22;174:1,14;175:2
**Medically (15)**
16:19;57:5,11,19;
77:25;81:9;99:4;
100:24;142:15;143:16,
25;144:2;160:23;
162:13;175:6
**medication (1)**
30:22
**medications (2)**
7:16;30:20
**Medium (39)**
10:10;11:25;13:6;
19:19;23:24;24:4,22;
26:16,18;27:23,25;
31:23,25;32:3,7,10;
33:7;43:4,7,16,23;44:1,
18,24;46:24;55:15;
59:16;79:7,16,23;
156:12,20;160:14;
167:25;169:13;170:18,
18;174:15;176:16
**meet (1)**
8:11
**Meeting (7)**
51:17,18;73:20;75:4,
6;172:9,13
**meetings (4)**
73:22;91:21;170:13;
172:17
**Melise (16)**
5:12,25;72:10;73:21,
25;74:6,10;75:25;
82:21;86:5;112:14;
127:13;128:10;133:22;
134:9;175:23
**Melise's (2)**
121:7;133:12
**Melnick (2)**
93:6;94:17
**member (1)**
143:15
**memo (6)**
145:21;146:8,12,17;
147:8;154:7
**memorandum (3)**
145:13,18;146:2
**men's (1)**
10:10
**mentioned (2)**
110:18;139:21
**metal (1)**
177:10
**middle (3)**
128:9;131:16;177:19
**might (68)**
16:25;18:18;20:18;
24:25;25:9,14,20,21;
27:6;28:23,25;29:15;
30:1,4,25;32:2,5;33:12,

23;37:20,25;38:2;39:6,
20;40:20;42:11,17,19,
23;46:8,21;47:5;55:10;
57:1,7;63:7,15,23;
64:4;65:14,25;66:20,
20;67:9;70:21;72:11;
78:4;90:3,11,23;91:24;
92:3;97:20,22;103:19;
105:23;123:6;124:5;
127:15;128:4,18;
149:11,23;150:7;
170:14;171:3,12,14
**mind (1)**
84:13
**Mine (2)**
83:6;170:13
**mini (1)**
178:5
**minimum (1)**
152:13
**minute (2)**
95:16;115:13
**minutes (3)**
19:7;130:4;131:4
**missing (3)**
48:9;64:20;82:24
**mod (27)**
43:9;59:18,24;60:3,
7,11,15,18,18;61:1,9,
12,16,23;101:13;
115:20,21;124:10;
125:10;126:10;131:16;
132:8,21;133:5;
177:13,13,14
**modification (11)**
144:3,12,14;147:2,8,
15,20;148:2,9;161:7;
166:23
**modified (1)**
146:25
**modify (7)**
144:6,18;165:14,19;
166:4,7;167:9
**modifying (2)**
149:12;160:16
**mods (3)**
60:21;176:15,19
**months (3)**
67:17,18;169:12
**Moran (2)**
10:10;11:24
**more (71)**
12:2,17;36:11;37:5;
39:12,23;40:1,18,23,
24;41:1,5;43:4,6;
47:11;54:3,4,19;55:10;
56:2;61:5;71:14;74:1;
75:19;76:8,14;78:18;
81:10,15,16,18,20,21,
25;83:6,14,17,22;
84:22,22;85:4,8,11,12,
16,20,24;87:9,21;89:2,
19;90:19;93:19;94:15;

97:6;99:4;102:21;
105:20,24;106:4,5,8;
111:3;114:1;123:9,12;
141:20;156:16;161:6;
162:18;174:14
**morning (1)**
26:19
**most (2)**
110:20;111:21
**mostly (2)**
13:19;71:11
**move (7)**
59:2;61:1;76:24;
78:5,7;80:4,13
**moved (11)**
78:10,13;79:4,5,17,
23;116:18;117:23;
118:5;139:20;164:8
**mowing (1)**
63:7
**multiple (5)**
107:20;110:19;
139:3;151:11;166:14
**must (1)**
144:13
**MVP (1)**
177:11
**myself (1)**
34:12

## N

**name (8)**
5:5,6,10,15;121:7;
127:3;128:3;157:24
**named (4)**
6:2;8:19;171:10,16
**nature (6)**
26:6,7;62:20;72:20,
21;74:15
**necessarily (2)**
65:4;164:2
**necessary (10)**
30:15;78:2;79:2,6,
15,22;98:21;122:12;
145:16;150:9
**necessitate (1)**
57:2
**neck (20)**
64:24;65:2;83:12,15,
18;84:5,9,18;87:10;
89:9,12;90:5;93:1,4;
99:24;100:8;102:12;
103:6;105:13;108:24
**need (33)**
7:20;16:3;20:18;
28:10;31:14;32:10;
35:25;39:23;40:23;
52:24;56:2;64:10,12,
24;71:4;78:22;81:9;
83:6;85:20;94:2;99:6;
101:22,24;111:2;
142:8;143:7;148:23;

154:10;156:6;164:2,3;
173:11,24
**needed (19)**
16:4;38:21;67:16;
79:23;85:8,11,16;87:9,
21;91:25;95:6,11,18,
22;106:5;116:1,3;
123:12;149:15
**needing (1)**
83:22
**needs (88)**
12:9;15:2;16:14;
17:18;18:22;19:2,4;
20:3,12;21:3;22:1;
25:4;26:13;32:17,19,
20,21;33:2;34:10;
35:11;36:14,19;38:24;
39:9,25;41:9;49:6,10,
12;52:20,24;53:2,19;
54:2,5,23;64:1;68:3,
19;73:25;74:9,12,25;
82:4,19;91:9;103:2,9;
104:3,15;107:13,19;
108:18;138:8;140:11,
22;141:22;142:1,4,5,
18;143:1,6,19;145:13,
23;146:9,17,18;147:10,
12;148:16;151:5,9;
152:14,20;153:2,7,18;
154:9;155:20;158:15,
19;159:25;160:19;
165:14,19;173:10
**needs/urger (1)**
160:17
**neither (1)**
127:11
**nerve (1)**
65:2
**neuropathy (1)**
93:7
**new (9)**
18:5,13;50:9;68:5,
14;108:2,4;136:13;
167:24
**next (19)**
6:17;11:18;49:24;
93:5;115:18,19;
116:19;117:8,23;
126:23;127:1,7,12;
128:6;129:6;132:14;
142:11;143:21;175:14
**night (3)**
125:3,12;128:11
**nobody (2)**
32:10;75:20
**nods (1)**
128:16
**none (1)**
6:13
**normal (7)**
37:16;87:3;121:14,
15;122:9;130:21;131:7
**Normally (2)**

106:24,24
**notation (35)**
53:15,22;84:4;85:6,
9;90:18;93:5,20;94:3,
6,17;95:5;96:18;98:2,
6;100:10,13;102:10,
15;105:12,14;109:23,
25;110:1,11;111:5;
121:4,21;129:7,20;
132:5;136:8,9,22;
149:20
**notations (14)**
83:9;89:1;92:18,20,
22,24;93:10,14,15,16;
95:13;96:5,22;136:3
**note (13)**
52:22;53:18;74:2;
81:24;86:18;87:22;
88:21;97:23;109:14;
135:7;136:6;138:5;
139:9
**noted (2)**
113:12;154:1
**notes (1)**
89:7
**notice (1)**
137:22
**noticed (1)**
113:15
**notification (4)**
137:11;147:1,7,19
**notifications (1)**
83:4
**notified (2)**
126:18;129:8
**notify (3)**
144:5,16,22
**nots (1)**
95:2
**November (12)**
73:7,15;83:24;85:18,
19;86:3;116:21,25;
118:7;121:1;125:15;
150:14
**number (22)**
42:25;43:15,17;
45:11;46:1,6;56:6;
59:21;71:15;74:17;
103:25;143:12;146:21;
158:4,6,8;160:4,12;
165:10,25;167:7,7
**numbers (2)**
74:19
**nurse (17)**
93:4;100:11,16,19;
110:2;117:3;119:25;
126:18;127:2,2,4,12;
129:8;131:1,4,9,11
**nursing (1)**
133:3

## O

Melise vs
Wall, et al

Kerri McCaughey
July 12, 2019

**objection (26)**
7:10;72:13;79:9;
97:13;99:16;105:25;
117:21;118:25;123:18;
132:18,24,25;133:24;
137:14;146:14;148:11;
149:7,25;151:1;
156:14;158:11;168:4,
7,12,13,21
**objections (1)**
7:8
**obligations (2)**
14:14;114:10
**obtain (5)**
22:7;33:24;150:9;
152:19,21
**obtained (4)**
9:7,13,18;14:23
**obviously (1)**
172:2
**occasions (5)**
73:18;151:11;
166:14;167:9;169:23
**occur (3)**
25:9;28:12;68:2
**occurred (2)**
124:16;132:14
**occurs (2)**
25:23;28:13
**October (3)**
93:12;95:13;150:12
**off (14)**
66:25;73:7,10,14;
78:1;83:1;114:14;
117:19;122:6,16;
126:17;129:11,16;
154:14
**offender (31)**
12:6;25:1;26:18;
38:23;58:21,24;59:11,
16,17;60:5,14,16,25;
61:5,12,24;64:9,11;
68:22,23;69:11,12;
99:10;115:23,25;
146:16;147:25;153:6;
154:11;164:9;173:12
**offenders (2)**
23:2;59:19
**offer (1)**
63:5
**officer (15)**
22:12,22;23:1,9;
25:3,3;26:10;27:3;
49:23;125:10;127:17;
128:1,3,7;176:25
**officers (2)**
31:9;127:9
**officially (1)**
46:16
**OFF-THE-RECORD (1)**
140:6
**often (2)**
28:25;123:11

**old (1)**
107:25
**on-call (3)**
24:11,12;25:6
**once (9)**
35:5;40:18,22;68:17;
70:14;86:12;91:6;
122:18;132:10
**one (79)**
6:18;12:17;14:23;
24:19;32:17;40:7;43:4,
6;44:6,16;45:9,10;
49:9;17;55:10,18;
56:24;58:17,21;62:15;
64:11;66:15;81:16;
88:15;95:9;105:3;
107:22,25;110:6,20;
111:18,22,23,25;112:2,
4,4,5,7,11,11,12,12;
114:1,3,5;115:21;
121:24;125:6,11;
137:3;139:22;140:14;
147:20;154:22;156:16;
157:19;158:8;159:21;
162:25;164:3,3,17;
165:9;166:17,19,21,22;
167:1,5,6,14,16;
171:15;175:9,16,18;
176:2,12
**one-on-one (1)**
74:6
**ones (7)**
16:23;17:4,4;41:20;
64:19;65:9;171:15
**only (33)**
12:10;13:12,24;
16:18;24:19;27:23,25;
28:18;33:23;35:14;
42:7;46:2;51:3;53:6;
60:6,10;68:25;69:14;
84:18;90:6,9,11;98:11;
111:11,15,24;121:24;
125:9,11;136:25;
144:1;172:1;177:21
**open (4)**
131:19,25;176:22;
177:3
**opened (1)**
97:18
**operation (8)**
141:2;161:9,13;
162:10,23;163:3;
164:23;165:1
**operational (6)**
13:3;15:13;37:8,11;
120:19;139:19
**Operationally (1)**
35:17
**operations (14)**
13:15;15:15;19:8,15,
23;20:5,7,16;37:16;
122:22;124:19;139:24;
140:23;162:6

**operations' (1)**
13:5
**opinion (2)**
54:17;110:6
**opportunities (1)**
14:20
**opportunity (1)**
162:18
**opposed (1)**
84:12
**options (5)**
39:10,13,14,15;
141:20
**order (152)**
40:19;41:4,8,13;
47:20;52:13,18,25;
56:6,10;57:15,21,25;
58:3,6,10,11;59:2,4,5,
6,23;60:6,9,24;61:5,7;
62:4,5,20;63:3,10;
65:19,20,24;66:2,12,
13,16;67:2,20,25;
68:15,25;69:9,11,12,
14,15,19,21;70:3,5,12,
13;71:4,5;77:13;78:1;
80:17,20;81:13,21;
83:2,25;84:1,7,20,24;
85:1,19;86:1;87:3,4,12,
13,16,23;90:19;91:9,
12,16;92:4,7,9,19;
93:11;94:21,23;95:12,
23,25;96:25;99:6;
101:22,24;102:5,9,13;
104:10;106:16;108:13;
110:15,17;111:16,21,
21,24;112:3;113:1,13,
21;114:6,12,20;115:6;
116:13;118:12,14,17;
130:16;136:16,23;
137:17;138:18,19,20,
23,24;139:3;143:17,19,
19;145:16;150:9;
151:5;161:5;162:17;
163:5;164:8,12;166:4,
11;167:11,12,12,13,18;
174:6,9;178:1,4
**ordered (3)**
57:6,11;102:3
**orderly (2)**
37:14;63:24
**orders (73)**
18:22;21:3,22;23:21;
32:13,15,17;39:9;
40:24;41:17,23;46:4,8;
47:6,8;59:20;68:17;
71:17;73:25;74:9,16,
20,25;75:3,8,12,15,16,
21;76:8,11,14,22;88:9,
17;102:11;110:18;
112:3;113:5;114:5;
138:21;139:3;144:20;
145:23;147:14,21;
149:2;150:21,25;

151:10,11,21;155:11;
156:3,8;158:15,15,19;
160:17,23;161:8;
162:9,13,21;163:10,11;
164:4,5;166:7,24;
167:10;174:4;175:3
**ordinarily (3)**
31:21;45:18;61:22
**organized (2)**
63:18;153:8
**orientation (2)**
18:6,13
**original (3)**
68:21;147:13;177:25
**Originally (4)**
8:6;39:7;87:12;
113:21
**osteoarthritis (10)**
83:12;84:5,8;89:9,
12,15;90:4;99:24;
100:8;102:12
**OT (1)**
93:7
**others (4)**
5:10;6:1;112:5,7
**Otherwise (7)**
28:5;92:19;116:15;
141:1;161:12;162:6;
164:22
**out (57)**
16:6;22:15;25:5,17;
33:23;34:12,17,18,22;
35:1;39:20;46:9,14,16,
18,21;47:3;52:15,17,
19,25;53:3;56:19;61:4,
17,25,25;63:18;67:21;
71:2;76:17,20;77:10;
88:16;100:15;117:4,
12;119:24;121:17,23;
122:9,14,18;127:10;
129:18;131:1,15,21;
132:5,10,11;136:12;
137:12;139:16;153:21;
174:20,23
**outside (5)**
56:1;122:11;125:19;
131:18,22
**over (14)**
22:8;27:3,13;34:18,
22;81:22;106:22,22;
107:2;133:21;134:4;
144:22;151:5,8
**overriding (1)**
98:21
**overrule (3)**
23:20;31:10,15
**oversaw (2)**
11:25;13:5
**overseeing (1)**
11:7
**over-the-counter (2)**
30:19,22
**overview (1)**

33:15

## P

**packet (5)**
69:20;120:11;
124:16,20,25
**packets (3)**
124:14,15,18
**page (17)**
83:10;127:23;128:6,
9,24;141:8,14;142:11,
11;143:13;145:7;
146:22;152:4;157:23,
23;165:23;175:25
**pain (15)**
83:12,16,18;84:4,18;
87:11;89:10;93:1,2;
94:12;100:17,18;
103:6;105:13;108:24
**paper (7)**
52:8,9,10;53:6,9;
55:1,3
**paragraph (5)**
143:21;157:24;
160:22;162:8;165:22
**paralegal (1)**
5:13
**Parenting (1)**
12:6
**part (2)**
76:7;120:11
**participant (2)**
115:22;116:7
**participate (1)**
61:18
**particular (21)**
7:11;19:19;29:13;
38:22;43:9,11;51:17;
62:7;67:14;80:23;92:7;
102:7;121:24;122:22;
123:4;141:22;142:20;
157:10,14;165:8;
175:21
**particularly (1)**
142:4
**parties (1)**
156:6
**past (2)**
111:9,12
**patient (2)**
92:25;93:7
**Patricia (1)**
169:3
**Patrick (1)**
121:9
**Patriot (1)**
8:24
**peer (1)**
139:21
**people (9)**
18:3;46:5;48:8,8;
59:14;65:10;91:24;

163:12;172:1
**Per (1)**
    93:6
**percent (3)**
    47:13,14,14
**perform (2)**
    101:7,13
**period (2)**
    48:21;116:10
**permanent (3)**
    12:24;48:13;78:18
**permanently (2)**
    12:16,22
**permitted (13)**
    29:23,25;30:4,9,17,
    19;31:2;56:9;57:21;
    114:5,11;144:10;
    162:17
**person (19)**
    26:13;28:18;34:21;
    43:4;58:16;59:2;63:22;
    69:19;70:20;71:3;82:4;
    87:16;114:13;121:22;
    127:25;148:20;159:19;
    164:12;176:20
**personal (4)**
    49:6;74:12;104:3;
    153:2
**personally (2)**
    69:16;75:24
**person's (1)**
    65:6
**perspective (2)**
    21:4;158:21
**pertaining (1)**
    140:14
**phone (1)**
    81:22
**phones (2)**
    131:17;177:5
**physical (2)**
    62:19;101:10
**physician's (1)**
    143:19
**pick (2)**
    107:1;139:22
**picked (1)**
    107:3
**picnic (1)**
    177:10
**piece (2)**
    95:19,21
**placed (2)**
    86:5;93:8
**plaintiff (26)**
    5:12,14;73:1,4,6,13,
    17;75:24;80:18;
    125:23;129:18;132:20;
    133:5;147:7,18;
    149:24;150:21;151:15;
    163:2,18;164:14,19,21;
    175:23;176:3,9
**PLAINTIFF'S (21)**

82:15;86:16;88:19;
92:12;102:25;103:24;
104:13;105:1;107:11;
108:16;109:10;114:24;
119:17;125:15;126:9;
133:8;135:3;138:3;
139:7;140:8;157:22
**planning (2)**
    19:14;20:1
**play (4)**
    38:14;62:11;63:18;
    177:11
**players (1)**
    177:12
**please (29)**
    5:6;6:21,23;7:21;
    88:18;89:8;102:24;
    103:23;104:12,25;
    107:10;108:15;109:9;
    114:23;118:10;119:16;
    133:7;135:2,4;137:16;
    138:2;139:6;140:7,19;
    141:4;152:3;156:16;
    165:10,22
**PM (8)**
    24:2,2,2,3,8,8,9;
    178:6
**point (41)**
    8:19;15:8,11;18:14;
    19:22;20:10;23:11;
    25:24;35:3;38:18;45:1;
    46:11,13,20,23;60:21;
    69:6;71:20;73:20;76:3;
    110:8;115:22;119:9;
    137:10,11;139:17;
    140:14,15;144:19;
    145:3;147:6,17;
    150:20;152:25;155:5,
    11;156:25;157:4;
    163:22;172:11;175:3
**policies (31)**
    15:4,5,9,12,14,16,16,
    19,20,25;16:1,6,11,13,
    21,22,25;17:2,6,10,13,
    17,21;19:4,9,12,24;
    20:20,24,24;140:14
**policy (60)**
    19:14,21;20:1,2,6,11,
    17;21:15;29:16;54:7;
    56:7;66:4,5,6,9;114:9,
    15,19;140:10,12,13,16;
    141:11,25;143:9;
    146:7,11;147:24;
    148:6;149:11,18,23;
    152:12;153:1;154:3,
    25;155:6,14,17,23,25;
    156:11,13,19,23;157:8,
    13;158:22,24;159:3,5,
    8,10,13,20;161:16;
    162:20;175:21;176:4,4
**popped (1)**
    176:22
**population (6)**

10:8;49:16;58:7;
59:22;64:14;173:12
**porter (6)**
    101:1,7,8,11;112:15,
    16
**posed (1)**
    7:23
**position (15)**
    10:2,4,19,22;11:4,16,
    18;13:1,4,7,11,13,24;
    14:10;170:22
**possible (14)**
    24:24;55:8;58:10;
    62:3;65:23;66:5,8;
    78:5,7,9,10;112:2;
    127:4;144:7
**possibly (2)**
    90:24;132:4
**post (1)**
    71:17
**potential (1)**
    25:23
**potentially (2)**
    53:13;110:5;164:3
**practice (2)**
    35:18;54:7
**practices (2)**
    158:14;160:13
**practitioner (3)**
    93:4;100:11;110:2
**prefer (2)**
    54:23,25
**preparation (2)**
    157:25;160:5
**prepare (6)**
    7:25;8:4,12;145:12;
    146:11;152:25
**prepared (1)**
    146:1
**preparing (1)**
    160:8
**prescribed (9)**
    142:15;143:16,24,
    25;144:2,7,18;160:23;
    162:13
**present (16)**
    5:10;26:17;35:18;
    36:22;37:15,25;38:2,7;
    39:21;64:4;85:2,6,9;
    140:24;161:9;163:14
**presented (5)**
    37:11;65:1;142:1;
    163:6,8
**presenting (1)**
    173:17
**presents (1)**
    69:12
**presumably (8)**
    34:6,18;40:16;41:11;
    98:16;128:3;133:19,20
**prevent (2)**
    57:7;112:24
**prevented (1)**

164:5
**preventing (1)**
    164:2
**prevents (3)**
    63:4;65:6;101:9
**previous (9)**
    90:19;92:9,14;99:23;
    104:6;105:6;109:20;
    111:21;137:10
**previously (6)**
    50:8;102:11;105:19;
    106:3;147:14;155:10
**primarily (1)**
    120:5
**print (4)**
    34:18;52:15,16,18
**printed (1)**
    113:22
**printout (1)**
    115:1
**prior (6)**
    85:12;87:4,4;113:6;
    119:3;166:1
**priority (1)**
    61:8
**prison (1)**
    11:11
**probably (1)**
    120:7
**problem (2)**
    72:15;137:4
**problematic (1)**
    72:12
**problems (3)**
    135:11;137:12,13
**procedure (4)**
    26:4,24;41:8;97:10
**procedures (18)**
    18:22,25;21:2,18,22;
    26:5;39:11;141:19;
    152:9,12,13;153:1;
    154:2,24;155:2;
    158:13;160:13,18
**proceedings (1)**
    177:24
**process (24)**
    22:20;23:4,18;26:22;
    49:2;54:10;67:4,7;
    68:7;70:9,15,20,22;
    119:7
**processes (1)**
    154:25
**produce (1)**
    148:24
**professional (8)**
    94:24;95:10;98:7,12,
    22;102:3,17;103:19
**professionals (3)**
    98:11;108:13;117:12
**program (33)**
    11:24,25;12:3,15,16,
    18;15:2,10,15,17,21;
    34:12;58:22,23,25;

59:17,19;60:16,19,25;
61:6,17,19,22,24;62:8;
115:23,25;140:24;
161:9;162:23;163:4,5
**programmatic (24)**
    12:11,14,21,24;
    13:11,18,21,24;14:2,4,
    9;15:24;16:8;17:8,21,
    25;19:22;21:11;34:14;
    45:5;46:13;64:1,1;
    170:19
**programs (7)**
    12:3;13:19;59:12,15;
    60:20;140:20;153:7
**promise (1)**
    140:4
**promoted (3)**
    10:20;13:14;139:18
**properly (3)**
    145:16;156:11,18
**protect (1)**
    154:16
**protocol (3)**
    29:13,19;54:6
**protocols (1)**
    18:21
**proved (1)**
    84:12
**provide (22)**
    10:7;29:25;30:5,9,
    14,19;41:15;46:15;
    62:21;81:9;84:5;99:21,
    22;147:6;148:8;149:1,
    12,24;150:4;157:4;
    165:12;174:15
**provided (12)**
    16:20,25;17:13;
    21:11;38:22;84:1;
    134:25;147:13;151:3,
    14;154:22;165:25
**provider (7)**
    51:11;53:15;82:3;
    90:7,11;166:4,15
**providers (2)**
    54:3;150:17
**providers' (1)**
    161:20
**provides (1)**
    146:25
**providing (4)**
    11:2;21:8;30:24;
    46:3
**provision (1)**
    30:3
**purposes (8)**
    20:11;39:3;68:21;
    78:12,14;80:14;91:8;
    142:8
**pursuant (2)**
    152:12;153:1
**purview (1)**
    15:21
**put (27)**

22:6;23:17;40:6,18;
41:1,11;52:22;55:5;
56:4,9,24;58:5,6,8;
59:21;65:23;66:8,11;
71:13;77:9,20,21;
85:20;98:2;107:6;
113:21;146:19
**puts (1)**
    52:13
**putting (3)**
    35:1;77:4;107:7

## Q

**qualify (1)**
    25:11
**quick (1)**
    140:5
**quickly (5)**
    6:10;108:8;128:22;
    157:23;176:14
**quote/unquote (1)**
    36:10

## R

**radiates (1)**
    93:1
**radio (3)**
    27:3,13,20
**ran (1)**
    46:16
**random (2)**
    113:20;116:14
**reach (4)**
    25:5;46:5;61:25;
    71:2
**reaching (1)**
    67:21
**read (20)**
    71:23;83:11;89:8;
    95:4;98:4;109:20;
    126:13;128:6;140:18;
    141:9,16;143:14,21;
    144:9;145:9;146:21;
    152:6;158:22;165:22,
    23
**readily (1)**
    140:21
**reading (11)**
    72:1;94:6;95:17,20;
    98:20;111:1,3;117:1;
    123:7;158:17,18
**real (1)**
    161:23
**really (1)**
    64:8
**reason (45)**
    7:13;45:17;53:14;
    57:24;61:18;64:22;
    66:14;67:15;78:4;
    83:20;84:14,18;86:8,8;
    87:13;90:6,9,11;91:4;

94:7;100:20;103:19;
105:20,23;106:19;
110:22;111:2,15;
113:1;114:6,12,20;
118:23;122:5;123:20;
128:11;136:25;137:17;
139:2;147:15;148:23;
162:1,25;164:25;
171:15
**reasonable (49)**
    32:21,24;33:12,24,
    25;34:3,7;37:19;38:21;
    42:3,12,13,15;45:4,19,
    24;50:21;67:23;78:11;
    79:2,6,15,19,22;80:10,
    14;81:5;82:5;88:24;
    89:17;91:25;132:22;
    138:6;139:10;142:13,
    18;144:21;145:10,13;
    146:24;148:9;149:5,
    13;152:19,21;157:1;
    158:15;176:1,5
**reasoning (1)**
    14:21
**reasons (35)**
    35:12,12,13;39:2,6;
    42:9,11,14,19,23;
    43:15;57:8,16;66:20,
    21;71:16;78:6,7;81:6,
    7;107:20;137:3;147:1,
    8,19;148:2,8;149:1,12,
    16,21,24;150:5;
    162:16;171:3
**reassigned (1)**
    39:3
**recall (67)**
    29:4,5,12,18;31:20;
    34:2;48:19;50:19;51:8,
    22;54:14;56:15;66:18;
    68:1;70:4,7,10;73:12,
    16,19,22;74:5,7,8,10;
    75:1,2,10,13,14,23;
    80:19,20,22;82:2;
    84:19,25;86:10,13;
    87:10;92:1;105:22;
    106:2,3;108:5,7,14;
    112:16,17;113:12;
    120:10,25;123:14;
    136:7;137:2;140:12,
    13,15;144:24;160:1,3;
    168:8,17,24;169:20;
    176:8,10
**receipt (1)**
    145:18
**receive (25)**
    14:10;18:14;23:4;
    40:14;41:17,18,19,20,
    24;48:12;50:11,17;
    51:14,25;58:12;59:5;
    69:21,23;81:20,25;
    83:7;120:3,12;132:22;
    170:4
**received (22)**

8:17;18:17;45:15;
47:21,22;49:6,9;50:21;
51:6;60:5;70:3,6;
71:25;83:23;97:11;
98:12;124:20;134:10,
23;148:19;149:8;176:8
**receives (2)**
    69:25;124:18
**receiving (13)**
    51:9,22;52:4,11;
    53:10;72:4;85:12;99:9,
    13;118:21;120:24;
    134:12;164:5
**recent (2)**
    110:20;111:21
**recently (2)**
    6:4;109:6
**RECESS (2)**
    49:5;82:12
**reclassification (2)**
    38:9,11
**reclassified (3)**
    38:23,25;39:6
**recognize (1)**
    88:20
**recollection (3)**
    56:12;66:10;85:23
**recommend (1)**
    161:6
**recommended (1)**
    54:1
**reconsidered (2)**
    38:18,20
**record (23)**
    5:6;7:24;34:9;53:10,
    17,18,21;54:15;68:21;
    83:1;86:19;96:8,13,24;
    97:8,20;98:3;103:15,
    20;143:20;145:21;
    176:14;177:23
**recorded (2)**
    124:12,13
**records (11)**
    36:5,7;52:14,23;
    53:15,22;107:21,24;
    133:12;147:3,4
**recreation (1)**
    131:16
**red (4)**
    68:22;70:1;146:19;
    148:19
**refer (5)**
    115:5;118:10;
    128:22;130:15;144:15
**referred (3)**
    93:8;126:11;139:18
**referring (9)**
    36:5;79:18;86:20;
    100:13;126:21;166:19,
    22;167:2,5
**refused (2)**
    116:4,8
**regard (24)**

14:10;15:5,24;21:9;
28:9;52:8;71:9;72:22,
25;73:21,24;74:9,24;
75:12;108:13;124:2;
142:4;148:25;158:13;
159:19;160:14,18;
163:1;164:19
**regarded (1)**
    166:23
**regarding (5)**
    50:8;73:3;145:23;
    146:2,8
**regardless (2)**
    57:20;145:11
**regenerate (1)**
    68:3
**Regina (1)**
    9:19
**Regular (1)**
    178:2
**regularly (1)**
    88:14
**reject (2)**
    171:8,12
**related (6)**
    15:14;37:7;57:1;
    64:2;74:5;85:13
**relation (1)**
    123:23
**relevant (3)**
    16:12;85:15;101:15
**reluctant (1)**
    63:5
**remain (1)**
    12:23
**remained (1)**
    12:15
**remember (9)**
    6:9;11:20;18:1,7;
    71:19;76:4,5;82:6;
    113:14
**remembered (1)**
    87:15
**remind (1)**
    7:9
**removed (1)**
    132:21
**rephrase (6)**
    6:23;16:7;42:16;
    46:7;48:17;95:3
**report (28)**
    26:16,18;32:6;73:3;
    119:19,22;120:3,15,24;
    121:11,14,15;122:1,3,
    17;123:8,12,14,16;
    124:3;125:8;129:2,22,
    24;130:4,22;132:6,15
**reported (6)**
    117:3,12;129:5;
    132:13;133:12;137:24
**REPORTER (5)**
    5:5,9;6:11;61:14;
    177:23

**reports (1)**
    122:18
**request (186)**
    21:10,11;22:5,6,7;
    28:16,18,21;32:19,20,
    20;33:2,5,12;34:7,8,10,
    11,17;35:1,6,9,11,23,
    25;36:11;37:10,11;
    39:25;41:9;42:3,5,12,
    13,15,20,22;45:19;
    47:9,10;49:7,12,13,14,
    15;50:8,15,21;51:3,17;
    52:13,14,20;53:2,4,19,
    23;54:5,16;55:7,11;
    56:16;62:9,14,15,20;
    64:8;67:13,23;68:3,5,8,
    9,15,19;74:1,2;75:18;
    80:1;81:8,12,14,15,18,
    20;82:19,22;83:22;
    84:17,21;85:1,13,24;
    88:24;89:25;90:6,7,12,
    15,18;93:19;94:10,24;
    98:8;99:15,18;100:21;
    102:21;103:2,5;104:3,
    15;105:20,24;106:4,13,
    25;107:13,19;108:21,
    23;109:15;110:23;
    111:2;112:19;122:8;
    138:6;139:10,25;
    142:13,14,17,20;
    143:10;144:25;145:11;
    146:17,18,24;147:10,
    12;148:16,17;149:8,8,
    20;150:5;152:19,20,
    21;153:3;154:9;
    155:18;157:2;158:13;
    161:6,7,7,21;162:18;
    163:1,14;165:12,17,19;
    168:2;170:1,6,9;171:4,
    9,14,25;172:5,18,22,
    24;173:4,9,10,15,16,
    25;176:1,6,9
**requested (17)**
    28:15,23;29:3,7,8;
    37:20;54:4,6;62:11;
    68:2;81:5;89:19;
    104:10;105:24;108:1;
    123:7;172:10
**requesting (10)**
    29:13,16;36:19;
    47:11;50:13,14;81:16;
    87:2;106:8;165:20
**requests (61)**
    12:9;15:2;16:15;
    19:2;29:21;32:23;
    33:17;34:3,15;39:10;
    41:18,19;45:4;47:14,
    16;48:12,15;49:11,18;
    50:9,11,13,17;51:6,9;
    52:1,4,8,11;53:10;
    54:20,24;74:13;
    108:22;109:19;110:19;
    144:21;148:10;149:5,

13;151:9,16;158:16;
159:25;160:12;161:20;
165:15;168:10,16,19;
169:7,11,14,18,22;
170:10;171:6,22;
173:7,13;174:2
**require (7)**
25:9;83:17;143:6;
144:3,12,13;149:12
**required (4)**
149:17,23;150:4;
163:13
**requirement (1)**
146:11
**requirements (2)**
146:6;147:24
**requires (3)**
39:16;149:18;174:14
**requiring (2)**
40:1;172:14
**respond (9)**
27:4;28:4;31:22;
32:3;45:14,16,18,20;
158:8
**responded (6)**
93:18;119:25;125:5;
148:15;158:9;160:21
**responds (3)**
26:12;28:3;41:2
**response (14)**
28:14;29:25;90:18,
20;98:3;158:4,6;160:4,
8,9,22;165:10,12,17
**responses (2)**
157:25;158:1
**responsibilities (4)**
11:22;13:17;14:17,
22
**responsibility (15)**
15:17;16:2,5;20:16;
22:2;70:11,13;71:16;
152:16;155:15,24;
156:2,5,12,19
**responsible (28)**
12:3;15:8,11,25;
16:11,13,14,18;18:21,
24;19:1,3,9,11,13;43:2,
5,9,11;69:1,18;70:21;
71:1;141:24;152:10;
158:23;159:3,4
**rest (1)**
7:20
**restricted (2)**
62:17,18
**restrictions (3)**
63:14;154:12;157:16
**retained (3)**
125:21;126:2,7
**return (1)**
47:10
**returned (1)**
126:4
**review (51)**

8:2,8;16:2;17:21,24;
20:6,17,20;34:9;35:6,7,
8,14,16;39:9;45:14;
50:23;63:10;67:18;
68:2,2,7,12;71:11;
81:4;85:24;87:13;88:8;
91:20,21;96:14;98:10;
106:25;107:1,3,5;
122:23;136:17;140:16;
161:20;166:8,10;
167:14,17,20,21,23;
168:15;169:17;170:13;
171:6
**reviewed (21)**
15:13,15;20:10;
41:24;103:12;107:17;
112:19;136:14;137:7;
140:14;143:1;144:1;
145:1;147:14;156:10;
160:24;161:17;162:14;
166:6;169:11;173:7
**reviewing (20)**
15:8,12;19:9,11;
20:11,20;35:11,13;
51:1;55:11,12;62:14;
92:2;99:2;123:14;
140:12,13;144:20;
161:5;170:15
**reviews (2)**
67:24;122:18
**revisit (1)**
154:6
**Rhode (7)**
8:24;9:8,14;120:1;
125:24;126:5;133:11
**RIDOC (1)**
140:20
**right (36)**
7:24;22:3;25:4;
38:16;39:9,25;43:20;
44:3;47:16;49:3;61:23;
62:2;66:19;76:7;89:12;
90:25;95:12,16;
115:20;116:18,25;
126:17,22;127:13;
128:11;129:9;132:8;
134:25;140:19;142:23;
157:20;162:16;169:10;
172:7;177:2,16
**role (3)**
15:1;20:23;42:8
**roll (2)**
125:4;128:21
**rolled (3)**
73:7,10,14
**room (17)**
7:20;125:18;127:8;
131:13,14,14,16,16,20,
23,25;132:3,8,11,17;
177:7,18
**roommate (1)**
44:15
**rooms (1)**

177:10
**Rosa (2)**
14:6;170:21
**Ruis (1)**
14:8
**rule (1)**
15:1
**rules (22)**
6:9;15:3
**run (10)**
46:9,14,17,21;47:2;
55:9;56:19;76:20;
77:10;174:20
**running (9)**
37:14;62:2;63:24;
174:23

**S**

**s/he (1)**
143:16
**safe (13)**
35:17,18;63:24;
133:23;134:17;137:10;
140:23;154:13;161:9;
162:10,22,22;163:3
**safety (22)**
35:13;37:15;62:22,
23;63:2;64:4;140:24;
144:1,5,17,22;145:4;
149:16;160:25;161:10;
162:3,15;163:6,8,15;
164:16,18
**Salas (3)**
75:2,4,7
**Salve (1)**
9:19
**same (23)**
12:23;13:3;14:20;
31:4;45:15,16;87:13,
16,16;90:19,20;92:19,
20;100:4;101:16;
105:3,6;109:19;
130:19;137:7;143:13;
146:22;164:10
**saw (19)**
53:23;96:4,11,22,25;
97:12,21,25;103:12,17;
104:8,18,22,24;105:9;
107:17;109:5;110:9;
135:19
**saying (38)**
39:4;47:7;53:1;
57:20;58:3;59:11;
60:12;70:25;75:21;
77:14;79:3;80:12;
83:23;84:13;85:3;
91:17;92:5;94:1,2,3,8,
9,14,15;100:10,12,17;
102:2,14,19,20,21;
110:15;111:22;134:23;
153:14;163:9,10
**Scan (1)**

53:13
**schedule (1)**
87:22
**screen (1)**
115:1
**scribble (1)**
126:23
**second (22)**
9:21;22:4;32:7,8;
57:8,22;58:2,6,7;66:8;
77:5,9,14,21;91:6;
95:9;108:25;127:23;
128:24;157:23,24;
160:22
**Section (14)**
140:18;141:4,5;
142:11,12;144:9;
145:22;146:6,11;
147:24;148:5;152:3,7;
175:25
**sections (2)**
156:10,17
**secure (2)**
28:10,11
**Security (71)**
10:10;11:25;13:6;
19:19;23:20,24;24:5,
22;27:25;32:3;35:12,
13;37:7,15;38:1,2,7,24,
25;39:21;42:23;43:4,
16,23;44:1,19,24;
46:24;55:9,15;59:16;
62:3;63:1,2;64:2;79:8;
84:24;85:2,7,9,13,15;
91:8;93:3,8;99:1;
100:21;121:7;140:25;
144:2,5,11,17,23;
145:4;149:16;153:5;
155:22;156:12,20;
160:14,25;161:11;
162:5,15;168:1;
169:13;170:19;174:15;
176:16,18
**security-based (1)**
62:8
**seeing (2)**
53:18;113:6
**seizure (4)**
48:8;64:19;65:9;
66:22
**self-report (1)**
99:3
**self-reported (14)**
36:17,18,21,23,23;
37:4;93:20;94:4,13,15;
98:25;99:10;100:14;
173:18
**self-reporting (1)**
81:11
**send (27)**
31:4,10,17;40:25;
50:7,19,23;51:1,12;
68:8,19,25;69:6;79:25;

80:2;98:8,13,17;99:14;
100:20;145:12;146:4,
12;147:18;153:21;
156:25;172:21
**sending (2)**
50:7;172:4
**sends (1)**
68:9
**sense (5)**
20:24;44:12;46:6;
132:4,9
**sent (20)**
47:20;50:8;67:13;
81:13;85:21,21;89:20;
97:16;119:4;120:1,15;
135:24;146:1,4,15;
147:22;157:3;172:24;
173:2;174:1
**sentence (2)**
141:16;160:22
**separate (6)**
19:15;52:21,25;53:4;
73:18;108:22
**separately (1)**
62:1
**September (1)**
111:6
**Sergio (2)**
14:6;170:21
**served (3)**
8:18,20;71:20
**service (2)**
78:13,24
**services (2)**
10:7,20
**set (10)**
86:1,4;104:10;107:8;
111:6,13;112:11;
115:8;138:13;177:4
**Several (5)**
45:7,12;56:23;
150:17;151:16
**Severe (4)**
83:12;84:4;89:10;
93:1
**sex (15)**
12:6;58:21,24;59:11,
16,17;60:5,14,16,25;
61:5,12,24;115:22,24
**shall (9)**
141:24;143:17,19,
22;144:4,16;145:19;
152:10,13
**sheet (1)**
157:16
**sheets (1)**
157:19
**shift (37)**
23:25;24:10,17,22;
25:5,24,24;26:11,11,
15,23;27:9,13;28:3,5,
17,18;29:15,24;31:3,6,
9,22,25;32:7;50:2;

121:1,5,9,10,16,18,24,
24;124:17;125:7;
127:20
**shifts (4)**
23:23;24:5;32:9;
152:16
**shift's (1)**
124:7
**short (1)**
48:21
**shovelling (1)**
63:6
**showed (1)**
39:7
**showers (2)**
131:17;177:6
**sic (1)**
12:11
**sick (2)**
23:15,16
**side (9)**
13:5;43:19,21,24,25;
44:3,3;59:25;177:2
**sides (3)**
58:20;60:3,4
**sign (6)**
41:10;97:15;114:14;
154:8,11,14
**signature (9)**
53:19,21;55:5;68:22;
95:15;110:1;126:19,
24;128:12
**signed (13)**
68:25;85:22;92:6;
93:4;95:12;112:4;
128:18;135:22,23;
139:23;146:20;148:19;
154:19
**significance (2)**
106:23;110:17
**significant (2)**
93:23;130:8
**signing (2)**
16:14;147:12
**signoff (3)**
114:13,17;157:16
**SINAPI (2)**
5:13,13
**single (3)**
44:11,13;70:20
**sit (1)**
88:17
**sitting (1)**
132:2
**situation (2)**
26:17;174:20
**six (3)**
10:17;43:18;44:2
**slack (1)**
139:22
**sleep (9)**
94:22;135:11;137:4,
12,13,20,23,25;138:22

**sleeping (4)**
73:7,11,14;119:24
**slide (1)**
177:1
**sliders (2)**
177:1,3
**slip (8)**
22:6,7,9,15;23:17;
49:13,14;67:18
**slips (3)**
49:15;50:7;114:14
**small (1)**
44:14
**snow (1)**
63:6
**Social (3)**
9:5,14;11:9
**solely (1)**
171:9
**solid (1)**
176:22
**somebody (22)**
23:11,17;25:14;
31:11,18;38:12;40:11;
55:23;56:10;57:3,5,8;
59:3;65:14,23;66:8;
77:2,12;78:20;79:4;
121:21;128:15
**someone (19)**
25:12,12,17;30:10;
31:7,13;38:3;48:22,25;
56:2;59:6;60:5,17,24;
62:11;63:3;65:16;
67:16;164:2
**sometime (1)**
135:25
**Sometimes (6)**
21:13;36:14;74:20;
111:18;113:19;164:10
**somewhere (2)**
13:9;129:19
**soon (1)**
17:24
**sorry (30)**
12:17;13:14;19:24;
41:9;48:17;56:18;
59:10;79:14;86:21;
89:6,14;90:20;91:2;
93:13;95:2,4;108:10;
113:25;120:17;127:9;
134:19,21;141:4;
151:6;157:11;158:6;
160:7;165:16;170:2;
173:20
**sort (14)**
11:2,10;16:24;29:25;
33:7;34:7;43:10;72:3;
75:20;85:7;134:10,13,
23;139:25
**sound (1)**
35:17
**speaking (1)**
75:2

**special (80)**
12:9;15:2;16:14;
17:18;18:22;19:2,4;
20:2;21:3;22:1;32:17,
19,20,21;33:2;34:10;
35:10,25;36:14,19;
39:9,25;41:9;49:10,12;
52:20,24;53:2,19;54:1,
4,23;68:3,19;73:25;
74:9,24;82:19;91:9;
103:2,9;104:15;
107:13,19;108:18;
109:15;138:8;140:10,
22;142:1,5,8,18;143:7,
18;145:23;146:9,16,
18;147:10,12;148:15,
23;151:5,9;152:14,20;
153:18;154:9;155:20;
158:14,19;159:25;
160:16,19,23;162:13;
165:14,19;173:10
**specific (16)**
59:14;60:21;62:17;
63:17,17;64:2,3;73:25;
76:19;124:10;126:10;
146:10;154:2,14,24;
162:1
**specifically (12)**
23:24;27:2;88:3,5;
114:15;140:16;147:24;
148:25;155:3,7;162:4;
163:18
**spell (1)**
5:6
**spinal (1)**
63:4
**spoke (2)**
8:1;14:23
**spoken (1)**
76:2
**sports (2)**
63:19;153:8
**staff (119)**
17:13;18:23,24;19:1,
16;22:16,17,19,23;
23:3,20,20,24;24:4,4,11,
12,13,16;25:6;27:4;
28:3;29:23;30:4,12;
31:2,6,7,10,13,14,17,
18,21;32:6,8,14;34:15,
17,25;35:1,2,18;36:25;
37:6;48:3;51:12,14;
57:13;69:7;70:16,23;
73:24;74:6,16,23;
75:11;80:12;91:9;
98:17;99:7,9,12;
119:10;125:3,8,8,9,11;
128:19;133:3;135:1;
140:24;141:25;142:14;
143:2,15,22,23;144:5,
6,16,18,22;145:4;
148:18,22;150:8;
152:15;153:4,5,5,19,

21;154:18;155:1,5;
156:7;158:14,24,25;
159:1,5,7,9,13,22;
160:14;161:10;163:6,
15,23;172:3,10,13,17,
20,24;173:3;174:1
**staff's (2)**
70:24;158:21
**staircase (1)**
55:25
**stairs (10)**
65:13,15,17,20;66:1;
101:13,15,19,25;177:4
**standard (2)**
178:1,4
**start (7)**
6:17,19;7:12;9:25;
108:2,24;113:13
**starting (2)**
9:3;121:5
**starts (1)**
160:22
**State (5)**
5:5,10,16,18;106:17
**stated (1)**
64:7
**statement (1)**
117:18
**states (1)**
92:25
**step (1)**
49:24
**Stephen (11)**
5:12,25;72:10;73:21,
25;74:6,10;75:25;
82:21;121:7;175:23
**steps (1)**
155:11
**sticky (1)**
81:24
**still (8)**
61:21;65:15;94:18;
97:15;100:11;112:15;
127:8;133:1
**stoll (1)**
79:10
**stop (3)**
108:25;136:12,13
**stopped (1)**
103:10
**storage (1)**
29:7
**store (3)**
29:19,20;38:5
**stored (8)**
28:13,19,23,25;29:3,
7,14,21
**STOWELL (16)**
5:19,19;82:10;
132:25;168:4,7,12;
169:2;170:25;171:13;
173:21;175:8;176:12,
13;177:21;178:4

**Strike (2)**
171:13;173:21
**submit (8)**
34:8;49:18;52:25;
68:14;87:3;155:2;
158:14;176:5
**submits (2)**
68:5;155:1
**submitted (19)**
54:21,24;87:1,6;
89:18;91:9;93:11;
94:23;95:9;96:14;97:3,
8;103:11,16;104:7,19;
110:7;122:19,20
**submitting (2)**
50:9;159:22
**subsection (1)**
10:11
**substances (1)**
7:16
**substitute (2)**
143:23;166:4
**suffer (1)**
65:10
**sufficient (11)**
21:19;84:6,10;99:14,
24;100:2,11,20,20,22;
122:24
**suggesting (2)**
36:25;37:2
**suggestion (1)**
68:10
**suitable (1)**
141:20
**SULLIVAN (34)**
5:15,16;72:13;79:9,
12;82:9,24;86:19;
97:13;99:16;105:25;
117:21;118:25;123:18;
127:23;132:18,24;
133:24;137:14;146:14;
148:11;149:7,25;
151:1;153:25;156:14;
158:11;167:2;168:13,
21;175:9,10;176:11;
178:2
**superior (1)**
122:19
**supervise (2)**
10:23;11:3
**supervising (1)**
10:25
**supervisor (3)**
11:5;14:4,7
**supplies (2)**
38:4;102:1
**support (2)**
56:2;173:25
**suppose (1)**
37:25
**supposed (2)**
28:1;159:23
**sure (24)**

Melise vs
Wall, et al

Kerri McCaughey
July 12, 2019

6:9;7:7,22;37:9;
42:8;43:1;52:12;57:4;
70:6;72:16;76:3;79:13;
80:22;90:14;91:5;
127:5,22;129:16;
132:3;135:21;139:17;
153:25;156:5;169:16
**surgery (3)**
48:22,25;67:3,11;
68:10
**sworn (1)**
5:3
**system (8)**
54:18;107:21,25,25;
108:2,4;113:22;139:4

---

**T**

**tables (2)**
131:17;177:10
**tablets (1)**
177:12
**talk (4)**
28:6;119:9;150:8;
159:12
**talked (2)**
62:6;74:23
**talking (1)**
176:14
**Tate (1)**
5:19
**telling (1)**
169:20
**temporary (1)**
48:24
**Ten (4)**
10:5,18;45:8,10
**tend (1)**
45:20
**testified (14)**
16:10;17:20;18:2;
19:7;46:2;55:16;67:1;
81:4;95:16;102:8;
155:10;170:3;171:21;
174:19
**testifies (1)**
5:3
**testify (1)**
7:17
**testifying (3)**
76:15;102:6;106:3
**testimony (4)**
7:13;119:3;145:23;
166:1
**therapeutic (6)**
58:17,19,21;59:1,13;
61:1
**therefore (5)**
47:5;56:20;60:9;
92:4;146:10
**thinking (2)**
92:3,6
**third (12)**

24:17,22;25:23;27:9;
29:24;31:22,25;109:2;
111:5,16;114:3;160:21
**though (6)**
52:10;70:24;92:9;
102:11;121:17;123:8
**thought (4)**
30:15;41:4;48:3;
90:3
**threaten (3)**
140:25;161:11;162:4
**Three (11)**
11:17;13:12;23:23;
39:13,14;67:17,18;
73:18;108:22;109:19;
138:21
**Throughout (2)**
7:7;49:16
**tier (33)**
55:22,24;56:1,5,11,
20,25;57:8,14,17,18,
22;58:2,6,7,14;59:24;
60:11;65:22,24;66:3,9,
11;76:19,20;77:5,9,10,
14,21;91:3;135:12;
177:5
**tiered (1)**
77:18
**tiers (4)**
55:17;172:2;176:15,
19
**times (3)**
32:6;51:17;115:4
**today (6)**
7:13,17;151:4,15;
152:1;159:15
**together (2)**
43:10;70:18
**told (7)**
14:25;18:3;54:9,11;
84:8;100:6;129:15
**took (9)**
85:18,23;125:24;
131:4;132:20;133:4,
21;134:4;135:17
**top (67)**
17:3;44:9;55:17,22,
24;56:5,10,25;57:14,
17;63:5;65:21,24;66:3,
11,25;73:7,11,14;
77:13,20;91:3;92:25;
93:25;94:3,4,6,22;95:5,
19;98:6;102:10,15;
108:24;115:15,21;
116:17,19,22,23;117:1,
4,5,13,14,16,19,20,22;
118:5,7;119:24;
126:17;127:13,20;
128:3,7,11,25;129:1,
25;134:1;150:12;
164:9;175:11;177:5,8
**total (3)**
43:23;44:5;46:5

**trail (3)**
52:8,9,10
**train (2)**
155:5,7
**training (4)**
14:10,23;18:14,17
**transcript (1)**
177:24
**transfer (5)**
116:14;141:20;
142:7;174:7,13
**transferred (3)**
115:18,20;142:2
**transfers (1)**
115:3
**transported (1)**
125:24
**treatment (32)**
12:6,6,8,10;17:18;
22:5;29:25;30:4;51:20;
58:22,22,24;59:11,17;
60:16,25;61:6,22,24;
62:8;78:14,24;115:23,
25;132:22;134:10,13,
16,23,25;142:9;174:17
**treatments (2)**
60:17;62:1
**triage (6)**
73:20,22;75:4,6;
91:21;170:12
**Trish (1)**
169:1
**trouble (1)**
100:17
**try (2)**
6:5;115:14
**trying (2)**
100:15;131:20
**two (4)**
13:2;44:16;58:20;
60:3,4;65:9;107:2;
113:5;133:21;134:4;
158:8;164:11;166:24;
167:9;176:2;177:1,18
**type (4)**
62:19;79:19;115:2;
174:12
**types (11)**
16:25;25:8;29:8;
32:13,14;48:6,18;
50:13,14;63:21;74:16
**typically (6)**
67:17;68:11;75:6;
81:23;107:1;174:7

---

**U**

**ultimately (4)**
49:20;71:16;80:4;
156:2
**Um-umm (1)**
61:13
**under (7)**

7:15;15:17,20;
143:22;144:3;165:13,
18
**underneath (1)**
128:13
**unilaterally (5)**
67:19,22;166:7,14;
167:9
**unit (23)**
19:14,15,18,19,21,
24;20:1;23:8;38:15;
43:19;44:3;59:7,18;
69:20;124:9;141:19,
21;176:18,19,21;177:3,
4,13
**units (8)**
23:7;43:18,24;44:2;
59:5,21;60:4;153:11
**University (1)**
9:19
**unless (3)**
7:10;27:4;140:22
**unusual (5)**
113:5,8,9,15,23
**up (27)**
23:19;39:7;40:23;
55:25;68:7;70:5;73:23;
78:19,20,22;79:20,21;
93:2,3,22;94:4,9;99:4;
100:19;101:19;131:19,
23,25;139:22;159:6;
172:9;177:4
**updated (3)**
19:12;20:25;107:24
**updating (1)**
19:13
**upon (5)**
38:24;145:10,18;
168:2;169:15
**upstairs (4)**
57:3,7,10,12
**urgent (2)**
158:15,19
**usable (1)**
140:21
**use (4)**
7:20;101:22,24;
141:19
**used (1)**
38:4
**using (3)**
6:14;101:20;173:8
**usually (3)**
51:16;91:21;111:17
**utility (1)**
127:8

---

**V**

**vacation (1)**
88:16
**valid (2)**
173:16,16

**validated (2)**
173:18,19
**van (2)**
120:1;125:24
**various (1)**
152:16
**verbal (1)**
6:13
**verification (1)**
173:11
**verified (2)**
37:1;173:3
**verifies (2)**
172:3,20
**verify (4)**
166:18;172:6,8,13
**versa (1)**
61:6
**Vhor (1)**
5:20
**via (2)**
120:1;143:18
**vice (1)**
61:6
**video (12)**
28:9,10,10,11,13,19,
23;29:7,8,17;125:14,23
**violation (1)**
175:4
**Visitation (1)**
13:19
**visitors (1)**
140:10
**visual (1)**
176:20
**Vohr (1)**
167:25

---

**W**

**wait (9)**
6:16,18;26:19;41:2,
3;58:15,25;115:13;
132:12
**walk (4)**
34:18;57:10;176:21,
23
**Wall (2)**
6:1;168:18
**walls (1)**
177:5
**warden (59)**
11:19,23,24;12:11,
13,14,18,21,24;13:12,
18,21,24;14:2,6,8,9;
15:10,24;16:8;17:8,22,
25;19:8,23,23;20:5,7,
17;21:12;34:14;45:6;
46:14;80:16;88:10;
114:13,17;120:17,19;
122:21,21;124:23;
139:19;141:6,11;
152:9;160:15,24;

161:6;162:14;165:14,
18;166:3;169:13,18,
20;170:8,11,18
**warrant (3)**
35:10;174:7,12
**warranted (2)**
35:9;143:16
**Warren (3)**
93:4,9,18
**way (32)**
7:4;8:24;12:7;20:18,
25;21:7,14,18;22:19;
23:14;36:3;37:7;42:10;
53:6,8,23;54:19;69:14;
96:10;97:24;101:16;
124:1;131:10;137:6;
139:4;147:11;148:5,
24;159:22;163:25;
173:2;175:1
**ways (3)**
32:23;49:17;176:2
**weapons (2)**
38:5,5
**wedges (1)**
173:14
**week (3)**
111:25;112:11;
135:17
**weeks (1)**
113:6
**weightlifting (1)**
62:19
**weights (1)**
154:13
**West (1)**
8:24
**whatsoever (1)**
30:22
**wheelchair (3)**
30:9,14;37:21
**wheelchairs (1)**
30:12
**Wherein (1)**
121:16
**white (20)**
26:20;27:1,2,4,6,11,
11;28:2,8,9,12,14;29:4;
31:22;32:1;123:23;
124:1,5;125:1,5
**whites (1)**
27:9
**whole (2)**
72:23;170:22
**whomever (1)**
145:15
**Whose (4)**
67:6;80:4;128:3,12
**win (1)**
61:4
**within (14)**
12:4;14:20;19:19;
38:13;45:17,20;59:24;
60:11;62:22;63:17;

64:14;70:20;77:3;
141:21
**without (10)**
44:15;47:17;51:1;
67:21;81:16;97:23;
106:8,13,25;167:23
**WITNESS (14)**
5:7;108:11;114:2;
118:11;128:16,23;
141:15;145:8;152:5;
158:5,7;165:11,24;
167:4
**word (3)**
6:12;127:12,14
**Work (11)**
9:5,14,22;33:8;
43:10,10;61:25;63:18;
70:18;74:21;77:22
**worked (1)**
153:3
**working (1)**
9:25
**works (1)**
23:9
**worse (1)**
93:3
**write (8)**
39:25;41:10,19;
49:10,12;67:17;68:12;
136:6
**writing (3)**
19:3;74:2;154:6
**written (17)**
67:25;81:23;82:1;
85:10;121:13;126:13;
147:1,7,19;151:3,14,
24;154:2,24;155:2;
156:25;157:4
**wrote (6)**
87:21;107:5;122:16;
127:16,17,18

## X

**x-ray (2)**
83:12;84:5
**x-rays (1)**
120:2

## Y

**yard (1)**
63:6
**year (8)**
9:9,20;11:20;13:13;
106:22,22,25;107:2
**years (8)**
10:5,19;11:17;13:2,
12;45:2;107:2;111:19
**yesterday (1)**
44:20

## 0

**02817 (1)**
8:25

## 1

**1 (12)**
82:14,15;90:20,22;
113:25;114:4;115:5;
116:22;142:12;145:9;
152:14;158:1
**1:12 (2)**
131:2;132:3
**1:17 (1)**
127:2
**1:17-cv-490 (1)**
6:3
**1:19:42 (1)**
129:1
**1:30 (1)**
127:9
**1:58 (4)**
127:12;132:4,5,20
**10 (2)**
108:15,16
**10/18/2015 (1)**
116:24
**10/28 (1)**
96:22
**10/28/2015 (1)**
93:20
**10:00 (1)**
5:1
**11 (16)**
24:8,10;27:5,14;
109:9,10;118:7,10;
121:1;125:15;137:16;
150:14;165:10;166:1;
167:3,7
**11/11 (2)**
115:13;135:25
**11/11/16 (1)**
135:9
**11/11/2016 (4)**
119:21;129:1;
133:13,18
**11/12 (2)**
83:3,8
**11/12/14 (1)**
108:25
**11/12/2015 (1)**
103:4
**11/16 (1)**
127:20
**11/17 (1)**
136:1
**11/17/16 (2)**
135:16,20
**11/19 (1)**
115:14
**11/19/14 (2)**

85:22;115:7
**11/19/2014 (2)**
116:10,13
**11/20/2015 (1)**
104:5
**11/3 (2)**
115:16,17
**11:00 (2)**
24:2,3
**11-7 (1)**
127:20
**11th (1)**
73:15
**12 (10)**
43:20,22;44:2,5;
86:4;114:23,24;115:8;
118:16;150:13
**12/09 (1)**
116:14
**12/12/16 (2)**
104:11;108:25
**12/12/2016 (1)**
106:18
**12/13/2016 (1)**
138:10
**12/21/2015 (3)**
104:17;105:3,5
**12/29/15 (1)**
105:17
**12/9/2014 (2)**
115:20;116:17
**12:22 (1)**
127:2
**12:41 (9)**
126:17;129:9,14,17,
19;132:20;134:2,9,24
**12:45 (1)**
131:1
**12th (2)**
83:24;85:18
**13 (4)**
10:1;119:16,17;
128:22
**14 (2)**
126:9;128:24
**145 (1)**
10:15
**15 (2)**
133:7,8
**16 (3)**
135:2,3;167:7
**17 (2)**
138:2,3
**18 (3)**
139:6,7;169:12
**18227 (1)**
8:24
**19 (5)**
86:3;115:21;140:7,8;
175:11
**1979 (1)**
9:10
**1981 (1)**

9:15
**1999 (1)**
9:21
**19th (1)**
85:19

## 2

**2 (8)**
86:15,16,20,21;
143:12;146:21;152:18;
157:23
**2/12/15 (1)**
86:2
**2/12/2015 (2)**
116:10,14
**2/9/2015 (1)**
86:25
**2:48 (4)**
133:18,25;134:9,24
**20 (2)**
157:21,22
**2000 (3)**
10:1;18:12,19
**2013 (3)**
11:21;12:18;93:6
**2014 (5)**
86:3;144:19;146:1;
147:6,17
**2015 (9)**
44:22;73:8;86:4;
89:5,6;93:12;115:8;
116:21;150:12
**2016 (21)**
12:16,19;44:22;
73:11,15;111:7;
117:11,14,16;118:1,2,
8;121:1;125:16;
144:19;146:1;147:6,
18;150:13,13,14
**2017 (1)**
13:9
**21 (6)**
73:11;93:6;117:11,
14,16;118:1
**22 (1)**
158:2
**24 (1)**
44:1
**24/7 (1)**
28:10
**24-hour (1)**
124:17
**25 (1)**
47:14
**28 (2)**
93:12;111:6

## 3

**3 (6)**
24:8;88:18,19;90:23;
92:15;141:8

**3/10/17 (1)**
   136:10
**3/10/2017 (1)**
   136:16
**3:00 (4)**
   24:2,2,8,8
**3:15 (1)**
   178:6
**30 (2)**
   73:7;116:21
**30th (1)**
   116:25
**31 (1)**
   131:4

**4**

**4 (4)**
   92:12,14;141:14;
   158:4
**40 (1)**
   130:4
**48 (4)**
   45:20;60:2;177:6,7

**5**

**5 (5)**
   102:24,25;142:11;
   150:12;175:25
**50 (1)**
   47:13

**6**

**6 (4)**
   103:23,24,25;128:10
**6/12 (2)**
   89:16,20
**6/12/2015 (1)**
   89:13
**6/13/2017 (1)**
   138:14
**6/19 (3)**
   89:4,21;95:12
**6/19/2015 (2)**
   92:21;96:18
**6/21/16 (1)**
   109:1
**6/21/2016 (2)**
   107:15;108:6
**6/21/2017 (1)**
   109:1
**6/28/2015 (1)**
   109:7
**6/28/2016 (5)**
   108:20;109:3,5;
   113:13,22
**6/7/2017 (1)**
   139:9
**6/9/2015 (4)**
   88:23;89:18,19;
   92:20

**7**

**7 (16)**
   24:2,3,8,8,10;27:5,
   14;104:12,13,14;
   105:7;108:8;118:2;
   145:7;150:13;158:1
**7/7/2016 (1)**
   117:10
**75 (1)**
   47:14

**8**

**8 (5)**
   104:25;105:1;
   108:10;158:6,8
**8/12/2016 (2)**
   117:10;118:4

**9**

**9 (9)**
   107:10,11;126:17;
   127:13;128:11;152:4;
   158:2;160:4,12
**9/08/2015 (1)**
   113:23
**9/08/2016 (1)**
   137:21
**9/1/1959 (1)**
   9:2
**9/14 (2)**
   110:5;113:2
**9/14/16 (1)**
   110:8
**9/19 (1)**
   113:3
**9/19/2016 (2)**
   110:4,8
**9/20/2015 (1)**
   116:20
**9/21/16 (1)**
   109:24
**9/21/2016 (3)**
   110:9;118:15,18
**9/28/2016 (2)**
   109:3;111:13
**9/8/2016 (2)**
   109:18;111:13
**906 (1)**
   43:18
**9-20 (1)**
   128:10
**96 (6)**
   43:20,22;44:4,6,7;
   55:15
**96-bed (1)**
   59:18
**982 (1)**
   44:20