UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

**STEPHEN MELISE**,
    *Plaintiff*

v.

**PATRICIA COYNE-FAGUE,** in her official
capacity as Director of the **DEPARTMENT OF
CORRECTIONS**; **et al.**,
    *Defendants*

**C.A. No. 1:17-cv-00490-MSM-PAS**

## STATE DEFENDANTS' STATEMENT OF UNDISPUTED FACTS

1. From at least August 1, 2014 to the present, Plaintiff has been incarcerated at the Adult
   Correctional Institution. Exhibit A (Inmate Events).

2. Through this lawsuit, Plaintiff challenges certain "prison conditions," as set forth in 42
   U.S.C. § 1997e(a).

3. The Prison Litigation Reform Act, 42 U.S.C. § 1997e, *et. seq.* applies to this case.

4. Requesting an accommodation for a bottom bunk assignment is an accommodation or request
   unique to correctional institutions. Exhibit E (Salas Deposition) at 25:4-25:6 ("bottom bunks
   are not something that exist outside of the prison"); Exhibit B (Warren Deposition), at 153:4-
   153:7 ("bottom bunk issue is only specific to a prison, so where would there be any literature
   or guidance about a bottom bunk").

5. Assignment to a bottom bunk involves numerous considerations by the deputy warden
   reviewing the request, including but not limited to, the number of bottom bunks available; the
   needs of certain inmates that almost always require an accommodation, such as elderly
   inmates, inmates with diabetes or seizures, or certain recent surgeries; enemy issues; gang

issues; and classification issues. Exhibit D (McCaughey Deposition), at 38:7-38-9, 46:8-46:10, 48:6-48:22; Exhibit V (Diniz Affidavit), at ¶ 5 ("Inmate bunk assignments are highly discretionary and often involve numerous considerations to maintain institutional safety and security for inmates and RIDOC staff.").

6.     Prison medical officials testified that some inmates consider bottom bunk assignments a "privilege" in prison, and therefore medical and /or prison officials must distinguish between inmates seeking a bottom bunk assignment for a necessary medical accommodation versus inmates seeking a bottom bunk assignment for an ulterior motive. Exhibit B (Warren Deposition), at 49:23-49:25 ("[E]verybody wants the bottom bunks, so, sometimes they do run low on them."); Exhibit C (Dr. Vhor Deposition), at 31:20-31:24 ("I would say bottom bunk requests were frequent, because everybody wanted a bottom bunk, and there was only a finite number of them available in any given facility."); Exhibit E (Dr. Salas Deposition), at 30:13-31:8.

7.     Dr. Vhor testified, "[t]here is a difference in correctional medicine and community medicine." Exhibit C (Dr. Vhor Deposition), at 151:03-151:05.

8.     RIDOC Policy 18.22 establishes a uniform procedure to ensure that existing RIDOC programs are readily accessible to and usable by inmates with special needs, unless such accommodation would materially impair the safe and efficient operation of the program, present a safety hazard, threaten the institutional safety and security, or otherwise cause extreme hardship in the operation of the institution or facility. Exhibit I (DOC Policy 18.22), at 1-2.

9.     Due the unique nature of certain inmate populations and facilities within the Adult Correctional Institutions, each facility is responsible for "developing and implementing

facility-specific procedures" to carry out RIDOC Policy 18.22. Exhibit D (McCaughey Deposition), at 152:09-152:24; Exhibit I (RIDOC Policy 18.22), at 9; Exhibit J (RIDOC's Answers to Plaintiff's Interrogatories), at Answer No. 25.

10. An inmate's request for reasonable accommodation may be initiated in either of two ways: (1) by the inmate personally submitting a special needs accommodation request form to a staff official; or (2) by a prescription order from a RIDOC medical provider. Exhibit I (RIDOC Policy 18.22), at 5.

11. A deputy warden designated as the Facility ADA Coordinator, reviews the special needs request "within a reasonable time" to evaluate a variety of factors, all of which are unique to a prison environment. Exhibit D (McCaughey Deposition) at 35:05-35:21, 36:09-36:20, 37:07-37:16, 38:04-38:08; *see also* Exhibit I (DOC Policy 18.22, at 6). Exhibit E (Salas Deposition) at 25:4-25:6 ("bottom bunks are not something that exist outside of the prison"); Exhibit B (Warren Deposition), at 153:4-153:7 ("bottom bunk issue is only specific to a prison, so where would there be any literature or guidance about a bottom bunk").

12. Among the factors considered by the deputy warden, designated as the Facility ADA Coordinator, may be, but are not limited to: safety, security, available alternatives, operational issues, the legitimacy of the request, and the orderly running of the facility. Exhibit D (McCaughey Deposition), at 35:05-35:21, 36:09-36:20, 37:07-37:16, 38:04-38:08; *see also* Exhibit I (DOC Policy 18.22) at 6.

13. When considering whether to approve an inmate's request for a bottom bunk, the reviewing deputy warden might consider whether the inmate's request for an accommodation conflicts with the prison staff's observations of the inmate's activities. Exhibit D (McCaughey

Deposition), at 36:09-36:20, 37:07-37:16, 38:04-38:08, 62:2-63:22; Exhibit C (Dr. Vhor

Deposition), at 35:22-36:02.

14.   The Programmatic Deputy Warden is generally designated as the Facility ADA Coordinator,

but the role may also be carried out by another deputy warden or the warden of the facility.

Exhibit H (Marcussen Affidavit), at ¶ 10; Exhibit D (McCaughey Deposition) at 88:09-88:17

("Q: What other administrator has the authority to review these orders? A: My coworker

deputy or the warden himself. Q: So in your absence, they could go to a different

administrator for approval? A: Yes.").

15.   Dr. Vhor testified: "In some circumstances, an inmate would request a bottom bunk for some

problem, and the correctional side would tell me that they really have no problem at all, that

they are just looking to get a bottom bunk, that they had them on camera without any

difficulty getting into a top bunk." Exhibit C (Dr. Vhor Deposition), at 35:22-36:02.

16.   The reviewing deputy warden also evaluates and/or considers: the nature of the claimed

disability or accommodation, the limited number of bottom bunks available in Medium

Security, the inmate's current bunk assignment, the number of bottom bunks available in that

housing module, and the number of bottom bunks available on the bottom tier/floor of each

module to avoid obstacles such as stairs and railings for those that have sought a special

needs accommodation. Exhibit D (McCaughey Deposition), at 46:08-48:10, 65:16-66:22;

Exhibit V (Diniz Affidavit), at ¶ 5 ("Inmate bunk assignments are highly discretionary and

often involve numerous considerations to maintain institutional safety and security for

inmates and RIDOC staff.").

17.   In the event an inmate needs to be moved to a different module, the reviewing deputy warden

may also need to work with the housing lieutenant for the module and take into consideration

4

any treatment programs[1] that the inmate is currently enrolled in or seeking to enroll in, as well as potential enemy and gang issues. *See* Exhibit D (McCaughey Deposition), 55:14-61:20, 65:07-65:16; *see also* 18.22 DOC at 6; Exhibit V (Diniz Affidavit), at ¶ 4.

18. Following the review, the deputy warden may do any of the following: approve the request; deny the request; ask for additional information. Exhibit D (McCaughey Deposition) at 39:09-39:22; *see also* Exhibit I (DOC Policy18.22), at 6; Exhibit H (Marcussen Affidavit), at ¶ 10.

19. If a request is approved, the deputy warden writes "approved" in red ink and sends the original to the inmate and sends a copy to the Dispensary for medical staff to process and scan into the EMR so it can be stored in the inmate's medical record. Exhibit D (McCaughey Deposition), at 148:18-148:21; Exhibit J (RIDOC's Answers to Plaintiff's Interrogatories), at No. 25.

20. If a request is denied, or more information is sought, the deputy warden indicates the appropriate notation and sends the original back to the Dispensary for medical staff to scan into the EMR system, so the request can be stored in the inmate's medical file. Exhibit J (RIDOC's Answers to Plaintiff's Interrogatories), at No. 25.

21. According to the Affidavit of Pauline M. Marcussen: "If a RIDOC medical provider prescribes a special needs accommodation on behalf of an inmate, the treating

---

[1] There are therapeutic communities within certain designated housing areas in Medium Security, such as F-Module, which houses inmates enrolled in the sex offender treatment programs. Exhibit D (McCaughey Deposition), 58:01-62:01. Each module, including F-Module, is comprised of 96 bunk beds, with 48 located on the first tier/floor, meaning that there are only 24 bottom bunks located on the first tier/floor. *See* Exhibit D (McCaughey Deposition), 58:01-62:01. As such, if an inmate enrolled in the sex offender treatment program is subsequently assigned a medical bottom bunk, but none were available in F-Module, the inmate would need to be reassigned to a different housing module until a bottom bunk became available in F-Mod. *See* Exhibit D (McCaughey Deposition), 58:01-62:01.

provider must enter a prescription order into the inmate's medical record within RIDOC's EMR. ***Exhibits 1–12*** attached hereto are prescription orders entered into the EMR." Exhibit H (Marcussen Affidavit), at ¶ 5.

22.   According to the Affidavit of Pauline M. Marcussen: "To ensure compliance with the Health Information Portability and Accessibility Act, 45 C.F.R. § 162, *et seq.*, ("HIPAA") and the Rhode Island Confidentiality of Health Care Communications and Information Act, R.I. Gen. Laws § 5-37.3-3 ("RICHI"), RIDOC security personnel, as well as prison administrative/operational staff, do not have access to the EMR." Exhibit H (Marcussen Affidavit), at ¶ 6.

23.   According to the Affidavit of Pauline M. Marcussen: "Because RIDOC security personnel cannot view a prescription order entered into the EMR, and do not have access to the EMR, a RIDOC medical provider must print an "administrative note" containing the prescription order to serve as the special needs accommodation request." Exhibit H (Marcussen Affidavit), at ¶ 7.

24.   According to the Affidavit of Pauline M. Marcussen: "When an administrative note is printed, it will contain any special needs prescription orders entered in the EMR for that inmate that are not expired (*i.e.*, the stop date has not yet lapsed) or manually removed from the EMR by a RIDOC medical provider. Expired special needs prescription orders are automatically removed." Exhibit H (Marcussen Affidavit), at ¶ 8.

25.   According to the Affidavit of Pauline M. Marcussen: "Once a RIDOC Medical provider prints special needs accommodation request, *i.e.*, the administrative note, the provider must then physically deliver the paper copy to a mailbox for the

Facility ADA Coordinator to review. ***Exhibits 13–20*** attached hereto, are printed

"administrative notes" submitted as special needs accommodation requests."

Exhibit H (Marcussen Affidavit), at ¶ 9; *see also* Exhibit J RIDOC's Answers to

Plaintiff's Interrogatories), No. 25.

26.   According to the Affidavit of Pauline M. Marcussen: "The Facility ADA

Coordinator, generally a deputy warden, will then review the printed special needs

accommodation requests, *i.e.*, the administrative notes, within a reasonable time and

either grant, modify, ask for more information, or deny the request by indicating so

on the paper copy and sending it to the inmate and/or back to the medical provider."

Exhibit H (Marcussen Affidavit), at ¶ 10.

27.   According to the Affidavit of Pauline M. Marcussen: "Unless printed, the

prescription orders, ***Exhibits 1–12***, would not be accessible or known to prison

administrative or operational staff but rather would only be accessed through the

EMR. If a prescription order is printed, it is designated as an "Administrative Note"

and can be physically forwarded to prison administrative or operational staff. The

"Administrative Notes" are attached to this affidavit as ***Exhibits 13–20***. Because

prison operational or administrative staff do not have access to the EMR, non-health

care staff must be made aware of the prescription order through the printing of an

"Administrative Note." Exhibit H (Marcussen Affidavit), at ¶ 11.

28.   On October 24, 2014, while Plaintiff was assigned to a top bunk (CMODR 05T), Plaintiff

submitted a medical request slip, stating "I need my bottom bunk back. I have a pinched

nerve in neck. You need to check it out to fulfill my request. TY." Exhibit A (Inmate

Events), at 2; Exhibit K (Medical Request Slip).

29.    On November 3, 2014, Plaintiff was reassigned to a bottom bunk (CMODR 01B), prior to his scheduled medical appointment. Exhibit A (Inmate Events), at 2.

30.    On November 12, 2014, Plaintiff presented to Nurse Marianne Warren NP ("Nurse Warren") and claimed to have chronic neck pain. Exhibit L (Medical Records).

31.    Nurse Warren entered a prescription order into the EMR, listing the order as "bottom bunk" and stating the reason for the accommodation was "neck pain." Exhibit H (Marcussen Affidavit), at Exhibit 1.

32.    Per Nurse Warren's prescription, the accommodation had a stop date of February 12, 2015. Exhibit H (Marcussen Affidavit), at Exhibit 1.

33.    Nurse Warren printed an Administrative Note the same day and submitted it as an accommodation request to the deputy warden for review. Exhibit H (Marcussen Affidavit), at Exhibit 13.

34.    As originally submitted the Administrative Note indicated, an order for a "bottom bunk" for the reason of "neck pain." Exhibit H (Marcussen Affidavit), at Exhibit 13.

35.     Deputy Warden McCaughey believed "neck pain" was not enough information for her to decide whether to authorize the bottom bunk request, and McCaughey referred the request back to the Dispensary with the notation "need more info?" Exhibit D (McCaughey Deposition), at 83:4-83:22; 85:20-85:22; Exhibit H (Marcussen Affidavit), at Exhibit 13.

36.    Nurse Warren received the returned Administrative Note and responded by writing "severe pain[,] osteoarthritis, neck on x-ray[.]" Exhibit H (Marcussen Affidavit), at Exhibit 13.

37.    On November 17, 2014, Nurse Warren sent the Administrative Note back to McCaughey, which McCaughey approved on November 19, 2014. Exhibit D (McCaughey Deposition), at 85:18-85:22; Exhibit H (Marcussen Affidavit), at Exhibit 13.

38.     McCaughey testified that following the approval, she has no reason to believe that the bottom bunk accommodation would not have been implemented between November 19, 2014, through February 12, 2015. Exhibit D (McCaughey Deposition), at 86:03-86:14.

39.     While it was unknown to McCaughey, Plaintiff was assigned to a bottom bunk on November 3, 2014, and remained on a bottom bunk through September 20, 2015, well beyond the stop date for this accommodation request. Exhibit A (Inmate Events).

40.     On February 9, 2015, prior to the expiration of the above-referenced approved bottom bunk request, and while Plaintiff was still assigned to a bottom bunk (CMODR 01B), Nurse Warren entered a prescription order for Plaintiff in the EMR, with a new stop date of June 12, 2015. Exhibit H (Marcussen Affidavit), at Exhibit 2; Exhibit A (Inmate Events).

41.     Nurse Warren printed an Administrative Note and submitted it, again listing the order as "bottom bunk" and stating the sole reason as "neck pain." Exhibit H (Marcussen Affidavit), at Exhibit 14.

42.     McCaughey received the February 9, 2015 request and testified that when she did so, she had no recollection of reviewing (or approving) the November 12, 2014 request. Exhibit D (McCaughey Deposition), at 86:15-86:02, 87:09-87:18.

43.     After reviewing the request, McCaughey believed "bottom bunk" and "neck pain" was insufficient documentation for her to review from a safety and security perspective, and she returned the Administrative Note to the Dispensary with the notation "need more info[.]" Exhibit D (McCaughey Deposition), at 87:09-87:22; Exhibit H (Marcussen Affidavit), at Exhibit 14.

44.   Nurse Warren received the returned Administrative Note, and responded, "if you need more info…please schedule time to see me." Exhibit H (Marcussen Affidavit), at Exhibit 14 (ellipses in original); *see also* Exhibit B (Warren Deposition), 101:10-101:12.

45.   There is no evidence that Nurse Warren resubmitted the Administrative Note or that McCaughey received the amended Administrative Note. *See* Exhibit D (McCaughey Deposition), 87:19-88:02; *see also* Exhibit H (Marcussen Affidavit), at Exhibit 14.

46.   As noted, *supra*, Melise continued on the bottom bunk through September 20, 2015. Exhibit A (Inmate Events).

47.   On or about June 9, 2015, while Plaintiff was still assigned to a bottom bunk (BMODL-08B), Nurse Warren entered a prescription order in the EMR, with a new stop date of December 12, 2015. Exhibit H (Marcussen Affidavit), at Exhibit 3.

48.   Nurse Warren printed an Administrative Note the same day, which again listed the order as a "bottom bunk" and the sole reason as "neck pain." Exhibit H (Marcussen Affidavit), at Exhibit 15.

49.   Similar to the prior requests, McCaughey did not believe that "bottom bunk" and "neck pain" provided sufficient information for her to evaluate whether Melise's request was appropriate from a safety and security perspective and McCaughey returned the Administrative Note to the Dispensary with the notation "more info?" Exhibit D (McCaughey Deposition), at 88:18-89:06, 90:14-90:17 (Q: So you are not sure what the medical basis would be for them to request that he was on the bottom bunk; is that correct? A: Based on the information they gave me, no."); Exhibit H (Marcussen Affidavit), at Exhibit 15.

50.   Nurse Warren received the returned Administrative Note and responded, "osteoarthritis neck, severe pain" and resubmitted the Administrative Note on or about June 12, 2015. Exhibit D (McCaughey Deposition), at 88:18-89:06; Exhibit H (Marcussen Affidavit), at Exhibit 15.

51.   McCaughey, still unaware the medical basis for the bottom bunk request, denied the request on June 19, 2015, and sent it back to the Dispensary. Exhibit D (McCaughey Deposition), at 88:18-89:06, 90:14-90:17; Exhibit H (Marcussen Affidavit), at Exhibit 15.

52.   When asked why she would have approved the bottom bunk assignment initiated on November 12, 2014, but denied the instant bottom bunk accommodation, McCaughey responded "[v]ery possibly, we were adding – we were adding ladders to the blocks at the time. I was right around that time." Exhibit D (McCaughey Deposition), at 90:22-91:1.

53.   McCaughey added that if there was a ladder leading to the top bunk, "[h]e has the capability of climbing to the top tier [*sic*] based on this information. I don't see any reason why he would not be able to. I am not sure why I would have approved it once and denied it a second time, if he could climb a ladder, I would deny it." Exhibit D (McCaughey Deposition), at 91:3-91:7.

54.   Despite not having an approved accommodation for a bottom bunk request, Plaintiff remained in a bottom bunk through September 19, 2015, was assigned to a top bunk on September 20, 2015, and then re-assigned to a bottom bunk on September 21, 2015, where he remained on a bottom bunk through October 4, 2015. Exhibit A (Inmate Events), at 2.

55.   Subsequently, on October 28, 2015, Nurse Warren added a second notation to the June 9, 2015 request (which had already been denied):

    *10/28/2015*
    *Pt. states he should not be on the top bunk because of severe neck pain that radiates into left arm. He says that climbing down and up makes pain worse. He is advised to follow-up with security.*

–Marianne Warren RNP

10/28/2015
Per Dr. Melnick on August 21, 2013 and Ken Davis OT, this pt. has cervical neuropathy and should be placed on bottom bunk. Referred to security
– Marianne Warren RNP.

Exhibit M (Administrative Note).

56.     There is no indication that McCaughey ever received the Administrative Note with Nurse Warren's October 28, 2015 notations. Exhibit D (McCaughey Deposition), at 96:04-96:23; Exhibit H (Marcussen Affidavit), at Exhibit 15.

57.     On November 12, 2015, Nurse Warren entered a prescription order for Plaintiff in the EMR, for a "bottom bunk" for the sole reason of "neck pain," with a new stop date of December 12, 2015. Exhibit H (Marcussen Affidavit), at Exhibit 4.

58.     On November 20, 2015, Nurse Warren entered a prescription order for Plaintiff in the EMR, for a "bottom bunk" for the sole reason of "neck pain," with a stop date of December 12, 2016. Exhibit H (Marcussen Affidavit), at Exhibit 5.

59.     Other than "neck pain," neither the November 12, 2015 prescription order nor the November 20, 2015 prescription order provided any other reason for the accommodation. Exhibit H (Marcussen Affidavit), at Exhibit 4 & 5.

60.     There is no evidence that either the November 12, 2015 nor the November 20, 2015 prescription orders were printed as Administrative Notes and no evidence that the Administrative Notes (or the prescription orders) were sent to or reviewed by McCaughey. Exhibit D (McCaughey Deposition), at 102:24-104:11; Exhibit H (Marcussen Affidavit), at ¶ 11.

61.     On or about November 29, 2015, Plaintiff presented to Dale Fogarty, RN ("Nurse Fogarty") and reported that he "fell off the top bunk in his sleep[.]" Exhibit N (Medical Record).

62.     During the examination, Plaintiff told Nurse Fogarty that approximately "2 ½ years ago he fell off the top bunk" at the Intake Services Center ("ISC"), but never reported it. Exhibit N (Medical Record).

63.     Nurse Fogarty observed that Plaintiff had "no visible signs of injury," was able "to walk back to mod," "refused pain medication," but also noted that Plaintiff informed him that he was not taking his lithium prescription regularly and that "when he sleeps he is 'knocked out.'" Exhibit N (Medical Record).

64.     Nurse Fogarty recommended Plaintiff discuss his psychological medications with Nurse Warren at his next visit with her. Exhibit N (Medical Record).

65.     The next day, November 30, 2015, Plaintiff reported to Nurse Warren that he "rolled off" his bunk onto the floor. Exhibit O (Medical Record).

66.     Plaintiff denied any loss of consciousness, but complained of pain in his back, right foot, left chest, and left buttock. Exhibit O (Medical Record).

67.     There is no evidence that a prescription order for a bottom bunk assignment was immediately ordered as a result of this fall.

68.     On December 21, 2015, Nurse Warren entered a prescription order, ordering a "bottom bunk" based upon "neck pain," with stop date of December 12, 2016. Exhibit H (Marcussen Affidavit), at Exhibit 6.

69.     Nurse Warren printed an Administrative Note and submitted it for deputy warden review. Exhibit H (Marcussen Affidavit), at Exhibit 16.

70.     The December 21, 2015 Administrative Note made no reference that Melise had fallen off a top bunk, nor did the December 21, 2015 Administrative Note indicate that the bottom bunk

was being ordered based on falling or any other sleep related matter. Exhibit H (Marcussen Affidavit), at Exhibit 16.

71.    McCaughey denied the request on December 29, 2015. Exhibit H (Marcussen Affidavit), at Exhibit 16; Exhibit D (McCaughey Deposition), 105:18-105:22.

72.    On June 21, 2016, Plaintiff reported to Nurse Warren that he had rolled off the top bunk while sleeping the previous night. Exhibit P (Medical Record).

73.    Plaintiff denied any loss of consciousness, but complained of pain in his fingers, neck, lower back, and left shoulder. Exhibit P (Medical Record).

74.    Nurse Warren noted in Plaintiff's EMR that:

> This is this patient's second reported fall from the top bunk. He is on the bottom bunk in this system for his neck pain. [I] placed him again on the bottom bunk, even though he has already been ordered [*sic*] bottom bunk.

Exhibit P (Medical Record).

75.    On June 21, 2016, Nurse Warren entered a new prescription order into the EMR for Plaintiff, listing the order as "bottom bunk" and the reason as "falls," with stop date of June 21, 2017. Exhibit H (Marcussen Affidavit), at Exhibit 7.

76.    There is no evidence that this prescription order was printed into an Administrative Note and/or that McCaughey ever received such request. Exhibit D (McCaughey Deposition), at 107:12-107:18; Exhibit H (Marcussen Affidavit), at ¶ 11.

77.    On June 28, 2016, Plaintiff presented to Dr. Salas for sleep-related issues. Exhibit Q (Medical Record).

78.    Plaintiff reported to Dr. Salas that he had been snoring, "wakes confused and has fallen out of bed twice," and that he had been in a bottom bunk before and wanted a bottom bunk again. Exhibit Q (Medical Record).

79.  Dr. Salas noted that Plaintiff was "on the waiting list for a sleep study," and entered a prescription order into the EMR, listing the order as "bottom bunk" and "falls, ?apnea," with a stop date of September 28, 2016. Exhibit Q (Medical Record) Exhibit Q (Medical Record); Exhibit H (Marcussen Affidavit), at Exhibit 8.

80.  There is no evidence that an Administrative Note was printed and submitted to a deputy warden until September 8, 2016. Exhibit D (McCaughey Deposition), at 108:16-109:08; Exhibit H (Marcussen Affidavit), at ¶ 11.

81.  On September 8, 2016, Nurse Mel White ("Nurse White") printed the Administrative Note, which had been entered on June 28, 2016. Exhibit H (Marcussen Affidavit), at Exhibit 17.

82.  Nurse Warren later submitted the Administrative Note for delivery to a deputy warden on September 14, 2016 or September 19, 2016. Exhibit B (Warren Deposition), at 110:03-110:10, 126:03-126:06 ("Q: It is a little ambiguous whether it was submitted to you on 9/14/16 or 9/19/16, but at some point between then and 9/21/2016, you saw it; is that correct? A: Yes."); Exhibit H (Marcussen Affidavit), at Exhibit 17.

83.  Shortly after receiving it, McCaughey approved the request on September 21, 2016, by circling the last (most recent) of the three orders listed, and writing "Approved" with her signature. Exhibit D (McCaughey Deposition), at 109:9-110:21; Exhibit H (Marcussen Affidavit), at Exhibit 17.

84.  This was the first time an Administrative Note indicated that Melise sought a bottom bunk accommodation for anything related to sleep apnea or falling off a top bunk.

85.  After McCaughey approved the request on September 21, 2016, copies were sent to the Plaintiff and to the Dispensary. Exhibit I (DOC Policy 18.22), at 7.

86.    As McCaughey described, the only way for a bottom bunk assignment to be implemented is "[w]hen the order is given to the offender, the offender presents that order to the housing lieutenant in his area." Exhibit D (McCaughey Deposition), at 69:11-69:13.

87.    Although the reason is not entirely clear, after Melise was approved for a bottom bunk assignment on September 21, 2016, he was not moved to a bottom bunk and the bottom bunk special accommodation request/assignment expired on September 28, 2016. Exhibit D (McCaughey Deposition), at 118:14-119:15; Exhibit A (Inmate Events).

88.    After the expiration of the bottom bunk order on September 28, 2016, Plaintiff did not renew or seek another bottom bunk assignment until after November 11, 2016.

89.    Without an active medical bottom bunk accommodation after September 28, 2016 – or even a pending request for an accommodation – Plaintiff remained on a top bunk until November 11, 2016, at 8:53 a.m. Exhibit A (Inmate Events).

90.    In the early morning hours of November 11, 2016, Plaintiff reported to the overnight shift commander, Lt. Patrick Flynn ("Lt. Flynn"), that he had rolled off his bunk while sleeping and injured his ankle. Exhibit D (McCaughey Deposition), at 128:22-131:14.

91.    Due to the late hour, Lt. Flynn contacted the hospital at the Intake Service Center ("ISC") and reported the incident to the on-call medical staff. Exhibit D (McCaughey Deposition), at 126:9-126:20.

92.    Nurse Amanda Omisore, RN ("Nurse Omisore") responded from the ISC to Medium Security to evaluate Plaintiff's injuries and noted that Plaintiff's right ankle appeared to be slightly swollen. Exhibit R (Medical Record).

93. Nurse Omisore reported her findings to the on-call physician, who recommended to transfer Plaintiff to the ISC until he could be transported to Rhode Island Hospital for x-rays later in the morning. Exhibit R (Medical Record).

94. However, Lt. Flynn advised Nurse Omisore that there would be staffing issues in the morning and recommended instead that Plaintiff be transported directly from Medium Security to Rhode Island Hospital that night. Exhibit Q (Medical Record).

95. Per Lt. Flynn's recommendation, Plaintiff was transported to Rhode Island Hospital and arrived at the Emergency Department at approximately 2:48 AM. Exhibit S (Rhode Island Hospital Medical Record).

96. Plaintiff was diagnosed with a "closed fracture of distal end of fibula," was issued an orthopedic boot, was told Plaintiff to apply ice and rest his foot and recommended that Plaintiff follow up with Rhode Island Hospital Orthopedics within one week. Exhibit S (Medical Record); Exhibit T (Medical Record).

97. Plaintiff was discharged and transported back to Medium Security on the morning of November 11, 2016. Exhibit S (Rhode Island Hospital Medical Record).

98. Plaintiff presented to the Dispensary later that morning for a follow-up appointment. Exhibit T (Medical Record).

99. Nurse Fogarty provided Plaintiff crutches and 600mg Motrin for pain and told him to rest, apply ice, and elevate his foot. Exhibit T (Medical Record).

100. Nurse Fogarty also noted that he had spoken with Dr. Salas, who indicated that he would "take care of the orders." Exhibit T (Medical Record).

101. Plaintiff was moved to A-Module that same day and reassigned a bottom bunk on the bottom tier (AMODL 06B). Exhibit A (Inmate Events).

102.   On November 11, 2016, Dr. Salas entered two prescription orders into the EMR: (1) "bottom bunk" stating the reason as "falls from sleep problem," with an expiration date of November 10, 2017; and (2) "bottom tier," with the reason as "crutches for broken ankle," with an expiration date of March 10, 2017. Exhibit H (Marcussen Affidavit), at Exhibit 10.

103.   The prescription orders were printed and submitted as an Administrative Note on November 11, 2016 and Deputy Warden McCaughey approved both special needs requests on November 17, 2016. Exhibit H (Marcussen Affidavit), at Exhibits 10 and 18.

104.   Plaintiff has remained on a bottom bunk since November 11, 2016. Exhibit A (Inmate Events).

105.   McCaughey occasionally receives Administrative Notes with multiple special needs requests. Exhibit D (McCaughey Deposition), at 110:13-111:23. When McCaughey would approve such a request, she "usually will approve the last one, because sometimes I have them listed from years before" and because it was the "most recent because it is the last one entered." Exhibit D (McCaughey Deposition), at 110:19-110:21, 111:17-111:23.

106.   Melise does not have a contractual relationship with the Rhode Island Department of Corrections, or any of its employees or officers; nor does Melise allege discrimination with respect to any aspect of employment.

107.   No evidence has been presented that Melise filed a complaint with the Rhode Island Commission for Human Rights, with respect to any allegation raised in this lawsuit. *See* Exhibit U (Plaintiff's Answers to RIDOC's Interrogatories), at No. 2, 4, 5, 6, 20.

108.   Melise claims his disability concerns: "Plaintiff's sleep apnea and related problems render him disabled, as it impairs his sleep function, with all the attendant detriment to non-sleeping activities[.]" Exhibit U (Plaintiff's Answers to In1terrogatories), at No. 10.

109. Melise adds that the accommodation he sought, but claims he did not timely receive, included: "1) provision of medical care to an inmate in response to an order from DOC medical staff; 2) access to the bottom bunk; and 3) access to a CPAC machine." Exhibit T (Medical Record).

110. There is no evidence that Wall or Coyne-Fague were ever aware of Melise's sleep related problems, falling out of bed, or neck pain issue.

111. McCaughey did not receive a sleep-related special accommodation request until September 14, 2016 or September 19, 2016, which she approved on September 21, 2016. Exhibit H (Marcussen Affidavit), at Exhibit 17.

112. Prison administrative and/or operational staff do not have access to an inmate's medical files stored in the EMR. Exhibit B (Warren Deposition), at 116:20-116:22; Exhibit H (Marcussen Affidavit), at ¶ 6; Exhibit J (RIDOC's Answers to Plaintiff's Interrogatories), at No. 25.

113. Any complaints or accommodations relating to "neck pain" are outside Melise's ADA/Rehabilitation Act claim.

114. Melise maintains that "[o]n May 31, 2016, DOC medical staff referred the Plaintiff for a sleep study." Exhibit U (Plaintiff's Answers to Interrogatories), at No. 10.

115. Melise contends that he "presented to Dr. Salas, who wrote that, although he had not received the results of the sleep study, he suspected that Plaintiff suffered from a sleep disorder. Dr. Salas referred Plaintiff for revaluation and treatment by physical therapy." Exhibit U (Plaintiff's Answers to Interrogatories), at No. 10.

116. None of the testimony or evidence reveals that Wall, Coyne-Fague, or McCaughey had any role in diagnosing Melise's sleep apnea.

117. None of the testimony or evidence reveals that Wall or Coyne-Fague had any involvement in

ordering, authorizing, or providing Melise a CPAP machine.

118. None of the testimony or evidence reveals that McCaughey had any involvement in reviewing a request for a CPAP machine until she received the Administrative Note completed on December 13, 2016, which she granted on December 14, 2016. Exhibit H (Marcussen Affidavit), at Exhibit 19.

119. There is no evidence that Wall or Coyne-Fague received any "Administrative Notes."

120. Deputy Warden McCaughey did not receive any prescription orders. Exhibit H (Marcussen Affidavit), at ¶ 11.

121. All Administrative Notes completed prior to September 9, 2016 referenced "neck pain" and no Administrative Note completed prior to September 9, 2016 referenced a bottom bunk accommodation for "falls." Exhibit H (Marcussen Affidavit), at Exhibits 13-17.

122. Prison administrative or operational staff do not have access to prescription orders unless they are printed out and forwarded as an "Administrative Note." Exhibit H (Marcussen Affidavit), at ¶¶ 5-11.

123. All "Administrative Notes" are signed by Deputy Warden McCaughey, or another deputy warden, evidencing their receipt and none of the prescription orders were signed by a deputy warden. Exhibit H (Marcussen Affidavit), at Exhibits 1-20.

124. The first "Administrative Note" received by Deputy Warden McCaughey providing notice of Melise's claimed disability, i.e., sleep apnea, was "completed" by a medical personnel on September 8, 2016, signed by Nurse Marianne Warren on September 14, 2016 or September 19, 2016, and "Approved" by Deputy Warden McCaughey on September 21, 2016. Exhibit H (Marcussen Affidavit), at Exhibit 17.

125. Deputy Warden McCaughey testified that there is no indication that she saw the June 21,

2016 prescription order. Exhibit H (Marcussen Affidavit), at Exhibit 7; Exhibit D

(McCaughey Deposition), at 107:10-107:18.

126.    Deputy Warden McCaughey testified that there is no indication that she saw the June 28,

2016 prescription order. Exhibit H (Marcussen Affidavit), at Exhibit 8; Exhibit D

(McCaughey Deposition), at 109:4-109:8.

127.    Melise testified:

> **Q:**    And have you had any issues with Deputy Warden McCaughey; in other words, does she not like you?
>
> **A:**    I don't really know of her, other than talking about the bottom bunk issues.

Exhibit F (Melise Deposition), at 74:16-74:19.

128.    Melise testified:

> **Q:**    And have you ever spoken to her prior to then?
>
> **A:**    No. I barely knew who she was.
>
> **Q:**    Had you had any interaction with her after that one conversation?
>
> **A:**    No, none at all.

Exhibit F (Melise Deposition), at 91:11-91:15.

129.    Melise testified:

> **Q:**    Do have you a belief one way or the other as to whether or not the denial of those orders was in any way motivated by any animosity toward you on anybody's part?
>
> **MS. DAVIS:** Objection
>
> **A:**    I don't understand.
>
> **Q:**    In other words, do you think they were doing it deliberately to put you in harm's way?
>
> **A:**    I don't know that.

* * *

**Q:**   [A]side from your issue with Officer Crane, you do not have any reason that you can tell me today to believe that anybody was doing this deliberately to put you in harm's way?

**A:**   No.

Exhibit F (Melise Deposition), at 77:5-78:2.

130.   Melise testified:

**Q:**   [D]o you have reason to believe that Deputy Warden McCaughey had denied your request for a bottom bunk in bad faith?

**A:**   I don't know why she denied it, and I don't have a reason. I never thought – I could never think of reason why she wouldn't. I always wondered, but I didn't have any definitive answer for myself.

Exhibit F (Melise Deposition), at 91:20-92:1.

131.   Dr. Salas, one of the treating physicians at the Department of Corrections, explained that

"bottom bunks are not something that exist outside of the prison." Exhibit E (Salas

Deposition), at 25:4-25:6.

132.   Dr. Salas testified:

[t]he place where bottom bunk orders become more contentious is with orthopedic related problems. I mean, to give you the context, bottom bunk is considered a privilege, or it's something that inmates want, and it's considered to be like they've gotten something. So many more people would ask me for a bottom bunk than I would grant. If they had the clear-cut indication, it was easy, you have seizure disorder, you have diabetes, you have a CPAP machine, you need a bottom bunk. but if they came in and said my wrist hurts, I can't climb the ladder, the number of people that would have asked for the bottom bunks would have exceeded availability. So, some judgment had to be made to sort of balance that desire by everyone to have them with the availability of them.

And clearly, not everyone that asks for one really needed one. They just wanted them. So that's what I learned as I went along, and then had to make those judgements.

Exhibit E (Salas Deposition), at 30:13-31:8.

133. Nurse Practitioner Marianne Warren testified, "everybody wants the bottom bunks, so, sometimes, they do run low on them." Exhibit B (Warren Deposition), at 49:24-49:25.

134. Nurse Warren also confirmed that she received "a lot" of bottom bunk requests. Exhibit B (Warren Deposition), at 158:8-158:9.

135. An inmate knows "when their orders are expiring because it is signed, and it is dated, so they make sure somebody knows that they need to have their order renewed[.]" Exhibit B (Warren Deposition), at 46:11-46:14.

136. Nurse Warren testified:

> [t]here is no recipe for a bottom bunk. There is no book to read about it; there is no class to take in school. It is kind, like, a prison specific judgment that you make, except for the clear, clear cases of diabetes, seizure, obvious injuries, recent surgeries, stuff like that.

Exhibit B (Warren Deposition), at 51:2-51:7.

137. Dr. Vohr, a DOC physician, identified that some of the conditions that would require a bottom bunk were:

> [a] seizure disorder; an elderly, frail person; someone physically unable to get to a top bunk. I would say bottom bunk requests were frequent, because everybody wanted a bottom bunk, and there was only a finite number of them available in a given facility.

Exhibit C (Vohr Deposition), at 31:20-31:24.

138. Dr. Vohr testified: "Bottom bunks were quite valuable, and inmates were capable of appearing to need a bottom bunk or expressing the need for a bottom bunk to the medical side, but wasn't substantiated by witnessed behavior on the security side." Exhibit C (Vohr Deposition), at 60:7-60:11.

139. Dr. Clarke testified that she believed there were a "few" special accommodations

for bottom bunk orders that were not medically indicated. Exhibit G, (Clarke Deposition), at 71:11-71:13.

140. Deputy Warden McCaughey testified that when reviewing a special accommodation request, she reviews it for "safety and security reasons." Exhibit D (McCaughey Deposition), at 35:10-35:13.

141. McCaughey added that she reviews requests to ensure the request is "[o]perationally, is it sound, is it safe, is it a safe practice, does it present a hazard for staff and inmates." Exhibit D (McCaughey Deposition), at 35:17-35:19.

142. McCaughey testified that some of the security concerns she might consider with respect to a bottom bunk assignment are "enemy issues, gang issues, housing assignment by reclassification." Exhibit D (McCaughey Deposition), at 38:8-38:9.

143. McCaughey added that because there are a limited number of bottom bunks available for assignment, her review "would be to make sure that those that have bunks have them for legitimate reasons that cannot be accommodated in any other way." Exhibit D (McCaughey Deposition), at 42:7-42:10.

144. McCaughey explained that running out of bottom bunks was "always a consideration," Exhibit D (McCaughey Deposition), at 46:10, as well as "job assignments." Exhibit D (McCaughey Deposition), at 62:12.

145. Later, McCaughey testified:

> **Q:** Granting a bottom bunk would have presented a safety hazard; is that what you are saying?
>
> **A:** I am saying that bottom bunk orders are – I have limited bottom bunk orders, so I am going to ensure that people who actually have them have documented medical documentation that indicates it is required.

**Q:** How would granting a request for a bottom bunk present a safety hazard to staff or the individual inmate?

**A:** By creating a climate issue.

**Q:** Would it have created a climate issue to grant it specifically for the plaintiff in this case?

**A:** It could have.

**Q:** Did it?

**A:** No.

**Q:** At any point, have you seen the granting of a bottom bunk create a hazard to staff or inmates?

**A:** Yes.

**Q:** In what way?

**A:** By granting bottom bunks to individuals who don't necessarily need them, and preventing someone who clearly does need one from potentially not getting one.

**Q:** Has that actually happened? Have you granted orders that prevented other inmates from receiving orders for a bottom bunk?

**A:** What I have had is an inmate who was on a bottom bunk who did not have a bottom bunk order being moved to a top bunk so another offender could come into that same cell and have the bottom bunk. Sometimes that's caused a climate issue between the two of them, if the person on the bottom bunk order does not appear to be legitimate.

**Q:** Was that a concern for the plaintiff in this case?

**A:** Was what a concern?

**Q:** The creation of a safety hazard to the inmate.

**A:** It was one of the things that I looked at, yes.

Exhibit D (McCaughey Deposition), at 163:8-164:17.

146.   McCaughey testified:

**A:** Very possibly we were adding – we were adding ladders to the blocks at the time. It was right around that time.

**Q:** I am sorry. Can you explain what that means?

**A:** He has the capability of climbing to the top tier, based on this information. I don't see any reason why he would not be able to. I am not sure why I would have approved it once and denied it a second time, if he could climb a ladder, I would deny it.

Exhibit D (McCaughey Deposition), at 90:24-91:7.

147. McCaughey testified:

**Q:** And, yet you are saying that this notation from the nurse practitioner was still not sufficient to approve a bottom bunk; is that what you are saying?

**A:** Because her notation is referring to his inability to climb a ladder, self reported.

**Q:** I am just trying to figure out how the fact that he has a documented condition, the nurse has indicated it to you, and that he is saying that he has pain and trouble because of that documented condition, he has pain in climbing up and down a ladder, and a nurse has decided that that is sufficient, a sufficient reason to send the request to you, why, based on your security concerns, why that is not sufficient to grant a bottom bunk?

**A:** Because it does not indicate medically that he cannot climb a ladder. In addition, he has consistently held a job as a block porter since he has been there.

**Q:** What does that have to do with it?

**A:** He is a janitor.

**Q:** What does the fact that he is a janitor have to do with his ability to climb a ladder?

**A:** His ability to perform the duties of a porter – in this case, it is called a porter. So he does not have a medical condition that prevents him from doing a physical job.

**Q:** What does his job as a porter have to do with him having to climb a ladder.

> **A:** Because he climbs stairs in the mod to perform his job duties.

Exhibit D (McCaughey Deposition), at 100:10-101:14.

148. From 2014 to 2016, Melise was employed as a porter who regularly climbed stairs in the modules to perform his janitorial services. Exhibit D (McCaughey Deposition), at 101:3-101:14.

149. Melise testified:

> **Q:** Are the sleeping arrangements different in medium security [than at the Intake Center where Melise had been incarcerated]?
>
> **A:** There are ladders.
>
> **Q:** How tall are the ladders?
>
> **A:** They go from the floor to the top bunk.
>
> **Q:** All the way from the floor to the top?
>
> **A:** Yes.
>
> **Q:** Do you have any trouble climbing the ladder?
>
> **A:** No trouble climbing the ladder.
>
> **Q:** But you had trouble climbing without the ladder to the top bunk?
>
> **A:** Yes.
>
> **Q:** What was the difficulty in climbing?
>
> **A:** In intake, the difficulty was pulling myself up. I was quite overweight at the time, so I had an issue with pulling myself, lifting myself in order to roll the rest of the way up.
>
> **Q:** Have you lost weight now?
>
> **A:** I am 40 pounds less right now.

Exhibit F (Melise Deposition), at 16:8-17:1.

150. Melise testified:

**Q:**     [W]hen you got to medium, that was not a problem anymore because the bunks in medium have a ladder; correct?

**A:**     That's correct.

**Q:**     So you were able to climb up into the upper bunk without any difficulty; correct?

**A:**     That's correct.

Exhibit F (Melise Deposition) at 72:5-72:11.

151.   There are many reasons that an inmate may be assigned a different bunk, including but not limited to: safety and security concerns, inmate reclassification, the availability of beds due to changes in the population of the facility, general facility maintenance and repairs, and approved requests for special accommodations approved by the deputy warden. Exhibit J (RIDOC's Answers to Plaintiff's Interrogatories), at No. 7.

152.   Orders for medically prescribed special accommodations are reviewed by the deputy warden of the facility to address institutional safety and security concerns and are denied if they would materially impair the safe and efficient operation of the program, present a safety hazard to staff or the individual inmate, threaten the security of the correctional institution/facility, or otherwise cause extreme hardship in the operation of the institution/facility. Exhibit J (RIDOC's Answers to Plaintiff's Interrogatories), at No. 9.

153.   Security and/or safety concerns implicated by the assignment of bunks include but are not limited to: limited number of bottom bunks; certain mods are designated for certain classifications of inmates; certain inmates cannot be kept in the same cell block or mod together; gang affiliation; and program limitations. Exhibit J (RIDOC's Answers to Plaintiff's Interrogatories), at No. 12.

154.   With respect to medical orders, Dr. Clarke testified "in a correctional setting, it's not like a community setting. So, Some medical orders are - - would just be self-care advice in the community." Exhibit G (Clarke Deposition), at 47:21-48:13.

155.   Dr. Clarke testified:

  **Q:**   The process -- I believe you testified earlier that the process of ordering a special needs accommodation was specific to the correctional context; right?

  **A:**   Right.

  **Q:**   It wasn't -- if you were treating a patient outside of the correctional system, you wouldn't enter an order for a special needs accommodation; correct?

  **A:**   Yes.

  Exhibit G (Clarke Deposition), at 61:05-61:13

156.   Nurse Warren testified:

  **Q:**   So, for those orders that require consideration by the security side, is that specific to special needs accommodations orders, or are there any other types of orders that –

  **A:**   No. Any kind of medical orders, no. Like, if I say a patient needs to a see a neurologist, or ear, nose, or throat doctor, that's an automatic, but if a patient is asking me if they can have their sneakers brought in from home, and I get every request that you can imagine, that's a conversation with security, because that could cause a huge problem if I let you have Nikes, and somebody else has sneakers from Walmart. So, there are a lot of things -- that's what makes Corrections difficult sometimes, because I am medical, but I am also working with security, and security has an obligation to keep me safe, to keep the patient safe, and all of the staff safe, so, it is complicated.

  Exhibit B (Warren Deposition), at 24:

157.   Nurse Warren testified: "So, I don't even have access to security. I don't even know why they are incarcerated. I don't have any access to that. I am just pure medical." Exhibit B (Warren Deposition), at 104:02-104:04.

158.   Nurse Warren testified:

**Q:**  Did anyone from security in those other facilities ever express to you that they had security issues as a result of granting those orders that you submitted?

**A:**  No – oh, yeah. Just, like, the cane. I gave that cane, and then we took it back.

Exhibit B (Warren Deposition), at 176:02-176:06.

159.  Dr. Salas testified:

**Q:**  Do you think that it would have been easier for you or better in some way if you had been given reasons for denials of special needs accommodation orders?

**MR. LATHAM:** Objection. You can answer.

**MR. SULLIVAN:** Objection.

**A:**  It's not really my place. The security staff and the security concerns of the facility are outside of what I do. I can't control that, nor do I particularly understand it all. So I just kind of operate within the confines of that world because that's where I'm practicing medicine.

Exhibit E (Salas Deposition), at 39:16-40:03.

160.  Dr. Salas testified:

**Q:**  Is it your understanding the deputy warden is permitted to make a determination about which medical reason an inmate is approved for a special needs accommodation?

**MR. SULLIVAN:** Objection.

**MR. LATHAM:** Objection.

**A:**  Yes.

**Q:**  Why is that?

**A:**  Because the special needs accommodations marry issue of medical care with an issue of security care, and to the degree that there is a security consideration with the requests, the security staff make a determination as to which ones they find acceptable or not. It's a combined process.

Exhibit E (Salas Deposition), at 77:04-77:18.

161.   After Melise's bottom bunk accommodation expired on September 28, 2016, there is no evidence that Melise requested another bottom bunk accommodation.

162.   Deputy Warden approved a bottom bunk assignment for neck pain on November 19, 2014. Exhibit H (Marcussen Affidavit), Exhibit 13.

163.   Other bottom bunk assignments for neck pain were denied because, in McCaughey's judgment, there was insufficient evidence or documentation that Melise required such an accommodation. Exhibit D (McCaughey Deposition), 36:12-36:17, 88:18-89:06, 90:02-91:07, 94:6-94:13; 105:18-105:22.

164.   Exhibits A through V are true and accurate copies.

Respectfully Submitted,

RIDOC Defendants,
By:

PETER F. NERONHA
ATTORNEY GENERAL

*/s/ Justin J. Sullivan*

Justin J. Sullivan (#9770)
Special Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL
150 South Main St. Providence, RI 02903
Tel: (401) 274-4400 | Ext. 2007
Fax (401) 222-2995
jjsullivan@riag.ri.gov

## <u>CERTIFICATE OF SERVICE</u>

      I, the undersigned, hereby certify that the within document has been electronically filed with the Court through the ECF system on Monday, September 26, 2022 and that it is available for viewing and downloading. I also caused a true and accurate copy of the within document to be served through the ECF system on the following parties and/or counsel of record:

*Counsel for Plaintiff*
Chloe A. Davis, Esq.
cad@sinapilaw.com

*Counsel for Defendants Fred Vohr and*
*Jennifer Clarke*
Jeffrey G. Latham, Esq.
Christine A. Stowell, Esq.
jlatham@tatelawri.com
cstowell@tatelawri.com