# EXHIBIT D

Kerri McCaughey - July 12, 2019

35

1      medical staff filling out the request and putting it in

2      your mailbox; is there any correctional staff involved

3      at any point during that?

4      A.  Not that I am aware of.

5   Q.  So once it gets to your mailbox, what do you do?

6      A.  I review the request.

7   Q.  What do you review it for?

8      A.  I review it to determine whether or not it may or

9      may not be warranted, depending on what the request is.

10  Q.  What, in your determination, would warrant a special

11     needs request; are you reviewing it for medical

12     reasons?  For security reasons?

13     A.  I am reviewing for safety and security reasons.

14  Q.  Is that the only thing that you review it for?

15     A.  No.

16  Q.  What else do you review it for?

17     A.  Operationally, is it sound, is it safe, is it a

18     safe practice, does it present a hazard for staff and

19     inmates.

20  Q.  Anything else?

21     A.  Legitimacy.

22  Q.  What does that mean?

23     A.  If the request is legitimate.

24  Q.  Can you explain what you mean by legitimate?

25     A.  If the special need is an actual legitimate request

Kerri McCaughey - July 12, 2019

36

1      that has been -- that there is an issue that has been

2      documented.

3  Q.   Documented in what way?

4      A.   In some cases, the diagnosis.

5  Q.   So are you referring to documented in medical records?

6      A.   Yes.

7  Q.   Do you have access to medical records?

8      A.   No.

9  Q.   Then how would you be able to determine if it was,

10     quote/unquote, "legitimate"?

11     A.   I would request more information.

12 Q.   Why would you be concerned about whether or not it was

13     documented?

14     A.   Because special needs sometimes come to us that

15     have no legitimacy.

16 Q.   Can you give an example?

17     A.   Instances that are self-reported.

18 Q.   Wouldn't all instances be self-reported by an inmate if

19     he is requesting a special needs accommodation?

20     A.   No.

21 Q.   What do you mean by self-reported?

22     A.   They present to medical that they have a

23     self-reported injury, a self-reported condition that's

24     not documented.

25 Q.   Are you suggesting that the medical staff have not

Kerri McCaughey - July 12, 2019

37

1      verified the complaint?

2      A.  I am not suggesting that.

3  Q.  How would you know whether or not something was

4      documented or self-reported?

5      A.  I would ask for more information from medical

6      staff.

7  Q.  And in what way is that concern related to security

8      operational or hazard concerns?

9      A.  I am not sure what you are asking me.

10  Q.  Would the legitimacy of the request affect whether the

11      request presented operational concerns?

12      A.  In some cases.

13  Q.  How so?

14      A.  It may interfere with the orderly running of the

15      facility itself.  It may present a safety or security

16      issue of the normal day-to-day operations.

17  Q.  How so?

18      A.  It depends on what the incident is.

19  Q.  Can you give some examples of what reasonable

20      accommodations might be requested?

21      A.  Canes, wheelchair accessibility, hand braces, knee

22      braces.

23  Q.  Anything else?

24      A.  Bottom bunks.

25  Q.  So I suppose I could imagine why a cane might present

Kerri McCaughey - July 12, 2019

38

1      some security concerns.  Can you explain how some of

2      the other accommodations might present security

3      concerns; such as if someone had a knee brace?

4      A.  Some medical supplies have and can be used as

5      weapons or to store weapons.

6  Q.  What about a bottom bunk assignment, how could those

7      present security concerns?

8      A.  Well, enemy issues, gang issues, housing assignment

9      by reclassification.

10 Q.  What do you mean housing assignment by

11     reclassification?

12     A.  Well, to determine where somebody is going to live

13     within the facility, there are a lot of considerations

14     that come into play before they're assigned their

15     housing unit.

16 Q.  Would that be right when they got to the facility?

17     A.  That would be the first time.

18 Q.  Are they reconsidered at any point?

19     A.  It depends.

20 Q.  Would classification be reconsidered if, for instance,

21     a reasonable accommodation was needed that could be not

22     provided in a particular facility?

23     A.  An offender cannot be reclassified to a higher

24     security based upon medical needs.

25 Q.  But could an inmate be reclassified to a lower security

39

```
 1        facility?
 2        A.  Not for medical reasons.
 3   Q.   So they could never be reassigned for medical purposes?
 4        A.  I am not going to say never.  I am saying I have
 5        never seen it happen.
 6   Q.   What other reasons might an inmate be reclassified
 7        after he was originally classified when he showed up?
 8        A.  By law.
 9   Q.   All right.  When you review special needs orders or
10        requests, what are the options for you to handle it?
11        What are the procedures?  You know, would you deny it,
12        approve it, ask for more information; are those the
13        three options for you to handle it?
14        A.  Those are the three options, yes.
15   Q.   Are there any other options?
16        A.  In some cases, if it requires a device of some
17        kind, I would ask to see it.
18   Q.   Ask to see the device?
19        A.  Yes.
20   Q.   Is that so that you could figure out if it might
21        present security concerns?
22        A.  Correct.
23   Q.   So when you decide that you need more information, what
24        do you do?
25        A.  I write that right on the special needs request,
```

Kerri McCaughey - July 12, 2019

42

1        A.  Correct.

2   Q.   What are the grounds that you have for denying a

3        reasonable accommodation request?

4        A.  It depends on what it is.

5   Q.   What would be some grounds for denying a request for a

6        bottom bunk?

7        A.  Again, bottom bunks, we only have so many.  So, my

8        role would be to make sure that those that have bunks

9        have them for legitimate reasons that cannot be

10       accommodated in any other way.

11  Q.   Are there any other reasons why you might deny a

12       reasonable request?

13       A.  Any reasonable request?

14  Q.   Yes.  What are the reasons why you would deny a

15       reasonable accommodation request other than --

16                   MS. DAVIS:  Let me rephrase.

17  Q.   You just said that you would, you might deny a bottom

18       bunk if you determine that it was not legitimate; are

19       there other reasons why you might deny a bottom bunk

20       request?

21       A.  Not enough information, no documentation to justify

22       the request.

23  Q.   Are there any security reasons why you might deny it?

24       A.  Well, in general, climate issues.  I don't have a

25       large, huge number of bottom bunks.  So, again, I am

Kerri McCaughey - July 12, 2019

46

1        A.  I don't have that number.

2   Q.   But earlier you testified that there are only so many

3        bottom bunks, and you are concerned about providing

4        them.  So does that mean that there are enough orders

5        for people to have bottom bunks to reach the total

6        number of bottom bunks available; does that make sense?

7                    MS. DAVIS:  Let me rephrase.

8   Q.   Were there so many bottom bunk orders that you might

9        run out of the bottom bunks?

10       A.  That's always a consideration.

11  Q.   Are you aware that it had happened at any point?

12       A.  No.

13  Q.   So at no point while you were the programmatic deputy

14       warden did you actually discover that you had run out

15       of bottom bunks to provide to inmates?

16       A.  I never officially ran out of bottom bunks, no.

17  Q.   What made you be concerned that you were going to run

18       out of bottom bunks?

19       A.  Availability.

20  Q.   Was there some point at which you were informed that

21       you might run out of bottom bunks?

22       A.  Yes.

23  Q.   So, you understand that at some point there was a

24       concern that medium security was not going to have

25       enough bottom bunks available?

Kerri McCaughey - July 12, 2019

48

1        A.  Yes.

2    Q.  So you would look at the condition that was asserted by

3        the medical staff, and decide if you thought it was

4        legitimate, or not?

5        A.  Yes.

6    Q.  What types of medical conditions did you believe to be

7        legitimate?

8        A.  People who have seizure disorders, diabetes, people

9        who are missing limbs.

10   Q.  Anything else?

11       A.  Elderly.

12   Q.  Did you receive bottom bunk requests for conditions

13       that were not permanent?

14       A.  Yes.

15   Q.  Would you grant those requests, if you believed that

16       they were legitimate?

17                  MS. DAVIS:  I am sorry.  Let me rephrase.

18   Q.  What types of impermanent conditions would you grant

19       bottom bunks for, if you can recall?

20       A.  Impermanent conditions?

21   Q.  Yes.  Conditions that were for a short period of time.

22       A.  Someone who had a surgery.

23   Q.  Anything else?

24       A.  Anything that was temporary, gestational.  If it

25       was a surgery or someone had a broken limb, yes, we

Kerri McCaughey - July 12, 2019

55

1   Q.   So you like getting them in paper?

2        A.  Yes.

3   Q.   Why is that?  What is it about paper that you like

4        better than electronic?

5        A.  I can put my signature on it.

6   Q.   Fair enough.  Can we go back a little bit to the

7        accommodation request for bottom bunks.  I think we did

8        not finish going through what all of the possible

9        security concerns would be.  Can you run through that

10       one more time, what all of the concerns might be that

11       you would be reviewing a bottom bunk request for?

12       A.  I would be reviewing a housing assignment

13       initially.

14  Q.   What do you mean?

15       A.  Bottom bunks in medium security, there are 96

16       cells, as I testified to, but those bottom bunks on the

17       top tiers of those cells are not available for medical

18       bottom bunk, so that's one consideration.

19  Q.   Why not?

20       A.  It has not been approved by medical to have anyone

21       who has an assigned medical bottom to be housed on a

22       top tier.

23  Q.   Why would it matter to medical why there is somebody

24       with a bottom bunk that was housed on the top tier?

25       A.  Because there is a staircase that goes up to a

Kerri McCaughey - July 12, 2019

56

1          tier.  If medical is coming in from outside, it is a

2          lot more difficult to support someone if they need to

3          get them down from there.

4               So we are not allowed to put anyone on a bottom

5          bunk on a top tier that has a medical bottom bunk

6          order, so that eliminates the number that I have.

7    Q.    How long has that been the policy?

8          A.  As long as I have been there.

9    Q.    Are you not permitted in any circumstance to put

10         somebody with a medical bottom bunk order on a top

11         tier?

12         A.  To the best of my recollection, yes.

13   Q.    That's never happened?

14         A.  I don't know that it has never happened.  I can't

15         recall that it has ever happened.

16   Q.    So would a request for a bottom bunk be denied on that

17         ground?

18         A.  I am sorry, on what ground?

19   Q.    On the ground that you run out of bottom bunks on the

20         first tier, and therefore, you do not have any bottom

21         bunks available; is that correct?

22         A.  I have never not had bottom bunks available, but I

23         have a limited ability of bottom bunk based on several

24         factors.  One of them is that I can't put medical

25         bottom bunks on a top tier.

Kerri McCaughey - July 12, 2019

57

1   Q.   Are there medical concerns related that might

2        necessitate a bottom bunk that would not affect whether

3        or not somebody could go upstairs?

4        A.   I am not sure what you are asking me.

5   Q.   So I can understand why, if somebody was medically

6        ordered a bottom bunk because of a broken leg, why that

7        might prevent them from being able to go upstairs to a

8        second tier, but are there other reasons why somebody

9        would be given a bottom bunk that would not affect

10       whether or not they could walk upstairs?

11       A.   If there is a bottom bunk ordered medically, they

12       cannot go upstairs.

13  Q.   The inmate, or the medical staff?

14       A.   The inmate cannot be housed on the top tier if he

15       has an approved bottom bunk order.

16  Q.   But I am asking, would there be reasons why it would

17       not matter whether they were on a top tier or a bottom

18       tier?

19       A.   Not medically.

20  Q.   So, you're saying that regardless of the basis for the

21       bottom bunk order, they are never permitted to be

22       housed on the second tier?

23       A.   Correct.

24  Q.   And has that ever been the reason why you denied a

25       bottom bunk order?

Kerri McCaughey - July 12, 2019

58

1       A.   No.

2   Q.   If you had a bottom bunk on a second tier available,

3        would you grant a bottom bunk order, or are you saying

4        that it would not be able to be implemented?

5        A.   I would not put an inmate that's got a medical

6        bottom bunk order on the second tier.  I would put

7        general population inmates on the second tier.

8   Q.   But who makes that decision of where to put them?

9        A.   The housing lieutenants.

10  Q.   So it is possible that you would have granted an order

11       for a bottom bunk, and so they have an approved order

12       for a bottom bunk, but then they do not receive that

13       bottom bunk because there are not enough bottom bunks

14       available on the first tier?

15       A.   Yes.  They would wait for an available bottom bunk,

16       especially if it is a medical bottom bunk for a person

17       who is in one of the therapeutic communities in the

18       building.

19  Q.   What do you mean by any of the therapeutic communities?

20       A.   I have two housing areas where both sides are a

21       therapeutic community; one of them is the sex offender

22       treatment program, and the other is a drug treatment

23       program.  So, if an inmate had a medical bottom bunk,

24       but was enrolling in the sex offender treatment

25       program, I would have to wait until a medical bottom

1           bunk was available in that therapeutic community in

2           order to move that person.

3    Q.    So there is no circumstance where somebody who has an

4           approved bottom bunk order would be able to change

5           housing units in order to receive that bottom bunk?

6           A.  If someone has a medical bottom bunk order, I am

7           going -- they will be assigned to a housing unit that

8           can accommodate that bottom bunk, if, in fact, it is

9           available.

10   Q.    So I am sorry.  I don't think I understand what you

11          were saying about sex offender and the drug treatment

12          programs.  How does those factor in?

13          A.  That eliminates, they are therapeutic communities,

14          so people who have a specific crime live in those

15          communities, because that's where their programs are.

16              So, anyone who is a sex offender in medium security

17          and is involved in the sex offender treatment program

18          is living in F Mod, which is a 96-bed unit.

19              So, some of those offenders in that program have

20          medical bottom bunk orders, and it eliminates the

21          number of housing units I can put the general

22          population inmates in that have medical bottom bunk

23          order.

24   Q.    Within F Mod, how many first tier cells are there?

25          A.  On each side?

Kerri McCaughey - July 12, 2019

60

1    Q.   Yes.

2         A.   There's 48.

3    Q.   There are two sides to the F Mod?

4         A.   There are two sides to all housing units, yes.

5    Q.   So, someone who was a sex offender and received a

6         bottom bunk order would only be allowed to be able to

7         be assigned to a bunk in F Mod?

8         A.   Correct.

9    Q.   And, therefore, if they have had a bottom bunk order,

10        they would only be able to be assigned bottom bunk

11        within the first tier of F Mod; is that what you're

12        saying?

13        A.   Yes.

14   Q.   There is no circumstance where a sex offender would be

15        assigned to a different mod?

16        A.   In some cases, the sex offender treatment program

17        may do individual treatments with someone on another

18        mod until they are able to be housed in F Mod that's on

19        the program.

20   Q.   So, are there inmates that are in those programs that

21        are not housed in those specific mods at any point?

22        A.   Yes.

23   Q.   Can you explain when and why?

24        A.   If someone has a medical bottom bunk order, but it

25        is assigned to the sex offender treatment program, I

Kerri McCaughey - July 12, 2019

61

1        can't move them to the mod that the therapeutic

2        community exists in if there is not a bottom bunk for

3        them, they are all taken.

4    Q.  So what would, essentially, win out, would the bottom

5        bunk order be more important than the sex offender

6        treatment program, or vice versa?

7        A.  If there is an approved medical bottom bunk order,

8        that would take priority, yes.

9    Q.  So they would be able to be assigned to a different mod

10       if they had an approved bottom bunk?

11       A.  Until a bed is available.

12   Q.  Until a bed is available in the sex offender mod?

13       A.  Um-umm.

14                   (REPORTER ASKS FOR CLARIFICATION)

15       A.  Yes.

16   Q.  While they are housed in a different mod, would they

17       not be able, or would that kick them out of the program

18       for some reason; would they not be able to participate

19       in the program?

20       A.  No.

21   Q.  They would still have access to all of the aspects of

22       that treatment program that they ordinarily would if

23       they were housed in that mod; right?

24       A.  To my knowledge, the sex offender treatment program

25       clinician reach out to those individuals, and work out

Kerri McCaughey - July 12, 2019

62

```
 1          their treatments separately that would be for them.
 2   Q.     All right.  So I think we were running through what all
 3          of the possible security concerns are for a bottom bunk
 4          order.  So we have gone through whether or not the
 5          order was legitimate and whether or not there were
 6          gang-related issues, and now we have talked about
 7          whether or not they were assigned to a particular
 8          treatment program, are there any other security-based
 9          concerns for a request for a bottom bunk?
10   A.     Considerations, other considerations would come
11          into play when someone is being requested for a bottom
12          bunk, job assignments.
13   Q.     How so, why would that be a concern when you were
14          reviewing a bottom bunk request?
15   A.     Depending on what the request is for, one of my
16          concerns would be could they hold a job, or would they
17          be restricted from specific jobs because of their
18          medical conditions.  Would they be restricted from any
19          type of physical activity, like weightlifting, because
20          of the nature of their bottom bunk order, and I request
21          medical to provide that for me so I can ensure their
22          safety within the facility.
23   Q.     The inmates' safety?
24   A.     Correct.
25   Q.     What would the concern be about holding a job have to
```

Kerri McCaughey - July 12, 2019

65

1        be presented to me.

2   Q.   Would that include like nerve issues in the neck, or

3        anything like that?

4        A.  Not necessarily.

5   Q.   So what else do you consider legitimate?

6        A.  Like I said, anything that prevents a person's

7        ability to climb a ladder.

8   Q.   What else; anything else?

9        A.  The two biggest ones I deal with are seizure

10       disorders and people that suffer or have diabetes.

11  Q.   Are there any legitimate, what you consider legitimate,

12       concerns that would allow you to grant the bottom bunk

13       that would not affect their ability to climb stairs, as

14       in, if somebody could not climb a ladder, might they

15       still be able to climb stairs?

16       A.  I don't know.  I can't answer whether someone could

17       climb a ladder or climb stairs.

18  Q.   But you can make that determination when you are

19       determining an order as legitimate?

20       A.  The stairs would not be an issue if the order is

21       going to be legitimate because they won't go on a top

22       tier.

23  Q.   I am asking if it would be possible to put somebody in

24       a top tier that has a bottom bunk order because their

25       condition might not have any effect on their ability to

66

1        climb stairs?
2        A.  If they have a medical bottom bunk order, they are
3        not going to go on the top tier.
4    Q.  I understand that is the policy, but would it be
5        possible to change the policy?
6        A.  I am not at liberty to determine whether a policy
7        gets changed.
8    Q.  Would it be possible to put somebody in the second
9        tier, even if it is against the policy?
10       A.  I have no recollection of that.  I can't answer
11       that.  I have never put anybody on a top tier bottom
12       bunk that has a medical bottom bunk order.
13   Q.  Have you ever had inmates that had a bottom bunk order
14       that were not given a bottom bunk for any reason?
15       A.  That had a legitimate one?
16   Q.  That had an approved order for a bottom bunk, were they
17       ever not given a bottom bunk?
18       A.  I don't recall.
19   Q.  All right.  Are there any other examples of legitimate
20       reasons why you might not grant -- why you might grant
21       a bottom bunk, any other reasons that you consider
22       legitimate, besides seizure disorders, diabetes, broken
23       limbs, and the inability to climb a ladder, anything
24       else that you can think of?
25       A.  Not off the top of my head.

Kerri McCaughey - July 12, 2019

69

```
 1          to medical, and medical is responsible for distributing
 2          it?
 3          A.  Yes.
 4   Q.     Who does medical distribute it to, just the inmate?
 5          A.  The individual himself, correct.
 6   Q.     Medical does not at any point send it to the
 7          correctional staff?
 8          A.  No.
 9   Q.     How does the order get implemented by an assignment of
10          the bunk?
11          A.  When the order is given to the offender, the
12          offender presents that order to the housing lieutenant
13          in his area.
14   Q.     The only way for the order to be implemented is if the
15          approved order is given to the inmate, and the inmate
16          has to personally give it to the housing lieutenant; is
17          that correct?
18          A.  Yes.  The inmate is responsible for keeping that
19          medical order either on his person or when he is in
20          housing unit on the door of his cell in a clear packet.
21   Q.     So if the inmate were to not receive an approved order,
22          it would not get implemented; is that correct?
23          A.  If the inmate did not receive it?
24   Q.     Yes.
25          A.  It won't get implemented until the inmate receives
```

Kerri McCaughey - July 12, 2019

83

```
 1                    (OFF THE RECORD)
 2   Q.   When is this order dated?
 3        A.   11/12.
 4   Q.   And what are the handwritten notifications on the
 5        document?
 6        A.   Mine are need more information, and then approved.
 7   Q.   When did you receive this document?
 8        A.   On or around 11/12.
 9   Q.   What are the other notations on the document?
10        A.   There is a document on the bottom of the page.
11   Q.   Can you read it?
12        A.   "Severe pain, osteoarthritis neck on x-ray."
13   Q.   By looking at this document, can you explain why you
14        asked for more info.?
15        A.   Because initially it just said bottom bunk, neck
16        pain.
17   Q.   Why would that require more info.?
18        A.   Because neck pain is not enough information for me
19        to go on.
20   Q.   Would you say that that is an illegitimate reason in
21        your determination?
22        A.   That's a request for needing more information.
23   Q.   And what was the basis for you saying that you received
24        it on or around November 12th?
25        A.   That's when the order is.
```

Kerri McCaughey - July 12, 2019

85

1   Q.   So on the face, this order would not, or this request

2        for a bottom bunk would not present to you any security

3        concerns; is that what you are saying?

4   A.   Correct.  If I am giving more information that I

5        can make a decision based on, then I would approve it.

6   Q.   So with this notation at the bottom, it did not present

7        any sort of security concerns?

8   A.   I just needed more information.

9   Q.   Did it present a security concern before the notation

10       on the bottom was written?

11  A.   I just needed more information.

12  Q.   So prior to receiving more information, was there a

13       security concern related to this request?

14  A.   There was a lack of information concern.

15  Q.   Why was that relevant to security?

16  A.   Because I needed more information to be able to

17       approve a bottom bunk.

18  Q.   Why do you think it took from November 12th to

19       November 19th to approve this order?

20  A.   When I got it, I put the need for more information,

21       and I sent it back to medical.  By the time they sent

22       it back to me and I signed it, it was 11/19/14.

23  Q.   Do you have any recollection of how long it took you to

24       review it and request more information?

25  A.   No.

Kerri McCaughey - July 12, 2019

86

1   Q.   When was this order set to expire?

2        A.  2/12/15.

3   Q.   So if you approved this on November 19, 2014, and it

4        was set to expire on February 12, 2015, does that mean

5        that Mr. Melise would have been placed in a bottom bunk

6        between those dates?

7        A.  According to this, yes.

8   Q.   Do you have any reason to believe, or any reason to

9        think that it would not have been implemented?

10       A.  Not that I can recall.

11  Q.   Is there any legitimate basis for not implementing this

12       once it is approved?

13       A.  Not that I can recall.

14  Q.   Okay.

15                  MS. DAVIS:  Exhibit 2.

16                  EXHIBIT 2, PLAINTIFF'S, MARKED FOR I.D.

17  Q.   What is this document?

18       A.  This is an administrative note.

19                  MR. SULLIVAN:  Just for the record, she

20       is referring to Exhibit 2.

21  Q.   Yes.  I am sorry.  Exhibit 2, can you identify this

22       document?

23       A.  Yes.

24  Q.   When was this document dated?

25       A.  2/9/2015.

Kerri McCaughey - July 12, 2019

87

1   Q.  Do understand why this document was submitted to you?

2     A.  They were requesting a bottom bunk.

3   Q.  Would it have been normal for them to submit this order

4     to you prior to the expiration of the prior order?

5     A.  In some cases.

6   Q.  So would it have concerned you why they submitted this

7     to you on the date that they did?

8     A.  No.

9   Q.  Why did you decide that you needed more information?

10     A.  I don't recall.  It says just bottom bunk, neck

11     pain.

12   Q.  Does the fact that you had originally approved an order

13     for the same reason affect your review of this order?

14     A.  No.

15   Q.  Would you have remembered that you had initially

16     approved an order for the same person for the same

17     thing?

18     A.  No.

19   Q.  By looking at it, can you tell what happened with this

20     document?

21     A.  I needed more information, and whoever wrote that

22     note to me wanted me to schedule a time.

23   Q.  Do you know if this order was ever approved?

24     A.  I don't.

25   Q.  Is it fair to say that it was not approved if there is

Kerri McCaughey - July 12, 2019

88

 1          no indication that it was approved?

 2          A.  I don't know if it was approved.

 3   Q.  If it was not specifically approved by you, is it fair

 4          to say that it was never implemented?

 5          A.  If it was not specifically approved by me, it does

 6          not mean in my absence it could not have gone to

 7          another administrator.

 8   Q.  What other administrator has the authority to review

 9          these orders?

10          A.  My coworker deputy or the warden himself.

11   Q.  So in your absence, they could go to a different

12          administrator for approval?

13          A.  Yes.

14   Q.  Does that happen regularly?

15          A.  It happens when one or the other of us is not

16          available, or is out on vacation.  We do not want the

17          orders to just sit.

18                    MS. DAVIS:  Exhibit 3, please.

19                    EXHIBIT 3, PLAINTIFF'S, MARKED FOR I.D.

20   Q.  Do you recognize this document?

21          A.  Administrative note.

22   Q.  When was it dated?

23          A.  6/9/2015.

24   Q.  Was this a request for a reasonable accommodation?

25          A.  Bottom bunk.

Kerri McCaughey - July 12, 2019

89

1   Q.   And what are the notations on this document?

2       A.  More information, and then denied by me.

3   Q.   What was the date it was denied?

4       A.  6/19.

5   Q.   2015; is that correct?

6       A.  I am sorry, 2015.  Yes.

7   Q.   What are the other handwritten notes on it; can you

8       please read them?

9       A.  "Osteoarthritis neck."

10  Q.   Does that say severe pain, maybe?

11      A.  Maybe.

12  Q.   And the date right above the osteoarthritis neck is

13      6/12/2015?

14      A.  I am sorry.

15  Q.   The date just above osteoarthritis?

16      A.  Oh, "6/12."

17  Q.   So is it reasonable to infer from this that this

18      document was submitted to you on 6/9/2015.  At some

19      date on 6/9/2015, you requested more information, and

20      on 6/12, it was sent back to you, and then it was

21      denied on 6/19; does that appear to be what happened

22      with this document?

23      A.  Yes.

24  Q.   Can you explain why you denied the document, or why you

25      denied the request?

Kerri McCaughey - July 12, 2019

90

1        A.  I don't know at the time.  I don't know.

2   Q.   Can you, by looking at it, can you explain what you

3        might have thought after looking at this document?

4        A.  Although he appears he has osteoarthritis in his

5        neck, it does not mean he can't climb a ladder.

6   Q.   Would that be the only reason why he would request a

7        bottom bunk, or that the medical provider would request

8        a bottom bunk for him?

9        A.  That's the only reason they gave.

10  Q.   I mean, the fact that he could not climb a ladder, is

11       that the only reason why the medical provider might

12       request a bottom bunk?

13       A.  I don't know.

14  Q.   So you are not sure what the medical basis would be for

15       them to request that he was on the bottom bunk; is that

16       correct?

17       A.  Based on the information they gave me, no.

18  Q.   Now, is this notation in response to your request for

19       more information the same as the previous order -- or,

20       I am sorry, the same as the response on Exhibit 1?

21       A.  Yes.

22  Q.   But you approved it on Exhibit 1, and you denied it on

23       Exhibit 3; can you explain why that might be?

24       A.  Very possibly we were adding -- we were adding

25       ladders to the blocks at the time.  It was right around

Kerri McCaughey - July 12, 2019

91

1          that time.

2     Q.    I am sorry.  Can you explain what that means?

3           A.  He has the capability of climbing to the top tier,

4           based on this information.  I don't see any reason why

5           he would not be able to.  I am not sure why I would

6           have approved it once and denied it a second time, if

7           he could climb a ladder, I would deny it.

8     Q.    Does it matter for security purposes why the medical

9           staff submitted an order for a special needs

10          accommodation?

11          A.  Yes, based on availability of bottom bunks.

12    Q.    When you are looking at this order, would you look at

13          how many bottom bunks were available at that time?

14          A.  No.

15    Q.    You would just assume that there is a limitation on

16          bottom bunks, and deny this order based on that

17          assumption; is that what you are saying?

18          A.  I have a lieutenant that keeps a list of all of the

19          bottom bunks in the building.

20    Q.    Would you review that list?

21          A.  We usually review that list at our triage meetings,

22          yes.

23    Q.    So, at any given time, did you have an understanding of

24          how many bottom bunks might be available for people who

25          needed a reasonable accommodation?

```
 1   Q.   You would have interpreted that as saying that he did
 2        not need a bottom bunk; is that what you are saying?
 3        A.  I am saying in this top notation, it's
 4        self-reported, that he has issues climbing up to a top
 5        bunk.
 6   Q.   So, after reading that top notation, you would have
 7        decided that it was not a legitimate reason for a
 8        bottom bunk; is that what you are saying?
 9        A.  What I am saying is if he could climb up a ladder,
10        I don't believe he had a legitimate request for a
11        bottom bunk.
12   Q.   Even if it was causing him pain?
13        A.  Self-reported.
14   Q.   So you don't believe him; is that what you are saying?
15        A.  I am saying it is self-reported.  I want more
16        documentation to tell me he actually could not climb.
17            The notation from Dr. Melnick gives a medical
18        condition.  It still does not tell me that he cannot
19        climb a ladder.
20   Q.   Why would whether or not he could climb a ladder affect
21        whether or not you would grant this order?
22        A.  Because he could sleep on a top bunk.
23   Q.   So you would not approve this order that was submitted
24        by a medical professional and as a request to you to
25        grant this inmate a bottom bunk because you did not
```

Kerri McCaughey - July 12, 2019

96

1      A.  On this?

2  Q.   Yes?

3      A.  No.

4  Q.   Is there any indication on this document that you saw

5       these additional notations?

6      A.  No.

7  Q.   Do you know how this document would have gotten into

8       the medical record?

9      A.  I don't.

10 Q.   Is there any way that you know of that we could

11      determine that you saw this?

12     A.  No.

13 Q.   Is that because there is no electronic record of when

14      documents are submitted to you and when you review

15      them?

16     A.  This is how I get them.  What medical does with

17      them when I give them back is what they do with them.

18 Q.   But there is no notation from you after 6/19/2015; is

19      that correct?

20     A.  That's correct.

21 Q.   So there is no indication on this document that you

22      ever saw these 10/28 notations; is that correct?

23     A.  Yes.

24 Q.   So, is that because there is no other electronic record

25      indicating whether or not you saw an order like this?

Kerri McCaughey - July 12, 2019

100

1     A.  Yes.

2   Q.  It is, that is sufficient?

3     A.  If he has that, yes.

4   Q.  Well, that's on the same document; is it not?

5     A.  Yes.

6   Q.  So you have already been told that he has a medical

7       condition that has been documented, which is

8       osteoarthritis in the neck; is that correct?

9     A.  Yes.

10  Q.  And, yet, you are saying that this notation from the

11      nurse practitioner was still not sufficient to approve

12      a bottom bunk; is that what you are saying?

13    A.  Because her notation is referring to his inability

14      to climb a ladder, self-reported.

15  Q.  I am just trying to figure out how the fact that he has

16      a documented condition, the nurse has indicated it to

17      you, and that he is saying that he has pain and trouble

18      because of that documented condition, he has pain in

19      climbing up and down a ladder, and a nurse has decided

20      that that is sufficient, a sufficient reason to send

21      the request to you, why, based on your security

22      concerns, why that is not sufficient to grant a bottom

23      bunk?

24    A.  Because it does not indicate medically that he

25      cannot climb a ladder.  In addition, he has

Kerri McCaughey - July 12, 2019

101

```
 1        consistently held a job as a block porter since he has
 2        been there.
 3   Q.   What does that have to do with it?
 4        A.  He is a janitor.
 5   Q.   What does the fact that he is a janitor have to do with
 6        his ability to climb a ladder?
 7        A.  His ability to perform the duties of a porter -- in
 8        this case, it is a called a porter.  So he does not
 9        have a medical condition that prevents him from doing a
10        physical job.
11   Q.   What does his job as a porter have to do with him
12        having to climb a ladder?
13        A.  Because he climbs stairs in the mod to perform his
14        job duties.
15   Q.   How is climbing stairs and climbing a ladder relevant
16        to each other, or in any way the same thing?
17        A.  He can climb.
18   Q.   He can climb with his legs?
19        A.  Yes.  He climbs up and down the stairs.
20   Q.   Using his legs?
21        A.  Yes.
22   Q.   What do you need to use in order to climb a ladder?
23        A.  Your legs and your arms.
24   Q.   So do you need to use your arms in order to climb
25        stairs?
```

Kerri McCaughey - July 12, 2019

102

1      A.   If you are carrying janitorial supplies, yes.

2   Q.   And, so, are you saying that it does not matter if a

3      medical professional has ordered that this inmate be

4      given a bottom bunk, all that matters is if you decide

5      that the basis for the order is legitimate; is that

6      what you are testifying to?

7      A.   No.   In this particular case, I didn't see this.

8   Q.   But you just testified that you would not have granted

9      the order based on that information?

10     A.   Based on the top notation.

11  Q.   Even though you had previously approved orders for this

12     inmate based on osteoarthritis in the neck, you would

13     not have granted this order; is that what you are

14     saying?

15     A.   Based on this, the top notation, no.

16  Q.   And it does not matter to you that a medical

17     professional has made the determination that the inmate

18     should be given a bottom bunk; is that what you are

19     saying?

20     A.   I am not saying it does not matter to me.   I am

21     saying I would request more information that is

22     documented in this case that he cannot climb a ladder,

23     but again, I didn't see this.

24               MS. DAVIS:   Exhibit 5, please.

25               EXHIBIT 5, PLAINTIFF'S, MARKED FOR I.D.

Kerri McCaughey - July 12, 2019

103

1    Q.   Can you identify this document?

2         A.   It's a special needs request form.

3    Q.   By looking at this, what is the date of the document?

4         A.   11/12/2015.

5    Q.   What is the request for?

6         A.   Bottom bunk, neck pain.

7    Q.   And by looking at this document, can you tell what

8         happened with it?

9         A.   The special needs appeared to have been generated,

10        and that's where it stopped.

11   Q.   So there is no evidence that this was ever submitted to

12        you or that you ever saw it or reviewed it or approved

13        or denied it; is that correct?

14        A.   Correct.

15   Q.   Because there is no electronic record of these being

16        submitted to you, there is no -- we have no ability to

17        determine if you ever saw this; is that correct?

18        A.   That's correct.

19   Q.   Is there a reason why a medical professional might have

20        entered it into the medical record and not giving it to

21        you?

22        A.   I don't know.

23             MS. DAVIS:   Exhibit 6, please.

24             EXHIBIT 6, PLAINTIFF'S, MARKED FOR I.D.

25   Q.   Exhibit Number 6, can you identify this document?

Kerri McCaughey - July 12, 2019

104

1       A.  Yes.

2   Q.  What is it?

3       A.  It is a personal needs request form.

4   Q.  When is the date?

5       A.  11/20/2015.

6   Q.  And as with the previous exhibit, is there any

7       indication that this was ever submitted to you or that

8       you ever saw this?

9       A.  No.

10  Q.  When is this requested order set to expire?

11      A.  12/12/16.

12                  MS. DAVIS:  Exhibit 7, please.

13                  EXHIBIT 7, PLAINTIFF'S, MARKED FOR I.D.

14  Q.  Exhibit 7, can you identify this document?

15      A.  Yes.  It is a special needs request form.

16  Q.  When is it dated?

17      A.  12/21/2015.

18  Q.  Is there any indication on it that you ever saw it, or

19      it was ever submitted to you?

20      A.  No.

21  Q.  We can assume that it was never implemented because

22      there is no indication that you ever saw it or approved

23      it or denied it; is that fair?

24      A.  I never saw it.

25                  MS. DAVIS:  Exhibit 8, please.

Kerri McCaughey - July 12, 2019

105

1                    EXHIBIT 8, PLAINTIFF'S, MARKED FOR I.D.

2   Q.   This exhibit may actually change your answer on the

3        last one because the date is the same, 12/21/2015; is

4        that correct?

5        A.  12/21/2015.

6   Q.   And that's the same date as the previous exhibit,

7        Exhibit 7?

8        A.  Yes.

9   Q.   Is there an indication on this document that you saw

10       it?

11       A.  Yes.

12  Q.   And what does the notation indicate to you?

13       A.  Bottom bunk, neck pain.

14  Q.   And what is the notation from you?

15       A.  Denied.

16  Q.   On what date?

17       A.  12/29/15.

18  Q.   And can you explain why this was denied?

19       A.  It had been denied previously.

20  Q.   Is there a reason why you did not request more

21       information?

22       A.  I don't recall.

23  Q.   Can you think of a reason why you might not have

24       requested more information on this request?

25                    MR. SULLIVAN:  Objection.  You can

Kerri McCaughey - July 12, 2019

107

1          I typically would pick earlier review dates.  This

2          would have gone over a year, almost two years.

3   Q.   If you had picked an earlier review date, how would you

4          have indicated that on the document?

5          A.  I would have wrote earlier review, and I would have

6          put the date.

7   Q.   And the effect of putting that on it would have meant

8          it expired on the date that you set; is that correct?

9          A.  Yes.

10                    MS. DAVIS:  Exhibit 9, please.

11                    EXHIBIT 9, PLAINTIFF'S, MARKED FOR I.D.

12  Q.   Can you identify this document?

13         A.  It's a special needs request.

14  Q.   When is it dated?

15         A.  6/21/2016.

16  Q.   By looking at this document, can you determine if you

17         ever saw it or reviewed it or approved or denied it?

18         A.  No.

19  Q.   Have you ever seen a request for special needs that

20         indicated multiple reasons?

21         A.  In the former medical records system, yes.  In the

22         current one, no.

23  Q.   How come?

24         A.  EMR, the electronic medical records were updated

25         from one system to another, and the old system just

108

1          gave us a list of anything that has ever been requested

2          with a start date and expiration date.  The new system

3          does not.

4     Q.   When did the new system go into effect?

5          A.  I don't recall.

6     Q.   Was it after 6/21/2016?

7          A.  I don't recall.

8     Q.   Can I ask you to look very quickly back at Exhibit 7?

9          A.  Yes.

10    Q.   I'm sorry, Exhibit 8?

11                    (WITNESS COMPLIES)

12    Q.   Do you know if you ever consulted with any medical

13         professionals in regard to this order?

14         A.  I don't recall.

15                    MS. DAVIS:  Exhibit 10, please.

16                    EXHIBIT 10, PLAINTIFF'S, MARKED FOR I.D.

17    Q.   Can you identify this document?

18         A.  Yes.  It is a special needs form.

19    Q.   And when is it dated?

20         A.  6/28/2016.

21    Q.   And what is the request for?

22         A.  There are three separate requests.

23    Q.   Can you explain what each request is for?

24         A.  The top is bottom bunk, neck pain.  Start date

25         11/12/14, stop date 12/12/16.  Bottom bunk -- second

Kerri McCaughey - July 12, 2019

109

```
1          entry, bottom bunk, falls, 6/21/16, expiring 6/21/2017,
2          and the third entry, bottom bunk, falls, question mark,
3          apnea, 6/28/2016 through 9/28/2016.
4    Q.    Is there any indication based on looking at this that
5          you saw this document on or after 6/28/2016, and by
6          after, I mean, recently after, or around the time of
7          6/28/2015?
8    A.    No.
9                    MS. DAVIS:  Exhibit 11, please.
10                   EXHIBIT 11, PLAINTIFF'S, MARKED FOR I.D.
11   Q.    Can you identify this document?
12   A.    I can.
13   Q.    What did?
14   A.    An administrative note.
15   Q.    Is it a request for special accommodations?
16   A.    Yes.
17   Q.    When is it dated?
18   A.    9/8/2016.
19   Q.    And does it contain the same three requests from the
20         previous exhibit that you read?
21   A.    Yes.
22   Q.    And what does it indicate to you on it, in the
23         handwritten notation, what does those indicate?
24   A.    Approved, 9/21/16.
25   Q.    And the bottom notation?
```

Kerri McCaughey - July 12, 2019

110

1         A.   What bottom notation?  That's a signature from the
2         nurse practitioner?
3    Q.   When is it dated?
4         A.   9/19/2016.
5    Q.   Or potentially 9/14?
6         A.   In my opinion, it could be either one.
7    Q.   It is a little ambiguous whether it was submitted to
8         you on 9/14/16 or 9/19/2016, but at some point between
9         then and 9/21/2016, you saw it; is that correct?
10        A.   Yes.
11   Q.   Do you see the other handwritten notation, the circle?
12        A.   Yes.
13   Q.   The circle, bottom bunk, can you explain to me what
14        that indicates?
15        A.   That's -- I circled that, saying that was the order
16        I was approving.
17   Q.   What is the significance of circling that order?
18        A.   As I mentioned before, some of these orders come
19        through with multiple requests on them.  This is the
20        most recent because it is the last one entered, so
21        that's why I would circle it.
22   Q.   Is there reason based on looking at this why you
23        approved this request?
24        A.   I approved it based on the information that was
25        there, falls and apnea.

Kerri McCaughey - July 12, 2019

111

1   Q.   And reading falls and apnea was a legitimate enough

2        reason to you that you did not feel the need to request

3        more information; is that a fair reading of this?

4   A.   Yes.

5   Q.   The fact that you circled that third notation, does

6        that mean that it was set to expire on September 28,

7        2016?

8   A.   Yes.

9   Q.   So it would not have been implemented past that date;

10       is that correct?

11  A.   I can only assume it would not have been

12       implemented past that date.  It was generated on

13       9/8/2016, and it was set to expire on 9/28/2016 based

14       on this documentation.

15  Q.   Is there a reason why you would have only approved the

16       third order?

17  A.   Like I said, they come to me.  I usually will

18       approve the last one, because sometimes I have them

19       listed from years before.

20  Q.   So you would not even consider looking or granting a

21       previous order that was not the most recent order?

22  A.   I am saying I circled the bottom one, and that's

23       the one I approved.

24  Q.   So you approved this order, and it would only last for

25       one week; is that fair to say?

Kerri McCaughey - July 12, 2019

118

1   Q.   After June 21, 2016.

2        A.   July 7, 2016.

3   Q.   And how long did he have a bottom bunk?

4        A.   Until 8/12/2016.

5   Q.   Was he moved to a top bunk on that date?

6        A.   Yes.

7   Q.   And was he assigned to a top bunk until November 11,

8        2016?

9        A.   Yes.

10  Q.   So can you, please, refer to back to Exhibit 11?

11                    (WITNESS COMPLIES)

12  Q.   And this is an order that you approved?

13       A.   Yes.

14  Q.   What was the date that you approved this order?

15       A.   9/21/2016.

16  Q.   So, based on Exhibit 12, was he given a bottom bunk

17       after you approved an order for giving him a bottom

18       bunk on 9/21/2016?

19       A.   No.

20  Q.   Do you know why he was not given a bottom bunk after he

21       was approved for receiving a bottom bunk accommodation?

22       A.   I don't.

23  Q.   Is there any reason you can think of why he was not

24       given a bottom bunk?

25                    MR. SULLIVAN:   Objection.

Kerri McCaughey - July 12, 2019

119

1        A.  That's something I would have to ask the housing
2            lieutenant.
3   Q.   But based on your prior testimony when you approved
4            this, you would have sent it back to medical?
5        A.  Yes.
6   Q.   And assumed that it would have gotten implemented
7            through the process; is that correct?
8        A.  Yes.
9   Q.   So you would not at any point talk to correctional
10           staff to ensure that this was implemented; is that
11           correct?
12       A.  That's correct.
13  Q.   And it appears that it was not implemented; is that
14           correct?
15       A.  Correct.
16                   MS. DAVIS:  Exhibit 13, please.
17                   EXHIBIT 13, PLAINTIFF'S, MARKED FOR I.D.
18  Q.   Can you identify this document?
19       A.  It is an incident report.
20  Q.   When is it dated?
21       A.  11/11/2016.
22  Q.   And can you tell me what the incident report is
23           describing?
24       A.  Inmate fell out of top bunk while sleeping.  Inmate
25           complained of an injured ankle.  Nurse responded, and

Kerri McCaughey - July 12, 2019

126

1    A.  Yes.

2  Q.  Do you know if any of that footage was retained?

3    A.  I do not.

4  Q.  Would there have been footage of when he returned from

5    Rhode Island Hospital?

6    A.  Yes.

7  Q.  Do you know if any of that footage was retained?

8    A.  I do not.

9              EXHIBIT 14, PLAINTIFF'S, MARKED FOR I.D.

10  Q.  Is this the log book specific to B mod that just

11    referred to as?

12    A.  Yes.

13  Q.  Can you read to me everything that is written on this

14    document?

15    A.  I'll do my best.

16  Q.  Thank you.  That's what I am asking?

17    A.  "12:41, B right, 9, top, apparently fell off his

18    bunk.  Lieutenant Flynn notified, nurse called."  Then

19    there is a signature in the log book by Lieutenant

20    Flynn.

21  Q.  Are you referring to the initials?

22    A.  This right here (indicating).

23  Q.  So the next line down, there is a scribble that is a

24    signature?

25    A.  Lieutenant Flynn's.

Kerri McCaughey - July 12, 2019

128

1           Officer Corvese?

2           A.  I don't.

3   Q.  But, presumably, that officer whose name is on the top

4           might be able to decipher this document?

5           A.  If it is his handwriting.

6   Q.  Can you look at the next page, and can you read who

7           that officer is at the top?

8           A.  Yes, "CO J. Machado."

9   Q.  What does it say there in the middle of the page?

10          A.  "9-20, Inmate Melise to A left, 6 bottom, from B

11          right, 9 top, reason broke foot last night from fall."

12  Q.  Do you know whose signature that is at the bottom

13          underneath that?

14          A.  It is a lieutenant.

15  Q.  Somebody?

16          A.  (Witness nods)

17  Q.  Are there documents that would help us decipher who

18          might have signed that; as in, are there other

19          documents that would indicate who was on staff that

20          day?

21          A.  It would be the roll calls.

22  Q.  Can you quickly refer back to Exhibit 13?

23                      (WITNESS COMPLIES)

24  Q.  And compare that to the second page of Exhibit 14, at

25          the top, see where it says date and time of incident,

Kerri McCaughey - July 12, 2019

129

```
 1        11/11/2016, 1:19:42 A.M.; is that what that says on top
 2        of the incident report?
 3        A.  Yes.
 4   Q.   And can you tell me what the time of the incident is
 5        reported in the log book?
 6        A.  It does not have the time next to Lieutenant
 7        Flynn's -- in front of the notation that Lieutenant
 8        Flynn was notified and the nurse was called.
 9   Q.   But the line right above that, does it say 12:41 A.M.?
10        A.  Yes.
11   Q.   Apparently fell off his bunk?
12        A.  Yes.
13   Q.   So does that appear to indicate that the time of the
14        incident was 12:41 A.M.?
15        A.  It could be that's when the inmate told him that he
16        fell off the bunk.  I am not sure what you are asking
17        me.  That's what it says 12:41.
18   Q.   So, it is fair to assume that the plaintiff fell out of
19        his bed somewhere close to 12:41 A.M.?
20        A.  According to this notation, yes.
21   Q.   And is that different from what is listed in the
22        incident report?
23        A.  Yes.  This is the time that Lieutenant Flynn
24        generated the report.
25   Q.   Does it not indicate at the top that that's the date
```

Kerri McCaughey - July 12, 2019

130

1          and time of the incident?

2          A.  Yes.

3     Q.   So it appears that the date and time listed in the

4          incident report for the incident is about 40 minutes of

5          from the time indicated in the log book; is that

6          accurate?

7          A.  That's what it appears, yes.

8     Q.   Do you know why there would have been a significant

9          discrepancy?

10         A.  I don't.

11    Q.   Do you know where Lieutenant Flynn would have gotten

12         the information about the date and time of the

13         incident?

14         A.  I don't.

15    Q.   It appears that did he did not refer to the log book in

16         order to determine the date and time of the incident;

17         is that fair to say?

18         A.  I am not going to answer for Lieutenant Flynn.

19    Q.   But it is not the same as what is in the log book?

20         A.  Correct.

21    Q.   It is normal for the date and time in an incident

22         report to be so different than what is indicated in the

23         log books?

24         A.  Not in my experience.

25    Q.   Based on the log book, it appears that the inmate fell

Kerri McCaughey - July 12, 2019

131

```
 1            out of his bed at approximately 12:45 A.M., and a nurse
 2            arrived at approximately 1:12; is that accurate?
 3            A.  Yes.
 4    Q.    So, it took approximately 31 minutes for a nurse to
 5            arrive; is that accurate?
 6            A.  Yes.
 7    Q.    Do you think that that's normal?
 8            A.  It depends on what else was going on at the intake
 9            center with the nurse.
10    Q.    Is there any way to determine what was going on at the
11            intake with the nurse?
12            A.  That would be in a log book at the intake center.
13    Q.    Can you explain to me what the day room is?
14            A.  The day room is, it is just a day room.  When
15            inmates come out of their cells, they are in their day
16            room, a recreation room in the middle of the mod.
17            There are tables, showers, phones.
18    Q.    Is it immediately outside of the cell, or are there
19            hallways between cells, and then they open up into the
20            day room -- I am just trying to get an idea of how it
21            is laid out?
22            A.  No.  It is immediately outside of the cell doors.
23    Q.    So would the cells be lined up around the day room?
24            A.  Yes.
25    Q.    And they would all open up into the day room?
```

Kerri McCaughey - July 12, 2019

148

```
 1        medical.
 2   Q.   But it did not include reasons for the modification or
 3        the denial?
 4        A.   Correct.
 5   Q.   In that way, you did not fully comply with this section
 6        of the policy; is that correct?
 7        A.   Correct.
 8   Q.   Why didn't you ever provide reasons for your
 9        modification or denial for reasonable accommodation
10        requests?
11                      MR. SULLIVAN:   Objection.   You can
12        answer, if you know.
13        A.   Why did I not?
14   Q.   Yes.
15        A.   Because I responded to them through the special
16        needs request, that gave them the answer on their
17        request.   They have it.
18   Q.   Who is they, the medical staff, or the inmates?
19        A.   The inmates received the red signed copy from me so
20        that they can have it on their person anywhere they are
21        in the facility.
22             So if any correctional staff questions whether they
23        have a special need for any reason, they are able to
24        produce that.   That's why I do it that way.
25   Q.   But, specifically, in regard to the denial, why did you
```

152

```
 1       today?

 2       A.  Yes.

 3  Q.   Can you, please, look at section III H, which is on

 4       Page 9?

 5                     (WITNESS COMPLIES)

 6  Q.   Can you read that?

 7       A.  Section H.

 8  Q.   Yes?

 9       A.  "Facility-specific procedures:  The warden or

10       designee of each facility shall be responsible for

11       developing and implementing facility-specific

12       procedures pursuant to this policy.

13            "Such procedures shall include at a minimum:

14            "1.  a description as to how special needs

15       accommodations are communicated to affected staff on

16       the various shifts who may have responsibility for

17       implementation of said accommodations; and

18            "2.  a designation of the locations where inmates

19       may obtain a request for reasonable accommodations of

20       special need(s) form."  A request, where an inmate can

21       obtain the request for reasonable accommodations."

22  Q.   And as we have discussed, you were the designee for

23       this facility; is that correct?

24       A.  Yes.

25  Q.   And did you at any point prepare, develop or implement
```

Kerri McCaughey - July 12, 2019

163

1   Q.   And would a request for a bottom bunk, in regard to the
2        plaintiff in this case, would that have ever materially
3        impaired the safe and efficient operation of the
4        program?
5        A.   Well, the bottom bunk order is not a program, but
6        it could have presented a safety hazard to staff and/or
7        other individual inmates.
8   Q.   Granting a bottom bunk would have presented a safety
9        hazard; is that what you are saying?
10       A.   I am saying that bottom bunk orders are -- I have
11       limited bottom bunk orders, so I am going to ensure
12       that people who actually have them have documented
13       medical documentation that indicates it is required.
14  Q.   How would granting a request for a bottom bunk present
15       a safety hazard to staff or the individual inmate?
16       A.   By creating a climate issue.
17  Q.   Would it have created a climate issue to grant it
18       specifically for the plaintiff in this case?
19       A.   It could have.
20  Q.   Did it?
21       A.   No.
22  Q.   At any point, have you seen the granting of a bottom
23       bunk create a hazard to staff or inmates?
24       A.   Yes.
25  Q.   In what way?

Kerri McCaughey - July 12, 2019

164

```
 1        A.  By granting bottom bunks to individuals who don't
 2        necessarily need them, and preventing someone who
 3        clearly does need one from potentially not getting one.
 4   Q.   Has that actually happened?  Have you granted orders
 5        that prevented other inmates from receiving orders for
 6        a bottom bunk?
 7        A.   What I have had is an inmate who was on a bottom
 8        bunk who did not have a bottom bunk order being moved
 9        to a top bunk so another offender could come into that
10        same cell and have the bottom bunk.  Sometimes that's
11        caused a climate issue between the two of them, if the
12        person on the bottom bunk order does not appear to be
13        legitimate.
14   Q.   Was that a concern for the plaintiff in this case?
15        A.   Was what a concern?
16   Q.   The creation of a safety hazard to the inmate.
17        A.   It was one of the things that I looked at, yes.
18   Q.   Are you aware that it ever did create a safety hazard
19        in regard to the plaintiff in this case?
20        A.   No.
21   Q.   Would granting the bottom bunk for the plaintiff in
22        this case have, otherwise, caused an extreme hardship
23        in the operation of the institution/facility?
24        A.   I don't know.
25   Q.   Do you have any reason to believe that it would have
```