# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STEPHEN MELISE,                :
      **Plaintiff**             :
                           :
**v.**                        :     **C.A. No.: 1:17-cv-00490-MSM-PAS**
                           :
**COYNE-FAGUE,** *et al.*        :
      **Defendants**           :

## PLAINTIFF'S OBJECTION TO STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Now comes the Plaintiff, Stephen Melise, in the above-described matter and does hereby object to Defendants Rhode Island Department of Corrections' ("DOC"), Kerri McCaughey's ("McCaughey"), Ashbel T. Wall's ("Wall"), and Patricia Coyne-Fague's ("Coyne-Fague") (collectively "State Defendants") Motion for Summary Judgment on all of Plaintiff's claims (ECF No. 111) on the grounds that State Defendants are not entitled to judgment as a matter of law, but rather that Plaintiff is entitled to partial summary judgment on all counts based on the undisputed material facts.  As further grounds, Plaintiff relies on his Memorandum of Law in Support of His Motion for Partial Summary Judgment ("Plaintiff's Memo") (ECF No. 107.1), Plaintiff's Statement of Undisputed Facts in Support of His Motion for Partial Summary ("Plaintiff's SUF") (ECF No. 108), and Record Appendix (ECF No. 109), as well as Plaintiff's Statement of Disputed Facts filed simultaneously herewith, and other documents referenced therein.

## ARGUMENT[1]

**I.**    **Rhode Island Has Broadly Waived Eleventh Amendment Immunity, Including for Discrimination Claims, Which Sound in Tort.**

Both the District Court and the Rhode Island Supreme Court have long recognized that

---

[1] For convenience, Plaintiff has followed State Defendants' organizational format and responds to each of State Defendants' argument in the order set forth in their Memorandum of Law.

Rhode Island has broadly waived its Eleventh Amendment immunity. *See e.g.*, *Marrapese v. State of Rhode Island*, 500 F.Supp. 1207, 1222-23 (D.R.I. 1980) (no state sovereign immunity from claims under § 1983 in light of statutory waiver that is "straightforward, uncomplicated and unreserved."). "[T]he Rhode Island Supreme Court has held that § 9-31-1 constitutes a broad waiver of sovereign immunity, including Eleventh Amendment immunity." *Pride Chrysler Plymouth, Inc. v. Rhode Island Motor Vehicle Dealers' License Comm'n*, 721 F. Supp. 17, 23 (D.R.I. 1989) (citing *Laird v. Chrysler Corp.*, 460 A.2d 425, 429 (R.I. 1983)). By enacting the Tort Claims Act, the State issued an unreserved and unambiguous mandate: it will "assume responsibility for a . . . range of wrongful behavior." *Marrapese*, 500 F.Supp at 1224. The language of the Tort Claims Act "manifests by overwhelming implication a legislative intent to place the state in the same position as any other private litigant." *Laird*, 460 A.2d at 430. In short, Rhode Island has chosen to broadly and consistently waive its Eleventh Amendment immunity and has made itself amenable to suit in Federal Courts for *any* action that sounds in tort, as is its prerogative. *See Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 528 n.13 (1982) ("Unlike other limitations on federal jurisdiction, the limitation imposed by the Eleventh Amendment and the doctrine of sovereign immunity may be waived by consent unequivocally expressed.").

This waiver of sovereign immunity, including Eleventh Amendment immunity, has been consistently recognized in cases where, as here, the cause of action sounds in tort. *See, e.g., Tang v. State of R.I. Dept. of Elderly Affairs*, 904 F.Supp. 55 (D.R.I. 1995) (finding waiver from 42 U.S.C. § 1981 action because it is in essence a "tort action"); *Pride Chrysler Plymouth*, 721 F.Supp. at 22 (finding of waiver of immunity from alleged civil rights, antitrust, and state law tort violations). With regard to causes of action for discrimination, like the one at issue here, it has been noted by this Court that discrimination causes of action are often " 'traditionally tortious'

causes of action—*e.g.,* sexual harassment and discrimination, age or race discrimination, negligence and wrongful discharge." *Bergemann v. State*, 958 F.Supp. 61, 69 (D.R.I. 1997).  The United States Supreme Court has long held that discrimination claims sound in tort.  *Curtis v. Loether*, 415 U.S. 189, 195, (1974).  In that case, the Supreme Court wrote,

> We think it is clear that a damages action under s 812 [of the Civil Rights Act of 1968] is an action to enforce 'legal rights' within the meaning of our Seventh Amendment decisions.  A damages action under the statute sounds basically in tort—the statute merely defines a new legal duty, and authorizes the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach.  As the Court of Appeals noted, this cause of action is analogous to a number of tort actions recognized at common law.

*Id.*; *see also Meyer v. Holley,* 537 U.S. 280, 285 (2003) ("This Court has noted that an action brought for compensation by a victim of housing discrimination is, in effect, a tort action. And the Court has assumed that, when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules.").

In the light of these holdings, it is not surprising that the few courts across the country that have addressed the issue have uniformly adhered to the proposition that discrimination claims sound in tort.  *See e.g. Perez-Serrano v. DeLeon-Velez*, 868 F.2d 30, 33 (1st Cir. 1989) ("an action for damages under Title VIII sounds basically in tort"); *Kennicott v. Sandia Corp.*, 314 F. Supp. 3d 1142, 1171 (D.N.M. 2018) ("Although no New Mexico court has determined whether an employment discrimination claim arises where the allegedly discriminatory employment decision is made, the Court sees no sound reason to treat the NMHRA and the NMFPWA differently than any other *tort* under New Mexico law." (Emphasis added)); *Krause v. UPS Supply Chain Sols., Inc.*, No. CIV.A.08-CV-10237DPW, 2009 WL 3578601, at *5 (D. Mass. Oct. 28, 2009) ("The Plaintiff's state law discrimination and retaliation claims under Chapter 151B and the MMLA …

are akin to tort."); *Walnut Creek Manor v. Fair Emp. & Hous. Com.,*814 P.2d 704, 715 (Cal. 1991) (en banc) ("federal housing discrimination claims sound in tort and damage awards should be governed by compensation principles applicable to tort law"); *Burchfiel v. Boeing Corp.*, 205 P.3d 145, 158 (Wash. Ct. App. 2009) ("Violation of the law against discrimination is a tort.").[2]

Courts addressing claims of *disability* discrimination specifically under state anti-discrimination statutes have similarly followed the U.S. Supreme Court's decision in *Curtis* and held that such actions sound in tort.  *McMillan v. Lincoln Fed. Sav. & Loan Ass'n*, 678 F. Supp. 89, 92 (D.N.J. 1988) (Holding, in the context of disability discrimination under the New Jersey Law Against Discrimination (NJLAD), "[a]s in *Curtis,* this Court finds that a damages action under the NJLAD sounds basically in tort, that is, 'the statute merely defines a new legal duty, and authorizes the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach.' ").  Similarly, in some cases, it has simply been assumed without discussion as self-evident that state law claims for disability discrimination are torts.  *See Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1121 (10th Cir. 1995) ("Plaintiffs' state law tort claims of wrongful disability discrimination are another matter.  In contrast to plaintiffs' claims regarding violation of the collective bargaining agreement, plaintiffs' claims that they were discriminated against because of their disabilities and contrary to the law of Oklahoma can be resolved without reference to the collective bargaining agreement.").  Another court rejected plaintiffs' claims for lost profits

---

[2] It is worth noting that while discrimination claims almost always sound in tort, there are rare instances wherein a contract was central to the dispute and the claim thus sounded in contract.  *See e.g. Dobbs v. Chevron U.S.A., Inc.*, 39 F.3d 1064, 1068 (10th Cir. 1994) (finding that claim arose from contract when the central question was whether the plaintiffs were "parties to implied contracts for careers" (internal quotation omitted)); *Flemma v. Halliburton Energy Servs., Inc.*, 303 P.3d 814, 820 (N.M. 2013) (discussing the validity of arbitration clause).  In such situations, there would of course be no waiver of Eleventh Amendment immunity.  These are the only two cases Plaintiff can find where a Court addressing the question of whether discrimination claims sound in tort did not agree with the above consensus.  There is clearly no contractual relationship here, and State Defendants concede that no contractual relationship exists.  *See* State Defendants' Motion for Summary Judgment, pg. 20 ("Melise lacks a contractual relationship with any of the State Defendants … .").

damages in a disability discrimination case under the Fair Housing Act (FHA), the New York State Human Rights Law (NYSHRL), and the New York City administrative code because those actions sounded in tort and lost profits are a contract damage. *Mancuso v. Douglas Elliman LLC*, 808 F. Supp. 2d 606, 632 (S.D.N.Y. 2011) ("lost profits are normal in contract cases, unusual in personal-injury tort cases."). As such, because discrimination claims sound in tort, Plaintiff's state law disability discrimination claims are clearly encompassed under Defendant State's broad waiver of sovereign immunity, including Eleventh Amendment immunity, provided for by the Tort Claims Act.

Therefore, in so far as tort and tort-like actions are concerned, there is simply no question that Eleventh Amendment immunity is not a bar to suit against the State of Rhode Island in this Court. Indeed, the Rhode Island Supreme Court held so in the most explicit possible terms:

> Accordingly, we find that the broad language of § 9-31-1, which unambiguously and without restriction holds the state "liable in all actions of tort in the same manner as a private individual or corporation [except for a limitation of damages] * * * " manifests, by "overwhelming implication," a legislative intent to place the state in the same position as any other private litigant and thus amenable to suit in either state or federal court.

*Laird,* 460 A.2d at 430; *see also Marrapese*, 500 F. Supp. at 1221–22 (noting that "the Rhode Island Tort Claims Act is remarkable for both its substantive breadth and its procedural simplicity. While other states were clinging fast to their tort immunity or giving consent to suit that was hedged with exceptions and conditions, Rhode Island enacted legislation that was straightforward, uncomplicated, and unreserved" in holding that it constituted a waiver of Eleventh Amendment Immunity). So long as the causes of action at issue sound in tort, or are based on traditionally tortious conduct, the State of Rhode Island cannot claim Eleventh Amendment immunity because it has been expressly waived.

### A.  The Rhode Island Civil Rights Act (RICRA) (Count II)

Plaintiff's claims under RICRA include both disability discrimination and constitutional claims, as discussed in detail in Section II below.  Because these claims sound in tort, Rhode Island has waived Eleventh Amendment immunity and may be sued in federal court.

While RICRA does not contain any express waiver of Eleventh Amendment immunity, when an action under RICRA sounds in tort, as outlined above, the Rhode Island Tort Claims Act provides a waiver of Eleventh Amendment immunity.  The only case specifically addressing Eleventh Amendment immunity in the context of RICRA is *Luceus v. Rhode Island*, No. CV 15-489ML, 2016 WL 7971311, at *5 (D.R.I. Dec. 13, 2016).  In that case, this Court agreed that "the Court in *Marrapese* construed Rhode Island's Tort Claims Act (R.I. Gen. Laws § 9–31–1) to constitute a waiver of Eleventh Amendment immunity in cases under 42 U.S.C. § 1983 in which the alleged constitutional violation arises from activities that are in the nature of tort at common law." *Id.*  In deciding to dismiss plaintiff's claims, this Court did not analyze whether discrimination claims, much like § 1983 claims, are also in the nature of a tort at common law.

However, the First Circuit did address this specific argument in regard to RICRA, in *Rathbun v. Autozone, Inc.*, 361 F.3d 62 (1st Cir. 2004), in the context of whether the general statute of limitations for torts should be applied.  There, in overturning the lower court's decision to apply the one-year statute of limitations found in the Rhode Island Fair Employment Practice Act, R.I. Gen. Laws § 28–5–17(a), the Court held that it would be more appropriate to apply Rhode Island's three-year statute of limitations for "[a]ctions for injuries to the person," R.I. Gen. Laws § 9–1–14(b), to RICRA's "tort-like rights of action."  *Id.* at 66-68.  The Court reinforced this idea by explaining that since RICRA is modeled after section 1981, and the U.S. Supreme Court had already "held squarely that the relevant state statute of limitations governing personal injury claims

applied to section 1981 actions," then the statute of limitations applicable to injuries to the person was the most appropriate.  *Id.* at 67[3]; *see also Partin v. St. Johnsbury Co.*, 447 F.Supp. 1297, 1299, 1301 (D.R.I.1978) (characterizing an action under section 1981 as "essentially an action to redress a violation of a tort duty" and applying the statute of limitations for injuries to the person).

Finally, as outlined in the previous section, there is a judicial consensus across state and federal jurisdictions that discrimination claims sound in tort and thus the holding in *Marrapese* does in fact support the determination that Rhode Island's Tort Claims Act waived Eleventh Amendment immunity for discrimination claims.  In *Luceus* it seems that the Plaintiff failed to bring this to the Court's attention and this esoteric but uncontroversial corner of the law was not addressed and did not factor into the Court's determination.

Therefore, Plaintiff's claims under RICRA, including both disability discrimination and constitutional claims, may proceed in this Court because Rhode Island has waived Eleventh Amendment immunity for such tort claims.

### B.  Rhode Island Civil Rights of People with Disabilities Act (RICRPD) (Count IV)

Plaintiff's claims under the RICRPD are inherently claims for disability discrimination, which, as explained above, are claims that sound in tort.  Thus, for the same reasons described above, Rhode Island has waived Eleventh Amendment immunity for these claims.

---

[3] Subsequently, in response to a certified question from the Rhode Island District Court on the statute of limitations applicable to RICRA, the Rhode Island Supreme Court held that FEPA's one-year statute of limitations was applicable.  *Horn v. S. Union Co.*, 927 A.2d 292, 297 (R.I. 2007).  However, the Court's reasoning did not deny that discrimination claims, including claims under RICRA, sound in tort. Indeed, FEPA claims are discrimination claims, which as explained earlier, sound in tort.  Rather, it based its decision on the *in pari materia* canon of statutory interpretation.  *Id.* at 294.  The dissenting opinion strenuously objected, repeatedly citing *Rathbun*, and arguing that "a violation of rights protected under the RICRA—which employs language almost identical to that of its federal counterpart—also would constitute an injury to the person."  *Id.* at 297-303 (Suttel, J., dissenting).  Furthermore, just two years after that decision, the Rhode Island General Assembly rejected the *Horn* majority's interpretation, amending RICRA to definitively apply a three-year limitations period to all claims brought pursuant to the Act, bringing the statute in line with the First Circuit's determination in *Rathbun*, and the dissenting opinion in *Horn*.  *See* P.L. 2009, ch. 368, § 1;  P.L. 2009, ch. 388, § 1.

## C.  Rhode Island Constitution Article I, Section 8

Claims of constitutional violations by individuals, when actionable, are actions in tort.  *See Esso Standard Oil Co. v. Freytes*, 467 F. Supp. 2d 156, 160 (D.P.R. 2006), *aff'd sub nom. Esso Standard Oil Co. v. Lopez-Freytes*, 522 F.3d 136 (1st Cir. 2008) ("the central issue complained of is the constitutional tort of a due process violation"); *Rodwell v. Forrest*, No. 289038, 2010 WL 2076933, at *3 (Mich. Ct. App. May 25, 2010) ("A constitutional tort arises from violation of a constitutionally protected right by the government"); *Duncan v. State,* 284 Mich.App. 246, 270, 774 N.W.2d 89 (2009) ("[t]ypically, a constitutional tort claim arises when a governmental employee, exercising discretionary powers, violates constitutional rights personal to a plaintiff.").

This is the case for the same reasoning that requires the conclusion that discrimination claims sound in tort.  Where "the statute merely defines a new legal duty, and authorizes the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach," then the "damages action under the statute sounds basically in tort[.]"  *Curtis*, 415 U.S. at 195.  The same reasoning applies when determining whether a constitutional provision creates a legal right; if it does create a legal right, then that legal right is a tort.  This is true of claims under the Rhode Island constitution as well as the federal constitution.  *See Bandoni v. State*, 715 A.2d 580, 586 (R.I. 1998) ("[Plaintiffs] aver that this Court should recognize a constitutional tort action directly from article 1, section 23, of the Rhode Island Constitution for the reasons articulated in *Bivens*."). Thus, when a Rhode Island constitutional provision gives rise to a direct cause of action for damages, that action is a tort.

Therefore, for the reasons outlined above, directly actionable claims under the Rhode Island Constitution are torts and torts are actionable against State Defendants under the uniquely broad waiver of Eleventh Amendment immunity under the Rhode Island Tort Claims Act.

### D. No Eleventh Immunity for Claims Against Officials in Their Individual Capacities

Although Defendants do not make this particularly clear in their filings, Eleventh Amendment immunity only applies to defendants in their official capacities but has no bearing on any claims against state officials in their *individual* capacity. It is well settled law that "[t]he Eleventh Amendment does not bar suits for damages against state officials sued in their individual capacities." *Haidak v. Univ. of Massachusetts-Amherst*, 933 F.3d 56, 76 (1st Cir. 2019) (citing *Hafer v. Melo*, 502 U.S. 21, 26 (1991)). Therefore, even if Defendants McCaughey and Wall are protected in their official capacities by the Eleventh Amendment, which Plaintiff vigorously contests, Plaintiff's individual capacity claims are unaffected.[4]

## II. RICRA Applies to Conditions Beyond Contractual Relationships

RICRA, on its face, applies to a broad swath of discriminatory conduct, both within and outside of contractual relationships:

> All persons within the state, regardless of race, color, religion, sex, disability, age, or country of ancestral origin, have, except as is otherwise provided or permitted by law, the same rights to make and enforce contracts, **to inherit**, purchase, to lease, sell, hold, and convey real and personal property, **to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property**, and **are subject to like punishment, pains,** penalties, taxes, licenses, and exactions of **every kind, and to no other**.

R.I. Gen. Laws § 42-112-1(a) (emphasis added). As this broad list of activities and situations demonstrates, making and enforcing contracts is merely one of the many rights to which RICRA guarantees equal treatment to people with disabilities. The statute is even more clear in § 42-112-

---

[4] That the state may indemnify Defendant McCaughey and/or Defendant Wall is of no moment to this analysis. "Although state monies may ultimately be used to satisfy a judgment obtained against a state official sued in his individual capacity, a state cannot extend its sovereign immunity to its employees by voluntarily assuming an obligation to indemnify them." *Cornforth v. Univ. of Oklahoma Bd. of Regents*, 263 F.3d 1129, 1133 (10th Cir. 2001) (citing *Griess v. Colorado,* 841 F.2d 1042, 1045–46 (10th Cir. 1988).

1(b), stating, "For the purposes of this section, the right to 'make and enforce contracts, to inherit, purchase, to lease, sell, hold, and convey real and personal property' includes the making, performance, modification and termination of contracts and rights concerning real or personal property, *and the enjoyment of all benefits, terms, and conditions of the contractual **and other relationships***."  (Emphasis added.)

If the statutory language were not sufficiently clear, this point is also made even within the cases incorrectly cited by State Defendants for the claim that "by its terms, RICRA is limited to discrimination in situations involving contractual relationships." State Def.'s Memo at 19.  For example, in *Rathbun v. Autozone, Inc.*, the First Circuit explains that RICRA is very broad in scope:

> The Rhode Island General Assembly enacted the statute in response to the United States Supreme Court's decision in *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). *See Ward v. City of Pawtucket Police Dep't,* 639 A.2d 1379, 1381 (R.I.1994) (discussing the RICRA's legislative history). The *Patterson* Court interpreted 42 U.S.C. § 1981 to provide protection from racial discrimination only in contract formation and not in the subsequent modification and performance of contracts. 491 U.S. at 171, 109 S.Ct. 2363. The RICRA aspired to fill this void and to afford the same expanded protection in instances of discrimination based on age, sex, religion, disability, and national origin.  The contours of the RICRA plainly reveal the General Assembly's overarching intent **to craft a broad civil rights act that would both complement and <u>supplement</u>** federal civil rights protections.  *See Eastridge v. R.I. Coll.,* 996 F.Supp. 161, 169 (D.R.I.1998); *Ward,* 639 A.2d at 1381–82.

361 F.3d 62, 67 (1st Cir. 2004) (emphasis added).  Contrary to State Defendants' assertion, *Rathburn* does not stand for the proposition that "RICRA is limited to discrimination in situations involving contractual relationships."  ***Indeed, the opposite is true.***

This Court has similarly rejected this exact argument—involving a case against a medical provider and a town arising out of quarantine and hazmat protocols imposed upon the plaintiffs

allegedly based on their race and/or national origin—as follows:

> In addition to arguing that this claim should be dismissed because her allegations are insufficient, Defendants also argue that the RICRA claim is not appropriate here because it is usually applied in the employment context or at least in contexts where there is a contract between the parties. On this point, case law counsels that liability under RICRA is not limited to employers; it has been broadly construed to extend liability *to any individuals who violate the statute through discriminatory conduct.*

*Olofinlade v. Atmed Treatment Ctr., Inc.*, No. CV 19-021-JJM-LDA, 2020 WL 1848084, at *3 n.3 (D.R.I. Apr. 13, 2020) (emphasis added) (citing *Khattab v. Smith Barney*, No. C.A. 14-261 ML, 2015 WL 1213181, at *2 (D.R.I. March 17, 2017) (finding that RICRA is an analog to 42 U.S.C. § 1981 and neither statute expressly limits liability to employers)); *see also, Doe Next Friend Doe v. City of Pawtucket*, 374 F. Supp. 3d 188, 203 (D.R.I. 2019), *aff'd in part, vacated in part, remanded sub nom. Doe v. Pawtucket Sch. Dep't*, 969 F.3d 1 (1st Cir. 2020) (analyzing plaintiff's RICRA claims to her federal claims including Title IX, the Equal Protection Clause, Title VI, and Section 504 of the Rehabilitation Act).

In short, while State Defendants are right that RICRA allows for claims of discrimination in employment contract matters, it also allows for claims in matters much farther afield, as is evident in its text, decisions of this Court and Rhode Island state courts, and its broad and remedial nature. Indeed, the very wording of RICRA provides for equal rights without regard to protected classes in five (5) separate and different categories: 1) "to make and enforce contracts," 2) "to inherit, purchase, to lease, sell, hold, and convey real and personal property," 3) "to sue, be parties, give evidence," 4) "to the full and equal benefit of all laws and proceedings for the security of persons and property," and 5) to be "subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." R.I. Gen. Laws § 42-112-1(a). State Defendants' argument ignores all but the first category while failing to state the obvious: that Plaintiff's claims

fall well within the last three (3) categories, including the right to full and equal benefits relative to rights under the ADA, RICRPD, common law, state statutes, and state constitution and to be subject to like punishment and pains during his incarceration, and no worse, on account of his disabilities.  Thus, here the RICRA protects Plaintiff Melise against discrimination on the basis of his disabilities, with or without a contractual relationship.

### III.   RICRPD Does Not Require Exhaustion of Remedies for Claims Arising Out Of The Discriminatory Provision of A Program, Activity Or Service Conducted By The State As Alleged In the Case at Bar.

R.I. Gen. Laws § 42-87-4, which outlines the civil liability and process for vindicating the rights established by the RICRPD, is divided into two separate sections and processes: subsection (a) allows for suits in court, and (b) outlines those claims subject to the jurisdiction and administrative requirements of the Rhode Island Commission for Human Rights (RICHR).  Under § 42-87-4(b), only claims "within the jurisdiction of the [RICHR] under chapter 5 of title 28, chapter 24 of title 11 or chapter 37 of title 34," must first be filed in the RICHR before suit can be brought.  These cited chapters cover claims arising out of fair employment practices (R.I. Gen. Laws § 28-5-1 *et seq.*), places of public accommodation, resort, or amusement (R.I. Gen. Laws § 11-24-1 *et seq.*), and fair housing practices (R.I. Gen. Laws § 34-37-1 *et seq.*).  These are the ***only*** areas where an RICHR administrative pre-filing requirement for a violation of the RICRPD exists.

However, the RICRPD prohibits disability discrimination with much broader scope than just those areas where the RICHR has jurisdiction.  Specifically, the RICRPD dictates that:

> No otherwise qualified person with a disability shall, solely by reason of his or her disability, be subject to discrimination by any person or entity doing business in the state; nor shall any otherwise qualified person with a disability ***be excluded from participation in or denied the benefits of any program, activity or service of***, or, by any person or entity regulated, by the state or having received financial assistance from the state or ***under any program or activity***

> *conducted by the state, its agents or any entity doing business with the state.*

R.I. Gen. Laws § 42-87-2; s*ee also* R.I. Gen. Laws § 42-87-3 (delineating specific discriminatory acts, including denying access to service, programs, or activities by an entity covered under the ADA.)  Here, the "program, activity, or service" at issue, residing and receiving medical treatment in the state-run prison under the care of the individual Defendants licensed or regulated by the state, ***does not fall into any of the areas where the RICHR has jurisdiction***.  This is not a matter of fair housing, public accommodations, or employment practices.  Thus, not only does Plaintiff not have an obligation to exhaust an administrative remedy with the RICHR, but if he did file a charge, the RICHR would not have the jurisdiction to hear that charge related to the matters at issue in this case.  Indeed, upon information and belief, the RICHR uniformly and routinely refuses to accept charges outside these explicit areas of its jurisdiction.  On the other hand, § 42-87-4(a), expressly allows claims outside of those three categories to proceed straight to court for relief.  To state otherwise renders § 42-87-4(a) superfluous.  Thus, in this case, Plaintiff had no obligation to exhaust administrative remedies, and this Court has express jurisdiction to hear Plaintiff's claims on that basis.

### IV.   Rhode Island Constitution Article I, Section 8 Allows Plaintiff to Proceed for Monetary Damages Against Defendants

Article 1, Section 8 of the Rhode Island Constitution, at least at it applies to cruel and unusual punishment, is either self-executing or actionable under RICRA in the context of disability discrimination.

#### A.   Article 1, Section 8 is Actionable Under RICRA when a Disabled Person Is Denied the Security of their Person and/or Subject to Punishment Based on Their Disability.

This Court does not need to conduct or resolve an inquiry of whether article 1, section 8 is self-executing because RICRA provides a statutory mechanism for a private right of action in the

case of an article 1, section 8 violation where the conduct at issue denies a disabled person the security of their person and/or subjects them to punishment based on their disability.

RICRA, as outlined above in Section II, makes actionable any conduct that denies to disabled people "the full and equal benefit of all laws and proceedings for the security of persons and property" or which would not "subject [them] to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." R.I. Gen. Laws § 42-112-1.  Here, Plaintiff was subjected to cruel and unusual punishment *because* of his disability, being imprisoned in a manner that caused him unnecessary pain and suffering and put him at unnecessary and easily preventable risk of serious injury.  As such RICRA provides a statutory method to enforce article 1, section 8's cruel and usual punishment clause where a disabled inmate is subject to cruel and unusual punishment on the basis of their disability.  *Rathbun*, 361 F.3d at 67 ("The contours of the RICRA plainly reveal the General Assembly's overarching intent to craft a broad civil rights act that would both complement and supplement federal civil rights protections.").

## B. Article 1, Section 8 Is Self-Executing with Respect to Cruel and Unusual Punishment.

On the other hand, even if RICRA did not provide a mechanism with which to bring claims for constitutional violations, article 1, section 8 of the Rhode Island Constitution is self-executing. It is settled that some portions of the Rhode Island Constitution are self-executing. *Compare In re Request for Advisory Opinion from House of Representatives (Coastal Res. Mgmt. Council)*, 961 A.2d 930, 937 (R.I. 2008) (article 3, section 6 and article 9, section 5 are both self-executing); *and Jones v. State of R.I.,* 724 F. Supp. 25, 34 (D.R.I. 1989) (due process clause of article 1, section 2, is self-executing; *with Doe v. Brown Univ.*, 253 A.3d 389, 400 (R.I. 2021) (anti-discrimination clause of article 1, section 2 is not self-executing); *and Bandoni v. State*, 715 A.2d 580, 587 (R.I.1998) (article 1, section 23 is not self-executing).

In "determining if a constitutional provision is self-executing," the Rhode Island Supreme Court has adopted the following test:

> A constitutional provision may be said to be self-executing *if it supplies a sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced;* and it is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law.' * * * In short, if complete in itself, it executes itself.

*Bandoni*, 715 A.2d at 587 (emphasis in original) (quoting *Davis v. Burke*. 179 U.S. 399, 403 (1900)).  In *In re Request for Advisory Opinion from House of Representatives*, the Court held "that article 3, section 6 and article 9, section 5 are self-executing.  Both article 3, section 6 and article 9, section 5 in effect constitute rules that endow general separation of powers principles with the force of law."  961 A.2d at 937.  The Court reasoned that "[t]hese two provisions are manifestly more than mere aspirational statements of general constitutional principles; they neither explicitly mandate nor inherently require further legislative action for them to become fully effective."  *Id.* Therefore, the provisions were determined to be self-executing.  *Id.*

Similarly, here, article 1, section 8 of the Rhode Island Constitution—"Excessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted; and all punishments ought to be proportioned to the offense"—authoritatively sets limits on the powers of each of the branches of government to establish bail, fines, and conditions of punishments and is more than "mere aspirational statements."  The provision also does not require any further legislative action, since courts in Rhode Island have been applying the provision in evaluating criminal sentences without issue for decades.  Further, the right to be free from cruel and unusual punishment is much more similar to the self-executing due process clause at issue in *Jones,* 724 F. Supp. 25, 34, than the Rhode Island victims' rights amendment at issue in *Bandoni*, on which Defendants chiefly rely.

However, it is not necessary for this Court to delve into such an analysis because the Rhode Island Supreme Court has already acknowledged and "reaffirmed [its] holding that the Eighth Amendment's prohibition against cruel and unusual punishment and the provisions of article 1, section 8, of the Rhode Island Constitution are identical." *State v. Monteiro*, 924 A.2d 784, 795 (R.I. 2007). Therefore, this Court needs to only look to the federal courts' interpretation of the U.S. constitutional provision to determine if the state's "identical" provision is self-executing.[5] The Rhode Island Supreme Court often looks to analogous United States Constitutional language when interpreting the contours of state constitutional rights with federal interpretation establishing a floor and state constitutions either running parallel or affording greater protections. *See, e.g., Pimental v. Dep't of Transp.*, 561 A.2d 1348, 1350 (R.I. 1989).

It is well settled law that the Eighth Amendment of the United States Constitution provides both a bar to cruel and unusual punishment and creates a right of action to enforce it against federal agents where no sufficient statutory remedy exists. In *Carlson v. Green*, the U.S. Supreme Court evaluated whether the damages for an Eighth Amendment claim were limited under Indiana's survivorship and wrongful-death laws, concluding that it was not because it did not provide an equal remedy. 446 U.S. 14, 18-23 (1980). The Court noted that "*Bivens* established that the victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right." *Id.* at 18 (citing *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971)). The Court concluded that "we have here no explicit congressional declaration that persons injured by federal officers' violations of the Eighth Amendment may not recover money damages from the agents but must

---

[5] The Eighth Amendment states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted while article 1, section 8 states "Excessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted; and all punishments ought to be proportioned to the offense."

be remitted to another remedy, equally effective in the view of Congress." *Id.* at 19.  Thus, without an equally effective remedy, the Eighth Amendment prohibition against cruel and unusual punishment was self-executing and not limited by state statutes providing incomplete remedies.

Courts have since enforced Eighth Amendment claims for monetary damages, continuing to apply this principle. *Joost v. Cornell Correction, Inc.*, 215 F.3d 1311, 2000 WL 627652 (1st Cir. 2000) (evaluating plaintiff's Eighth Amendment claim without reference to separate statute conferring right to sue); *Koprowski v. Baker*, 822 F.3d 248, 255 (6th Cir. 2016) (reversing district court's dismissal of prisoner's Eighth Amendment claim based on erroneous holding that Inmate Accident Compensation Act was prisoner's exclusive remedy); *Bagola v. Kindt*, 131 F.3d 632, 638 (7th Cir. 1997) (inmate could bring *Bivens* claim separate from any claim under workers' compensation scheme).

 Thus, because the U.S. Supreme Court has determined the Eighth Amendment of the U.S. Constitution to be self-executing, this Court should similarly find that Rhode Island's "identical" provision is self-executing.

### V.    Disability Discrimination and Failure to Accommodate under the ADA, Rehabilitation Acts, RICRPD, and RICRA

State Defendants' argument for granting summary judgment in their favor on Plaintiff's disability related claims appears to be that 1) Plaintiff does not claim a disability related to his neck condition, 2) because Defendant McCaughey did not have access to Plaintiff's medical records, Defendant McCaughey was not aware of Plaintiff's sleep disorder until September 21, 2016 and therefore she owed him no accommodation, and 3) Defendant McCaughey declined to approve Plaintiff's accommodation for non-discriminatory, security-based concerns.  As explained below, ***each of these arguments is contrary to the <u>undisputed facts</u> presented and well-settled law.*** Finally, although State Defendants make no arguments about the substance of Plaintiff's disability

discrimination claims under state laws, the RICRPD and RICRA, Plaintiff is entitled to summary judgment on these claims based on the undisputed facts.

### A. Plaintiff's Disability for Cervical Neck Pain

**First**, contrary to Defendants' claim, Plaintiff has asserted a disability related to his cervical neck condition. *See* Plaintiff's Memo, Section IV.A.1. Further, although Defendants cite to testimony of Plaintiff Melise stating that he did not have trouble climbing a ladder, this testimony is ambiguous at best, does not address whether he experienced *pain* while climbing, and is plainly belied by the ***contemporaneous*** undisputed evidence in the record (as opposed to testimony over three years after the fact). *See* Plaintiff's SUF ¶27 ("I am having severe pain in - neck, back, chest and arm due to nerve damage. I had gone to clinic but the doctor there would not listen to me. He just kept trying to give me Advil, when I told him that it wouldn't help me for the pinched nerve and I also stated that I wanted to be back on the Neurotin"); ¶40 (Plaintiff Melise reported to Nurse Warren that because of his condition, it was hard for him to climb a ladder to the top bunk); ¶89 (Plaintiff's cellmate wrote a letter on September 19, 2016 to Defendant Clarke stating, "He has a lot of problems with his neck including a pinched nerve and two spinal diseases all documented … I've seen for myself that he is experiencing a lot of trouble getting up and down the ladder[.]"); Plaintiff's SDF State ¶149.

Simply put, Plaintiff Melise's testimony that he did not have trouble climbing a ladder indicates that he was capable of climbing a ladder, ***not that he never experienced pain while doing so.*** This is very similar to the disability at issue in *Molina v. DSI Renal, Inc.*, where the district court found as follows:

> [Defendant] DSI argues Molina does not meet the definition of "disabled" because she is not substantially limited in any major life activity. Specifically, DSI points to Molina's testimony that her pain did not impact her ability to do any of her activities, and did not

change the way she did her household activities or how she worked. DSI also cites to records from Molina's initial EEOC interview, where the intake worker wrote, "Cp denies that she is limited in any way, and that she does everything as before."

However, these statements, when considered in context and in light of other evidence in the record, do not foreclose a finding that Molina was disabled. Molina testified that she "learned to tolerate the pain" to be able to continue working even on days when the pain was severe. When testifying that she continued to do her household tasks such as cooking, cleaning and taking care of her disabled husband, Molina explained: "I had to do everything because I'm by myself."

EEOC regulations implementing the ADAAA, though not binding precedent, provide helpful guidance to understanding the new disability standard. Specifically, the regulations instruct that when evaluating whether someone is "substantially limited" the focus should not be on the "outcomes" the person can achieve, as "an impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." Instead, the EEOC advises comparing the "condition under which the individual performs the major life activity," or "the manner in which the individual performs the major life activity" as compared with the general population. This comparison can include considering, among other factors, "pain experienced when performing a major life activity." Thus, the fact that Molina learned to work through her pain to continue performing her regular tasks does not necessarily preclude her from being considered disabled. This is especially true where, as here, there is evidence Molina's condition affected her in the activities of sleeping, sitting, standing, and lifting. Moreover, Molina testified she took pain medicine at night, and also took Tylenol, which if she was experiencing pain at an eight out of ten level would reduce the pain to a five. This is relevant because the amendments to the TCHRA direct that a determination as to whether an individual is substantially limited must be made without taking into account mitigating measures, such as medication.

840 F. Supp. 2d 984, 994–95 (W.D. Tex. 2012) (record citations omitted). This analysis is

extremely relevant to Plaintiff's Melise's disabling cervical neck condition, because Defendant

McCaughey repeatedly testified that she did not consider Plaintiff's "neck pain" to be a sufficient

justification for needing an accommodation of a bottom bunk assignment because "it does not

mean he can't climb a ladder." Plaintiff's SUF ¶¶22-26. Despite the fact that Plaintiff Melise was

capable of climbing a ladder, and did so from approximately October 5, 2015 to after his final fall on November 11, 2016, the fact that his cervical neck pain *caused substantial pain* in doing so was sufficient to prove Plaintiff's disability and entitlement to an accommodation.  Plaintiff's SUF ¶¶31, 124; *see also Munoz v. California Dep't of Corr. & Rehab.*, 842 F. App'x 59, 61–62 (9th Cir. 2021) (overturning district court's decision for applying wrong legal standard for concluding "that 'difficulty climbing to an upper bunk qualifies as an impairment, but it does not qualify as a substantial limitation on [Munoz's] major life activity of climbing."); *Garcia-Hicks v. Vocational Rehab. Admin.*, 148 F. Supp. 3d 157, 168 (D.P.R. 2015) ("Persuaded by the holdings in Molina and Barlucea, the EEOC's Proposed Rules stating that back pain is sometimes a disability, expressions by several courts of the new low bar for surviving motions to dismiss under the ADAAA, and Congress' intent that the term "substantially limits" be broadly interpreted, the Court finds that plaintiff Garcia has pled sufficient facts to notify defendants of her claim and state a right to relief under the ADA.").

Furthermore, despite the fact that State Defendants argue that Plaintiff had no cervical neck disability, Defendants do not deny, and appear to admit, that Defendant McCaughey was fully aware of and did receive numerous bottom bunk orders from medical providers.  *See* State Defendants' Memo at 33 ("the record does reveal that Deputy Warden McCaughey did deny and/or seek additional information for bottom bunk accommodations on or about February 9, 2015; June 19, 2015; and December 29, 2015.").  That knowledge was sufficient to require Defendant RIDOC to accommodate Plaintiff's disability, including granting Plaintiff's cervical neck disability by assigning him to a bottom bunk.

Therefore, based on the undisputed evidence, Defendant RIDOC is liable for its failure to accommodate Plaintiff's cervical neck disability.

**B. Defendant McCaughey's Knowledge of Plaintiff's Disability for Sleep Apnea Was Sufficient to Require Accommodation of His Disability**

State Defendants also argue at length that Defendant McCaughey could not have known about Plaintiff's sleep apnea until September 21, 2016, and because she granted one of the orders entered for a bottom bunk, then Defendant RIDOC is somehow off the hook for its obligation to accommodate Plaintiff's known disability. This argument is not worthy of any credence for several reasons. **First**, Defendants are apparently willfully oblivious to the fact that the special needs order signed by Defendant McCaughey on September 21, 2016 *contained the prior orders dated June 21, 2016 and June 28, 2016*. **Second**, the fact that Defendant McCaughey was aware of Plaintiff's disability prior to his final fall from a top bunk is sufficient to obligate Defendants to accommodate Plaintiff's known disability, full stop. **Third**, Defendants cannot use their own broken and ineffective system for review of special needs accommodation orders as a defense to deny knowledge of Plaintiff's need for an accommodation.

As an initial matter, in analyzing State Defendants' Motion for Summary Judgment, all reasonable inferences must be drawn in Plaintiff's favor. Thus, regarding Defendants' claim that Defendant McCaughey was not aware of the bottom bunk orders from June 21, 2016, June 28, 2016, and September 8, 2016, *this Court is obligated to infer that Defendants did see these orders.* Defendants admit these orders were entered into Plaintiff's electronic medical record ("EMR"). *See* State Defs. SUF ¶¶75, 79, 81. The only basis for Defendants' claim that Defendant McCaughey never saw those orders was that they were never returned to medical staff to be scanned into Plaintiff's EMR. However, that does not prove that they were not printed and submitted to Defendant McCaughey, and Plaintiff is entitled to the reasonable inference that such orders were submitted to Defendant McCaughey, and she simply took no action in response to them. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (all justifiable

inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion).

Furthermore, Defendants cannot claim that they had no knowledge of Plaintiff's numerous bottom bunk orders for sleep apnea because the very order that was approved on September 21, 2016 **contained all three orders.** *See* Plaintiff's SUF ¶¶99-103; State Defs.' SUF ¶¶24, 105. Two of the three orders had stop dates long after Plaintiff's final fall from the top bunk, but Defendant McCaughey intentionally chose to only grant the final order, which had a stop date of only one week after it was approved. Plaintiff's SUF ¶103; State Defs.' SUF ¶83. Just because she chose to ignore the other orders, does not entitle Defendants to any inference that she was not aware of each of those orders, including that two of the orders remained pending after September 21, 2016.

As Plaintiff explained in his Motion for Summary Judgment, once Defendant McCaughey was on notice of Plaintiff's need for an accommodation, Defendant RIDOC was obligated to provide a reasonable accommodation. *See* Plaintiff's Memo at 25-31.[6] Here, even if there is a reasonable factual dispute about *when* Defendant McCaughey became aware of Plaintiff's disability related to his sleep disorder, the undisputed record demonstrates that she did become aware of it **at the latest** on September 21, 2016, when she approved Dr. Salas' order for a bottom bunk. Plaintiff's SUF ¶¶96, 99-103. At that point, Defendant RIDOC was obligated to accommodate Plaintiff's disabilities and determine if there was a continuing need for a bottom bunk. *See Hacker v. Cain*, No. CV31400063JWDEWD, 2016 WL 3167176, at *12 (M.D. La.

---

[6] "[W]hile the ADA's reasonable accommodation requirement does not apply under Title II, its 'reasonable modifications' requirement—'A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity,' 28 C.F.R. § 35.130(b)(7); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 121 S. Ct. 1879, 149 L.Ed. 2d 904 (2001)—has been held to apply in the prison context." *Hacker v. Cain*, No. CV31400063JWDEWD, 2016 WL 3167176, at *11 (M.D. La. June 6, 2016).

June 6, 2016) ("a plaintiff-inmate must usually request a modification to commence an interactive process that considers that possibility. Nonetheless, he or she is excused from doing so in a situation in which the defendant was unquestionably aware of the disability by, for example, *receiving reports from its own doctor that recommend one or more specific accommodations*." (emphasis added) (internal citation omitted)); s*ee also Pappas v. D.C.*, 513 F. Supp. 3d 64, 93 (D.D.C. 2021) ("Most crucially here, an employer's 'duty to accommodate is a continuing duty that is not exhausted by one effort.'").   The fact that the same order demonstrated Plaintiff's continuing need—by including **three separate orders** for a bottom bunk, two of which contained stop dates much later than the order approved by Defendant McCaughey—conclusively establishes that State Defendants had an obligation to continue providing the reasonable accommodation of a bottom bunk.   *See Faison v. Vance-Cooks*, 896 F. Supp. 2d 37, 59 (D.D.C. 2012) (finding defendant not entitled to summary judgment where requests received in October 2005, flexible schedule was arbitrarily eliminated one month after requests were submitted and other accommodations not provided until December 2007 and 2008); *Greer v. Richardson Indep. Sch. Dist.*, 472 Fed.Appx. 287, 296 (5th Cir. 2012) ("where the defendant otherwise had knowledge of the individual's disability and needs but took no action," not even the failure to expressly request a specific accommodation (or modification) fatally undermines an ADA claim); *Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274, 283 (1st Cir. 2006) ("Generally, the cases construing 'reasonable accommodations' are persuasive authority with respect to cases involving 'reasonable modifications.' " (citing *McGary v. City of Portland,* 386 F.3d 1259, 1266 n. 3 (9th Cir. 2004)).

Furthermore, since knowledge alone is sufficient to entitle Plaintiff to a reasonable accommodation, Plaintiff need not prove discriminatory animus.  Defendants appear to argue that Defendants were required to demonstrate animosity or some sort of discriminatory intent towards

Plaintiff to be liable on a failure to accommodate claim, which is simply not the case, and Defendants cite no caselaw in support of this proposition.  "A plaintiff may recover compensatory damages for violations of Title II of the ADA or Section 504 of the Rehabilitation Act if he proves that the defendant's discriminatory actions were intentional." *Pierce v. D.C.,* 128 F. Supp. 3d 250, 278 (D.D.C. 2015) (citing *Liese v. Indian River Cnty. Hosp. Dist.,* 701 F.3d 334, 344 (11th Cir. 2012); *Meagley v. City of Little Rock,* 639 F.3d 384, 389 (8th Cir. 2011); *Ferguson v. City of Phoenix,* 157 F.3d 668, 674 (9th Cir. 1998)).  "In disability discrimination lawsuits, many courts have authorized plaintiffs to establish intentional conduct by establishing that the defendant acted with 'deliberate indifference' to the plaintiff's rights." *Id.* (citing *Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 829 (D.Md. 1998) ("The question of intent in    accommodations cases does not require that plaintiff show that defendants harbored an animus towards her or those disabled such as she.  Rather, intentional discrimination is shown by ***an intentional, or willful, violation of the Act itself***." (emphasis added)); *see also McCoy v. Tex. Dep't of Crim. Justice*, No. C-05-370, 2006 U.S. Dist. LEXIS 55403, at *23–24, 2006 WL 2331055, at *7 (S.D. Tex. Aug. 9, 2006) ("In the prison context, ... failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners.").

State Defendants' insistence that it was somehow the responsibility of Plaintiff Melise— an inmate-patient with virtually no control over any aspect of his life in confinement—to continually reiterate his need for an accommodation is preposterous and contrary to the intent of the ADA.  "Section 504 and Title II mandate that entities act *affirmatively* to evaluate the programs and services they offer and to ensure that people with disabilities will have meaningful access to

those services." *Pierce v. D.C.*, 128 F. Supp. 3d 250, 269 (D.D.C. 2015) (emphasis in original) (citing 42 U.S.C. § 12131(2); 28 C.F.R. § 35.150(a); 28 C.F.R. § 35.150). "This affirmative duty is seemingly at its *apex* in the context of a prison facility, in light of the uneven power dynamic between prison officials and inmates that inherently and appropriately exists, and also the fact that departments of corrections have complete control over whether prison inmates (disabled or not) receive any programs or services at all." *Id.* (emphasis in original).

Finally, Defendants cannot rely on their own broken and ineffective system for review of special needs accommodation orders as a defense to deny knowledge of Plaintiff's need for an accommodation. *See Lewis v. Cain*, No. 3:15-CV-318, 2021 WL 1219988, at *27 (M.D. La. Mar. 31, 2021), *reconsideration denied*, No. CV 15-318-SDD-RLB, 2021 WL 5287856 (M.D. La. Oct. 8, 2021) (in finding that prison "systemically failed to provide access and accommodations to disabled inmates by failing to follow both Title II's implementing regulations and its own policies and procedures relating to ADA compliance," court found it significant that ADA Coordinator received little to no training and "showed a general lack of familiarity with assessment forms he was responsible for evaluating and approving, and often concluded that inmates' disabilities were purely medical conditions not in need of accommodations.").

Because of State Defendants' "affirmative duty" to evaluate programs and duties "to ensure that people with disabilities will have meaningful access to those services," *Pierce*, 128 F. Supp. 3d at 269, their repeated reliance on the fact that security has no access to medical records is unavailing and no defense. Out of more than a thousand bottom bunk orders provided by State Defendants to Plaintiff in discovery, less than fifty were in the form of "Administrative Notes," with signatures from a deputy warden. *See* Plaintiff's SUF ¶212. State Defendants and other witnesses repeatedly testified that there was no way for security or medical staff to track the special

needs orders once submitted.  *See* Plaintiff's SUF ¶¶19, 199-204.  Therefore, State Defendants have failed in their affirmative duty to evaluate their systems and to make reasonable modifications to security protocols, and thus cannot rely on that entirely ineffective system to justify their refusal and failure to accommodate Plaintiff's disabilities.

To put it another way, in light of this affirmative obligation imposed on the State Defendants "to ensure that people with disabilities will have meaningful access to those services," the law does not allow them to intentionally blind themselves to the needs of disabled inmates by implementation and operation of an ineffective system.  In a situation such as this, in the case at bar, "We didn't know," is not an available defense.  To the contrary, the State Defendants are charged by law with constructive notice and liability for reckless disregard of those needs by their intentional failure to implement and operate a system designed to identify, document, address, and accommodate the health and safety needs of disabled inmates.

### C. Defendants Have No Justification for Failing to Accommodate Plaintiff's Disabilities

State Defendants appear to argue that because bottom bunk orders are not always medically clear cut, and can include medical judgments, then it is acceptable for Defendant McCaughey to be making her own medical judgment about the special needs orders submitted by medical staff. ***This is entirely contrary to the RIDOC's own written ADA Policy and to the applicable case law.*** As explained in Plaintiff's Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment (ECF No. 107-1), this is not a case of differences in opinions between medical professionals.  ***This case involves a pure denial of medical care prescribed by medical professionals, without a legitimate security-based justification for such denials.***

As the First Circuit, in *Kiman*, explained, "[u]nlike the defendants' decisions regarding the diagnosis and treatment of [plaintiff's] ALS, the defendants' failure to give him access to his

medications is not, on these facts, a medical 'judgment' subject to differing opinion—it is an outright denial of medical services." 451 F.3d at 286. Similarly, Defendant McCaughey— although believing herself entitled to make medical judgments and substitute her judgment for that of the actual medical professionals—was not a medical professional, had no training in medical care, and was **not** permitted to override or ignore the **medical orders** submitted by Plaintiff's medical providers. Plaintiff's SUF ¶¶140 (When a medical provider submitted a special needs order, it was a process of reaching a medical opinion and the medical provider made a determination of medical need.), 142 (Special needs orders are medical orders and were the only medical orders reviewed by Defendant DOC security staff.), 147 (Defendant McCaughey is not a doctor or a nurse and has no medical training, other than First Aid and CPR.), 148 (Defendant McCaughey, who is not a medical provider, should not have been deciding or determining medical treatment for an inmate, and it was not appropriate for her to have access to inmate medical records.). It was exactly because Defendant McCaughey was not a medical provider that she could not have access to inmate-patients' medical records, which State Defendants repeatedly admit, *see* State Defs. SUF ¶¶22, 23, 112, 122. That lack of access, lack of training, and lack of authority is precisely why the RIDOC's ADA Policy states, "[u]nder no circumstances shall correctional staff substitute their judgment for that of medical staff where a medical accommodation has been prescribed." Plaintiff's SUF ¶ 158.

Despite this clear prohibition, State Defendants ***admit*** that Defendant McCaughey was reviewing special needs orders for bottom bunks based on the medical legitimacy. *See, e.g.*, State Defs. SUF ¶51 ("McCaughey, still unaware [of] the medical basis for the bottom bunk request, denied the request on June 19, 2015, and sent it back to the Dispensary."). Although Defendants repeatedly cite the security-based justifications for reviewing special needs accommodation orders,

the reality is that Defendant McCaughey never reached a security-based justification for denying Plaintiff's bottom bunk orders.  *See* Plaintiff's SUF ¶123.  Defendant McCaughey denied that she found a "climate issue" if she granted Plaintiff's Melise's orders for a bottom bunk.  McCaughey Dep. 163:17-21 ("Q. Would it have created a climate issue to grant it specifically for the plaintiff in this case? A. It could have. Q. Did it? A. No.").  Defendant McCaughey also denied determining that granting such orders would create any other security or safety concerns or would create an extreme hardship on the operation of the facility.  Plaintiff's SUF ¶123.  The only true security-based justification that ***could*** have been appropriate for denying a bottom bunk order was the availability of bottom bunks, but again, Defendant McCaughey testified that she never even looked at the availability of bottom bunks when reviewing special needs orders.  Plaintiff's SDF State ¶143 (McCaughey Dep. 91:2-14 ("Q. When you are looking at this order, would you look at how many bottom bunks were available at that time? A. No.")).

As is clear from State Defendants' arguments, the justification for Defendant McCaughey's denial of Plaintiff's bottom bunk orders was speculative at best.  State Defendants' repeated claims that the limited number of bottom bunks justified Defendants' denial of Plaintiff's bottom bunk orders was vastly overstated and never rose to the level or a legitimate security concern.  *See* Plaintiff's SUF ¶¶212-24 (demonstrating that despite stated concerns, number of approved bottom bunk orders never even reach half of the total available bottom bunks).  This is not sufficient for overcoming a claim of disability discrimination under the ADA, Rehabilitation Act, RICRPD, and RICRA.  *See* 28 C.F.R. § 35.130(h) ("A public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities. However, the public entity must ensure that its safety requirements are *based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities.*") (emphasis added); *Chisolm v.*

*McManimon*, 275 F.3d 315, 327 (3d Cir. 2001) ("MCDC's repetition of the word 'security' in its brief and general references to 'security' issues in the warden's deposition are not supported by any showing that 'security' in fact is implicated in making available to an inmate at appropriate times the services and aids that Chisolm requested."); *Reyes v. Dart*, No. 17 C 9223, 2019 WL 1897096, at *8 (N.D. Ill. Apr. 29, 2019) ("Dart contends that the Jail was not required to provide ALDs in light of their security risks. … That kind of speculative security concern cannot defeat an ADA claim, particularly on summary judgment."); *Henderson v. Thomas*, 913 F. Supp. 2d 1267, 1311 (M.D. Ala. 2012) ("the ADOC insisted that the sole purpose of the armbands policy at Limestone is to allow correctional officers to identify easily whether a prisoner is in a dormitory other than the one to which he is assigned (which would implicate legitimate safety concerns). That justification is not credible."); *see also United States v. Virginia*, 518 U.S. 515, 533 (1996) (addressing discrimination generally, "[t]he justification must be genuine, not hypothesized or invented post hoc in response to litigation.").

Furthermore, Defendants have made no attempt to argue that no reasonable accommodation was available or that providing the requested accommodation would have been unduly burdensome.  *See Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996) ("Importantly, Westville did not defend on the ground that no reasonable accommodations existed that would have allowed him access to those programs. The prison officials admitted that they knew that Love had requested access to activities …. Their reason for denying access was based solely on the fact that he was a quadriplegic housed in the infirmary unit.").  Of course, State Defendants could not make such an argument because it would cost virtually nothing to have assigned Plaintiff to a bottom bunk between the first special needs order, November 12, 2014 and the final fall, November 11, 2016.  Defendants have even admitted that Plaintiff was permanently

assigned to a bottom bunk following his last fall and have not claimed that any hardship resulted from such assignment.  State Defs. SUF ¶104.  Finally, it is significant that other facilities run by the RIDOC have not enacted the same discriminatory and illegal practice of having security review the medical legitimacy of bottom bunk or other special needs accommodation orders and have apparently operated just fine under the same security conditions of a prison institution.  Plaintiff's SUF ¶186.

Therefore, because State Defendants have neither demonstrated a specific security-based concern for denying and/or ignoring Plaintiff's bottom bunk orders, nor even argued that Plaintiff's disabilities could not be reasonably accommodated, Defendants' motion for summary judgment on Plaintiff's ADA and Rehabilitation Act claims must be denied.

### D. Defendants' Motion for Summary Judgment on Plaintiff's State Law Disability Claims Must Be Denied.

State Defendants fail to even make arguments for why Defendants Wall and McCaughey should not be held individually liable on Plaintiff's claims pursuant to the RICRPD and RICRA. Plaintiff fully incorporates his arguments made on the individual liability of Defendants Wall and McCaughey in Plaintiff's Memo in support of his motion for partial summary judgment, in Sections IV.B.1. and 3.  Because these claims are legally viable, as discussed above, Defendants' motion for summary judgment on these claims should be denied, and Plaintiff's motion should be granted.

### VI. Plaintiff Has Presented Sufficient Undisputed Evidence on His Eighth Amendment Claims That Defendants DOC, McCaughey, and Wall Are Liable for Cruel and Unusual Punishment

For nearly identical reasons as explained above in Section V above, Defendants' reliance on Defendant McCaughey's medical judgments cannot support their defense to Plaintiff's constitutional claims for cruel and unusual punishment.  Again, Plaintiff fully incorporates the

arguments in Plaintiff's Memo in support of his motion for partial summary judgment, in Sections IV.C. In particular, since Defendants' argument regarding Defendant Wall consists of one sentence, Plaintiff incorporates his argument specific to Defendant Wall's supervisory liability, rather that reiterating the entire argument here.

As an initial matter, Defendants do not make any argument that Plaintiff did not have a serious medical need, either in regard to his cervical neck condition or to his sleep disorder. Therefore, this Court must accept as undisputed that both of Plaintiff's disabilities presented a serious medical need.

Defendants' entire argument regarding Plaintiff's cervical neck condition is premised on the incorrect contention that Defendant McCaughey was making a professional judgment in denying Plaintiff's medical orders for a bottom bunk assignment. However, even in State Defendants' Memo, their argument rests on Defendant McCaughey's ***medical*** judgments. *See* State Defs.' Memo at 42 ("McCaughey's reasons for doing so are well established by the record and does not suggest deliberate indifference, *i.e.*, ladders had just been installed for the bunk beds at Medium Security Melise confirmed that he had no difficulty reaching the top bunk in Medium Security with the use of a bunk-bed ladder."). There is simply no bifurcation. Defendant McCaughey's determination that Plaintiff Melise could climb a ladder was plainly a determination about his medical condition, of which she had no knowledge or training. This was ***not*** a legitimate safety or institutional concern on which to base her denial of Plaintiff's need related to his cervical neck condition. *See Hacker v. Cain*, No. CV31400063JWDEWD, 2016 WL 3167176, at *15 (M.D. La. June 6, 2016) ("If such denial occurs, 'the alleged imposition of administrative inconvenience, unattached to any legitimate penological objective such as security,' will offer no

excuse." (citing *Monmouth Cnty. Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 337 (3d Cir. 1987)).

Furthermore, Defendants' argument regarding Plaintiff's sleep disorder again rests on the false premise that Defendant McCaughey only received one the special needs accommodation orders, which she granted on September 21, 2016, and it was then Plaintiff's "responsibility to seek a renewal of the accommodation and there is no evidence that Melise made such a request to anyone." State Defs.' Memo, at 42. Defendants go so far as to admit that, "prescription orders were placed into the EMR in June 2016 (twice) for a bottom bunk assignment due to sleep apnea and/or 'falls,'" but claim that "there is no evidence that McCaughey or any non-medical personnel received such orders." *Id.* at 43. This claim is wildly incorrect, since the very orders referenced were *on the same order form that Defendant McCaughey approved on September 21, 2016*. Plaintiff's SUF ¶¶99-103. Literally, the order that Defendant McCaughey circled for approval was the order entered on June 28, 2016, that Defendants claim not to have ever received. In order to effectively demonstrate how preposterous Defendants' claim is, Plaintiff has provided a screen shot of the order form reviewed and approved by Defendant McCaughey below:

**Special Needs/Urgent Orders**

| Order | Reason | Start Date | Stop Date | Ordered By |
|---|---|---|---|---|
| Bottom bunk | neck pain | 11/12/2014 | 12/12/2016 | Marianne Warren NP |
| Bottom bunk | falls | 06/21/2016 | 06/21/2017 | Marianne Warren NP |
| Bottom bunk | falls, ?apnea | 06/28/2016 | 09/28/2016 | Christopher Salas MD |

Screenshot of Plaintiff's App. Ex. E at 12.  Plaintiff urges that this conclusively establishes that Defendants' argument that Defendant McCaughey and Defendant RIDOC was not adequately on notice of Plaintiff's substantial medical need is wholly unworthy of credibility or belief.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000) (the court "must disregard all evidence favorable to the moving party that the jury is not required to believe.").  No reasonable juror could ever believe that Defendants were not on notice of Plaintiff's sleep disorder and need for a bottom bunk to prevent the substantial risk of injury from falling from a top bunk.[7]

"It is well established that '[d]eliberate indifference requires [only] knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood[,]' " *Pierce v. D.C.*, 128 F. Supp. 3d 250, 279 (D.D.C. 2015) (granting summary judgment to plaintiff for compensatory damages).  Here, the evidence before the Court conclusively demonstrates that Defendant McCaughey's conduct was worse than doing nothing because she took the affirmative step of approving only the bottom bunk order that would last one week, and rejected the two other bottom bunk orders, ***on the same form***, that had later stop dates.  Plaintiff's SUF ¶¶102-103.  If that were not enough evidence of Defendants' deliberate indifference, Defendant McCaughey's conduct after Plaintiff's final fall from the top bunk should be conclusive.  After being informed of Plaintiff Melise's final fall, knowing it resulted in a broken leg, Defendant McCaughey still unilaterally modified Dr. Salas' bottom bunk order dated November 11, 2016 ***to prohibit Plaintiff from a continued bottom bunk assignment***.  SUF ¶120.  To avoid any feigned factual dispute, the notations on the order were as follows:

---

[7]  In any event, for the reasons previously argued above in Section V.B., Plaintiff further contends that Defendants are charged with constructive notice of the Plaintiff's need for this accommodation for his disability as the "We did not know defense" fails where the State Defendants have maintained a system that fails to comply with the express statutory obligation to determine and meet the needs of disabled inmates.

**Special Needs/Urgent Orders**

| Order | Reason | Start Date | Stop Date | Ordered By |
|-------|--------|-----------|-----------|------------|
| Bottom bunk | falls from sleep problem | 11/11/2016 | 11/10/2017 | Christopher Salas MD |
| Bottom tier | crutches for broken ankle | 11/11/2016 | 03/10/2017 | Christopher Salas MD |

Screenshot of Plaintiff's App. Ex. E at 13 (handwritten notation stating "*when broken ankle healed – bottom bunk expires as well"). This modification—which ends a medically authorized and required bottom bunk order when the Plaintiff's broken ankle heals—demonstrates Defendant McCaughey's continued blatant and intentional disregard for Plaintiff's safety. *Id.* Defendant McCaughey did this despite the fact that she knew 1) she had no medical training, 2) that DOC regulations forbid her from overriding medical orders except for overriding security concerns, 3) that there were no legitimate security concerns, and, 4) that Plaintiff has fallen from the top bunk on several previous occasions and injured himself. Such conduct exhibits undisputed premeditated, reckless, and intentional disregard of the Plaintiff's basic right to be free from harm and injury while enjoying or participating in a program, activity, or service provided by the State. That the State of Rhode Island would even defend let alone vigorously defend such conduct is not only concerning, but, together with the other evidence in this case, establishes that the State does

**Page 34 of 40**

not merely condone such conduct, but that it is a willing participant in the premeditated, reckless, and intentional and deliberate disregard of the Plaintiff's clearly established rights.

Based on this undisputed record, this Court should deny Defendants' motion for summary judgment and grant Plaintiff's motion for partial summary judgment for liability on Plaintiff's constitutional claims for cruel and unusual punishment. *See Pierce*, 128 F. Supp. 3d at 279 ("This willful blindness to Pierce's hearing disability and his need for accommodation plainly amounts to deliberate indifference, and Pierce is therefore entitled to compensatory damages on Claims I and II of his complaint.").

### VII.   Qualified Immunity Is Irrelevant to this Court's Determination

State Defendants are not entitled to qualified immunity for violations of Plaintiffs statutory and constitutional rights because Plaintiff's rights were clearly established long before November 2015, when Plaintiff first fell from a top bunk.

It is unclear from Defendants' argument how Plaintiff's rights were not clearly established at the time of the violations. Defendants seem to argue that no rights were violated, as Defendants essentially regurgitate prior arguments. Nevertheless, the caselaw makes it clear that Plaintiff's rights under the ADA, Rehabilitation Act, RICRPD, and RICRA were all clearly established prior to 2015. *See Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274, 283 (1st Cir. 2006) (establishing the standard for disability discrimination claims against a prison, including establishing that prisons could be liable for failing to issue a bottom bunk). Indeed, in *Pierce*, 128 F. Supp. 3d at 279, the court found the District of Columbia's Correctional Treatment Facility liable under the ADA and Rehabilitation Act on September 11, 2015 for nearly the same conduct.

Plaintiff's rights under the Eighth Amendment of the US Constitution and article 1 § 8 rights under the Rhode Island Constitution were also clearly established long before the violations

at issue with this case.  *See Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976) (establishing standard for deliberate indifference to serious medical needs of prisoners); *Kosilek v. Spencer,* 774 F.3d 63, 82 (1st Cir. 2014) (reiterating test for deliberate indifference); *Battista v. Clarke*, 645 F.3d 449, 453 (1st Cir. 2011) ("it is enough for the prisoner to show a wanton disregard sufficiently evidenced by 'denial, delay, or interference with prescribed health care.' ").

Thus, the violations at issue in this case were clearly established as of 2015, prior to Defendant McCaughey's repeated denials of Plaintiff's bottom bunk orders.

### VIII.    Plaintiff's Negligence Claim Does Not Require Expert Testimony

Plaintiff's claim for negligence against Defendants DOC, Defendant McCaughey, and Defendant Clarke do not require expert testimony because the only security-based justification provided by Defendant McCaughey for denying Plaintiff's bottom bunk orders was an unsubstantiated concern for the number of bottom bunks available in the Medium Security Facility.

As Defendants point out, expert testimony is required in certain negligence claims.  The Rhode Island Supreme Court has explained:

> The use of expert testimony arises from a need which comes in turn from the fact that the subject matter of the inquiry is one involving special skills and training beyond the ken of the average layman. If all the facts and circumstances can be accurately described to a jury and if the jury is as capable of comprehending and understanding such facts and drawing correct conclusions from them as is the expert, there is no necessity for the expert testimony. The jury in such instances can determine the question just as well as the expert.

*Rhode Island Res. Recovery Corp. v. Restivo Monacelli LLP*, 189 A.3d 539, 547 (R.I. 2018).  Here, Defendant McCaughey admitted that she never identified or determined that there were any security-specific concerns related to assigning Plaintiff Melise to a bottom bunk at the Medium Security Facility:

> Q. Are you aware that it ever did create a safety hazard in regard to the plaintiff in this case?
> A. No.
> Q. Would granting the bottom bunk for the plaintiff in this case have, otherwise, caused an extreme hardship in the operation of the institution/facility.
> A. I don't know.
> Q. Do you have any reason to believe that it would have created an extreme hardship of the operation of the institution/facility?
> A. I don't know.
> Q. You don't know? Does that mean you have no information to believe it would have created an extreme hardship?
> A. I have no information to believe that this particular case would have created an extreme hardship as one of the areas that I looked at.

Plaintiff's SUF ¶123.  Indeed, Defendants admit that Plaintiff has been assigned to a bottom bunk since his last fall on November 11, 2016, without further incident, demonstrating that there were no safety or security concerns implicated by such assignment.  *See* State Def.'s SUF ¶104.  The only potentially legitimate security-based concern ever identified by Defendant McCaughey as a justification for her illegal practice of reviewing special needs orders was the number of available bottom bunks in the Medium Security Facility.  Plaintiff's SUF ¶213.  This is the only defense that could be submitted to the jury, and there is nothing complicated or uncommon about the number of total available bottom bunks compared to the number occupied by inmates with approved medical orders.  This would not be an inquiry "involving special skills and training beyond the ken of the average layman."  *Restivo*, 189 A.3d at 547.  Either there were a sufficient number of bottom bunks available or there were not.

This case presents a very different circumstance than in the cases cited by Defendants holding that expert testimony was required to evaluate prison administrators' decisions implicating safety and security concerns.  *See Karn v. PTS of Am., LLC*, No. GJH-16-3261, 2022 WL 743944, at *6 (D. Md. Mar. 11, 2022); *Villalobos v. Bd. of Cty. Comm'rs of Doña Ana Cty.*, 322 P.3d 439,

441 (N.M. App. 2014) (While "a case in which an expert is not necessary to establish negligence in a prison context may exist, it is not this case" because plaintiff needed to show "the standard of care for the monitoring of inmates, jail design, video surveillance[.]").  For example, in *Karn*, the court described the security matters at issue as follows: "Here, determining whether Defendants acted negligently towards Plaintiff requires knowledge of restraints, security and escape prevention measures, and general knowledge about the care, custody, and transportation of pre-trial detainees and prisoners. That knowledge is not likely to be within the scope of knowledge of an average person."  2022 WL 743944 at *6.  That is a very different security issue than simply determining whether there were enough bottom bunks available.

Furthermore, unlike in many other inmate cases where there is a question of the medical care provided, which would generally require expert testimony, here, medical providers had already repeatedly made the medical determination that there was a medical need for a bottom bunk.  At that point, as DOC's ADA Policy made clear, "[u]nder no circumstances shall correctional staff substitute their judgment for that of medical staff where a medical accommodation has been prescribed. Medically prescribed accommodations may be reviewed only to address institutional safety and security concerns."  Plaintiff's SUF ¶158.  Finally, even if it were relevant for the jury to determine whether Defendants were on notice that Plaintiff was in danger of harm, it is well within "the ken of the average layman" to determine that a fall from a top bunk would cause Plaintiff harm.  Therefore, no medical testimony is required where risk of harm was obvious and the only judgment to be made by security staff was for security-specific concerns.

**WHEREFORE,** Plaintiff respectfully prays that this Court:

1.      Deny State Defendants' Motion for Summary Judgment;

2. Grant Plaintiff's Motion for Partial Summary Judgment as to liability against the Defendants, specifically:

 a. For violations of the ADA and RA against Defendant DOC;

 b. For violations of the RICRPD and RICRA against Defendant DOC, Defendant McCaughey, Defendant Vohr, Defendant Clarke, and Defendant Wall;

 c. For violations of the Eighth Amendment of the United States Constitution, actionable pursuant to 42 U.S.C. § 1983 and Supp. 25 (D.R.I. 1989) against Defendant DOC, Defendant McCaughey, Defendant Vohr, Defendant Clarke, and Defendant Wall;

 d. For violations of the Rhode Island Constitution, article 1 § 8, actionable directly in accordance with *Jones v. State of Rhode Island*, 724 F.Supp 25, or under the RICRA against Defendant DOC, Defendant McCaughey, Defendant Vohr, Defendant Clarke, and Defendant Wall; and,

 e. For negligence against Defendant DOC, Defendant McCaughey, and Defendant Clarke; and

3. Continue the matter for such further proceedings as may be necessary, including the determination of appropriate relief and damages and an award of attorney's fees.

<br>

Plaintiff,
By his attorneys,

**Date: October 12, 2022**     **/s/ Chloe A. Davis**
                **Chloe A. Davis, Esq. (#9334)**
                **Richard A. Sinapi, Esq.  (#2977)**
                Sinapi Law Associates, Ltd.
                2374 Post Road, Suite 201
                Warwick, RI 02886
                Phone: (401) 739-9690; Fax (401) 739-9040
                Email:  cad@sinapilaw.com; ras@sinapilaw.com

## <u>CERTIFICATION</u>

I hereby certify that on **October 12, 2022,** a true copy of the within was filed electronically via the Court's CM/ECF System.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and the filing is available for viewing and downloading from the court's cm/ecf system.  Service on the counsel of record has been effectuated by electronic means.

**/s/ Chloe A. Davis**