# EXHIBIT B

```
 1                    (DEPOSITION COMMENCED AT 10:20 A.M.)

 2                            MARIANNE WARREN, N.P.

 3                    Being duly sworn, deposes and testifies as

 4       follows:

 5                            THE REPORTER:  State your full name and

 6       spell your full name for the record, please.

 7                            THE WITNESS:  Marianne Warren,

 8       M-A-R-I-A-N-N-E, W-A-R-R-E-N.

 9                            THE REPORTER:  For the record, would

10       counsel state their names and whom they represent?

11                            MS. DAVIS:  My name is Chloe Davis, and I

12       am here representing the plaintiff, Stephan Melise.

13                            MR. DaCRUZ:  Michael DaCruz, paralegal,

14       Sinapi Law.

15                            MR. SULLIVAN:  Justin Sullivan, on behalf

16       of the Department of Corrections.

17                            MS. STOWELL:  Christine Stowell, on

18       behalf of Dr. Clarke, Dr. Vohr, and representing the

19       fact witness, Marianne Warren.

20                            EXAMINATION BY ATTORNEY DAVIS

21    Q.   Hi, Marianne?

22         A.   Hi.

23    Q.   My name is Chloe Davis, and I represent the plaintiff

24         in this case, Stephan Melise, and you are here in

25         response to a notice of deposition in the case entitled
```

9/29/2021                              Marianne Warren, N.P.

```
 1        is -- as you know, things can happen in prison.  So,

 2        some things do have to get -- I need to walk with

 3        security on behalf of the entire prison, so, yes, I do.

 4            Just because I put an order in, it does not mean it

 5        needs to be -- I have a -- I have a great relationship

 6        with security in all of the buildings that I currently

 7        work in, so, just because a patient asks me for a cane,

 8        I still have to talk it over, because a cane can become

 9        a weapon.

10            So, there are things that I do need to talk about

11        with security, and it is not always easy, because you

12        are talking about safety, you are talking about

13        Americans with Disabilities, and we are also talking

14        about security.

15   Q.   So, for those orders that require consideration by the

16        security side, is that specific to special needs

17        accommodations orders, or are there any other types of

18        orders that --

19   A.   No.  Any kind of medical orders, no.  Like, if I

20        say a patient needs to a see a neurologist, or ear,

21        nose, or throat doctor, that's an automatic, but if a

22        patient is asking me if they can have their sneakers

23        brought in from home, and I get every request that you

24        can imagine, that's a conversation with security,

25        because that could cause a huge problem if I let you
```

```
 1            have Nikes, and somebody else has sneakers from

 2            Walmart.

 3                 So, there are a lot of things -- that's what makes

 4            Corrections difficult sometimes, because I am medical,

 5            but I am also working with security, and security has

 6            an obligation to keep me safe, to keep the patient

 7            safe, and all of the staff safe, so, it is complicated.

 8    Q.      Has the process for -- let's sort of first start with

 9            the medical orders that don't require security

10            approval, what is the procedure for submitting those

11            orders?

12    A.      Okay.  That's a great question.  So, if you are a

13            patient, and you need to see an ear, nose, and throat

14            doctor, our system has a pathway, so, those go directly

15            to a person.  So, there are inside orders, because we

16            have consultants that come to the prison from Brown

17            Medicine, from Lifespan that come in.  Like, we have a

18            neurologist that comes, we have a foot doctor that

19            comes.

20                 So, all I have to do is put under those special

21            needs, on-site consultant, and that goes to one person

22            automatically in the system.  That person creates a

23            list, so that when that doctor calls monthly and says,

24            do you need me to come this month, then that person

25            will say, yes.  We need you.  We have 40 people, or
```

9/29/2021                                    Marianne Warren, N.P.

```
 1   Q.   How long can an order last?

 2        A.   A year.

 3   Q.   That's the maximum time frame?

 4        A.   I was told it could be a year, but it is a year,

 5        and then they have to be renewed yearly, but you can

 6        also make it temporary, like, somebody could have a

 7        sprained ankle, and you can give them a bottom bunk for

 8        a month.  You could do that, too.  It could be

 9        temporary.

10   Q.   What happens when an order expires?

11        A.   So, then the patient knows.  The patients know when

12        their orders are expiring because it is signed, and it

13        is dated, so they make sure somebody knows that they

14        need to have their order renewed, and it just gets

15        renewed, if it is necessary.

16   Q.   So, it is, essentially, up to the inmates to make sure

17        that their orders get renewed?

18        A.   Yes.

19   Q.   Those orders that are sort of automatic, are they -- is

20        there any sort of process of them getting --

21        A.   No.

22   Q.   -- auto-renewed, or do they --

23        A.   No.

24                        THE REPORTER ASKS FOR CLARIFICATION

25   Q.   Those orders that are ordinarily, automatically
```

9/29/2021                          Marianne Warren, N.P.

```
 1          approved, do those have to go through the same process
 2          to be renewed by being resubmitted?
 3          A.  Yes.
 4  Q.   Is there any process for medical to know when an order
 5          is going to expire, or is it only the inmates that
 6          know?
 7          A.  There is no mechanism in the EMR that alerts me.
 8  Q.   So there is no system that sort of keeps track of
 9          approved orders?
10          A.  No.
11  Q.   Has that procedure, for submitting orders in paper
12          format getting them back either approved or denied, or
13          request for more information and resubmitting, has that
14          procedure changed over time while you were working at
15          Medium Security?
16          A.  No.
17  Q.   And it was always the same, and you are saying the same
18          process is in place at the Women's facility currently?
19          A.  Yes.
20  Q.   Are you aware of any D.O.C. policy in regard to the
21          first tier in relation to special needs accommodation
22          orders?
23          A.  I am not aware of a policy, but I know there is a
24          first tier.
25  Q.   Has anyone ever told you that only certain orders have
```

```
 1         It can happen.
 2    Q.   Did you ever attend triage meetings with Deputy Warden
 3         McCaughey?
 4    A.   Yes.
 5    Q.   What were those meetings?
 6    A.   Just talking about any problems or any patients
 7         that were challenging.  We would just kind of all work
 8         together, security, plus social work would be there,
 9         and we were just -- and the nursing staff as well, so
10         all of the disciplines would be, Dr. Vohr, so it would
11         be like an opportunity to discuss certain patients,
12         certain issues.
13    Q.   How frequently would those meetings occur?
14    A.   Like once a month, if I recall.
15    Q.   Did you usually attend them?
16    A.   I did, unless I was really busy, and I couldn't go.
17    Q.   Do you ever recall discussing bottom bunk orders during
18         those meetings?
19    A.   I can't remember specifically, but I am sure that
20         we did discuss special needs.  You know, like I said,
21         there is no boss that is going to tell you not to put a
22         patient on a bottom bunk, if you think it is medically
23         necessary.  They are not going to take that
24         responsibility, nor should they, really.
25             It is like treating high blood pressure, so, okay,
```

9/29/2021                          Marianne Warren, N.P.                                    51

```
 1              this is the recipe for high blood pressure.
 2                  There is no recipe for a bottom bunk.  There is no
 3              book to read about it; there is no class to take in
 4              school.  It is kind, like, a prison specific judgement
 5              that you make, except for the clear, clear cases of
 6              diabetes, seizure, obvious injuries, recent surgeries,
 7              stuff like that.
 8      Q.      So it was a judgement call, correct, a professional
 9              judgement call?
10      A.      A professional judgement call.
11      Q.      Did you ever discuss the fact that your special needs
12              accommodations orders were frequently being denied with
13              anyone?
14      A.      Yes.
15      Q.      Who did you discuss it with?
16      A.      I think Dr. Vohr, and Dr. Clarke knew.
17      Q.      Do you remember specific conversations?
18      A.      I think they just both recommended -- I mean, I
19              didn't specifically go tell on people and mention
20              specific circumstances, but I think they just were
21              aware of the challenges, because they just kind of said
22              the same thing, use the judgement.  Remember, you can't
23              give everybody a bottom bunk.  Just do your best.
24      Q.      Did you discuss that with anybody else?
25      A.      The bottom bunk?
```

9/29/2021                                Marianne Warren, N.P.

```
 1   Q.   Is it your understanding that it was, that the
 2        determination of whether it was reasonable or not, that
 3        security was making that determination from a security
 4        perspective, or from a medical perspective?
 5                  MR. SULLIVAN:  Objection.
 6   A.   I can't answer that.
 7   Q.   What is your understanding of how they were supposed to
 8        be determining it?
 9   A.   It's supposed to be medical, security are two
10        different disciplines, but we need one another, so my
11        understanding is medical necessity should be approved,
12        unless they think it is not reasonable.
13   Q.   Did you believe that this was a reasonable request?
14   A.   Yes.
15   Q.   Did you believe that there was any security-based
16        reasons for this to be returned to you for more
17        information?
18                  MS. STOWELL:  Objection.  I am going to
19        direct you not to answer.  She is not in security.
20                  MS. DAVIS:  You cannot direct her not to
21        answer.  You can contest it later, if we want to use
22        her deposition testimony, but this isn't privileged.
23        You cannot tell her not to answer non-privileged
24        questions.
25                  MS. STOWELL:  You can answer, if you have
```

```
1            an opinion.

2            A.   So, I don't even have access to security.  I don't

3            even know why they are incarcerated.  I don't have any

4            access to that.  I am just pure medical.

5    Q.   So this question came back to you for more information,

6            and is it your understanding that it had anything to do

7            with security-based reasons?

8    A.   No.

9    Q.   You have nothing to do with security, and is it

10           possible that you could have been asked any questions

11           related to security?

12                     MR. SULLIVAN:  Objection.

13                     MS. STOWELL:  Objection.

14   A.   No.

15   Q.   So this necessarily would have been requesting more

16           medical information; correct?

17   A.   Correct.

18                     EXHIBIT 11, PLAINTIFF'S,

19                     MARKED FOR I.D.

20   Q.   Does this look like a bottom bunk order submitted by

21           you again on June 9, 2015?

22   A.   Yes.

23   Q.   And did you provide the same information that you had

24           previously provided to Deputy McCaughey?

25   A.   Yes.
```

9/29/2021                          Marianne Warren, N.P.                                    107

```
 1          A.  So, what makes this document different is now I am
 2          telling her, I am actually giving her so much
 3          information, and telling her that I am unable to put
 4          the patient on the top bunk.
 5              I am telling her that the bottom bunk for me
 6          stands, that's what I am telling her.
 7   Q.     So this was the same order that you previously
 8          submitted on June 9th?
 9   A.     Um-umm, yes.
10   Q.     Which came back denied on June 19th?
11   A.     Right.
12   Q.     And the next handwritten note is dated October 28,
13          2015; is that correct?
14                    MS. STOWELL:  Right here (indicating).
15   A.     Right, right.  So I sent this back.  She says no,
16          but somehow I didn't get this back.
17              Somehow I did not get this in my -- I didn't have
18          access to that, probably until October, and then I
19          write on that all of this information, that the patient
20          is telling me he can't be on it, plus there is
21          documentation from the occupational therapist, and a
22          previous provider that the patient has cervical
23          neuropathy, and should be placed on the bottom bunk.
24              So I keep sending the patient -- so what is
25          happening is the patient is coming to me, and I am
```

 1       sending the patient back to security, because I can't

 2       do anything else.

 3    Q.   So is that because this order that you had originally

 4       submitted was still in the system somehow?

 5       A.  Yes.  It never leaves the system.  It always stays

 6       in the system.

 7    Q.   But it was not approved?

 8       A.  It was not approved.  It is denied.

 9    Q.   Why was it not until October 28th that you resubmitted

10       it?

11       A.  I don't know, because I probably was not aware of

12       it.  They can't call me on the phone, text me.  I don't

13       know what is going on.  I just make the order, and then

14       I don't know what happens after.

15           Somehow this paper gets back to me.  I was not

16       aware until then.

17    Q.   So when you became aware, you submitted this order,

18       again, with all of this additional information?

19       A.  Exactly.

20    Q.   Did you believe that this order should have been

21       granted -- should have been approved?

22       A.  Yes.

23    Q.   Do you believe that it should have been approved back

24       on June 9th?

25       A.  Yes.

```
 1    Q.   Were you frustrated by the fact that the order had not

 2         been approved?

 3         A.  Yes.

 4    Q.   Did you believe it was appropriate or necessary to

 5         provide this level of detail to get this order

 6         approved?

 7         A.  Yes.

 8    Q.   Just to clarify, you believe that -- when you say yes,

 9         do you mean it was necessary to get Deputy McCaughey to

10         approve it, or that it was -- or did you believe that

11         it was your job to be providing this much information?

12         A.  Yes.

13    Q.   In order to get it approved?

14         A.  Yes.

15    Q.   Without providing this level of information, you could

16         not get it approved; is that accurate?

17         A.  Correct.

18    Q.   But did you think you should have to provide this

19         amount of information?

20                      MR. SULLIVAN:  Objection.

21         A.  No.

22    Q.   Why not?

23         A.  Umm, I just believe that we should all respect the

24         disciplines that work in the prison, everyone.

25    Q.   Did you believe that Deputy McCaughey was not
```

```
 1              respecting your medical determinations?
 2                      MR. SULLIVAN:  Objection.
 3         A.  Yes.
 4    Q.   Was that something that you felt occurred often?
 5         A.  Yes.
 6    Q.   And that's in relation to more inmates than just
 7         Stephan Melise?
 8         A.  Yes.
 9    Q.   And that was frustrating to you?
10         A.  Yes.
11    Q.   Did you do anything about that frustration?
12         A.  I did what I could.
13    Q.   What do you mean by that?  Are you referring to
14         submitting all of this additional information?
15         A.  Yes.
16    Q.   Did you do anything else?
17         A.  I probably discussed it with my bosses, and they
18         were probably just as frustrated as I was.
19    Q.   Do you recall ever specifically discussing Stephan
20         Melise with any of your bosses?
21         A.  No, not specifically, probably generally, but not
22         specifically.
23    Q.   Can you tell, from looking at this, what happened after
24         October 28th?  Do you have any idea if it was approved,
25         or denied?
```

```
 1    Q.   What did he report to you on October 29, 2015?

 2    A.   That he still is struggling with his neck and left

 3         arm weakness.  The weakness in the left arm.  So, he is

 4         still struggling with it.

 5    Q.   And did he report that that, that because of that

 6         condition, it was hard for him to climb a ladder?

 7    A.   Yes.  I didn't document it, but yes.

 8    Q.   What did you do in response to this?

 9    A.   So it looks like following, I probably started with

10         conservative treatment, occupational therapy -- he is

11         already seeing occupational therapy.  He has already

12         had x-rays, he is still complaining, even with

13         nonsteroidal antiinflammatories, and so, now, I am

14         taking the next step, which is to do the MRI.

15              So, it looks like I am taking his complaint

16         seriously, and we are moving along here, you know, to

17         see what is causing the problem.  Why does he keep

18         having this chronic pain in his neck.

19    Q.   So you are attempting to treat the condition that he is

20         complaining of, and at the same time, you were

21         submitting an additional request for a bottom bunk; is

22         that right?

23    A.   Yes.  It looks like I documented that.  I keep

24         referring him, because security is denying it, and I am

25         not.  So, I am sending him to security, and I can't get
```

```
 1           him a bottom bunk.
 2    Q.     Did you believe that at this time, he had a medical
 3           condition that necessitated a bottom bunk?
 4    A.     Yes.
 5    Q.     And you believed that that bottom bunk should have been
 6           approved?
 7    A.     Yes.
 8                     MR. SULLIVAN:  Objection.
 9    Q.     From a medical standpoint, you believe that should have
10           been approved from a medical standpoint?
11    A.     Yes, at that time.
12                     EXHIBIT 15, DEFENDANT'S,
13                     MARKED FOR I.D.
14    Q.     Did you submit this request on November 12, 2015?
15    A.     Yes.
16    Q.     So, this is a new request, approximately two weeks
17           after the previous request was sent?
18    A.     Yes.
19    Q.     Do you have any idea what happened with this request?
20    A.     I do not.
21    Q.     Okay.
22                     EXHIBIT 16, PLAINTIFF'S,
23                     MARKED FOR I.D.
24    Q.     Does this look like a request for a bottom bunk that
25           was completed by you on November 20, 2015?
```

1    that he fell out of his bunk had any relation to a

2    sleep disorder?

3    A.  No.

4    Q.  Is that something that you have seen before, a sleep

5        disorder that might cause somebody to fall out of bed?

6    A.  No.

7    Q.  At that time you were not --

8    A.  No.

9    Q.  You may not have connected those two --

10   A.  No.

11   Q.  -- events?

12   A.  Because he just said he rolled off, so I don't know

13       that could be true.

14   Q.  But in any case, you still believed he needed a bottom

15       bunk order because of his osteoarthritis condition?

16   A.  Right, and his neck and his left arm numbness.

17                      EXHIBIT 20, PLAINTIFF'S,

18                      MARKED FOR I.D.

19   Q.  Do you recall treating Mr. Melise on June 21, 2016?

20   A.  No.

21   Q.  You have no memory of reporting another fall from the

22       top bunk?

23   A.  I do not.

24   Q.  What did you do in response to his complaints?

25   A.  So, it looks like I did create another bottom bunk

```
1            order on that day, and I sent him for -- I wrote a note
2            about how I had been placing him on the bottom bunk,
3            and he wasn't on the bottom, that I ordered the bottom
4            bunk slip again, and I ordered x-rays of his neck.
5   Q.   What were his injuries that he reported were caused by
6            the fall?
7            A.  It says, he rolled off, landed on to the floor last
8            night.  So it was, like, an unwitnessed fall.  Denies
9            loss of consciousness, and complaining of pain in the
10           second and third fingers, and neck pain.  Low back and
11           left shoulder pain, and I examined him, and I just
12           ordered x-rays of his neck again.
13  Q.   Were those injuries that you would expect to be
14           associated from a fall from a top bunk?
15           A.  Yes.
16  Q.   And you said you submitted another top (sic) bunk
17           request?
18           A.  Yes.  I did, bottom bunk ordered, x-rays, warm
19           compresses.
20  Q.   After this second fall that he reported to you, was
21           there any reason to believe that his falls were related
22           to a medical condition?
23           A.  No.
24  Q.   Did you still believe at this time that his medical
25           condition necessitated a bottom bunk order?
```

1    Q.   So does it looks like this was an order that had

2         already been submitted on June 28th, 2016?

3    A.   Yes.

4    Q.   So you had submitted an order on June 21st; correct?

5    A.   Yes.

6    Q.   And you had submitted that to Deputy McCaughey?

7    A.   Yes.

8    Q.   And then a week later, does this look like Dr. Salas

9         entered a new order?

10   A.   Correct.

11   Q.   That was, do you know if that was submitted?

12   A.   It looks like it was.

13   Q.   This was one was submitted by you on September 14th;

14        correct?

15   A.   No.  This one was submitted by the nurse.  It looks

16        like Mel White on 9/8, she printed it up.

17   Q.   Then you signed it on --

18   A.   And then I signed it on the 14th, you're right.

19   Q.   So this specific document was submitted on

20        September 14th; correct?

21   A.   Correct.

22   Q.   And that was three months after -- or two-and-a-half

23        months after Dr. --

24   A.   Oh, right.

25   Q.   Sorry.  Let me finish.  I know it is hard.  Let me

```
 1              orders were just being denied?

 2                          MS. STOWELL:  Objection.

 3              A.  Orders were being denied, yes, and things can

 4              happen to you when you work there, too.

 5                   So you can get in all kinds of trouble.  So you can

 6              only push back so far.

 7     Q.       What do you mean by that?

 8              A.  Everybody -- it is a risky job.  I don't like even

 9              being in here, actually.  I am just hoping I don't get

10              fired.  I guess if I do, I do.  Whatever.

11                          MS. STOWELL:  You are not going to get

12              fired.

13     Q.       Are you suggesting there is a culture of retaliation at

14              the ACI?

15              A.  No.  Not all, but in that place, at that time, it

16              was difficult to get things done for the patients,

17              that's all I am saying.

18                   It is not like that in any building, it's not like

19              that for me anywhere, but at that time, it was

20              challenging.

21     Q.       At that time, in Medium Security, when you were

22              attempting to get these bottom bunk orders approved,

23              were you concerned about retaliation?

24              A.  It is possible.

25     Q.       Did that prevent you from doing things that might have
```

```
 1            A.  With respect to security, why would security put
 2            someone on a lower tier?  They would be making that
 3            determination based on, you know, maybe the age or
 4            something, or something that they see, or maybe they
 5            just felt it was a better fit for that person to be on
 6            a bottom tier.
 7     Q.     But you have no personal knowledge of that?
 8     A.     No, none.
 9     Q.     You mentioned that you felt at the time when you were
10            at Medium Security that it was possible that you would
11            be retaliated against, could you explain what you meant
12            by that?
13            A.  Do I have to?
14     Q.     Unfortunately.
15                      THE WITNESS:  I do?
16                      MS. STOWELL:  Yes.
17            A.  Oh, my God, then I am going to get fired now?
18     Q.     I am not suggesting that at all.
19                      MS. STOWELL:  Off the record.
20                      (BRIEF OFF-THE-RECORD DISCUSSION)
21            A.  Well, I did get in a lot of trouble when I worked
22            there.  I actually got thrown out of the building for a
23            week, so --
24     Q.     Was that related to any reason?
25            A.  That was related to my special needs, because I was
```

9/29/2021                              Marianne Warren, N.P.                              165

```
 1              of the difficulty between security and accommodating

 2              medical requests?

 3         A.   That's it, and that's why Dr. Clarke rescued me.

 4              She said I am going to get you out of there.  You have

 5              been there long enough.  That's why she took me out.

 6              She knew.

 7    Q.   Have you returned to Medium Security?

 8         A.   Once in a while I go, and it is different now.

 9    Q.   How so?

10         A.   It is just better.  It is all new security, and

11              there are no problems there.  She is gone.  There is a

12              new deputy.  I was there a lot this summer, and

13              everything was just great, but I don't work there now,

14              I work at Women's and Minimum.

15    Q.   Primarily at Women's?

16         A.   Yes.

17    Q.   Was there any adverse employment action taken against

18              you with respect to special needs request?

19                      MS. STOWELL:  Objection.

20         A.   Just -- except for that, the fact that I had to be

21              taken out until I could go back in, but other than

22              that, no.  No.  Everything has been fine.

23    Q.   Taken out?

24         A.   I was not allowed back at Medium Security for one

25              week until I could have a meeting with all of the
```