# EXHIBIT E

Christopher Salas, M.D. - July 23, 2019

62

1      THE WITNESS: You're right, sleep
2 study. I ordered the bottom bunk -- never mind,
3 scratch that. So I ordered a bottom bunk, yeah,
4 yeah. I'm sorry, what was your question?
5 A. I'm sorry it's really hard because it's the
6 old EMR. I'm just not used to how these notes
7 look.
8      MS. DAVIS: Could you read the last
9 question.
10      (QUESTION READ)
11 A. Yes.
12 Q. Was it unusual in any way that the plaintiff had
13 been reporting falling out of bed in association
14 with his sleep issues?
15      MR. LATHAM: Objection. You can
16 answer.
17 A. Sleep apnea and sleep disorder breathing is
18 not an uncommon diagnosis. It's seldom the case
19 that somebody wakes up in the middle of the night
20 and falls out of bed because of it, though. So,
21 yes, kind of unusual.
22 Q. Was it unusual simply because it was infrequent;
23 is that what you're saying?
24 A. I don't know that I've had a second patient
25 that's ever reported that particular symptom

1        associated with these other symptoms that are
2        consistent with sleep disorder breathing.  Full
3        grown adults that have sleep apnea don't typically
4        fall out of bed.  They might wake up in the middle
5        of the night.  They might be a little groggy, but
6        they don't fall out of the bunk, it's a bit odd.
7   Q.   Did the fact that he reported falling out of bed a
8        few times contribute to your decision to submit an
9        order for a bottom bunk?
10  A.   Absolutely.  I think my normal practice when
11       somebody reports symptoms consistent with sleep
12       apnea would be get the sleep steady first and only
13       order bottom bunk after the sleep study came back
14       positive and put him on a CPAP machine.
15  Q.   But because he had reported also having falls, are
16       you saying that that would have contributed to
17       requiring a bottom bunk prior to receiving the
18       sleep apnea machine?
19  A.   Yes.
20  Q.   At this point did you believe that the plaintiff
21       did in fact have a sleep disorder?
22  A.   He had symptoms that were consistent with it.
23       So you get the test to rule it in or out if it's
24       the pattern.
25  Q.   Based on this record as in Exhibit 1 you did in

1      A.   No.
2  Q.   Do you know why there are multiple orders in the
3      system?
4                  MR. SULLIVAN:  Objection.
5                  MR. LATHAM: Don't guess.  If you
6      know.
7      A.   The system doesn't have -- doesn't force you
8      to only write one, so you can write ten if you
9      want.  So they sometimes will accumulate.
10 Q.   So, do you think that these prior existing orders
11     are just lingering in the system?
12                 MR. LATHAM: Objection.  You can
13     answer.
14     A.   I'm better now about removing duplicates in
15     my electronic medical record when I'm sort of what
16     I call it cleaning up my patients, but when I
17     first started, there would sometimes be multiple
18     orders that were essentially duplicates, sometimes
19     for different reasons, and sometimes not.  And
20     they just -- it's just sort of a feature of the
21     system, or lack of feature of the system, that
22     they kind of accumulate that way.
23 Q.   But this was a function to get rid of prior
24     existing orders?
25     A.   I don't remember how it worked in the old

1      system.
2  Q.  So is it your testimony that you, because this was
3      early on in your experience at Medium, you would
4      just add a new order, just to be safe?
5                 MR. SULLIVAN:  Objection.
6                 MR. LATHAM: Objection.
7  A.   If you look at the order in the computer, the
8      way it's written, it looks redundant because she
9      wrote a bottom bunk, falls, dated 6-21-16 for a
10     year, and then I came along a week later and wrote
11     the same order for three months, which is a subset
12     of the year.  Which one would you follow?  It's
13     not really clear.  Either way, the intent on my
14     part was to get the bottom bunk approved, and by
15     writing that second order, I created another piece
16     of paper which would have went before them to be
17     assessed again.  When I said renew in the note,
18     what I meant is I was trying to get the
19     reconsideration of the order because it was denied
20     before, apparently in the sense that the patient
21     was telling me, oh, I don't have it.  Because he
22     says he was in a bottom bunk and requests again.
23     So I'm assuming what I meant by that he isn't in
24     one now and wants it, which is why I wrote the
25     order.

1          When you're writing it, you don't see the old
2     ones next to it the way it displays in this, and
3     at the time I was still getting used to how you
4     would do these, so I probably -- if I had seen
5     Marianne's order at the same exact time, maybe I
6     would have chose a different end date.  It's
7     arbitrary.  I picked three months because that's
8     what I pick.  I was probably thinking the sleep
9     study would be done by then and I'd have an
10    answer.  That's just how that plays out.  So you
11    don't remember exactly why I chose that start
12    date.  You think it might have just been --
13              MR. LATHAM: Hold on.
14  Q.  You don't recall why exactly you chose that stop
15    date, you just think it might have been for
16    convenience?
17  A.  No.  I mean, the stop date, I would have made
18    that up.  It's an arbitrary thing.
19  Q.  Do you recall what happened with this order?
20  A.  No.
21              EXHIBIT 4 (PLAINTIFF'S EXHIBIT 4
22              MARKED FOR IDENTIFICATION)
23  Q.  Do you recognize this document?
24  A.  Yes.
25  Q.  Do you know if this was the next time that you saw

Christopher Salas, M.D. - July 23, 2019

70

1  and then that information goes on like an SD card,
2  a memory chip that goes to the manufacturer of the
3  equipment to get analyzed and interpreted.
4  Q. Do you know how long it typically takes once the
5  sleep study has been done before results come back
6  from the outside company?
7  A. No.
8  Q. Do you know why it took until September 2nd for
9  the plaintiff to receive a sleep study?
10             MR. SULLIVAN:  Objection.
11 A. No.
12 Q. Did that time frame seem unusual to you?
13             MR. LATHAM: Objection.
14 A.  I have no basis to know that at that point.
15 Q. Well, currently, would it appear surprising in any
16 way for you -- if you saw that he received a sleep
17 study on 9-2 when it was ordered on May 31st?
18             MR. LATHAM: Objection.  I just want
19 to be clear, because he hasn't worked in Medium
20 for a while.  You're asking him currently, are you
21 asking him about Max, or what are you asking him?
22 Q. About Medium, having been at Medium for a year,
23 would you be surprised now that it took so long
24 for him to receive the sleep study?
25             MR. LATHAM: Objection.

```
 1        A.    To be honest, I don't know.  I never really
 2              gave it that much thought.  So they would -- the
 3              results would come back when they would come back.
 4              Most of the time I wasn't actually looking at the
 5              result from the time frame when I ordered it to
 6              even know how long it was.  Like, it wouldn't
 7              normally be natural to even recognize what the
 8              time frame was for the receipt of the result.  So
 9              I don't know, to be honest.  I just don't think
10              about it that way.
11   Q.         At this visit do you know if you did anything
12              about the bottom bunk order?
13        A.    I wrote that I would also check for the
14              bottom bunk form, which to me means I would
15              probably look to see if there was an approved or
16              denied form in the pile of forms that come back
17              from them to let me know if they've been approved
18              or denied, but I didn't write anything else
19              besides that here.
20   Q.         So you wouldn't have checked on the status and
21              then put anything in the records.  Is it normal to
22              say that you will check and not add anything to
23              the record?
24                        MR. LATHAM: Objection.  You can
25              answer.
```

Christopher Salas, M.D. - July 23, 2019

72

1     A.    Yes.
2  Q.  Can you tell from this record if you in fact
3      followed up or checked on it?
4     A.    No.
5                 EXHIBIT 5 (PLAINTIFF'S EXHIBIT 5
6                 MARKED FOR IDENTIFICATION)
7  Q.  What does this document look like?
8     A.    So, this would have been the special needs
9      printout from the same day as that second visit.
10     And it's the same as the previous visit.  So the
11     special needs haven't changed.
12  Q.  The start date on the last order in this document
13     is 6-28-16; is that correct?
14     A.    Yes.
15  Q.  And so is it fair to say that you didn't add a new
16     order on this date, but you did attempt in some
17     way to print this or get it in some way to the
18     deputy warden; is that a fair assessment?
19     A.    No.  I mean, this document wouldn't have gone
20     to her.  The special needs form would have went to
21     her.  I don't know what I did.  I don't know what
22     I did after I wrote the note that day.  I don't
23     know if I just looked for the form in the pile or
24     I sent another one to her or spoke to her.  I just
25     don't know what happened.

Christopher Salas, M.D. - July 23, 2019

80

1  Q.   Do you know what happened with this order after it
2       was approved?
3                 MR. SULLIVAN:  Objection.
4  A.   I do not.
5  Q.   Do you recall ever looking at the sleep study that
6       was done for this patient?
7  A.   At the time, no.  I did look at it because it
8       was in the packet that Jeff had.
9  Q.   So you recall looking at it in preparation for
10      this deposition?
11 A.   Last week, yeah.
12 Q.   But do you recall looking at it as part of the
13      plaintiff's treatment?
14 A.   No.  This is just like hundreds of other --
15                EXHIBIT 7 (PLAINTIFF'S EXHIBIT 7
16                MARKED FOR IDENTIFICATION)
17 Q.   So this looks familiar because you recently looked
18      at it in preparation for this deposition?
19 A.   Yes.
20 Q.   Did it confirm your suspicion that the plaintiff
21      had a sleep disorder?
22 A.   Yes.
23 Q.   Did you do anything in response to this study?
24 A.   I don't recall.
25                MS. DAVIS: That's all for that one?