UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **STEPHEN MELISE**,<br>　　　*Plaintiff*<br><br>v.<br><br>**PATRICIA COYNE-FAGUE,** in her official<br>capacity as Director of the **DEPARTMENT OF<br>CORRECTIONS**; **et al.**,<br>　　　*Defendants* | **C.A. No. 1:17-cv-00490-MSM-PAS** |

<u>**STATE DEFENDANTS' REPLY IN FURTHER SUPPORT OF<br>THEIR MOTION FOR SUMMARY JUDGMENT**</u>

     **NOW COME** Defendants the State of Rhode Island, the Department of Corrections

("RIDOC" or the "State"), as well as, former-Director A.T. Wall (individual capacity only)

("Wall"), RIDOC Director Patricia Coyne-Fague (official capacity only) ("Coyne-Fague"), and

former-Medium Security Deputy Warden Kerri McCaughey (individual and official capacities)

("McCaughey") (collectively, "State Defendants"), and hereby reply to Plaintiff's objection to

the State Defendants' Motion for Summary Judgment. State Defendants incorporate by reference

the arguments asserted in their previously filings, as if fully set forth herein.

## I.    THRESHOLD ISSUES

     Several threshold issues dominant Plaintiff's position:  first, that this Court should create

an issue of fact where none exists concerning Prescription Orders that may have been entered

into the Electronic Medical Record (EMR) system but never printed or otherwise delivered to

Deputy Warden McCaughey, and second, that by reviewing the accommodation requests written

by medical personnel, Deputy Warden McCaughey was substituting her medical judgment for

those of medical personnel. Neither argument has any basis in fact or law and have been rejected

by the First Circuit Court of Appeals. Finally, Plaintiff failed to exhaust his administrative

remedies as a precondition to suit. State Defendants will address each of these threshold issues in

turn.

### A.   The undisputed record establishes that State Defendants' knowledge is limited to the printed Administrative Notes that McCaughey actually received

"Summary judgment is 'the put up or shut up moment in litigation.'" *Guldseth v. Fam.*

*Med. Assocs. LLC*, 45 F.4th 526, 533 (1st Cir. 2022).  If the moving party meets their initial

evidentiary burden of showing there's no genuine factual issue for trial, the burden shifts to the

non-moving party to "demonstrate that a trier of fact could reasonably resolve that issue in her

favor." *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010). The nonmoving

party may not rely on "conclusory allegations, improbable inferences, and unsupported

speculation" to defeat summary judgment. *Guldseth*, 45 F.4th at 533; *Garmon v. National*

*Railroad Passenger Corp.*, 844 F.3d 307, 312 (1st Cir. 2016) ("Although [the court] will draw all

reasonable inferences in the nonmovant's favor, [the court] will not 'draw unreasonable

inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective.'").

Rather, "the non-moving party must come ***armed with some evidence*** to show that a reasonable

jury could find for them, lest their claims get caught in the summary-judgment scythe."

*Guldseth*, 45 F.4th at 533 (internal citations omitted) (emphasis added).

The Affidavit of Pauline Marcussen establishes that State Defendants (and McCaughey in

particular) did not know of or have access to the Plaintiff's prescription orders (State's Exhibits

1-12). State's SUF, at ¶ 21-27. If a RIDOC medical provider prescribes a special needs

accommodation on behalf of an inmate, the treating provider must first enter a prescription order

into the inmate's medical record within the EMR. State's SUF, at ¶ 21. RIDOC administrative

and security personnel do not have access to the EMR and cannot view prescription orders.

State's SUF, at ¶¶ 21-22, 27. Because RIDOC security personnel cannot access the EMR, the treating medical provider must print out the prescription order as an "administrative note" to serve as a special needs accommodation request, and then physically deliver the paper copy to a designated mailbox for the Facility ADA Coordinator to review. State's SUF, at ¶¶ 23-25, 27. Once the Facility ADA Coordinator receives the paper copy, they review it within a reasonable time and either grant, modify, request more information, or deny the request by writing on the paper copy and sending it back to the inmate and/or the medical provider. State's SUF, at ¶ 26.

As the undisputed record establishes, Plaintiff's prescription orders (State's Exhibits 1–12) could not be accessible or known to State Defendants because they can only be accessed through the EMR. State's SUF, at ¶ 27. The only relevant inquiry with respect to knowledge, therefore, rests with the printed Administrative Notes (State's Exhibits 13-20). The undisputed evidence establishes that McCaughey received, in total, seven (7) "Administrative Notes" submitted on behalf of Plaintiff:[1]

- November 12, 2014 (approved), State SUF, at ¶¶ 33-37 (State's Exhibit 13);

- February 9, 2014 (need more info), State SUF, at ¶¶ 41-45 (State's Exhibit 14);

- June 9, 2015 (denied), State SUF, at ¶¶ 49-51 (State's Exhibit 15);

- December 21, 2015 (denied), State SUF, at ¶¶ 69-71 (State's Exhibit 16);

- September 19, 2016 (approved), State SUF, at ¶¶ 83-85 (State's Exhibit 17);

- November 11, 2016 (approved), State SUF, at ¶¶ 103-104 (State's Exhibit 18); and,

- December 14, 2016 (approved), State SUF, at ¶¶ 118 (State's Exhibit 19).

Not only is it evident from McCaughey's signature and handwritten notes that she received these

---

[1] Each of these Administrative Notes are discussed in detail in State Defendants' Motion and Objection. However, this number was erroneously listed as five in State Defendants' Objection.

Administrative Notes, but McCaughey's testimony also confirms her receipt. State's SUF, at ¶¶ 33-37, 49-51, 69-71, 83-85, 103-104, 118.

State Defendants have met their burden to establish that they lacked knowledge of Plaintiff's prescription orders (State's Exhibits 1-12), and that McCaughey only knew of the seven (7) Administrative Notes that she actually received. *See Guldseth*, 45 F.4th at 533. The burden now rests with Plaintiff, who offers no evidence whatsoever that would enable a jury to find otherwise.  Moreover, this Court may not rely upon speculation. *See id.* ("[T]he non-moving party must come ***armed with some evidence*** to show that a reasonable jury could find for them.") (emphasis added). While Plaintiff attempts to disguise his lack of evidentiary support with dramatic statements, in the absence of any specific evidence, Plaintiff cannot avoid the swing of "the summary-judgment scythe" on this issue. *Id.*; *see also Garmon*, 844 F.3d 307, 312 (1st Cir. 2016) (the court "will not 'draw unreasonable inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective.'"); *Snell v. Neville*, 998 F.3d 474, 488 (1st Cir. 2021) ("Nor has Snell produced evidence of any specific grievances he may have filed which voiced dissatisfaction with Dr. Ruze's medical treatment (even as he insists he must have submitted them) or which complained to Dr. Ruze about accessing the Terminal.").  In the absence of any factual dispute, knowledge of the prescription orders cannot be imputed to McCaughey.

**B.  The stop date on a bottom bunk is not a medical opinion**

For medical staff, the "stop date" for a bottom bunk request is "arbitrary." State's SUF, at ¶ 176. The "stop date" included on a bottom bunk request does not constitute a medical opinion or medical determination. State's SUF, at ¶¶ 24, 176. Dr. Salas explained the unscientific nature of a bottom bunk "stop date" while reviewing a request he submitted on behalf of Plaintiff:

> **Q.**    You don't recall why exactly you chose that stop date, you
>           just think it might have been for convenience?
>
> **A.**    No. I mean, the stop date, I would have made that up**. It's an
>           arbitrary thing**.

State's SUF, at ¶¶ 27, 176 (emphasis added). For medical staff, the stop date does little else than

serve as an arbitrary date in the EMR. State's SUF, at ¶¶ 24, 176 ("When an administrative note

is printed, it will contain any special needs prescription orders entered in the EMR for that

inmate that are not expired (i.e., the stop date has not yet lapsed) or manually removed from the

EMR by a RIDOC medical provider.").

On the other hand, for RIDOC administrators and security personnel the "stop date" on a

bottom bunk request serves as a "review date." *See* State's SUF, at ¶ 181. In the event an inmate

wishes to continue an approved bottom bunk request past the stop date, the inmate must submit a

request to renew it, at which time any changes in the inmate's condition or circumstances will be

reviewed. *See* State's SUF, at ¶ 181. If the inmate does not submit a request prior to the review

date, the request will simply expire at that time. *See See* State's SUF, at ¶¶ 24, 178; 182. This

practice aligns precisely with the deference afforded to State Defendants when faced with a

decision at the crossroads of prison administration and medical judgments:

> In an institution like the Treatment Center, as in an ordinary prison,
> security and administrative concerns may clash with the welfare and
> comfort of individuals, as the district court recognized. . . . Any
> professional judgment that *decides* an issue involving conditions of
> confinement must embrace security and administration, and not
> merely medical judgments.

*Cameron*, 990 F.2d 20 (1st Cir. 1993); *see also Kosilek v. Spencer*, 774 F.3d 63, 83 (1st Cir.

2014). Plaintiff's attempt to color the review dates on Plaintiff's bottom bunk requests, as

"medical decisions" should not be credited, as it is directly contradicted by the evidence and

binding authority. *See* State's SUF, at ¶ 176; *see also Cameron v. Tomes*, 990 F.2d 20 (1st Cir.

1993); *Kosilek v. Spencer*, 774 F.3d 63, 83 (1st Cir. 2014).

### C.  Prison administrators do not substitute their judgment for medical opinions

While Plaintiff argues that the decisions of prison medical staff is of paramount

importance and must always be followed without question, the First Circuit has expressly

rejected such a concept because it directly conflicts with the responsibilities of prison

administrators to use their own professional judgment when a medical accommodation conflicts

with prison safety and security, such as prescribing an inmate to use cane. *See Cameron*, 990

F.2d 20. Instead, the Court of Appeals has recognized that in the prison context, medical

decisions are inseparable from security and institutional concerns:

> [W]hen it comes to appraising the judgments of the administrators, it does not follow that they are bound to do what the doctors say is best for [the plaintiff] even if the doctors are unanimous. The administrators are responsible to the state and to the public for making professional judgments of their own, encompassing institutional concerns as well as individual welfare. Nothing in the Constitution mechanically gives controlling weight to one set of professional judgments.

*Cameron*, 990 F.2d 20; *see also Kosilek*, 774 F.3d at 83 ("When evaluating medical care and

deliberate indifference, security considerations inherent in the functioning of a penological

institution must be given significant weight.").

Despite Plaintiff's attempt to paint McCaughey requesting more information as

substituting her own "medical judgment," McCaughey's requests were certainly reasonable, if

not required under the circumstances. During her tenure as deputy warden, McCaughey was

responsible for ensuring that Medium Security did not run out of bottom bunks, State's SUF, at

¶¶ 16, 143-144, 165, and addressing other institutional concerns associated with bottom bunk

requests, such as: ensuring that the reason for the request was for a legitimate and documented

need and not based on convenience or desire, State's SUF, at ¶ 147, and did not conflict with

prison staff's observations of the inmate's activities, State SUF, at ¶ 13; determining whether the

claimed reason for the request, if legitimate, posed a safety hazard with respect to any job duties

assigned to that inmate, State SUF, at ¶ 145-147; and, assessing whether there is a potential for a

"climate issue" to arise between cellmates, State SUF, at ¶ 145.

Climate issues have arisen between other inmates where it appears that an inmate is being

given preferential treatment, rather than a accommodation for a legitimate medical reason. *See*

State SUF, at ¶ 145. In the context of bottom bunks, McCaughey testified about a climate issue

that she experienced where:

> an inmate who was on a bottom bunk who did not have a bottom
> bunk order being moved to a top bunk so another offender could
> come into that same cell and have the bottom bunk. Sometimes
> that's caused a climate issue between the two of them, if the person
> on the bottom bunk order does not appear to be legitimate.

*See* State's SUF, at ¶ 164. McCaughey acknowledged that while Plaintiff's bottom bunk request

did not result in a climate issue, she still nevertheless evaluated the potential for one to arise prior

to approving or denying Plaintiff's requests. *See* State's SUF, at ¶ 164. In similar cases, the First

Circuit deferred to such rationale while recognizing that prisons have "interests in 'maintaining

security and order' within the institution. *See Snell v. Neville*, 998 F.3d 474, 501 (1st Cir. 2021)

("For security purposes, the DOC defendants refused accommodations which appeared to

preference one inmate over others, such as allowing Snell access to the first-floor Terminal

without a no-stairs restriction when all other would-be users would need to prove that they

required an accommodation."). Given the inseparable nature of security and medical decisions in

the prison context, such deference is appropriate here.

### D.  Plaintiff Failed to Exhaust his Administrative Remedies

The Prison Litigation Reform Act provides that:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Accordingly, inmates are required to exhaust all available administrative processes before filing a federal lawsuit relating to the conditions of his or her confinement, even if some or all of the relief the inmate seeks is not available through the administrative process. *See Booth v. Churner*, 532 U.S. 731, 734 (2001); *Porter v. Nussle*, 534 U.S. 516, 532 (2002) ("The PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."); *Medina–Colaudie v. Rodriquez–Mateo*, 292 F.3d 31, 36 (1st Cir. 2002). ("Congress clearly made the exhaustion of administrative remedies a necessary antecedent to filing a claim in federal court.").

RIDOC has grievance policies and procedures[2] that are available to all inmates. *See* DOC Policy 13.10-4; *see also Young v. Wall*, No. CIV.A. 03-220S, 2006 WL 858085, at *3 (D.R.I. Feb. 27, 2006) ("[I]t is undisputed that the RIDOC has a grievance policy in place and is available…."). While health care issues are not considered grievable area under the standard grievance process, *see* Policy 18.10-4, inmates may still submit complaints related to health care services under Policy 18.11-3 DOC. Plaintiff submits no evidence that he ever pursued any of his claims under either of RIDOC's grievances procedures. *See Porter v. Nussle*, 534 U.S. at 532 (holding that the PLRA exhaustion requirement applies to all inmate suits about prison life). For

---

[2] RIDOC's grievance policies are publicly available at: https://doc.ri.gov/news-info/inmate-life.php

this reason, Plaintiff's federal claims must be dismissed.

## II.   PLAINTIFF'S CLAIMS UNDER THE AMERICANS WITH DISABILITIES ACT (ADA) AND REHABILITATION ACT FAIL AS A MATTER OF LAW

The DOC Defendants are entitled to summary judgment on Melise's statutory claims of disability discrimination under the ADA and the Rehabilitation Act.  For the purposes of the Court's analysis, those two claims are substantively identical.[3] *See, e.g.*, *Snell*, 998 F.3d at 498 (citations omitted); *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 4 (1st Cir. 2000); *Theriault v. Flynn*, 162 F.3d 46, 48 n.3 (1st Cir. 1998) ("Title II of the ADA was expressly modeled after Section 504 of the Rehabilitation Act, and is to be interpreted consistently with that provision.").

Under the ADA, a plaintiff can establish a disability discrimination claim in several different ways: by showing "disparate treatment on account of disability," by showing that a neutral policy has a disparate impact, or by showing that "a public entity has refused to affirmatively accommodate his or her disability where such accommodation was needed to provide 'meaningful access to a public service.'"  *Nunes v. Massachusetts Dep't of Correction*, 766 F.3d 136, 144-45 (1st Cir. 2014) (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 276 (2d Cir. 2003)).  Melise's ADA and Rehabilitation Act claims can be further streamlined, as they are based entirely on McCaughey's actions in allegedly failing to provide him with a reasonable

---

[3] The Rhode Island Civil Rights of People with Disabilities, R.I. Gen. Laws § 42-87-1, *et seq.* ("RIPDA") is substantively identical to the ADA and courts have generally analyzed claims pursuant to the law as developed under the ADA, with exception to the application of mitigating circumstances such as reasonable accommodations, prosthetic devices, medications, or auxiliary aids. *See Evans v. Rhode Island Dep't of Bus. Regul.*, No. CIV.A. 01-1122, 2004 WL 2075132, at *5 (R.I. Super. Aug. 21, 2004) (quoting R.I. Gen. Laws § 42-87-1); *see also Adkins v. Nat'l Grid USA Serv. Co., Inc.*, No. 1:21-CV-0310-MSM-PAS, 2022 WL 3701602, at *2 (D.R.I. Aug. 26, 2022). Accordingly, State Defendants will also address Plaintiff's RIPDA claim under this framework as well.

accommodation in the form of a bottom bunk assignment.[4] *See* Plf.'s Mot. Partial Summ. J. (ECF 107), at 34-35 ("Defendant DOC is liable under the ADA based entirely on the actions of Defendant McCaughey.").

> Melise's reasonable accommodation claim can only survive summary judgment if:
>
> "the record reflects sufficient evidence to create a genuine issue of material fact that:
>
> "(1) [Melise] is a qualified individual with a disability;
>
> "(2) . . . he was either excluded from participation in, or denied the benefits of a public entity's services, programs, or activities or was otherwise discriminated against; and
>
> "(3) . . . such exclusion, denial of benefits, or discrimination was by reason of [his] disability."

*Snell*, 998 F.3d at 499 (citing *Kiman*, 451 F.3d at 283). "The third prong of an ADA Title II reasonable accommodation claim mandates that [Melise] explain how the decision to deny a reasonable accommodation was discriminatory, even if the actors denying the accommodation did not have any intent to discriminate." *Id.* at 500 n.3 (citing *Kiman*, 451 F.3d at 285). Additionally, "[t]he statutes entitle [a plaintiff] to reasonable accommodations, not to optimal ones finely tuned to his preferences." *Nunes*, 766 F.3d at 146 (citations omitted). A plaintiff alleging failure to accommodate must make a showing that his proposed accommodation is both effective and reasonable. *See Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 259 (1st Cir. 2001).

---

[4] Despite Melise's feint at a disparate impact theory in his Motion for Summary Judgment, he makes no attempt to address the prima facie case for such a claim, and the only evidence he cites relates to McCaughey's actions with respect to Melise. *See* Plf.'s Mot. Partial Summ. J. (ECF 107), at 32-33; *cf. Femino v. NFA Corp.*, 274 F. App'x 8, 10 (1st Cir. 2008) (finding that plaintiff's evidence that her own disability benefits were terminated was "not enough to demonstrate a disparate impact on the particular group [she] identifie[d]"). Similarly, in his Objection, Melise attempts to mount a facial attack on the DOC's privacy-based policy of preventing security staff from accessing inmates' medical records but provides no concrete evidence as to how that policy has detrimentally affected other disabled inmates. *See* Plf.'s Obj. (ECF 117), at 25-26.

Because the "ADA prohibits discrimination because of disability, not inadequate treatment for disability[,]" Melise must "show[ ] that the DOC defendants' decisions regarding the reasonable accommodation were 'so unreasonable as to demonstrate that they were discriminating against [Melise] because of his disability[.]'" *Snell, 998 F.3d* at 500-01.  "Without discrimination, there would be no ADA claim." *Id.* at 500 n.35.  In assessing the reasonableness of a plaintiff's proposed accommodation in a jail setting, the Court must afford due deference to the facility's interest in "maintaining security and order." *Id.* at 501 (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 n. 23 (1979)).

Moreover, if he seeks to recover damages from the DOC through his ADA and Rehabilitation Act claims, Melise must also prove that he was subjected to *intentional* discrimination. *See Nieves–Márquez v. Puerto Rico*, 353 F.3d 108, 126 (1st Cir. 2003) (citing *Alexander v. Sandoval*, 532 U.S. 275, 280-81 (2001) ("[P]rivate individuals may recover compensatory damages under § 504 and Title II only for intentional discrimination.").  And the First Circuit has held that such intentional discrimination requires "evidence 'of . . . animus toward the disabled.'" *Carmona-Rivera v. Puerto Rico*, 464 F.3d 14, 17 (1st Cir. 2006) (quoting *Nieves–Márquez*, 353 F.3d at 126-27 (1st Cir. 2003)); *cf. S.H. ex rel. Durrell v. Lower Merion School Dist.*, 729 F.3d 248, 263 (3d Cir. 2013) (recognizing that First Circuit's decision in *Nieves–Márquez* indicates "that plaintiffs seeking compensatory damages must demonstrate a higher showing of intentional discrimination than deliberate indifference, such as discriminatory animus").

Under First Circuit precedent, and for the reasons previously described, Melise cannot establish discrimination because of disability, let alone animus or intentional discrimination.[5]  In his deposition, Melise specifically disclaimed any belief that McCaughey harbored any animus against him, with respect to his disabilities or otherwise. *See* SUF ¶¶ 127-30.  And Melise cannot show that McCaughey's specific actions were "'so unreasonable as to demonstrate that [McCaughey was] discriminating against [Melise] because of his disability[.]'" *Snell*, 998 F.3d at 500 (quoting *Kiman*, 451 F.3d at 285).

First, although Melise argues that McCaughey's knowledge of multiple bottom bunk requests was sufficient to require the DOC to grant those requests, this argument ignores the settled law that the "DOC defendants also had interests in 'maintaining security and order' within the institution when they determined whether providing the accommodation to [Melise] would have been reasonable," and that "such rationales" are entitled to deference. *Snell*, 998 F.3d at 501 (1st Cir. 2021) (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 n.23 (1979)).  McCaughey has testified that she evaluated all bottom bunk requests, including Melise's, in the light of prison safety and security issues, including the possibility that climate issues might arise from other inmates' perception—justified or not—that a bottom bunk accommodation had been granted to an inmate who did not require one. Although Plaintiff highlights that his bottom bunk assignment did not – in the end –  create "climate issues," when evaluating special accommodation issues, prison officials do not have the benefit of a crystal ball and McCaughey

---

[5] As discussed in more detail in Section V, Melise cannot establish that McCaughey acted with deliberate indifference with respect to the bottom bunk requests she received as Administrative Notes; *a fortiori*, Melise also cannot establish that McCaughey acted with discriminatory animus. *See Durrell*, 729 F.3d at 263 (citing *Nieves–Márquez*, 353 F.3d at 126-27) (recognizing that discriminatory animus requires "a higher showing of intentional discrimination than deliberate indifference").

knew from her past experience that these type of accommodation requests had create hostile inmate climate issues.  SUF ¶¶ 140-44; *see* SUF ¶ 145 (explaining that climate issues have previously occurred "if the person on the bottom bunk order does not appear to be legitimate" and confirming that the creation of a safety hazard to Melise "was one of the things that [McCaughey] looked at"); *cf. Snell*, 998 F.3d at 501 ("For security purposes, the DOC defendants refused accommodations which appeared to preference one inmate over others[.]"). Given the ongoing tension between the limited number of bottom bunks and the large number of inmate requests for bottom bunks – as well as the ever present concern that inmates will seek and receive special benefits not provided to other inmates – Melise's requests for a special accommodation was a valid institutional concern. SUF ¶¶ 132-34, 143-44. With respect to McCaughey's June 19, 2015, and December 29, 2015 denials, the record also shows that ladders had been recently installed for the bunk beds in Medium Security and that Melise had "[n]o trouble climbing the ladder" to reach a top bunk. SUF ¶¶ 52-53, 149; see SUF ¶ 150 (confirming that Melise was "able to climb up into the upper bunk without any difficulty").

As to McCaughey's purported knowledge of Melise's sleep apnea—and even setting aside Melise's specious argument that the Court is obligated to infer that McCaughey contemporaneously received the June 2016 prescription orders but chose not to act on them for almost three months—it is undisputed that McCaughey approved the sole prescription order on the September 2016 Administrative Note that listed Melise's potential "?apnea" as the basis for a bottom bunk accommodation. SUF ¶¶ 83-84.  The other two orders were based on "neck pain" and "falls" and thus contained no information about any sleep-related disability. SUF ¶ 83; *see* SUF ¶¶ 168-69.  The September 28, 2016 stop date for the June 28, 2016 "falls, ?apnea" order was set by Dr. Salas, who also noted in the EMR that Melise was on the waiting list for a sleep

study. SUF ¶ 79.  Melise cannot charge McCaughey with knowledge of a diagnosis that did not

yet exist, and McCaughey's decision to approve a prescription order, in full, cannot support a

claim of discrimination under the ADA.  To the extent that Melise disagrees with the adequacy

of Dr. Salas's September 28, 2016 stop date, "courts have differentiated ADA claims based on

negligent medical care from those based on discriminatory medical care." *See Kiman*, 451 F.3d

at 284-85.

　　　　As a result, Melise simply cannot show that McCaughey's decisions were "'so

unreasonable—in the sense of being arbitrary and capricious—as to imply that [they were]

pretext for some discriminatory motive, such as animus, fear, or apathetic attitudes.'" *Id.*

(quoting *Lesley v. Chie*, 250 F.3d 47, 55 (1st Cir. 2001)); *cf. Snell*, 998 F.3d at 501 ("In the DOC

defendants' reasonable interpretation of [plaintiff]'s medical needs and the institution's security

needs, [plaintiff] would not significantly risk his health by climbing stairs despite his injuries and

maladies, and the prison would suffer less potential institutional unrest if the DOC defendants

required [plaintiff] to so navigate.").  Despite Melise's attempts to paint McCaughey's actions as

"an outright denial of medical services," the record shows that McCaughey acted reasonably in

performing the difficult task of reviewing Melise's requests for an accommodation in the prison

context—many of which she granted. *Kiman*, 451 F.3d at 287; *see Carmona-Rivera v. Puerto

Rico*, 464 F.3d 14, 18 (1st Cir. 2006) ("The record is devoid of evidence or reasonable inferences

that these delays . . . were anything more than the result of a slow-moving bureaucracy or that

they were intentionally undertaken by the defendants to purposefully discriminate against

[plaintiff] because of her disability.").

## III.   THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

　　　　Wall and McCaughey are entitled to qualified immunity from the damages claims that

Melise asserts against them in their individual capacities.  In his Objection, Melise fails to

address the proper test for determining "whether the right at issue was 'clearly established' at the

time of [a] defendant's alleged misconduct."[6] *Matalon v. Hynnes*, 806 F.3d 627, 633 (1st Cir.

2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  That inquiry has two sub-parts,

the first of which "requires the plaintiff to identify either 'controlling authority' or a 'consensus

of cases of persuasive authority' sufficient to send a clear signal to a reasonable official that

certain conduct falls short of the constitutional norm."[7] *Alfano v. Lynch*, 847 F.3d 71, 75 (1st Cir.

2017) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).  "[T]he clearly established law must

not be gauged at too high a level of generality; instead, it must be 'particularized' to the facts of

the case." *Id.* at 76 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  A plaintiff must

show that "the existing precedents establish the applicable legal rule with sufficient clarity and

---

[6] To be clear, the State denies that any constitutional violations have occurred; however, those substantive issues will be addressed separately. *See infra* Section V.

[7] Although at least one federal circuit has held that "the qualified immunity defense is available for ADA and Rehabilitation Act claims[,]" *Roberts v. City of Omaha*, 723 F.3d 966, 972 (8th Cir. 2013), the damages claims against Wall and McCaughey in their individual capacities under the ADA and Rehabilitation Act fail for the independent reason that those statutes do not allow for suits against state officials in their individual capacities—a point that Melise does not challenge in his Objection. *See Kiman v. N.H. Dep't of Corrections*, 451 F.3d 274, 290 (1st Cir. 2006); *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002).  Melise has also not contested the fact that "[i]f an officer is found to be deserving of qualified immunity under federal law, he [or she] will also be granted qualified immunity for the same claim under Rhode Island law." *Estrada v. Rhode Island*, 594 F.3d 56, 63 (1st Cir. 2010) (citing *Hatch v. Town of Middletown*, 311 F.3d 83, 89-90 (1st Cir.2002).  Accordingly, although the qualified immunity analysis will focus primarily on Melise's Eighth Amendment claim, it is dispositive and applies equally to Melise's ADA and related state-law claims against not only Wall and McCaughey, in their individual capacities, but also the State of Rhode Island and its officials, sued in their official capacity. *See Gray v. Derderian*, 400 F. Supp. 2d 415, 424 (D.R.I. 2005) ("The Rhode Island Supreme Court in *Calhoun* also states clearly that no liability can be charged to the State, based on the doctrine of *respondeat superior*, if the state's agent or employee is immune from prosecution…."); *cf Saunders v. State*, 446 A.2d 748, 752 (R.I. 1982) (recognizing the State cannot be held liable for the negligent acts of a correctional officer protected by personal immunity).

specificity to put the official on notice that his contemplated course of conduct will violate that rule." *Id.* (citing *Matalon*, 806 F.3d at 633). "It is not enough that the rule is suggested by then-existing precedent." *Wesby*, 138 S. Ct. at 590.

"The second sub-part asks whether an objectively reasonable official in the defendant's position would have known that his [or her] conduct violated that rule of law." *Alfano*, 847 F.3d at 75 (citing *Wilson v. City of Boston*, 421 F.3d 45, 57-58 (1st Cir. 2005)). "The question is not whether the official actually abridged the plaintiff's constitutional rights but, rather, whether the official's conduct was unreasonable, given the state of the law when he [or she] acted." *Id.* (citing *Amsden v. Moran*, 904 F.2d 748, 751–52 (1st Cir. 1990)). "The plaintiff's burden to demonstrate that the law was clearly established is thus 'a heavy burden indeed.'"[8] *Estate of Rahim by Rahim v. Doe*, No. 21-1086, 2022 WL 11602542, at *6 (1st Cir. Oct. 20, 2022) (quoting *Lachance v. Town of Charlton*, 990 F.3d 14, 20 (1st Cir. 2021)).

Melise cannot succeed on either sub-part.  To begin, while Melise cites multiple cases in his Objection for the proposition that the Eighth Amendment prohibits officials from acting with deliberate indifference to an inmate's serious medical need, blanket statements of legal standards do not provide clear, particularized notice of what conduct is forbidden. "'[G]eneral statements of the law are not inherently incapable of giving fair and clear warning' to public officials[;] . . . rather, the existence of fair and clear warning depends on whether, 'in the light of pre-existing

---

[8] Melise's burden is even heavier with respect to his claim against Wall, which rests on a theory of supervisory liability for Wall's purported failure to reform the accommodation review process.  "When a supervisor seeks qualified immunity in a section 1983 action," the clearly established law analysis implicates the question of whether it was "clearly established that a supervisor would be liable for constitutional violations perpetrated by his subordinates in that context." *Camilo-Robles v. Hoyos*, 151 F.3d 1, 6 (1st Cir. 1998) (citations omitted).  "In other words, for a supervisor to be liable there must be a bifurcated 'clearly established' inquiry—one branch probing the underlying violation, and the other probing the supervisor's potential liability." *Id.*

law' the unconstitutionality of the challenged *conduct* is 'apparent[.]'" *Alfano*, 847 F.3d at 76

(emphasis added).  Moreover, Eighth Amendment claims based on medical needs contain an

objective as well as a subjective element, and both prongs necessarily implicate the fact- and

context-specific question of whether the defendants acted reasonably. *See Snell v. Neville*, 998

F.3d 474, 495 (1st Cir. 2021) ("As for whether the defendants provided adequate care, prison

officials are not required to render ideal care, let alone cater to an inmate's preferred healthcare

regimen."); *id.* at 497 ("[I]f defendants acted reasonably in light of the inmate's serious medical

need, . . . we will not decide they acted with deliberate indifference in violation of the Eighth

Amendment, even if the defendants' actions resulted in an inmate's discomfort[.]").

Melise also misrepresents the facts of *Pierce v. D.C.*, 128 F. Supp. 3d 250 (D.D.C. 2015),

when he claims that the *Pierce* court held the District of Columbia liable under the ADA and the

Rehabilitation Act "for nearly the same conduct" at issue here.  *Pierce* involved a deaf inmate

who could not effectively communicate in English and relied on American Sign Language (ASL)

to communicate with others. *Pierce*, F. Supp. 3d at 275.  Despite the facts that the inmate's

deafness—and his resulting inability to meaningfully access health services, rehabilitation

classes, the grievance process, and other prison programs and services—were "obvious and

indisputably known to the provider of services," prison officials essentially ignored the inmate's

requests for an ASL interpreter, relying instead on the ineffective practices of "lip reading and

handwritten notes." *See id.* at 264, 270, 275-76.

Among other factual differences from Melise's own situation, the *Pierce* defendants

apparently failed to review the plaintiff's needs and accommodation requests in *any* meaningful

way. *See id.* at 274 ("The record shows that [plaintiff] made repeated requests for an ASL

interpreter with respect to various aspects of his incarceration experience, and that [defendant]'s

employees and contractors generally declined to discuss the matter further, preferring to rely on lip reading and handwritten notes."); *id.* at 275 ("[B]ecause the prison staff did not undertake any genuine assessment of [plaintiff]'s abilities whatsoever, their lay opinions about what worked for [plaintiff] and what [plaintiff] could do amounted to entirely uninformed speculation[.]"). Because it deals with an entirely distinct course of conduct and represents an out-of-circuit nonbinding precedent, for the purposes of this case *Pierce* cannot "establish the applicable legal rule with sufficient clarity and specificity to put the official on notice that his [or her] contemplated course of conduct will violate that rule." *Alfano*, 847 F.3d at 75 (citing *Matalon*, 806 F.3d at 633). Moreover, one District Court case from another jurisdiction does not amount to a "'consensus of cases of persuasive authority[.]'" *Id.* (quoting *Anderson*, 483 U.S. at 640).

*Kiman v. N.H. Dep't of Corrections*, 451 F.3d 274 (1st Cir. 2006), the single remotely comparable case Melise cites in his qualified immunity objection, still differs from his case in several crucial respects. *Kiman* involved an inmate with amyotrophic lateral sclerosis, also known as ALS or Lou Gehrig's Disease, who alleged that the defendants violated the ADA "by failing to properly treat his disease and by failing to reasonably accommodate his resulting disability" in multiple ways, including by refusing to place him in a bottom bunk. *Kiman*, 451 F.3d at 276, 289. The defendants had acknowledged the inmate's disability by issuing him a cane and a shower chair pass; in fact, the inmate had been issued "a bottom bunk pass that was in effect the entire time he was incarcerated" but that was apparently not honored. *Id.* at 278, 289. Besides the inmate's significant mobility issues, a bottom bunk pass was warranted because "[t]here was no ladder to get on the top bunk," forcing the inmate with ALS to either "rely on his cellmate to get to the top bunk" or "hoist[ ] himself up to the bunk, sometimes gaining leverage on the edge of the latrine or sink in the cell." *Id.* at 278. After the district court granted summary

judgment for the defendants, the First Circuit vacated that decision, finding that certain aspects of the claim presented triable issues of fact; with respect to the bottom bunk, the First Circuit found that the inmate's deposition testimony that he had unsuccessfully requested a bottom bunk created an issue of fact as to whether the defendants failed to provide him with a reasonable accommodation. *Id.* at 289-90.

Despite Melise's best efforts to gloss over these distinctions, *Kiman* thus presents a substantially different scenario from his own case. *Kiman* involved an inmate with ALS who had already been granted multiple mobility accommodations in a prison environment without a ladder to help him reach his top bunk. *Kiman*, 451 F.3d at 278, 289; *cf.* SUF ¶¶ 149-50 (Melise had "[n]o trouble" climbing the ladder to top bunk). Moreover, while the precise details of New Hampshire's prison administrative process are not apparent from the face of the opinion, *Kiman* appears to have involved a dispute over whether a validly issued bottom bunk pass was improperly ignored, not a dispute over whether an inmate should have been granted a bottom bunk pass. *Kiman*, 451 F.3d at 278, 289; *cf.* SUF ¶¶ 16, 18-20, 26.

Even if *Kiman* is viewed as providing sufficiently clear and specific notice under the first sub-part of the clearly established law analysis, under the second sub-part, Melise cannot demonstrate that either Wall or McCaughey's "conduct was unreasonable, given the state of the law when [they] acted." *Alfano*, 847 F.3d at 75. "[E]ven if a constitutional right is clearly established, [a] defendant is entitled to qualified immunity so long as a reasonable official in [defendant]'s position could believe, albeit mistakenly, that his [or her] conduct did not violate" plaintiff's constitutional rights. *Philip v. Cronin*, 537 F.3d 26, 34 (1st Cir. 2008) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)); *see also Justiniano v. Walker*, 986 F.3d 11, 26 (1st Cir. 2021) (same).

If Melise is correct and *Kiman* represents the relevant state of the law, i.e., an inmate who has trouble accessing the top bunk without the presence of a ladder must be granted a bottom bunk assignment, then the presence of top bunk ladders and Melise's ability to use those ladders without difficulty both indicate that Wall and McCaughey "'acted objectively reasonably in applying clearly established law to the specific facts they faced.'" *Wilson v. City of Boston*, 421 F.3d 45, 58 (1st Cir. 2005) (quoting *Burke v. Town of Walpole*, 405 F.3d 66, 86 (1st Cir. 2005)); *see* SUF ¶¶ 149-50. At the very least, the distinction between *Kiman* where ladders were not available and this case where ladders were available, provides a sufficient factual distinction for purposes of qualified immunity. A further material factual distinction between *Kiman* and this case arises from the actual "'action[s] taken'" by each set of defendants. *Wilson*, 421 F.3d at 58 (quoting *Starlight Sugar, Inc. v. Soto*, 253 F.3d 137, 142 (1st Cir. 2001)). Here, the challenged actions stem from the review of Melise's requests for a bottom bunk accommodation rather than the refusal to implement an enforceable bottom bunk pass. *Kiman*, 451 F.3d at 278, 289; *cf.* SUF ¶¶ 16, 18-20, 26. In *Kiman*, the First Circuit distinguished between defendants' purported failures to respond to plaintiff's "complaint that he was being kept on a top bunk" despite his bottom bunk pass, which raised an issue of fact on plaintiff's ADA claim, from defendants' "attempt[s] to verify [plaintiff]'s need for the cane for both medical and security reasons[,]" which did not. *Kiman*, 451 F.3d at 285, 289-90. Melise falls within the second category where McCaughey was attempting to verify Melise's need for the accommodation from a security perspective.

Moreover, *Kiman* counsels that safety and security concerns are properly considered by prison officials when deciding whether to grant a requested accommodation, and the undisputed facts show that McCaughey appropriately took such concerns into account in making her

decisions. *See Kiman*, 451 F.3d at 285-86; *cf.* SUF ¶¶ 140-45.  In Snell, a 2021 case involving denials of access to a first-floor prison library in 2015 and 2016, the First Circuit reaffirmed that prison officials' interests in maintaining security and order are germane to the reasonable accommodation analysis and are entitled to deference from reviewing courts. *Snell*, 998 F.3d at 482-84, 501.  As such, even if Melise could show that McCaughey's decisions violated the law, "the 'added measure of protection' provided by qualified immunity" insulates those decisions from liability. *Wilson*, 421 F.3d at 58 (quoting *Cox v. Hainey*, 391 F.3d 25, 31 (1st Cir. 2004)). Accordingly, both Wall and McCaughey are entitled to qualified immunity because Melise cannot establish that their actions were objectively unreasonable in the light of clearly established law.

## IV.   THE ELEVENTH AMENDMENT BARS SUIT AGAINST THE STATE OF RHODE ISLAND AND ITS OFFICIALS (COUNTS I, II, IV, AND VI)

### A.  Counts II, IV, AND VI

"The test for finding that a state has waived its Eleventh Amendment immunity is a stringent one." *Acevedo López v. Police Department of the Commonwealth of Puerto Rico*, 247 F.3d 26, 28 (1st Cir. 2001). The United States Supreme Court has expressed that it "will find waiver only where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction." *Edelman v. Jordan*, 415 U.S. 651, 673 (1974). This Circuit has similarly expressed that "[a] state's consent to suit in the federal courts must be 'unequivocally expressed'" and that the waiver "must be 'stated by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" *Acevedo López*, 247 F.3d at 28. Furthermore, "in order for a state statute or constitutional provision to constitute a waiver of Eleventh Amendment immunity, it must specify the state's intention to subject itself to suit in *federal court*." *Id.*

(emphasis in original); *see also Edelman*, 415 U.S. at 677 n.19 ("Whether Illinois permits such a suit to be brought against the State in its own courts is not determinative of whether Illinois has relinquished its Eleventh Amendment immunity from suit in the federal courts").

In this case, Melise asserts three state law claims[9] under the Rhode Island Civil Rights Act ("RICRA") (Count II), the Rhode Island Civil Rights of Persons with Disabilities Act ("RIPDA") (Count IV), and Article I, Section 8 of the Rhode Island Constitution (Count VI),[10] and asks this federal court to award monetary damages against the State of Rhode Island, as well as Coyne-Fague and McCaughey, in their official capacities. No explicit waiver of Rhode Island's Eleventh Amendment immunity expressing the State's "intention to subject itself to suit in *federal court*" can be found in the text of any of these statutory and constitutional provisions. *Acevedo López*, 247 F.3d at 28 (emphasis in original). Plaintiff concedes this point. *See* Plf.'s Obj. (ECF 117), at 6-8 ("RICRA does not contain any express waiver of Eleventh Amendment Immunity…."); *see also Acevedo López*, 247 F.3d at 28 ("It must be 'stated by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'").

Further, despite Plaintiff's claim that Rhode Island has waived Eleventh Amendment immunity for claims that sound in discrimination, this Court has recognized that the State of Rhode Island has not waived its Eleventh Amendment immunity with respect to state law discrimination claims, including RICRA. *See e.g.*, *Luceus v. Rhode Island*, No. CV 15-489 WES,

---

[9] The State does not assert Eleventh Amendment immunity for the fourth state law claim at this time, Negligence (Count VII), and will address that claim *infra,* in section VI(C).

[10] No Rhode Island statute, constitutional provision, or Rhode Island case law has "unequivocally expressed" Rhode Island's intention to waive its Eleventh Amendment immunity and allow state constitutional claims to be brought in federal court.

2018 WL 1626263, at *4 (D.R.I. Mar. 30, 2018), *aff'd*, 923 F.3d 255 (1st Cir. 2019). In *Luceus*,

this Court held "that the Eleventh Amendment required dismissal of [the plaintiff]'s claims

against the State under Rhode Island's Fair Employment Practices Act and Rhode Island's Civil

Rights Act." *Id.* In so holding, this Court found that the Rhode Island Supreme Court's decision

in *Laird v. Chrysler* is not "controlling precedent construing this issue under either FEPA or

RICRA."[11] *Luceus v. Rhode Island*, No. CV 15-489ML, 2016 WL 7971311, at *5 (D.R.I. Dec.

13, 2016), *report and recommendation adopted*, No. CV 15-489 ML, 2017 WL 318646 (D.R.I.

Jan. 23, 2017); *see also Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 254 (1985))

("Consequently, a state will be deemed to have waived its immunity only where stated by the

most express language or by such overwhelming implication from the text as will leave no room

for any other reasonable construction."). Similarly, the Rhode Island Superior Court has rejected

attempts to find waiver of sovereign immunity with respect to state discrimination laws. *See*

*Mitchell v. State Dep't of Corr.*, No. P.C. 02-6968, 2003 WL 22389814, at *2 (R.I. Super. Sept.

23, 2003) ("The immunity of the sovereign from suit is not waived for actions under the Rhode

Island Civil Rights Act.") (footnote omitted).

Just as in *Luceus*, here too "Plaintiff misinterprets the applicable standard…." *Luceus v.*

*Rhode Island*, 2018 WL 1626263, at *5. Courts may not imply general waivers of Eleventh

Amendment immunity. *United States v. Mitchell*, 445 U.S. 535 (1980); *Mitchell v. State Dep't of*

*Corr.*, 2003 WL 22389814, at *2 (emphasis added) ("Waivers of sovereign immunity *cannot be*

*implied* but must be unequivocally expressed."). Rather, waiver "must be stated by the most

---

[11] The Rhode Island Supreme Court's decision in *Laird* predates RICRA by nearly a decade and is exclusively limited to review of the text of the Rhode Island Tort Claims Act, R.I. Gen. Laws § 9-31-1 *et seq.*  Plaintiff's RICRA claims emanates from an entirely different statutory scheme. *See* R.I. Gen. Laws § 42-112-1 (1990); *see also Laird*, 460 A.2d at 425.

express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction." *Acevedo López*, 247 F.3d at 28 (internal quotes omitted); *cf Mitchell v. State Dep't of Corr.*, 2003 WL 22389814, at *2 (emphasis added) ("Waivers of sovereign immunity *cannot be implied* but must be unequivocally expressed."); *see also Laird v. Chrysler Corp.*, 460 A.2d 425, 428 (R.I. 1983) ("The fact that a state has relinquished its sovereign immunity in its own courts is not determinative of whether it has waived its Eleventh Amendment immunity from suit in federal courts."); *Mitchell*, 445 U.S. at 535. It is undisputed that no explicit waiver of Rhode Island's Eleventh Amendment immunity expressing the State's "intention to subject itself to suit in *federal court*"[12] can be found anywhere in the statutory language of RICRA, R.I. Gen. Laws § 42-112-1, *et seq.*, or RIPDA, § 42-87-1, *et seq. See* Plf.'s Obj. (ECF 117), at 6-8 ("RICRA does not contain any express waiver of Eleventh Amendment Immunity…."). With respect to Plaintiff's state constitutional claim, an unequivocal expression of the General Assembly's "intention to subject itself to suit in federal court" is nowhere to be found in Article I, Section 8 of the Rhode Island Constitution. *See* R.I. Const. art. I, § 8; *see also McKinney v. State*, 843 A.2d 463, 470 (R.I. 2004) ("The Eighth Amendment to the United States Constitution and article 1, section 8, of the Rhode Island Constitution are identical."); *cf Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 265 n.7 (1989) ("Petitioners have come forward with no evidence, or argument, which convinces us that the word "fine," as used in the late 18th century, would have encompassed private civil damages of any kind."); *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 430 (1971) ("The Fourth Amendment was adopted in 1791, and in all the intervening years

---

[12] RIPDA makes clear that "proceedings shall be brought in the *superior court*…." R.I. Gen. Laws § 42-87-5(a) (emphasis added); *see also id.* at § 42-87-4(a).

neither the Congress nor the Court has seen fit to take this step.") (Blackmun, J. dissenting). No Rhode Island statute, constitutional provision, or judicial opinion has ever "unequivocally expressed" Rhode Island's intention to waive its Eleventh Amendment immunity and allow state constitutional claims to be brought in federal court.

Plaintiff's reliance on *Tang v. Rhode Island Department of Elderly Affairs* is similarly misplaced. 904 F. Supp. 55, 63 (D.R.I. 1995). In *Tang*, the Rhode Island District Court found implicit Eleventh Amendment waiver for an employment discrimination claim brought under 42 U.S.C. § 1981 by relying on its own pre-*Seminole* decision in *Pride Chrysler Plymouth v. R.I. Motor Vehicle Dealers' License Commission* in which the court held that § 1983 waived states' immunity under the Supreme Court's decision in *Pennsylvania v. Union Gas Company*. 721 F. Supp. 17, 22 (D.R.I. 1989) (citing *Pennsylvania v. Union Gas Company*, 491 U.S. 1 (1989)). The Supreme Court, however, later overruled its decision in *Union Gas*, holding that Congress lacks power under Article I of the United States Constitution to abrogate States' sovereign immunity to suits commenced or prosecuted in federal courts. *See Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 66 (1996) ("We feel bound to conclude that *Union Gas* was wrongly decided and that it should be, and now is, overruled."); *see also U.S. v. Georgia*, 546 U.S. 151, 158 (2006) (holding that Congress may abrogate Eleventh Amendment immunity when properly exercising its power under Section 5 of the Fourteenth Amendment). Not only is *Tang* largely irrelevant because Plaintiff does not assert a § 1981 claim, but since then, the First Circuit has repeatedly confirmed that § 1981 does not provide a "private right of action for damages against state actors." *Buntin v. City of Bos.*, 857 F.3d 69, 75 (1st Cir. 2017) ("We conclude that § 1983 remains 'the exclusive federal damages remedy' for § 1981 violations by state actors."); see also Sinapi v. Rhode Island Bd. of Bar Examiners, 910 F.3d 544, 553 (1st Cir. 2018) (finding no waiver of Eleventh

Amendment immunity for a discrimination under the ADA, absent "actual violations of the Fourteenth Amendment."). Simply put, the Eleventh Amendment immunity of the State of Rhode Island has not been waived as to RICRA, RIPDA, or Article I, Section 8 of the Rhode Island Constitution. *See e.g.*, *Rhode Island v. United States*, 115 F. Supp. 2d 269, 278 (D.R.I. 2000), *aff'd as modified sub nom. Rhode Island Dep't of Envtl. Mgmt. v. United States*, 304 F.3d 31 (1st Cir. 2002), and *enforcement granted*, 301 F. Supp. 2d 151 (D.R.I. 2004) (noting that "waivers of sovereign immunity are strictly construed" and that "§ 9–31–1 appears to be something less than 'unequivocal expression' that the State has waived its immunity with respect to statutory 'whistleblower' claims as well as common law tort actions."). Absent such an express waiver, this Court lacks subject-matter jurisdiction over this claim, as asserted against the State of Rhode Island and its official capacity defendants. *See Acevedo López*, 247 F.3d at 28.

## V.      PLAINTIFF'S EIGHTH AMENDMENT CLAIMS FAIL AS A MATTER OF LAW

Both Wall and McCaughey are also entitled to summary judgment on Melise's § 1983 claims for violations of the Eighth Amendment.  As explained in more detail below, Melise cannot establish any abridgment of his Eighth Amendment rights; however, his supervisory liability claim against Wall also fails for the independent reason that he cannot establish "an affirmative link between the abridgement and some action or inaction on [Wall]'s part." *Parker v. Landry*, 935 F.3d 9, 14 (1st Cir. 2019) (citations omitted). Melise's claim rests on Wall's presence at a September 22, 2015, DOC executive staff meeting, where one item of discussion involved a non-party inmate who fell from a top bunk and broke his foot while his prescription order for a bottom bunk was under review.  Melise also alleges that Wall was aware of several similar incidents, as well as complaints by Nurse Warren and Dr. Jennifer Clarke. *See* ECF 108 ¶ 232, ECF 124 ¶ 232.  Based on Wall's asserted knowledge that multiple inmates with bottom bunk prescription orders had been injured by falling from a top bunk, Melise argues that Wall

was deliberately indifferent to McCaughey's use of a dangerous and illegal practice and that his failure to reform that practice demonstrates his acquiescence thereto.

This theory is "'simply too tenuous' to support recovery." *Ramirez-Lluveras*, 759 F.3d at 23 (quoting *Febus–Rodriguez v. Betancourt–Lebron*, 14 F.3d 87 (1st Cir.1994)); *see id.* ("This theory twice fails: it tries to prove causation using only negligence, and the causal link between that negligence and [plaintiffs' injury] is entirely speculative."). Even assuming *arguendo* that all the other falling incidents Melise references rose to the level of legal or constitutional violations—a sweeping, fact-specific conclusion for which Melise has presented no evidence, and which ignores the legitimate, individualized considerations inherent in reviewing a bottom bunk request—a handful of events over an unspecified time frame is not the type of "widespread abuse" necessary to establish a supervisor's deliberate indifference. *Id.* at 20; *see id.* ("[I]solated instances of unconstitutional activity ordinarily are insufficient . . . to show deliberate indifference.") (quoting *Maldonado–Denis v. Castillo–Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994)); *cf Barreto-Rivera v. Medina-Vargas*, 168 F.3d 42, 48 (1st Cir. 1999) (holding that officer's disciplinary history of thirty abusive or violent incidents over twenty-five-year period was sufficient evidence that supervisor displayed deliberate indifference to officer's violent propensities). Nor has Melise offered legally sufficient evidence for the required finding that it was Wall's own acts or omissions that "'led *inexorably*'" to any alleged constitutional violations by his subordinates. *Ramirez-Lluveras*, 759 F.3d at 19 (quoting *Hegarty*, 53 F.3d at 1380); *see id.* (quoting *Hernández v. Fortuño–Burset*, 640 F.3d 1, 16 (1st Cir. 2011)) ("[Section] 1983 liability cannot rest solely on a defendant's position of authority."). If anything, the minutes of the September 2015 meeting cited by Melise demonstrate Wall's goal of ameliorating the risk of

delays by shortening the review process for bottom bunk accommodations.  *See* ECF 109, Ex. II at 7.

Turning to McCaughey, in addition to the previously identified threshold issues, Melise cannot show that any of McCaughey's actions were so reckless or unreasonable as to demonstrate her "'actual knowledge of impending harm, easily preventable.'" *Feeney*, 464 F.3d at 162 (quoting *Watson v. Caton*, 984 F.2d 537, 540 (1st Cir. 1993)).  Upon receiving an Administrative Note for Melise's November 19, 2014 request for a bottom bunk assignment based on "neck pain," McCaughey requested—and received—further information before granting the request once that information was received. SUF ¶ 162.  Setting aside the fact that McCaughey ultimately *granted* the accommodation, the act of seeking material information about a claimed medical need in order to support the request from a safety and security perspective is the antithesis of indifference towards that need. *Cf. Ortiz-Martinez v. Fresenius Health Partners, PR, LLC*, 853 F.3d 599, 606 (1st Cir. 2017) (holding in ADA case that "[defendant]'s attempts to further clarify [plaintiff]'s requests and to seek specific information regarding her accommodation needs were not unreasonable").

With respect to the bottom bunk requests that McCaughey denied on June 19, 2015, and December 29, 2015, the record shows that ladders had been recently installed for the bunk beds in Medium Security and that Melise had "[n]o trouble climbing the ladder" to reach a top bunk. SUF ¶¶ 52-53, 149; *see* SUF ¶ 150 (confirming that Melise was "able to climb up into the upper bunk without any difficulty").  McCaughey was also obligated to consider bottom bunk requests in the light of prison safety and security issues, including the possibility that climate issues might arise from other inmates' perception—justified or not—that a bottom bunk accommodation had been granted to an inmate who did not require one. SUF ¶¶ 140-44; *see* SUF ¶ 145 (confirming

28

that the creation of a safety hazard to Melise "was one of the things that [McCaughey] looked at"); *cf. Snell*, 998 F.3d at 501 (affording deference to rationale that, "[f]or security purposes, the DOC defendants refused accommodations which appeared to preference one inmate over others").

Given the ongoing tension between the limited number of bottom bunks and the large number of inmate requests for bottom bunks—as well as the fact that, like the defendants in *Snell,* McCaughey was concerned with creating a situation that appeared to treat similarly situated inmates differently— the availability of the number of bottom bunks and ensuring that special accommodations were warranted were valid institutional concerns. SUF ¶¶ 132-34, 143-44. "Needless to say, if defendants acted reasonably in light of the inmate's serious medical need, including by refusing an accommodation for safety or institutional concerns," then they have not "acted with deliberate indifference in violation of the Eighth Amendment, even if the defendants' actions resulted in an inmate's discomfort[.]" *Snell*, 998 F.3d at 497 (citations omitted). And although the December 29, 2015, denial postdated Melise's first reported fall, it is undisputed that the Administrative Order that McCaughey reviewed and denied contained ***no*** information about Melise's November 29, 2015, fall or his risk of future falls. SUF ¶ 70.

These considerations preclude any finding that McCaughey's decisions of June 19, 2015, and December 29, 2015, violated Melise's Eighth Amendment rights, even if—contrary to his testimony that he had "[n]o trouble climbing [a] ladder"—the act of climbing the ladder to his top bunk caused Melise neck pain. SUF ¶ 149; *see Snell*, 998 F.3d at 497. In *Snell*, which involved an Eighth Amendment claim based on the denial of a plaintiff's access to a prison's first-floor law library, the First Circuit upheld the grant of summary judgment for all defendants after noting that the plaintiff "had walked up and down stairs (even if with a cane in hand and

even if with some difficulty) in other parts of the prison throughout his confinement, denting [plaintiff]'s argument that the DOC defendants callously disregarded the risk he would suffer a more severe injury without the accommodation." *Snell*, 998 F.3d at 498 (footnote omitted). "The DOC defendants, as the record reflects, thus reasonably believed [plaintiff] could traverse stairs to the second-floor law library without suffering serious or irreparable harm." *Id.*; *see id.* at 501 ("In the DOC defendants' reasonable interpretation of [plaintiff]'s medical needs and the institution's security needs, [plaintiff] would not significantly risk his health by climbing stairs despite his injuries and maladies, and the prison would suffer less potential institutional unrest if the DOC defendants required [plaintiff] to so navigate.").

The undisputed facts show that McCaughey made similarly reasoned decisions, based on the lack of an indication that Melise—who climbed stairs and performed other physical tasks as part of his job duties when he worked as a porter from 2014 to 2016—was medically unable to climb a ladder to a top bunk. *See* SUF ¶¶ 147-48. "As long as prison administrators make judgments balancing security and health concerns that are 'within the realm of reason and made in good faith,' their decisions do not amount to a violation of the Eighth Amendment." *Kosilek*, 774 F.3d at 92 (quoting *Battista v. Clarke*, 645 F.3d 449, 454 (1st Cir. 2011)).

Finally, on both September 21, 2016, and November 17, 2016—the sole instances when McCaughey was presented with Administrative Notes that referenced Melise's sleep disorder, his risk of falling, or his injuries from previous falls as reasons for a bottom bunk—McCaughey *approved* Melise for a bottom bunk accommodation. SUF ¶¶ 83-84, 102-03, 121. Specifically, on September 21, 2016, McCaughey approved the order entered by Dr. Salas on June 28, 2016 with a stop date of September 28, 2016; however, because the September 8, 2016 Administrative

Note listing Dr. Salas's order[13] also lists two earlier, unexpired bottom bunk orders from Nurse

Warren with later stop dates, Melise asserts in his Objection that McCaughey's decision to

approve only Dr. Salas's last order was "worse than doing nothing" and evinced her deliberate

indifference. SUF ¶¶ 79-83; ECF 117 at 33.

That claim dissolves under scrutiny.  The oldest order of the three on the September 8,

2016 Administrative Note was entered by Nurse Warren on November 12, 2014 for neck pain; in

addition to the previously discussed substantive issues regarding Melise's neck pain as a

potential basis for a bottom bunk accommodation, that order predated the two subsequent June

2016 orders by over eighteen months. SUF ¶ 83.  Given the presence of far more up-to-date

orders, it was entirely reasonable for McCaughey to follow her usual practice by considering and

approving the most recent order instead of an order that was almost two years old. *See* SUF

¶¶ 24, 105, 172.

As for the two competing June 2016 orders—one entered by Nurse Warren on June 21,

2016 for "falls" with a stop date of June 21, 2017, and one entered by Dr. Salas on June 28, 2016

for "falls, ?apnea" with a stop date of September 28, 2016—the fact that McCaughey relied on

one medical professional's recommendation over another's cannot sustain a finding of deliberate

indifference. *See Snell*, 998 F.3d at 497 ("Both doctors are permitted to have a differing medical

opinion . . . but such does not make for an Eighth Amendment violation."); *Ruiz-Rosa v. Rullan*,

485 F.3d 150, 156 (1st Cir. 2007) (citing *Feeney*, 464 F.3d at 161-62) ("[S]ubstandard care,

malpractice, negligence, inadvertent failure to provide care, and disagreement as to the

---

[13] Despite what Melise contends in his Objection, McCaughey has not argued that she never
became aware of the contents of Dr. Salas's June 28, 2016 prescription order, only that she did
not do so until Nurse White printed and submitted the September 8, 2016 Administrative Note
listing the three unexpired orders.

appropriate course of treatment are all insufficient to prove a constitutional violation.").  As Dr. Salas noted in his deposition, the two competing June 2016 prescription orders made the question of which order to approve "not really clear." SUF ¶ 173.  Melise's own preference for a later stop date notwithstanding, McCaughey did not act with deliberate indifference when she followed and approved Dr. Salas's recommendation. *See Snell*, 998 F.3d at 495-97.

Finally, on November 17, 2016, McCaughey granted the November 11, 2016 bottom bunk order entered by Dr. Salas for "falls from sleep problem" following Melise's November 11, 2016 fall.  SUF ¶¶ 102-03.  It is also undisputed that Melise had already been placed in a bottom bunk immediately after his November 11, 2016 fall and has remained on a bottom bunk since that date. SUF ¶ 104.  Despite those facts, Melise nevertheless asserts that McCaughey's November 17, 2016 approval displays a blatant disregard for Melise's safety because McCaughey modified the stop date of the bottom bunk assignment from November 10, 2017 to March 10, 2017, the stop date of Dr. Salas's November 11, 2016 bottom tier order for Melise's "crutches for broken ankle[.]" SUF ¶ 102.

Melise does not explain how the approval of an accommodation could constitute inadequate care amounting to a constitutional violation. *See Kosilek*, 774 F.3d at 83 (quoting *Torraco v. Maloney*, 923 F.2d 231, 235 (1st Cir. 1991)) ("[T]he Constitution proscribes care that is 'so inadequate as to shock the conscience.'").  Indeed, because Melise was already on a bottom bunk as of the November 11, 2016 fall and has remained on a bottom bunk ever since, the six days it took to process the paperwork were of no moment and Melise does not contradict the State Defendants' numerous averments that immediately after the November 11, 2016 fall, he had (and remains to have) access to a bottom bunk. SUF ¶ 104; *see Rodriguez-Cirilo v. Garcia*, 115 F.3d 50, 52 (1st Cir. 1997) (quoting *Maldonado Santiago v. Velázquez García*, 821 F.2d

822, 831 (1st Cir. 1987)) ("Section 1983 imposes a causation requirement similar to that of ordinary tort law.").  And given that Melise has disavowed any theory that McCaughey harbored an ongoing animus towards him, he has not adequately explained how the Court can properly consider the November 17, 2016 decision as evidence of McCaughey's subjective state of mind with respect to her previous decisions. *See* SUF ¶¶ 127-30.

As for Melise's argument that the modified stop date proves McCaughey's general disregard of his serious medical needs, to constitute deliberate indifference "such disregard must be akin to criminal recklessness, requiring consciousness of 'impending harm, easily preventable.'" *Kosilek*, 774 F.3d at 83 (quoting *Watson*, 984 F.2d at 540).  This standard "leave[s] ample room for professional judgment, constraints presented by the institutional setting, and the need to give latitude to administrators who have to make difficult trade-offs as to risks and resources." *Battista*, 645 F.3d at 453 (citing *Farmer*, 511 U.S. at 844).

McCaughey's November 17, 2016 decision sits well within that zone of protected conduct.  Any potential risks that might follow from a date four months in the future are too attenuated to support a finding of "'impending harm[.]'" *Kosilek*, 774 F.3d at 83 (quoting *Watson*, 984 F.2d at 540).  More importantly, and as McCaughey explained at her deposition, the effect of her modification was that the bottom bunk order would be reviewed—and possibly extended—along with the bottom tier order on March 10, 2017. *See* State's SUF, at ¶¶ 177, 179, 181. Although Melise may have preferred the guarantee of a twelve-month accommodation over a review at the four-month mark, nothing about the November 17, 2016 approval prevented Melise from remaining in a bottom bunk after March 10, 2017 if an extension was indicated— which is, in fact, exactly what happened. SUF ¶ 104.  And because McCaughey acted with knowledge of the availability of future reviews and potential extensions when she modified the

33

stop date, in no way can she be said to have disregarded the risk of harm to Melise by providing care "that is 'so inadequate as to shock the conscience.'" *Snell,* 998 F.3d at 497 (quoting *Feeney v. Correctional Medical Services Inc.*, 464 F.3d 158, 162 (1st Cir. 2006)).

## VI.   PLAINTIFF'S STATE LAW CLAIMS FAIL AS A MATTER OF LAW

Melise asserts four (4) state law claims: RICRA (Count II), RIPDA (Count IV), a claim under Article I, Section 8 of the Rhode Island Constitution (Count VI), and a common law negligence claim (Count VII). Each of these claims fails as a matter of law. Accordingly State Defendants will address each of these claims in turn.

### A.   Count VI fails because no implied cause of action exists under Article I Section 8 of the Rhode Island Constitution (Count VI)

While it is true that Article I, Section 8 has been viewed as "identical" to the Eighth Amendment of the United States Constitution in the context of criminal sentencing, *see McKinney v. State*, 843 A.2d 463, 470 (R.I. 2004), the Rhode Island Supreme Court has never recognized the two clauses are "identical" in the civil context. Unlike its federal counterpart, Rhode Island law has never recognized a *Bivens*-type civil action. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971); *contra Bandoni v. State*, 715 A.2d 580, 594-95 (R.I. 1998) (declining to recognize an implied cause of action under Article I, Section 23 of the Rhode Island Constitution); *see also Folan v. State*, 723 A.2d 287, 292 (R.I. 1999); *cf. Doe v. Brown University*, 253 A.3d 389, 399-401 (R.I. 2021) (holding that plaintiffs could not maintain a cause of action under the antidiscrimination clause of the Rhode Island Constitution because the clause was not self-executing). Here, Plaintiff makes no argument that Article I, Section 8 of the Rhode Island Constitution is self-executing and Count VI should be dismissed on this point alone. Plaintiff's assertion that *Bivens* automatically creates a cause of

action for money damages[14] directly under a state constitutional provision is unfounded and misunderstands both *Bivens* and *Bandoni*. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 430 (1971); *Bandoni v. State*, 715 A.2d 580, 594-95 (R.I. 1998).

Despite *Bandoni* and its progeny, which counsel that a court should not create a damages action from a state constitutional provision, Plaintiff invites this Court to follow *Bivens*, where the United States Supreme Court created an implied cause of action under the United States Constitution.  In *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, the United States Supreme Court "authorized a damages action against federal officials for alleged violations of the Fourth Amendment." *Egbert v. Boule*, 213 L. Ed. 2d 54 (June 8, 2022) (citing *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971)). The Court subsequently extended *Bivens* on two occasions. *See Davis v. Passman*, 442 U.S. 228 (1979); *Carlson v. Green*, 446 U.S. 14 (1980).  But as the Supreme Court has more recently recognized, "*Bivens*, *Davis*, and *Carlson* were the products of an era when the Court routinely inferred 'causes of action' that were 'not explicit' in the text of the provision that was allegedly violated." *Hernandez v. Mesa*, 206 L. Ed. 2d 29 (Feb. 25, 2020). In the forty-two (42) years since, the Supreme Court continued to "dramatically curtail[ ] its holding in *Bivens*" and repeatedly reaffirmed its position that "[a]t bottom, creating a cause of action is a legislative endeavor … [a]nd the Judiciary's authority to do so at all is, at best, uncertain." *Egbert v. Boule*, 213 L. Ed. 2d 54 (June 8, 2022) (citing *Hernandez v. Mesa*, 206 L. Ed. 2d 29 (Feb. 25, 2020)) ("Over the past 42 years, however, we have declined 11 times to imply a similar cause of action for other alleged

---

[14]  It is worth noting that Plaintiff's state constitutional claim is duplicative of his federal constitutional claim, which he brings under 42 U.S.C. § 1983.

constitutional violations."); *see also Bandoni*, 715 A.2d at 586 n.8 (citing *Bivens*, 403 U.S. at

388) (internal cites omitted); *see also Egbert*, 213 L. Ed. 2d 54 (June 8, 2022).

      Plaintiff's invitation to follow and create a *Bivens* action for state constitutional law,

conflicts not only with the Rhode Island Supreme Court's interpretation of state constitutional

law but also with the more recent pronouncements from the United States Supreme Court where

the Court has made clear that a *Bivens* remedy is an extremely disfavored judicial activity and

that the Court has "consistently refused to extend *Bivens* to any new context or new category of

defendants." *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 68 (2001); *see also*

*Hernandez v. Mesa*, 206 L. Ed. 2d 29 (Feb. 25, 2020). The Supreme Court has cast significant

doubt on the *Bivens* doctrine as "an extraordinary act that places great stress on the separation of

power" because "[a]t bottom, creating a cause of action is a legislative endeavor … [a]nd the

Judiciary's authority to do so at all is, at best, uncertain." *Egbert v. Boule*, 213 L. Ed. 2d 54 n.3

(June 8, 2022). The Rhode Island Supreme Court has adopted a similar position as well. *See*

*Bandoni v. State*, 715 A.2d 580, 587 (R.I. 1998) ("[I]f a cause of action for damages that are due

to an official's failure to apprise crime victims of their rights is created, it must originate from the

floor of the General Assembly and not from the bench of the Supreme Court."). Most recently,

the Court sharply limited *Bivens* and stopped just short of overruling the doctrine altogether: "[I]f

we were called to decide *Bivens* today, we would decline to discover any implied causes of

action in the Constitution." *Egbert v. Boule*, 213 L. Ed. 2d 54 (June 8, 2022); *Hernandez v.*

*Mesa*, 206 L. Ed. 2d 29 (Feb. 25, 2020); *see also Ziglar v. Abbasi*, 198 L. Ed. 2d 290 (June 19,

2017).

      For these reasons, and most notably the Supreme Court's advisement that *Bivens* actions

should be limited to the facts and circumstances already recognized and that new *Bivens* actions

should not be recognized counsels against Plaintiff's argument that this Court should create a state *Bivens* type action, particularly where the Rhode Island Supreme Court has rejected previous arguments to create a similar type of cause of action.

**B.   Count II fails because RICRA does not govern the relationship between a prison and inmates**

The Rhode Island Supreme Court and the First Circuit have instructed courts to look to federal law when examining RICRA and other analogous civil rights statutes. *Doe Next Friend Doe v. City of Pawtucket*, 374 F. Supp. 3d 188, 203 (D.R.I. 2019), *aff'd in part*, *vacated in part*, *remanded sub nom. Doe v. Pawtucket Sch. Dep't*, 969 F.3d 1 (1st Cir. 2020); *see also Colman v. Faucher*, 128 F.Supp.3d 487, 491 n.8 (D.R.I. 2015) ("The Rhode Island Supreme Court analyzes [RICRA] claims using substantive federal law from analogous causes of action."). The Rhode Island General Assembly enacted RICRA in response to the Supreme Court's decision in *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 (1989), which interpreted 42 U.S.C. § 1981 to provide "protection from racial discrimination *only in contract formation* and not in the subsequent modification and performance of contracts." *Rathbun v. Autozone, Inc.*, 361 F.3d 62, 67 (1st Cir. 2004). Section 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory *to make and enforce contracts*, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981 (emphasis added). In interpreting the plain language of the statute, the Supreme Court made clear that "§ 1981 protects two rights: "the same right ... to *make* ... contracts" and "the same right ... to ... *enforce* contracts." *Patterson*, 491 U.S. at 176. The Court explained that the first right, to "make" contracts, "extends only to contract formation," whereas the second

right, to enforce contracts, "embraces protection of a legal process and of a right of access to legal process, that will address and resolve contract-law claims without regard to race." *Id.* at 177.

In enacting RICRA, the Rhode Island General Assembly aspired to fill two gaps left by § 1981; RICRA extends protections beyond contract "formation" to include "performance, modification and termination of contracts" and expands the type of discrimination prohibited to also include "age, sex, religion, disability, and national origin." R.I. Gen. Laws § 42-112-1(a); *Rathbun*, 361 F.3d at 67 (noting that RICRA "complement[s] and supplement[s] federal civil rights protections" provided by 42 U.S.C. § 1981). RICRA provides, in relevant part, as follows:

> All persons within the state, regardless of *race, color, religion, sex, disability, age, or country of ancestral origin*, have, except as is otherwise provided or permitted by law, the same rights to *make and enforce contracts*, to inherit, purchase, to lease, sell, hold, and convey real and personal property, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property, and are subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

R.I. Gen. Laws § 42-112-1(a); *see also Domino's Pizza,* 546 U.S. at 475 ("But while Congress revised Patterson's exclusion of postformation conduct, it let stand *Patterson*'s focus upon contract obligations. In fact, it positively reinforced that element by including in the new § 1981(b) reference to a 'contractual relationship.'"); R.I. Gen. Laws § 42-112-1(b) (referencing contractual relationships).

The Rhode Island Supreme Court has expressly acknowledged that because it has not "had the opportunity to examine the requirements for establishing a claim under RICRA" courts must rely upon the federal courts that have "established the requirements for the statute's federal counterpart, codified at 42 U.S.C. § 1981." *Doe v. Brown Univ.*, 253 A.3d 389, 396 (R.I. 2021)

(citing *Hammond v. Kmart Corporation*, 733 F.3d 360, 362 (1st Cir. 2013). The United States

Supreme Court has made clear that § 1981 has one "specific function: It protects the equal right

of [a]ll persons within the jurisdiction of the United States to *make and enforce contracts* without

respect to race." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 475 (2006) (emphasis added).

While Plaintiff attempts to carve out rights enumerated in RICRA that independent of a

contractual relationship, the United States Supreme Court rejected such an interpretation with

respect to the nearly identical language in § 1981, when it stated:

> [O]ne cannot seriously contend that the grant of the other rights
> enumerated in § 1981 [that is, other than the right to "make" contracts,]
> *i.e.*, the rights "to sue, be parties, give evidence," and "enforce
> contracts" accomplishes anything other than the removal of legal
> disabilities to sue, be a party, testify or enforce a contract. Indeed, it is
> impossible to give such language any other meaning.

*Patterson*, 491 U.S. at 177 (brackets in original) (internal quotes omitted). Each of those same

rights enumerated in RICRA, just as in § 1981, "embrace[ ] protection of a legal process and of a

right of access to legal process, that will address and resolve contract-law claims…." *See id.*; *see

also Domino's Pizza*, 546 U.S. at 475 ("McDonald's formulation simply ignores the explicit

statutory requirement that the plaintiff be the 'perso[n]" whose "right ... to make and enforce

contracts… was impaired….'") (internal citations omitted). By its terms, RICRA, like its

predecessor 42 U.S.C. § 1981, is limited to discrimination in situations involving contractual

relationships. *See e.g.*, *Washington v. Honeywell International, Inc.*, 323 F.Supp.3d 309 (2018)

(discrimination based on employment contract); *Lima v. City of E. Providence*, 17 F.4th 202, 205

(1st Cir. 2021) (discriminatory retaliation based on employment contract); *Mota v. Okonite Co.,

Inc.*, 578 F. Supp. 3d 299, 301 (D.R.I. 2022) (constructive discharge based on employment

contract); *Liu v. Striuli*, 36 F. Supp. 2d 452, 479 (D.R.I. 1999) (discrimination based on higher

education contract); *Olofinlade v. Atmed Treatment Ctr., Inc.*, No. CV 19-021-JJM-LDA, 2020

WL 1848084, at *3 (D.R.I. Apr. 13, 2020) (discrimination based on contractual relationship with a private medical provider); *cf Domino's Pizza,* 546 U.S. at 475 ("Absent the requirement that the plaintiff himself must have rights under the contractual relationship, § 1981 would become a strange remedial provision designed to fight racial animus in all of its noxious forms….").

Contrary to Plaintiff's view, RICRA, like § 1981, was not "meant to provide an omnibus remedy for all" injustices. *See Domino's Pizza*, 546 U.S. at 479. There is a lack of any authority where a court has permitted a RICRA claim to proceed in the absence of a contractual relationship; whether with the defendants or a third party, a contract is required. *See Domino's Pizza,* 546 U.S. at 475; *see also Doe v. Brown Univ.*, 253 A.3d 389, 396 (R.I. 2021) ("The Rhode Island Civil Rights Act provides that '[a]ll persons within the state, regardless of race, color, religion, sex, disability, age, or country of ancestral origin, have, except as is otherwise provided or permitted by law, the same rights to make and enforce *contracts*….") (ellipses in original).

In *Doe v. Brown University*, a Providence College student brought a Title IX and a RICRA claim against Brown University, seeking money damages and equitable relief on the basis that Brown University had failed to fully investigate the plaintiff's sexual assault at a Brown University dormitory and discipline the suspected assailants. 253 A.3d 389, 393 (R.I. 2021). The federal district court determined that plaintiff could not proceed under Title IX as a non-student at Brown University and declined to exercise supplemental jurisdiction, dismissing the RICRA claim without prejudice for the plaintiff to refile in state court. *Id.* at 394, *aff'd* 896 F.3d 127, 133 (1st Cir. 2018). Following the dismissal, the plaintiff refiled her state law claims in Superior Court, which dismissed the RICRA claim. *See Doe v. Brown Univ.*, 253 A.3d 389, 394 (R.I. 2021). On appeal, the Rhode Island Supreme Court characterized the plaintiff's RICRA claim, in the absence of a direct contractual relationship with Brown University, as "an

interference with [a] contractual relations claim" with respect to Providence College. *Id.* at 396. The court affirmed the dismissal of the RICRA claim on the basis that "plaintiff, as a student at Providence College, had an education contract with Providence College" and could not show as a matter of law that Brown University's actions or inactions intentionally interfered with the contractual relationship between the plaintiff and Providence College. *Id.* at 398.

In the prison context, this Court has previously recognized that a state prisoner lacks standing to bring a discrimination claim under RICRA's federal counterpart, 42 U.S.C. § 1981, absent a contractual relationship with the correctional facility. *See Neufville v. Coyne-Fague*, No. CV 20-005 WES, 2021 WL 322686, at *4 (D.R.I. Feb. 1, 2021), *aff'd*, No. 21-1158, 2021 WL 3730224 (1st Cir. June 2, 2021). In *Neufville v. Coyne-Fague*, the court dismissed a state prisoner's § 1981 claim "because he has not alleged any kind of *contractual relationship* with Defendants here, nor any interference with his ability to make or enforce *any contract* based on race."); *Fantini v. Salem State Coll.*, 557 F.3d 22, 34 (1st Cir. 2009); *see also Amaker v. Foley*, No. 94-CV-0843E(SR), 2003 WL 21383010, at *4 (W.D.N.Y. Feb. 18, 2003), *aff'd sub nom. Amaker v. Zon*, 117 F. App'x 806 (2d Cir. 2005); *see also Martinez v. Ensor*, 958 F. Supp. 515, 517 (D. Colo. 1997). Here, Plaintiff acknowledges that as an inmate he lacks a contractual relationship with State Defendants. *See* Plf.'s Obj. (ECF 117), at 4, 12. *Neufville*, No. CV 20-005 WES, 2021 WL 322686, at *4 (D.R.I. Feb. 1, 2021), *aff'd*, No. 21-1158, 2021 WL 3730224 (1st Cir. June 2, 2021). As such, in the absence of a contractual relationship, Plaintiff's RICRA claim fails as a matter of law and must be dismissed. *See Doe v. Brown Univ.*, 253 A.3d 389, 394 (R.I. 2021); *Domino's Pizza,* 546 U.S. at 475.

C.  **Count VII fails because Plaintiff cannot prove common law negligence in the absence of an expert witness to establish the requisite standard of care in a prison environment**

In his Objection, Melise concedes that expert testimony is required in negligence cases that implicate the standards of care in specialized fields beyond the knowledge of lay persons and that disputes over prison administration often fall into that category.  Nevertheless, he contends that his case does not require expert testimony because the sole factors germane to the inquiry of whether McCaughey acted reasonably are "the number of total available bottom bunks compared to the number occupied by inmates with approved medical orders." Plf.'s Obj. (ECF 117), at 37.

Treating the administrative oversight of prison bunk assignments as a math problem where the only relevant considerations are the number of inmates and bottom bunks is a dangerous oversimplification that is wholly unsupported by the facts. *See* SUF ¶ 5 (listing considerations involved in reviewing bottom bunk request, "including but not limited to, the number of bottom bunks available; the needs of certain inmates that almost always require an accommodation, such as elderly inmates, inmates with diabetes or seizures, or certain recent surgeries; enemy issues; gang issues; and classification issues"); SUF ¶ 143 (discussing need to ensure that inmates assigned to bottom bunks "have them for legitimate reasons that cannot be accommodated in any other way"); SUF ¶ 145 (discussing risk of climate issues "if the person on the bottom bunk order does not appear to be legitimate").  Despite Melise's attempts to downplay the safety and security risks posed by a potential climate issue because no such issue came to pass in his case, McCaughey testified to her personal knowledge that climate issues have resulted from inmates' perceptions that bottom bunk orders were illegitimate and stated that the potential of such a climate issue was "one of the things [she] looked at" when reviewing Melise's

bottom bunk requests. SUF ¶ 145. More generally, the process of reviewing bottom bunk requests necessarily implicates the safety and security concerns inherent in housing large groups of inmates, some of whom may need to be kept apart due to "enemy . . . [or] gang issues[.]" SUF ¶ 142.

The result is that the bottom bunk assignments at issue in this case "are not something that exist outside of the prison." SUF ¶ 131. As Dr. Salas testified in his deposition, "special needs accommodations marry [the] issue of medical care with an issue of security[.]" SUF ¶ 160. The First Circuit has recognized that prison officials' professional judgments as to inmates' conditions of confinement necessarily "must embrace security and administration" concerns. *Cameron*, 990 F.2d at 20. Even as a medical professional practicing in the prison environment, Dr. Salas recognized that those security concerns fell outside his own area of expertise. *See* SUF ¶ 159 ("The security staff and the security concerns of the facility are outside of what I do. I can't control that, nor do I particularly understand it at all."). A proper understanding of those concerns thus "requires knowledge far beyond the ken of an ordinary lay person." *Rhode Island Resource Recovery Corp. v. Restivo Monacelli LLP*, 189 A.3d 539, 548 (R.I. 2018).

Once again, *Snell* is instructive. Although that case involved ADA and Eighth Amendment claims rather than negligence, the First Circuit's ADA analysis turned on whether the prison official defendants' decision to deny the requested accommodation of access to a first-floor law Terminal was reasonable in light of both medical *and* security concerns, including the defendants' policy of "refus[ing] accommodations which appeared to preference one inmate over others[.]" *Snell*, 998 F.3d at 501. By Melise's logic, the First Circuit should have found that the defendants acted unreasonably based on the mere fact that they denied an available accommodation. Instead, the First Circuit properly recognized that the prison officials' security-

based rationale was entitled to deference and was crucial to the question of whether their actions were reasonable. "Terms like 'reasonable' . . . are relative to circumstances, and the circumstances of a prison are different from those of a school, an office, or a factory, as the Supreme Court has emphasized[.]" *Crawford v. Indiana Dep't of Corrections*, 115 F.3d 481, 487 (7th Cir. 1997), abrogated on other grounds, *Erickson v. Bd. of Governors of State Colleges & Universities for Ne. Illinois Univ.*, 207 F.3d 945 (7th Cir. 2000) (citing *Turner v. Safley*, 482 U.S. 84, 84-91 (1987)).

## CONCLUSION

**WHEREFORE**, State Defendants respectfully request that this Honorable Court deny Plaintiff's Motion, grant State Defendants' Motion, enter summary judgment in favor of State Defendants, and award Judgment pursuant to Rule 54(b).

Respectfully Submitted,

STATE DEFENDANTS,
By:

PETER F. NERONHA
ATTORNEY GENERAL

*/s/ Justin J. Sullivan*

Justin J. Sullivan (#9770)
Special Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL
150 South Main St. Providence, RI 02903
Tel: (401) 274-4400 | Ext. 2007
Fax (401) 222-2995
jjsullivan@riag.ri.gov

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that the within document has been electronically filed with the Court through the ECF system on Monday, September 23, 2022 and that it is available for viewing and downloading. I also caused a true and accurate copy of the within document to be served through the ECF system on the following parties and/or counsel of record:

*Counsel for Plaintiff*                 *Counsel for Defendants Fred Vohr and*
Chloe A. Davis, Esq.               *Jennifer Clarke*
cad@sinapilaw.com                Jeffrey G. Latham, Esq.
                                             Christine A. Stowell, Esq.
                                             jlatham@tatelawri.com
                                             cstowell@tatelawri.com


                                            */s/ Justin J. Sullivan*_____