UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| STEPHEN MELISE, | : | |
|     Plaintiff | : | |
| | : | |
| v. | : | C.A. No.: 1:17-cv-00490-MSM-PAS |
| | : | |
| COYNE-FAGUE, et al. | : | |
|     Defendants | : | |

**PLAINTIFF'S STATEMENT OF ADDITIONAL UNDISPUTED FACTS**

Now comes the Plaintiff pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule Cv 56 and does hereby submit the within Statement of Additional Undisputed Facts in addition to Plaintiff's Statement of Undisputed Facts (ECF No. 108) and in support of Plaintiff's Motion for Partial Summary Judgment (ECF No. 107), and in support of Plaintiff's Reply To State Defendants' Objection to Plaintiff's Motion for Partial Summary Judgment filed simultaneously herewith.

### I. Material Facts

250. Plaintiff Melise testified as follows regarding his history of falling out of bed:

> Q. So if we fast-forward to 2014 -- 2013, I am sorry, when 17 you returned to intake, did you ever fall off the bed?
> A. Yes.
> Q. And was that the first time that's happened?
> A. While I was locked up, yes.
> Q. Has it happened prior to being at the ACI?
> A. I have fallen off the bed at home quite a few times.
> Q. How many times would you say?
> A. I just wake up, and -- probably in my lifetime, at least ten times.
> …
> Q. So, in the intake in 2013, was that the first time at the ACI that that's happened?
> A. Yes.
> Q. Could you just describe what you recall?
> A. I woke up out of a dead sleep, and I was in a kicking motion, and the kick had jerked my body off the bunk, and I fell on the floor and landed on my cup.

> …
> Q. Can you describe how you kicked off the bed?
> A. My left leg actually was kicking out away from the bed. I was sleeping on my side, my right side, my left leg was on the top, and I was kicking -- as I woke up, my foot was extended over the side of the bed, and my body jerked off with it, and I landed backwards on my cup.
> …
> Q. So, you were at medium security in 2015, and it happened again?
> A. Yes.
> Q. And what caused you to fall that time?
> A. I don't know. I move around. I do not sleep still, so I move around while I sleep.

Melise Dep. (Plaintiff's App. Ex. A) (ECF No. 109-1) 32:16-35:20.

> Q. Since 2016, do you still move around in your sleep?
> A. Yes.
> Q. Have you ever hurt anything moving around?
> A. Just my leg or foot when I kicked the ladder, like I do thrash when I sleep. For some reason, I don't -- when I fall into a sleep, I don't stay still. I act out the motions that I am dreaming of physically, so -- that's how I end up kicking the ladder a lot.
> Q. So if you are dreaming about moving, you are like walking?
> A. I sometimes will move, I'll wake up and my legs are still moving.
> Q. And just to jump back to your fall, the one you had at intake, do you remember if you fell off the top bunk, or the bottom bunk?
> A. I fell off the bottom bunk that day.
> Q. And you were not injured for that one?
> A. No. I was sore for a few minutes, and that was it.
> Q. Do you remember the first time you ever fell off the bed?
> A. No -- in my life?
> Q. Yes.
> A. Definitely not. I used to fall off quite a bit when I was a child and wake up on the floor, and sometimes I would sleep on the floor because of falling, and I would wake up in the morning not knowing how I got there.
> Q. So this was a problem that you have had since childhood?
> A. I would have to say so, yes.
> Q. Do you recall the first time you fell as an adult?
> A. No. I don't remember as an adult the first time.

Melise Dep. 66:17-67:24.

251. Dr. Salas provided testimony on the reason why inmates with seizure disorders required bottom bunk orders as follows:

> Q. For special needs orders such as seizure disorders --
> A. That's more clear-cut.
> Q. And that would be because it's in the interest of the patient's safety to be on the bottom bunk; is that correct?
> A. Yeah, I mean it's almost like from our perspective we want it to be that way. Seizure disorders, it just has to be, so they're just given the bottom bunk.
> Q. That's to prevent the patient from potentially being injured by falling out of bed, right?
> A. Right. Anybody can fall out of a bunk. So, anybody can get injured. **But with a seizure disorder, it's like you know ahead of time that there is a potential for problems. So you go ahead and preemptively try to prevent it**.

Salas Dep. (Plaintiff's App. Ex. D) (ECF No. 109-4) 28:4-20.

252. Dr. Salas testified as follows regarding Plaintiff's reported falling out of bed:

> Q. Did the fact that he reported falling out of bed a few times contribute to your decision to submit an order for a bottom bunk?
> A. Absolutely. I think my normal practice when somebody reports symptoms consistent with sleep apnea would be get the sleep steady first and only order bottom bunk after the sleep study came back positive and put him on a CPAP machine.
> Q. But because he had reported also having falls, are you saying that that would have contributed to requiring a bottom bunk prior to receiving the sleep apnea machine?
> A. Yes.

Salas Dep. 63:7-19.

253. Dr. Salas testified as follows:

> Q. And by looking at this order for falls and possibly sleep apnea, are those reasons that would require a shorter expiration date?
> A. It's hard to answer that question, so the neck pain could be permanent or a week. The falls could be permanent or a week. Sleep apnea generally sticks around forever. So, that's more of a permanent indication.
> Q. Specifically for this patient, the plaintiff, at the time that you submitted this order, did you consider the issue to be one that was nonpermanent?

> A. When I wrote the order back in June, I wrote it for three months because that was the time frame I was following up on the patient with, and I believed at the time that I would have the sleep study to make a final determination as to whether he had sleep apnea, and it should be a permanent order, or whether the falls issue would need to be worked up in some other way.

Salas Dep. 78:25-79:19.

254. Plaintiff Melise's Electronic Medical Record Audit Report shows that each special needs order submitted by Plaintiff's medical providers was printed. Audit Train Excerpt (Plaintiff's Additional Exhibit KK), 7 (Special Needs Order dated June 9, 2015 printed by Nurse Warren), 21 (Special Needs Order dated November 12, 2015 printed by Nurse Warren), 23 (Special Needs Order dated November 20, 2015 printed by Nurse Warren), 33 (Special Needs Order dated December 21, 2015 printed by Nurse Warren), 35 (Special Needs Order dated December 28, 2015 printed by Mel White, RN), 54 (Special Needs Order dated June 21, 2016 printed by Nurse Warren), 60 (Special Needs Order dated June 28, 2016 printed by Dr. Salas), 71 (Special Needs Order dated September 8, 2016 printed by Nurse Warren on September 19, 2016), 79 (Special Needs Order dated November 11, 2016 printed by Dr. Salas).

255. Plaintiff Melise's Electronic Medical Record Audit Report shows that Dr. Salas checked on bottom bunk orders on September 8, 2016. Audit Trail Excerpt at 66.

256. Dr. Salas testified that CPAP machines require a permanent bottom bunk order. Salas Dep. 22:9-23:8; 30:13-22.

257. More recently, when security attempted to revoke Plaintiff's permanent bottom bunk order based on his CPAP machine, Dr. Salas recent the order, explicitly asserting that Plaintiff's bottom bunk order based on his CPAP machine was permanent. Melise Supplemental Medical Records (Plaintiff's Additional Exhibit LL), RIDOC1RFP00950, 987.

258. Defendant McCaughey testified that she never looked at the availability of bottom bunks when reviewing special needs orders.  McCaughey Dep. (Plaintiff's App. Ex. H) (ECF No. 109-8) 91:2-14 ("Q. When you are looking at this order, would you look at how many bottom bunks were available at that time? A. No.").

259. Defendant McCaughey testified as follows in regard to finding a climate issue related to Plaintiff Melise's bottom bunk orders: "Q. How would granting a request for a bottom bunk present a safety hazard to staff or the individual inmate? A. By creating a climate issue. Q. Would it have created a climate issue to grant it specifically for the plaintiff in this case? A. It could have. Q. Did it? A. No." McCaughey Dep. (Plaintiff's App. Ex. H) (ECF No. 109-8) 163:14-21.

260. Defendant Wall was informed about the policy in which security personnel were requesting additional medical information in order to approve or deny special needs orders from medical providers for bottom bunks, on April 9, 2014 when he was sent minutes from the Medium Security Facility Triage Meeting on March 26, 2014.  April 9, 2014 Email to Wall (Plaintiff's Additional Exhibit MM); Plaintiff's App. Ex. U, RIDOCRFP50604, 50617 ("The Deputy receives them and reviews them for security issues. Sometimes he needs to know more information than what was is being given. If something is denied or sent back, Deputy Diniz said for staff to call him and something may be able to be worked out. The Deputy stated he wants to make sure inmates are not manipulating the system.").

261. Defendant Wall was informed about the policy in which security personnel were requesting additional medical information in order to approve or deny special needs orders from medical providers for bottom bunks, on August 4, 2014 when he was sent minutes from the Medium Security Facility Triage Meeting on July 16, 2014.  August 4, 2014 Email to Wall

(Plaintiff's Additional Exhibit NN); Plaintiff's App. Ex. U, RIDOCRFPA30032, 30034-37 (containing extensive conversation about bottom bunk orders including deputy warden requesting more medical information and being denied when deputy warden did not believe they were medically needed).

262. Defendant Wall was informed about the policy in which security personnel *frequently* overruled and denied special needs orders from medical providers for bottom bunks, on August 8, 2014 when he was sent minutes from the Medium Security Facility Staff/Brass Meeting on June 23, 2014. August 8, 2014 Email to Wall (Plaintiff's Additional Exhibit OO), p. 10 of 12 ("Medical bottom bunks//Lt. Fetter asked what the criteria is for a medical bottom bunk//it seems the facility is running low on them- Deputy McCaughey stated she is denying them all of the time when she finds it is not necessary.").

263. Defendant Wall was informed about the policy in which security personnel overruled and denied special needs orders from medical providers, including expressly Nurse Practitioner Marianne Warren's orders, on September 18, 2014 when he was sent minutes from Healthcare Services Managers Meetings on August 7, 2014 and August 28, 2014 discussing those denials. September 18, 2014 Email to Wall (Plaintiff's Additional Exhibit PP), p. 4 of 9 ("Mr. Bouchard along with Dep Warden McCaughey will begin reviewing NP Warren's special need requests for inmates at Medium and will explain to NP Warren why certain requests she is making are being denied."); p. 7 of 9 ("Mr. Bouchard along with Dep. Warden McCaughey, have been reviewing NP Warren's special need requests for inmates at Medium. NP Warren has ordered cervical pillows and diabetic shoes, items which have been rejected.").

264. As the Director of the Department of Corrections, Defendant Wall had final and ultimate authority over the conduct of Defendant McCaughey, Deputy Diniz, and Warden

DeSousarosa and over establishing programs to offer adequate medical care and hospital services for inmates.  DOC Organizational Chart (Plaintiff's App. Ex. BB) (ECF No. 109-28).

265. Another inmate, Lance Nicoletti ("Mr. Nicoletti"), witnessed Plaintiff fall from his bunk, on or about June 21, 2016 when he was Plaintiff's cellmate and was awoken by Plaintiff falling the six or seven feet from his top bunk to the ground, landing on a plastic clothes bin, and again on or about November 11, 2016, when he was in the cell immediately next door to Plaintiff's cell, and was again awoken by the noise of Plaintiff's fall.  Affidavit of Lance Nicoletti ("Nicoletti Aff.") (Plaintiff's Additional Exhibit QQ), ¶4, 5.

266. This same inmate also recalled that Plaintiff snored a lot in his sleep.  Nicoletti Aff. ¶3.

                                                      Plaintiff,
                                                      By his attorneys,

**Date:  November 18, 2022**          **/s/ Chloe A. Davis**
                                                    **Chloe A. Davis, Esq. (#9334)**
                                                    **Richard A. Sinapi, Esq.  (#2977)**
                                                    Sinapi Law Associates, Ltd.
                                                    2374 Post Road, Suite 201
                                                    Warwick, RI 02886
                                                    Phone: (401) 739-9690; Fax (401) 739-9040
                                                    Email:  cad@sinapilaw.com; ras@sinapilaw.com

## **CERTIFICATION**

Page **7** of **8**

Jeffrey G. Latham, Esquire
Christine A. Stowell, Esquire
Tate & Latham
jlatham@tatelawri.com
cstowell@tatelawri.com

Justin J. Sullivan, Esquire
Department of the Attorney General
State of Rhode Island
jjsullivan@riag.ri.gov

      I hereby certify that on **November 18, 2022,** a true copy of the within was filed electronically via the Court's CM/ECF System. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and the filing is available for viewing and downloading from the court's cm/ecf system. Service on the counsel of record listed above has been effectuated by electronic means.

                                                    **/s/ Chloe A. Davis**